# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF FLORIDA

BAHAMAS SALES ASSOCIATE, LLC

                                 Plaintiffs,                      Case No. 3:08-cv-1012-J-32JRK

vs.

DONALD CAMERON BYERS,

                                 Defendant.
_____

DONALD CAMERON BYERS,

                                 Counterclaim Plaintiff,

vs.

BAHAMAS SALES ASSOCIATE, LLC, et al.,

                                 Counterclaim Defendants.
_____

BAHAMAS SALES ASSOCIATE, LLC

                                 Plaintiffs,                      Case No. 3:08-cv-1062-J-32JRK

vs.

DARRYL WILLIS,

                                 Defendant.
_____

DARRYL WILLIS,

                                 Counterclaim Plaintiff,

vs.

BAHAMAS SALES ASSOCIATE, LLC, et al.,

                                 Counterclaim Defendants.

_____

1

EDWARD R. WEBB, et al.,

                    Plaintiffs,                Case No. 3:09-cv-516-J-32JRK

vs.

GINN FINANCIAL SERVICES, et al.,

                    Defendants.

_____

MARK F. BAILEY, et al.,

                    Plaintiffs,                Case No. 3:10-cv-422-J-32JRK

vs.

ERG ENTERPRISES, LP, et al.,

                    Defendants.

_____

TODD TALIAFERRO, et al.,

                    Plaintiffs,                Case No. 3:11-cv-199-J-32JBT

vs.

ERG ENTERPRISES, LP, et al.,

                    Defendants.

_____

R. VICTOR TAGLIA, et al.,

                    Plaintiffs,                Case No. 3:12-cv-731-J-32JBT

vs.

ERG ENTERPRISES, LP, et al.,

                    Defendants.

_____

2

## COMPLAINT AND DEMAND FOR JURY TRIAL

PLAINTIFFS, for their Complaint herein, allege as follows:

### JURISDICTION

1.    This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a) and (c).  This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state common-law claims alleged herein.

2.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(a) and (d).  This Court has personal jurisdiction over each Defendant because Defendants, individually or through agents, officers or representatives, engaged in business activities and maintained business offices in the State of Florida; committed statutory violations in the State of Florida; and caused injuries to Plaintiffs arising from acts or omissions occurring in the State of Florida, all as alleged herein.

### VENUE

3.    Venue is appropriate in this Court under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and division, and because several Defendants reside and/or transact business in this district and division.

### THE PARTIES

4.    From 2006 to 2008, all Plaintiffs bought lots in a single resort project: the Ginn Sur Mer subdivision on Grand Bahama Island ("GSM").

5.    Plaintiffs William J. Andrews, Jr. ("W. Andrews"), Mark R. Roodvoets and Jon D. Andrews ("J. Andrews") are residents of South Carolina and Plaintiff Charles B. Lesesne is a resident of Florida.  Plaintiffs W. Andrews, Roodvoets, J. Andrews and Lesesne ("Andrews Group") bought Lot 272 on March 23, 2007.

3

6.   Plaintiffs Mark F. Bailey and Gay L. Bailey ("Bailey") are residents of Florida who bought Lot 67 on February 16, 2007.

7.   Plaintiff Beachfront Holdings & Investments, Ltd. ("Beachfront") is a Bahamian corporation formed to purchase, on February 15, 2007, GSM Lots 43 and 44.  Plaintiffs Stephen D. Ponsler and Assed F. Kalil are residents of Indiana who entered into mortgage notes along with Beachfront to finance Lots 43 and 44.

8.   Plaintiffs Steven R. and Andrea P. Bredahl ("Bredahl") are residents of New Jersey who bought Lot 39 on December 22, 2006 and Lot 33 on March 9, 2007.

9.   Plaintiff Donald Cameron Byers ("Byers") is a resident of Texas who bought Lot 234 on December 22, 2006.

10.  Plaintiffs Joseph Cappuccino and Shelley R. Jensen ("Cappuccino Group") are residents of California who bought Lot 281 on August 10, 2007 and Lot 282 on February 25, 2008.

11.  Plaintiff James W. Carell is a resident of Tennessee.  Timothy Sell is a resident of Michigan.  Sell and Carell ("Carell Group") bought Lot 312 around Feburary 2008.

12.  Plaintiff Jerry A. Cicolani, Jr. is a resident of Florida and Kris Brenneman is a resident of Ohio.  Cicolani and Brenneman ("Cicolani Group") bought Lot 104 on December 13, 2006.

13.  Plaintiff Clear Reef Properties, Ltd. ("Clear Reef") is a Bahamian corporation formed to purchase, on March 13, 2007, Lot 42.  Plaintiff James A. Card is a resident of Indiana who entered into a mortgage note along with Clear Reef to finance Lot 42.

14.  Plaintiff Rickie A. Clemmons is a resident of North Carolina.  Plaintiff Timothy Sell is a resident of Michigan.  Clemmons and Sell ("Clemmons Group") bought Lot 494

4

on December 13, 2006.

15.   Plaintiffs Kevin T. Crawford and David P. Jankowski ( "Crawford Group") are residents of Michigan who bought Lot 209 on February 22, 2008.

16.  Plaintiffs Troy A. Domnick and Lauren K. Domnick ("Domnick") are residents of Wisconsin who bought Lot 487 on June 22, 2007.

17.  Plaintiffs Dean A. Fresonke, Stephanie L. Fresonke, David D. Garner, Stephen M. Tormey, Denise M. Tormey, Tom G. Harvey and Sandra M. Harvey ("Fresonke Group") are residents of Florida who bought Lot 437 on March 15, 2007.

18.  Plaintiffs Thomas K. Hoyer and Caroline A. Hoyer are residents of the State of Texas.  Bruce L. Freeman and Jill J. Freeman are residents of North Carolina.  Plaintiffs Hoyer and Freeman ("Hoyer Group") bought Lot 448 on February 2, 2007.

19.  Plaintiffs James W. Jackson, Bernard J. Shaughnessy Jr., and Frederick A. Reeping ("Jackson Group") are residents of Pennsylvania who bought Lot 488 on April 13, 2007.

20.  Plaintiff James Josephson ("Josephson") is a resident of New York who bought Lot 493 on December 13, 2006.

21.  Plaintiff Susan C. Kherkher ("Kherkher") is a resident of Texas who bought Lot 270 on March 20, 2007.

22.  Plaintiffs Thomas E. Lammertse and Mary L. Sipski ("Lammertse") are residents of New Jersey who bought Lot 179 on April 13, 2007.

23.  Plaintiffs Kenneth W. Liles and Patricia M. Liles ("Liles") are residents of Washington who bought Lot 46 on December 13, 2006.

24.  Plaintiffs Arthur M. and Alexandria A. Maciag ("Maciag") are residents of Michigan who bought Lot 109 on December 13, 2006.

25.  Plaintiff Doug Smith ("Smith") is a resident of Tennessee who bought Lot 498 on December 15, 2006.

26.  Plaintiffs R. Victor Taglia and John G. Grubbs ("Taglia Group") are residents of Florida who bought Lots 220 and 429 on December 22, 2006.

27.  Plaintiffs Todd and Maureen Taliaferro ("Taliaferro") are residents of Michigan who bought Lot 208 on December 22, 2006.

28.  Plaintiffs Ronald P. Van, as trustee of the Ronald P. Van Jr. Revocable Trust u/a/d August 25, 2006 and Kathy Jo Van, as Trustee of the Kathy Jo Van Revocable Trust u/a/d August 26, 2006 ("Van") are residents of Illinois who bought Lot 203 on May 18, 2007.

29.  Plaintiff Anja M. Verhees ("Verhees") is a resident of Florida who bought Lot 79 on December 22, 2006.

30.  Plaintiff Edward R. Webb ("Webb") is a resident of Georgia who bought Lot 261 on February 2, 2007.

31.  Plaintiff Darryl Willis ("Willis") is a resident of California who bought Lot 189 on March 15, 2007.

32.  Defendant Ginn Financial Services, LLC is a Georgia Limited Liability Company with its principal place of business in Palm Coast, Florida.

33.  Defendant Bahamas Sales Associate, LLC is a Delaware corporation with its principal place of business in Palm Coast, Florida.

34.  Defendant ERG Enterprises, LP is a Georgia limited partnership with its principal place of business in Palm Coast, Florida.

35.  Defendant Edward R. ("Bobby") Ginn, III is an individual specializing in luxury resort development.  Bobby Ginn directly or indirectly owns and controls, and

served as the CEO for, Defendant ERG.

36.  Defendant Lubert-Adler Management Company, LP d/b/a Lubert-Adler Partners, LP is a Delaware limited partnership with its principal place of business in Pennsylvania. Lubert-Adler Partners is a private-equity fund management company that invests and participates in real estate development projects.

37.  Defendant Dean S. Adler is an individual who co-founded Lubert-Adler Partners with Ira M. Lubert.  Dean Adler is the Chief Executive Officer of Lubert-Adler Partners.

38.  As alleged below, Dean Adler and Lubert-Adler Partners directed, controlled, ratified and/or participated in the actions of ERG, Bobby Ginn, Ginn Financial and BSA. At all material times, Dean Adler and Lubert-Adler Partners had actual knowledge or knowledge fairly implied on the basis of objective circumstances, of the acts of those Defendants.

39.  Each Defendant is sued individually as a primary violator and as an aider and abettor.  As alleged below, in acting to aid and abet the commission of the fraud and other wrongful conduct alleged herein, each Defendant was aware of that fraud and wrongful conduct.  Each Defendant rendered substantial assistance or encouragement to the accomplishment of the fraud and was aware of its overall contribution to the conspiracy, scheme, and common course of wrongful conduct alleged.

40.  Each Defendant is joined in this action as a co-conspirator.  As alleged below, each Defendant entered an agreement with the other Defendants to commit or to participate in the commission of the unlawful acts and schemes to defraud alleged.

41.  The following Defendants shall hereafter be referred to as set forth below:

| Defendant(s) | Herein Referred to As |
|---|---|
| Lubert-Adler Management Company, LP d/b/a Lubert-Adler Partners, LP | LA Partners |
| Collectively: Dean Adler; LA Partners | LA |
| Edward R. ("Bobby") Ginn, III | Bobby Ginn |
| ERG Enterprises, LP | ERG |
| Collectively: Dean Adler; Lubert-Adler; Bobby Ginn; ERG | Lubert/Ginn |
| Ginn Financial Services, LLC | Ginn Financial |
| Bahamas Sales Associate, LLC | BSA |

## FACTUAL BACKGROUND:  CASH OUT SCHEME

### I.  Introduction

42.  After the U.S. real estate market collapsed beginning in late 2005, financiers Dean Adler and Lubert-Adler orchestrated a scheme to loot GSM in order to obtain a $675 million loan ("Loan") they used to eliminate their investment risk and harvest unearned profits from unfinished resort projects ("Cash Out Scheme").

43.  In late 2005, LA was heavily invested in several U.S. resort projects with Bobby Ginn.  After the U.S. market began to collapse, LA wanted to cash out its investments in some of the U.S. projects before they turned to losses.  In addition, because LA's reputation depended on its ability to deliver return on investment to the blue-chip investors in its real estate funds, LA devised a scheme to extract unearned future profits from the U.S. projects, notwithstanding market declines.

8

44. To meet its objectives for the Cash Out Scheme, LA needed a massive loan. So LA combined GSM with four U.S. projects into a large collateral pool.

45. While the Cash Out Scheme was extraordinarily complex, LA's goals were simple. Dean Adler secretly disclosed LA's objectives in a memo to its Advisory Group:

   a.  Pull its investments from four U.S. projects without showing losses.

   b.  Eliminate its liability for existing debt in the four U.S. projects.

   c.  Take unearned future profits from GSM and the U.S. projects.

46. Dean Adler convinced ERG and Bobby Ginn to participate in the Cash Out Scheme, enticing Bobby Ginn with a chance to eliminate his liability for project debt and obtain part of the Loan proceeds. Nothwithstanding ERG and Bobby Ginn's participation, LA masterminded and controlled the Cash Out Scheme.

47. Lubert/Ginn sacrificed GSM as fodder for the Cash Out Scheme: boosting the Loan size and the future profits they took from Loan proceeds. LA structured the Loan to extract all future value from GSM, making GSM liable for the entire Loan debt and subject to foreclosure when the Loan defaulted – without giving GSM any benefit from the Loan.

48. Lubert/Ginn used the Cash Out Scheme to loot GSM months before any lots were sold. Because they knew potential GSM lot buyers would never purchase lots if they knew about the Cash Out Scheme, LA concealed the Scheme from the GSM sales team and potential GSM buyers.

49. Even after the Loan went into default and its existence became public knowledge, Lubert/Ginn mischaracterized the Loan terms to conceal its purpose and impact on GSM. Lubert/Ginn continues to the present to conceal material facts concerning the Loan.

## II.   The Relationship Between LA and Bobby Ginn

50.  Starting in 1997, LA invested in real estate and resort development projects with

luxury resort developer Bobby Ginn ("GLA Projects").  LA provided capital for each GLA

Project in exchange for 80% interest and compounded priority return.  By May 2006, LA

had invested over $800 million in GLA projects.

51.  Bobby Ginn was the public face for GLA Projects, ballyhooed as a visionary

developer of luxury resorts, with a track record of projects offering exceptional amenities.

## III.  The Problem: LA was Heavily Invested In U.S. Resort Developments When the
   U.S. Market Collapsed

52.  In late 2005, the U.S. real estate market began a decline that Bobby Ginn would

later describe as brutal and unprecedented:

> "The market crash[] from the end of 2005 . . . to July of 2006 was as big a falloff
> in housing as I have ever seen in 40 years.  And it hasn't gotten better, it's
> gotten a little worse . . . . The market was going bad from the end of 2005
> through the entire year of 2006, but the first six months of 2006 was brutal.  I
> mean it's like somebody threw a rock off the ledge, it was sharp and [a] long
> downhill fall…."  (Transcript of 07/23/08 Ginn Resorts Conf. Call.)

53.  At the time of the market collapse, LA had a problem:

a.  LA was heavily invested in GLA Projects throughout the U.S., many of which

were still in the early stages of development.

b.  Some U.S. Projects were in trouble, with hundreds of lot sales that failed to close.

c.  LA had liability for debt in the U.S. Projects.

54.  LA was unwilling to accept the risk it might not recoup its investments and earn

profits from the U.S. Projects.

## IV.  The Solution:  LA Devised a Scheme to Cash Out with Record Profits

### The Credit Suisse Syndicated Term Loan

55.  In 2005, Credit Suisse marketed a new loan product to owners of luxury resorts.

As U.S. Bankruptcy Judge Ralph B. Kirshner explained of a Credit Suisse loan to the owner of the Yellowstone Mountain Club:

> In 2005, Credit Suisse was offering a new financial product for sale.  It was offering the owners of luxury second-home developments *the opportunity to take their profits up front by mortgaging their development projects to the hilt....* The development *owners would take most of the money out as a profit dividend, leaving their developments saddled with enormous debt....* Numerous entities that received Credit Suisse's syndicated loan product have failed financially, including ... Ginn.  If the foregoing developments were anything like this case, they were *doomed to failure once they received their loans.*

*In re Yellowstone Mtn. Club, LLC,* Case No. 08-61570-11, Adv. Pro. No. 09-00014, Dk. 289, Partial & Interim Order, 2009 WL 3094930, at *3-4 (Bank. D. Mont. May 13, 2009); Mem. of Decision, 436 B.R. 598, 609, 655-60 (Bank. D. Mont. Aug. 16, 2010) (avoiding $209 million fraudulent transfer) (emphasis added).

56.  LA saw a solution to its problem.  In March 2006, Dean Adler devised the complex transaction to obtain a $675 million Credit Suisse loan ("Loan") and use the Loan to cash out of four U.S. Projects after the market collapse, recoup its invested capital, eliminate liability and "harvest" future profits it would not have realized, if at all, for many years.

57.  Dean Adler convinced ERG and Bobby Ginn to participate in the Cash Out Scheme, enticing Bobby Ginn with the opportunity to elimate personal liability for debt in the Projects and obtain a slice, albeit small, of Loan proceeds.

58.  Nothwithstanding ERG and Bobby Ginn's participation, Dean Adler directed the Cash Out Scheme.  Internal emails reveal Dean Adler told Bobby Ginn and the transaction team in March 2006 the Loan was "the single most important task that the LA Fund (and [Ginn]) has before it in the next 60 days."  An email forwarding instructions from Dean Adler on the Loan includes the message, "More input from the chairman."

59.  Internal documents reveal LA used the Loan to cash out of several GLA Projects

and siphon unearned future profits after the U.S. market collapse.  In a secret memo to LA Advisory Boards, Dean Adler explained the goals of the Loan, including:

    a.  "[i]mmediate mitigation of 100% of the capital risk" for LA and "removal of all guarantee exposure" for LA and Ginn by "paying off all existing recourse debt" and replacing it with debt recourse to the Projects.

    b.  "[a]n immediate dividend of $333,125,000" for "the harvesting of profits with no risk of capital loss" to "provide an earlier than anticipated profit distribution."

60.  Quite simply, after the U.S. market crashed, LA used the Loan to cash out its investments before they turned to losses.

61.  But LA was not satisfied with avoiding losses after the market crash.  It wanted profits.  And LA was not satisfied with modest profits.  It wanted the maximum profits it might have earned in the best of all possible worlds assuming the Projects were fully developed and every lot sold, with no unforeseen costs and no market declines.

62.  Without the Loan, Project timetables reveal LA would only receive profits, if any, as development progressed and lots were sold over 7-10 years.  But LA was not willing to wait.  So LA structured the Loan to provide instant payout of future profits, even though two of the Projects were already failing, with hundreds of lot sales cancellations.

63.  As the U.S. market was collapsing and with knowledge that some of its GLA Projects were failing, LA used the Loan to emerge with record profits for its investors, burnishing its reputation and enhancing the financial performance of its investment funds at a time when it was actively seeking to raise capital for new funds.

<u>LA's Complex Loan Transaction</u>

64.  Dean Adler masterminded the extraordinarily complex $675 million Loan transaction, which required 8,250 pages of closing documents.  After the Loan closed, LA

siphoned $333 million from the proceeds, giving $7 million to Ginn. Through aggressive use of a credit line, the Loan debt ultimately grew to over $850 million.

65.   To ensure they had no liability for the Loan debt, Lubert/Ginn were neither borrowers nor guarantors of the Loan. Instead, Lubert/Ginn directed the formation of two shell companies (Ginn-LA Conduit Lender and Ginn-LA CS Borrower) to serve as borrowers and conduits to transfer the Loan proceeds. To secure the Loan, LA devised a risky cross-collateralization plan using GSM as the largest source of collateral.

66.   The Cash-Out Scheme provided immense benefits to Lubert/Ginn. LA cashed out with $333 million, giving $7 million to Ginn. As the market fell around them, Lubert/Ginn emerged unscathed, with records profits for LA and no liability for Project debt.

Lubert/Ginn Sacrificed GSM to Obtain the Loan

67.   LA wanted the Loan to be as big as possible, initially hoping for as much as $800 million. Even at $675 million, an internal document described the Loan as "the largest syndicated land loan financing ever completed."

68.   To maximize the Loan size, LA created a large collateral pool, combining GSM with four U.S. Projects, two of which were already failing from the U.S. market collapse.

    a.   Tesoro (Florida)

    b.   Quail West (Florida)

    c.   Hammock Beach River Club (Florida)

    d.   Laurelmor (North Carolina)

69.   Lubert/Ginn knew the U.S. Projects did not provide enough collateral for the $675 million Loan. So they used GSM as the largest piece of the collateral pool, providing 41% of the total collateral for the Loan.

70.   Lubert/Ginn also knew lot sales in the U.S. Projects could not service the massive

Loan debt because the Tesoro and Quail West had hundreds of lot sales cancellations after the market collapse.  Lubert/Ginn needed GSM as the primary source for Loan repayment.

**V.  Effects of the Loan on GSM**

71.  The moment the Loan closed, the effects on GSM ("Loan Effects") were immediate and devastating.  Even though GSM received no benefit from the Loan, it was ruined:

<u>The Loan Looted GSM</u>

72.  Lubert/Ginn used the Loan to extract every dime of future value from GSM, prior to development and months before a single lot was sold.

73.  GSM land was purchased just months earlier for $24 million, and GSM had few other assets at the time of the Loan.  Nevertheless, LA used the Loan to extract $618 million in projected future value from GSM.

<u>The Loan Mortgaged GSM to the Hilt</u>

74.  Before the Loan, GSM had a $12 million mortgage.  Under the Loan:

a.  GSM's $12 million mortgage was replaced with a $276 million mortgage.

b.  GSM was liable for the entire $675 million Loan.

c.  The Loan placed a lien on substantially all GSM assets and land, as well as ownership of and control over GSM development.

<u>GSM Was Liable for Loan Payments</u>

75.  Before the Loan, GSM was independently capitalized, responsible for its own debt.  After the Loan, GSM was liable for the massive payments required to service Loan debt.

<u>The Loan Left No Money for GSM Development</u>

76.  Before the Loan, internal documents reveal lot sales were "by far [the] largest source of funds for development expenses" for GLA Projects, and Lubert/Ginn intended to use GSM lot sale proceeds to fund GSM development.  Under the Loan:

a. 100% of GSM lot sale proceeds were allocated to Loan payments, leaving

nothing for development.

b. GSM could not take out additional debt to fund development.

77. Quite simply, the Loan left GSM with no money, making development impossible.

<u>GSM Was Sacrificed to Likely Default and Foreclosure</u>

78. Before the Loan, GSM was subject to its own market conditions on Grand Bahama

Island.  As alleged more fully below, LA's cross-collateralization handcuffed GSM to two

failing U.S. Projects:  Tesoro and Quail West.

79. Lubert/Ginn knew a Loan default was likely in light of the Tesoro and Quail West

lot sales cancellations.  For this reason, they knew the cross-collateralization scheme

placed GSM at serious risk of foreclosure when Tesoro and Quail West did not sell

sufficient lots to repay the Loan.

80. In a pre-Loan disclosure Memo to LA Advisory Boards, Dean Adler explained the

main risk of "cross-collateralizing" five separate Projects:

> [T]he principal risk of any cross-collateralized financing is that Project A (e.g.,
> Tesoro), though highly successful on its own, could nevertheless be lost to
> foreclosure in the event that Project B (e.g., Laurelmor) or Project C (e.g., Grand
> Bahamas-West End) do not perform well, thereby causing the Credit Suisse loan
> to go into default.

81. Dean Adler knew this was the script for a Loan default.  And even though Adler

transposed Project names in his example, he knew the U.S. market was in free-fall and the

Tesoro and Quail West Projects would not meet sales projections.  As a result, the risk of

foreclosure disproportionately fell to GSM.

82. As alleged more fully below, Dean Adler knew the risks of cross-collateralization

were material and very real.  For this reason, he warned LA's Advisory Board about the

general risks of cross-collateralization, though not the disparate risk to GSM.  Yet Lubert/

Ginn intentionally concealed from GSM lot buyers the collateralization of GSM with the failing Tesoro and Quail West Projects, and the likelihood of default and GSM foreclosure.

## VI.  Lubert/Ginn Maximized the Loan Size with Inflated Lot Sales Projections

### Cushman & Wakefield's TNV Appraisal Method

83.  The Loan size depended on the value of the Projects Lubert/Ginn included in the collateral pool.  To determine the value of the Projects, Credit Suisse used Cushman & Wakefield to perform Total Net Value ("TNV") appraisals.

84.  Cushman defined TNV as "the sum of the market value of the bulk lots of the entire planned community, as if all of the bulk lots were complete ... and available for sale ... as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

85.  Lubert/Ginn knew Cushman's TNV far exceeded the Projects' actual market value. For example:

   a.  A county appraiser valued Tesoro real and tangible property in 2006 at $74.9 million.  Yet Cushman's April 2006 TNV for unsold Tesoro lots was $210 million.

   b.  Ginn bought the GSM land in August 2005 for $24.5 million.  Yet Cushman's June 2006 TNV for GSM was an astounding $618 million.

86.   Internal documents show LA principals (including Dean Adler, Robert Rosenberg and Stuart Marguilies) acknowledged Cushman's TNV overstated the Projects' fair-market value by several hundred million dollars.

87.   Lubert/Ginn also knew Credit Suisse's use of the TNV valuation allowed them to increase the Loan size beyond what was reasonable given the actual value of the Projects.

88.   Lubert/Ginn knew because the Loan size was based on TNV, it did not comply with U.S. banking laws, including the Financial Institutions Reform, Recovery, and

Enforcement Act ("FIRREA"), which required an "As Is" or "Market Value" appraisal. Lubert/Ginn knew this was why Credit Suisse coordinated the Loan through its "Cayman Islands Branch," an off-shore "affiliate" with a New York address and no actual physical presence in the Cayman Islands, and why Credit Suisse syndicated the Loan to non-regulated entities, such as hedge funds.

<u>Lubert/Ginn Used Inflated Lot Sales Projections to Boost the Loan Size</u>

89.    Cushman's TNV used Lubert/Ginn's projections of future lot sales in the Projects ("Sales Projections").  Higher Sales Projections meant a bigger Loan.

90.    Lubert/Ginn's Sales Projections for Tesoro and Quail West ignored hundreds of sales cancellations for those Projects in the fourth quarter of 2005.    Internal documents reveal LA principals (including Dean Adler, Robert Rosenberg and Stuart Marguilies) and others on the transaction team discussed how to increase Sales Projections notwithstanding the Tesoro and Quail West cancellations, by manipulating sales, costs and absorption rates over the projection period.

91.    Sales Projections forecast the sale of 397 lots in Tesoro by 2009 and 290 lots in Quail West by 2008.  Lubert/Ginn knew the Projections were inflated for at least the following reasons:

a.   Ginn held launch events for Tesoro in October 2005 and Quail West in December 2005.  The Tesoro launch generated sales reservations or contracts for nearly 450 residential lots and 50 condominium units.  The Quail West launch generated sales reservations or contracts for nearly 450 lots.

b.   In the wake of the collapsing U.S. market, the majority of Tesoro and Quail West contracts and reservations were either cancelled or failed to close.

c.   At the time of the Sales Projections, there were only 11 Tesoro lots and 25 Quail

West lots under contract.

92.    The Tesoro situation was so bad by May 2006 that LA principal Robert Rosenberg recommended Dean Adler use Tesoro sales cancellations as a reason for LA Advisory Boards to approve the Loan.  Without the Loan, Rosenber advised, LA would not reach profit goals in the near-term.

**VII.  Lubert/Ginn Knew The Loan was Likely to Default**

93.    Lubert/Ginn knew their Sales Projections for Tesoro and Quail West made a Loan default likely, and they engaged their attorneys to evaluate the default risks in light of the Tesoro and Quail West sales cancellations.  An internal email reveals that less than a month before closing, Lubert/Ginn and their lawyers discussed:

   a.  Whether Loan terms allowed use of the Loan credit line for Loan repayment.

   b.  Whether they could use the credit line if they were out of compliance with Loan terms for failing to meet Sales Projections.

94.    In another email less than a month before closing, Morris, Manning & Martin lawyer Sonny Morris advised that Dean Adler was concerned the failure to meet Sales Projections would result in a Loan default.

95.    Dean Adler's concern shows in his May 22, 2006 draft disclosure memo to LA Advisory Boards, which proposed that $75 million of the $333 million distribution to LA would be held "[in] reserve…as sort of a contingency fund that could be used to 'balance' the loans in the event that the Projects collectively fail to perform as anticipated." Ultimately, however, Adler set his concerns aside and Lubert/Ginn proceeded with the Loan, without taking any reserve to protect against default.

96.    In a stunning email hours after the Loan closed and LA cashed-out, Ginn executive and attorney Bobby Masters joked with Morris, Manning & Martin attorney

Sonny Morris and an LA executive about the likelihood of default and foreclosure:

> June 8, 2006 (5:25 p.m.) email from Bobby Masters to Sonny Morris and Neill B.
> Faucett: "The Credit Suisse deal has closed. Wires on the way. Sonny, please
> prepare the deed-in-lieu."
> 06/08/2006 Reply from Neill Faucett, 6:31 p.m.: "Well said."

Not only was Masters Bobby Ginn's right-hand-man, he single-handedly executed Loan

documents on behalf of multiple GLA entities controlled by Lubert/Ginn.

97.    In the quarter after the Loan closed, Quail West and Tesoro lot sales predictably

fell far short of Sales Projections, with 3Q 2006 total net revenues for those Projects at 3%

of forecasted amounts. And sales did not improve. While Sale Projections forecast 74

Tesoro lot and condo closings for 2006, with 290 more through 2008, there were fewer

than 40 Tesoro lot closings (and no condo closings) through 2008. While Projections

forecast 66 Quail West lot closings for 2006, with 224 more through 2008, there were only

21 Quail West lot closings through 2008.

**VIII.   The Loan's Size and Terms were Highly Unusual**

98.    The Loan was not routine financing. The Credit Suisse Syndicated Term Loan

("CS STL") was first marketed in 2005 to resort owners, offering a loan size that was

previously unavailable. A key feature of the STL allowed owners to take massive

distributions from loan proceeds without using the money for development.

99.    In this way, the CS STL allowed developers to cash out of their investments,

saddling their projects with liability for the loan and a crushing debt load. By mid-2009,

eight resorts that obtained the CS STL (including GSM) were either in foreclosure,

bankruptcy or liquidation,  Around the same time, Credit Suisse stopped offering the STL.

100.  If the CS STL was unique, Lubert/Ginn's Loan was one-of-a-kind. The Loan was

the largest CS STL and the only one that cross-collateralized five separate developments.

The Loan was the antithesis of routine financing for GSM.  When the U.S. market
collapsed, Lubert/Ginn used the Loan to cash out of the failing Tesoro and Quail West
Projects, loot GSM and sacrifice GSM to serious risk of foreclosure.

## IX.    Lubert/Ginn Concealed the Cash Out Scheme and Loan Effects

101.  Lubert/Ginn closed the Loan before any GSM lots were sold.  Because they knew
no one would buy GSM lots if they learned the Loan Effects, they concealed those facts.

102.  Lubert/Ginn commanded a small team to close the Loan deal, keeping the Loan
Effects a secret outside the transaction team.  They prohibited those with knowledge of the
Loan Effects from disclosing material facts – even to the sales force selling GSM lots.

103.  Lubert/Ginn were obligated by Loan terms to submit the shell companies set up as
borrowers to a ratings analysis by Standard and Poor's.  While Lubert/Ginn provided S&P
with information on Loan terms, they did not report several material facts, including that
GSM received no benefit under the Loan; that TNV overstated the Projects' fair-market
value by several hundred million dollars; that Sales Projections for Tesoro and Quail West
did not account for hundreds of sales cancellations; that they anticipated those Projects
would not meet Sales Projections; that the $333 they took from Loan proceeds left Tesoro
and Quail West too thinly capitalized to survive; and that, just one month prior to closing
the Loan, Dean Adler was concerned the failure to meet Sales Projections would result in a
Loan default.

104.  Plaintiffs were not S&P subscribers, and they did not see any S&P ratings reports
on the Loan borrowers until after they sought legal advice on the Cash Out Scheme.

## X.  Lubert/Ginn Had a Duty to Disclose the Loan Effects to GSM Buyers

<u>Bobby Ginn's Prior Statements About GSM Development</u>

105.  Before the Cash Out Scheme, Bobby Ginn dedicated years preparing to develop

GSM.  He purchased land, designed the resort and amenities, negotiated with the

Bahamian government on development scope and timing, and obtained significant

concessions from the government to build GSM and sell lots.  GSM was to have been

Bobby Ginn's crowning achievement.

106.  Created before Lubert/Ginn obtained the Loan, a GSM marketing book described

Bobby Ginn's elaborate plans to develop GSM as "a $4.9 billion world-class resort

community" featuring:  4,400 condominium and hotel units around a 20-story "grand

palace," 1,800 residential homesites, signature golf courses by Jack Nicklaus and Arnold

Palmer, a private airport, "mega-yacht marina," "Monte Carlo-style casino" to be "the

premier casino in the islands," swim pavilions, a beach club, a world-class salon and spa,

nightclubs, restaurants, "world-class shopping," a "grand canal" connecting resort areas,

and elaborate gardens, fountains and pools throughout.

107.  The GSM marketing book identified Bobby Ginn as the visionary behind these

grand plans.  Describing King Louis XIV (the Sun King) and his vision for Versailles, the

book cast GSM (originally "Versailles sur Mer") as Bobby Ginn's tribute to Versailles:

> . . . The influence of the Sun King and his vision began with a palace,
> embraced a city and then rippled throughout the countryside of Europe.  The
> power elite created their own tributes to Versailles with sumptuous castles and
> fountain-filled gardens.  Today a new tribute is being created across the sea on
> the island of Grand Bahama.  This new vision belongs to Bobby Ginn (Ginn
> Clubs & Resorts Founder) and, like Louis XIV, he will compromise nothing to
> see it fulfilled.

> . . . [T]he West End of Grand Bahama Island offers the ideal location on which
> to realize this heroic vision. . . . It is the canvas on which Ginn will create a
> resort masterpiece. . . .

> . . . Like the Sun King, Bobby Ginn is very present when it comes to bringing
> his visions to life.  He sets the tone, approves the plans and ensures that what is
> created is what he intended.

108.  The first page of the GSM marketing book was a signed letter from Bobby Ginn

("Bobby Ginn Letter"), which also appeared on the GSM website:

> It's been a few years since we first announced plans for a new Club & Resort on Grand Bahama Island.  Since then, we've envisioned and re-envisioned.  We've worked very closely with the Bahamian government to develop an agreement that would benefit all those involved.  The goal throughout it all was to perfect the conditions that would allow us to envision, develop and operate the largest and finest resort destination in the islands.  It wasn't easy – if it was, anyone could do it – but we got there.  This vision will have a major impact on The Bahamas and all of the Caribbean.  The fact is, we would not have compromised the integrity of our vision, nor would we have shared any plans that we weren't 100% certain we could both develop and operate to the level you've come to expect from the Ginn Clubs & Resorts team.  After reaching an agreement with the Bahamian government, we have perfected a destination of such grand pageantry and breathtaking awe, that we were compelled to name it for arguably the greatest palace ever conceved and realized… the Palace at Versaille.  The following pages outline the details and opportunity of this vision.  We are happy to share it with you.

109.  Once the Loan closed and in light of the Tesoro and Quail West sales cancellations, Lubert/Ginn knew the Bobby Ginn Letter was false and misleading because the Loan had looted GSM, crippled it with crushing debt, left no money for development and exposed it to likely foreclosure.

110.  Even before the Loan closed, Lubert/Ginn knew a Loan default and GSM foreclosure were likely, given the Tesoro and Quail West sales cancellations.  And Lubert/Ginn financial records for 2006 reveal the situation only got worse:

> a.  Tesoro and Quail West total net revenues for 3Q 2006 were at 3% of forecast.
>
> b.  The borrowers and subsidiary guarantors under the Loan had a combined net balance sheet deficit of $124.7 million as of June 30, 2006.
>
> c.  The balance sheet deficit was $154.2 million as of September 30, 1996.
>
> d.  The balance sheet deficit was $227.6 million as of December 31, 2006.

111.  Before the end of 2006, default was imminent and Lubert/Ginn were already in discussions with Credit Suisse about restructuring the Loan.

112.  Plaintiffs purchased their GSM lots beginning in December 2006.  By that time, Lubert/Ginn knew a Loan default was imminent.  Against this background and with this knowledge, Lubert/Ginn had a duty to correct the misleading statements in the Bobby Ginn letter and the GSM marketing book.

113.  After the Loan closed and before their lot purchases, Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steve Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick Clemmons, Kevin Crawford, Lauren and Troy Domnick, Dean and Stephanie Fresonke, Tom Hoyer, James Jackson, David Jankowski, Shelley Jensen, James Josephson, Ozzie Kalil, Susan Kherkher, Tom Lammertse, Brian Lesesne, Ken and Pat Liles, Art and Alexandria Maciag, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Doug Smith, Vic Taglia, Maureen and Todd Taliaferro, Ron Van, Anja Verhees, Richard Webb and Darryl Willis each received and read the marketing book and the Bobby Ginn Letter.

114.  Based on the Bobby Ginn Letter and the GSM Marketing book, those Plaintiffs reasonably believed Bobby Ginn intended to develop and operate GSM and that Bobby Ginn was not aware of anything that might interfere with his ability to do so.

115.  Lubert/Ginn knew those Plaintiffs had no knowledge of the Cash Out Scheme, the Loan Effects or the imminent Loan default prior to their GSM lot purchases.  Lubert/Ginn knew any reasonably prudent GSM buyer would consider the Loan Effects and the imminent Loan default important and would not buy a GSM lot if they knew those facts.

116.  Once the Loan closed, Lubert/Ginn had a duty to correct prior statements in the Bobby Ginn Letter and inform Plaintiffs of the Loan Effects and the imminent Loan default.  Instead, Lubert/Ginn intentionally concealed those facts.

117.  Lubert/Ginn also had a duty to disclose the Loan Effects and imminent Loan default based on the parties' relative access to information, the importance of the Loan Effects to Plaintiffs' GSM lot purchase decisions, and Lubert/Ginn's awareness that Plaintiffs could not with reasonable diligence learn those facts.

## XI.  The Loan Default

118.   The Loan went into default in early-2007 and, after a restructuring agreement, again in mid-2008.  In December 2009, the Credit Suisse lenders filed a lawsuit to foreclose on GSM.  After years of secret negotiations, backroom deals and legal proceedings, in November 2011 the Lenders obtained title and development rights to one parcel of GSM containing residential lots, while Lubert/Ginn formed a new company to take title to the "resort core" parcel.  To the present, Lubert/Ginn continue to loot GSM, setting up various companies to buy and sell different parcels within the resort core.

119.  The Loan default was not due to meager GSM lot sales:  at least 194 sales closed through 2007 and at least 215 by mid-2008.  Nor was the default unexpected. Lubert/Ginn knew a default was likely due to their massive $333 million distribution and the Tesoro and Quail West sales cancellations.

120.  Even though GSM lot sales were thriving, LA's cross-collateralization of GSM with Tesoro and Quail West allowed the lenders to foreclose on GSM.  Dean Adler's risk disclosure to the LA Advisory Board became reality:  Project A (GSM) though highly successful on its own, was nevertheless lost to foreclosure when Project B (Tesoro) and Project C (Quail West) did not perform well, thereby causing the Loan to go into default.

## XII.  Lubert/Ginn's Fraudulent Statements Before the Loan Became Public

121.  By Spring 2008, Lubert/Ginn knew the Loan default and some Loan terms would soon become public knowledge.  In an effort to conceal the Loan Effects, Lubert/Ginn

caused editions of the *Ginn Sur Mer Living* publication to be sent to GSM lot owners,
including Plaintiffs.  Those publications, which were intended to conceal the Loan Effects,
offered assurances on GSM development and the Bahamas real estate market.

Spring 2008:  Bahamian Real Estate is Safe

122.  Lubert/Ginn caused a February/March 2008 edition of *Ginn Sur Mer Living* to be
sent to GSM lot owners.  The publication reported investors were buying Bahamas real
estate to shield their investments from U.S. market declines.  Sales VP Greg Ulmer said,
"The Caribbean market is on the verge of exploding, not just here at Ginn sur Mer, but all
over the islands.  With the U.S. market a little soft, there's been a big upsurge in the
number of people looking here to find a safe haven for their real estate investments."

123.  While this statement was true, it was misleading because it failed to disclose the
Loan Effects, including Lubert/Ginn's knowledge before the Loan closed that Tesoro and
Quail West would not meet Sales Projections and that default was likely, Lubert/Ginn's
knowledge before Plaintiffs closed on their GSM lots that default and GSM foreclosure
were imminent and the fact that the Loan had defaulted in 2007.

124.  After their lot purchases, Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey,
Beachfront, Steven Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry
Cicolani, Clear Reef, Kevin Crawford, Lauren and Troy Domnick, Tom Hoyer, James
Jackson, David Jankowski, James Josephson, Ozzie Kalil, Susan Kherkher, Ken and Pat
Liles, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Vic
Taglia, Anja Verhees, Richard Webb and Darryl Willis received and read the
February/March 2008 edition of *Ginn sur Mer Living*.  It reinforced their belief at the time
of purchase that GSM lot purchases would not be subject to U.S. market declines.

125.   The February/March 2008 *Ginn sur Mer Living* also concealed the Loan Effects,
preventing them from becoming public knowledge and preventing all Plaintiffs from
learning about the Loan Effects.  As a result, all Plaintiffs did not take earlier steps to
mitigate their losses or initiate legal action.

<u>Bobby Ginn in Spring 2008:  GSM is Moving Full Speed Ahead</u>

126.   Lubert/Ginn caused a subsequent Spring 2008 edition of *Ginn Sur Mer Living* to
be sent to GSM lot owners, including Plaintiffs.  The publication included an article
entitled, "Full Speed Ahead for Ginn sur Mer," which reported, "Construction on the $4.9
billion Ginn sur Mer mega-mix resort on the western tip of the island is moving full speed
ahead and President and CEO Bobby Ginn is certain that money is in place to see the
project through."  The article included Bobby Ginn's assurances about GSM development:

 a.   "I would say we're on schedule, I think we're probably a little ahead of schedule
  in what we initially set out to do."

 b.   "We've done everything we can do to be sure that when we're talking with our
  customer, they have the assurance that what they're buying is going to be
  developed with the quality and standards that our company is known for."

127.   These statements were false and misleading because Bobby Ginn failed to
disclose the Loan Effects and default.

128.   In the same publication, Bobby Ginn said GSM was not subject to U.S. market
declines:  "Even though the housing and the debt markets in the U.S. and U.K. have
slipped, there is still a huge demand for The Bahamas…."

129.   While this statement was true, it was misleading because Bobby Ginn failed to
disclose the Loan Effects, including Lubert/Ginn's knowledge before the Loan closed that

Tesoro and Quail West would not meet Sales Projections and that default was likely,
Lubert/Ginn's knowledge before Plaintiffs closed on their GSM lots that default and GSM
foreclosure were imminent and the fact that the Loan had defaulted in 2007.

130.  After their lot purchases, Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey,
Beachfront, Steven Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry
Cicolani, Clear Reef, Lauren and Troy Domnick, Dean and Stephanie Fresonke, Tom
Hoyer, James Jackson, David Jankowski, James Josephson, Ozzie Kalil, Susan Kherkher,
Ken and Pat Liles, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard
Shaughnessy, Vic Taglia, Anja Verhees, Richard Webb and Darryl Willis received and
read the Spring 2008 *Ginn sur Mer Living*.

131.  The publication reinforced those Plaintiffs' beliefs at the time of purchase that
GSM lot purchases were not subject to U.S. market declines and reassured them that GSM
development was proceeding on schedule.  It also concealed the Loan Effects, preventing
them from becoming public knowledge and preventing all Plaintiffs from learning about
the Loan Effects.  As a result, all Plaintiffs did not take earlier steps to mitigate their losses
or initiate legal action.

### XIII.  Lubert/Ginn's Fraudulent Statements After the Loan Became Public

132.  When the Loan and some of its terms became public in July 2008, Lubert/Ginn
caused and made public statements mischaracterizing the Loan Effects.  These statements
were intended to conceal the true facts about the Cash Out Scheme and the Loan Effects
and to prevent GSM lot owners from initiating legal action based on the Cash Out Scheme.

<u>2008 Robert Gidel Statement</u>

133.  On July 1, 2008, LA directed Ginn President Robert Gidel to issue a statement

about the Loan that included fraudulent representations and concealed the Loan Effects:

a. The Gidel Statement described the Loan as "a non-recourse $675 million credit
   facility." This was false and misleading. While the Loan was non-recourse for
   Lubert/Ginn, GSM was fully liable for the Loan and mortgaged to the hilt. In
   addition, the default had already triggered the Lenders' right to foreclose on GSM.

b. The Gidel Statement pledged, "…there will be no disruption to the continued
   development of the Ginn sur Mer project …." This was false and misleading.
   From the moment it closed, the Loan looted GSM and left no money for
   development. In addition, the default had already triggered a GSM foreclosure.

134. After their GSM lot purchases, Plaintiffs Jones Andrews, Beachfront, Steven
Bredahl, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick Clemmons,
Dean Fresonke, James Jackson, Shelley Jensen, James Josephson, Ozzie Kalil, Susan
Kherkher, Tom Lammertse, Brian Lesesne, Ken and Pat Liles, Art and Alexandria Maciag,
Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Vic
Taglia, Maureen and Todd Taliaferro, Ron Van, Richard Webb and Darryl Willis read a
July 1, 2008 Go Toby article entitled, "Florida Real Estate Developer, Ginn Clubs and
Resorts, Misses Principal and Interest Payment," which reprinted the Gidel Statement.

135. The Gidel Statement reassured those Plaintiffs the Loan would not impact GSM,
and GSM development was proceeding on schedule. It also concealed the Loan Effects,
preventing them from becoming public knowledge and preventing all Plaintiffs from
learning about the Loan Effects. As a result, all Plaintiffs did not take earlier steps to
mitigate their losses or initiate legal action.

## 2008 Bobby Ginn Press Conference

136.  On August 6, 2008, Bobby Ginn appeared at a press conference to reassure GSM lot owners the Loan default would not affect GSM.  Bobby Ginn's statements at the press conference were false and misleading because he concealed the Loan Effects and pledged: the Loan did not affect GSM; GSM was not in danger; all the money to develop GSM was in an escrow account; he could back up his prior promises about GSM development; money existed to guarantee completion; and he was unaware of anything to prevent him from developing and operating GSM.  (*See* Predicte Act L68 for excerpts.)

137.  Plaintiffs Liles watched a web video of the Bobby Ginn press conference in August 2008.  Plaintiffs Jones Andrews, Mark Bailey, Beachfront, Steven Bredahl, Cameron Byers, Andy Card, Jerry Cicolani, Clear Reef, James Jackson, Ozzie Kalil, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, Art and Alexandria Maciag, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Vic Taglia, Maureen and Todd Taliaferro, Anja Verhees, Ron Van, Richard Webb and Darryl Willis read an August 7, 2008 *Freeport News Reporter* article entitled, "Bobby Ginn Gives Assurances that Grand Bahama Project is Safe," which included statements from the press conference.

138.  Plaintiffs Jones Andrews, Mark Bailey, Steven Bredahl, Andy Card, Jerry Cicolani, Clear Reef, James Jackson, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, Art and Alexandria Maciag, Fred Reeping, Tim Sell, Bernard Shaughnessy, Vic Taglia, Maureen and Todd Taliaferro, Ron Van, Richard Webb and Darryl Willis read an August 7, 2008 Jones Bahamas article entitled, "Ginn Project 'Safe,'" which included statements from the Bobby Ginn press conference.

139.  As a result of Bobby Ginn's August 2008 press conference, Plaintiffs Andrews

Group, Bailey, Beachfront, Bredahl, Byers, Card, Carell Group, Cicolani Group, Clear

Reef, Clemmons Group, Jackson Group, Kalil,  Kherkher, Liles, Maciag, Ponsler, Taglia

Group, Taliaferro, Van, Verhees, Webb and Willis reasonably believed the Loan would not

impact GSM, and GSM development was proceeding on schedule.  Bobby Ginn's

statements at the press conference also prevented the Loan Effects from becoming public

knowledge and preventing all Plaintiffs from learning about the Loan Effects.  As a result

all Plaintiffs did not take earlier steps to mitigate their losses or to initiate legal action.

<u>January 2010 Bobby Ginn Letter to GSM Lot Owners</u>

140.  On January 2, 2010, Bobby Ginn sent a letter to GSM lot owners, including

Plaintiffs.  The letter was intended to convince lot owners GSM development was

proceeding on schedule.  In the letter, Bobby Ginn made fraudulent representations and

failed to disclose the Loan Effects and the Credit Suisse lenders' foreclosure on GSM.

(*See* Predicate Act L76 for excerpts.)

141.  The Bobby Ginn letter was false and misleading because he failed to disclose that

GSM development had come to a standstill, HUD had prohibited GSM lot sales in the U.S.

since October 2008 and Credit Suisse lenders had obtained a December 23, 2009 $495

million foreclosure judgment against GSM.

142.  Plaintiffs Jones Andrews, Beachfront, Steven Bredahl, Joseph Cappuccino, Andy

Card, Jerry Cicolani, Clear Reef, Lauren Domnick, Dean and Stephanie Fresonke, Tom

Hoyer, James Josephson, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, Steve

Ponsler, Mark Roodvoets, Tim Sell, Vic Taglia, Maureen and Todd Taliaferro, Anja

Verhees, Ron Van, Richard Webb and Darryl Willis received and read the 2010 Bobby

Ginn Letter to lot owners after they made their GSM lot purchases.  Plaintiff Mark Bailey

may have received and read the 2010 Bobby Ginn Letter.

143.  As a result of the 2010 Bobby Ginn letter, Plaintiffs Andrews Group, Beachfront, Bredahl, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Domnick, Fresonke Group, Hoyer Group, Kalil, Kherkher, Liles, Maciag, Ponsler, Smith, Taglia Group, Taliaferro, Van, Verhees, Webb and Willis reasonably believed GSM development was on schedule.  The letter also prevented the Loan Effects from becoming public knowledge and prevented all Plaintiffs from learning the Loan Effects. As a result, Plaintiffs did not take earlier steps to mitigate their losses or take legal action.

**XIV.  Lubert/Ginn's Misrepresentations Concealed the Loan Effects**

144.  The statements described in Paragraphs 121-123, 126-129, 133, 136 and 140 were intended to conceal the true facts about the Cash Out Scheme and the Loan Effects.  By making these fraudulent representations and concealing the Loan Effects, Lubert/Ginn prevented Plaintiffs from learning about the Loan Effects.

145.  Plaintiffs Andrews Group, Cicolani Group, Josephson, Kherkher, Lammertse, Liles, Van and Webb did not discover the Loan Effects until on or after October of 2008, when they began investigating rumors about the Loan and problems with GSM development.  Those Plaintiffs did not discover the Cash Out Scheme until on or after May 2010, when more information on the Loan became available.

146.  Plaintiff Willis did not discover the Loan Effects until on or after June 2009, when he began investigating rumors about the Loan and problems with GSM development. Willis did not discover the Cash Out Scheme until on or after May 2010, when more information on the Loan became available.

147.  Plaintiff Byers did not discover the Loan Effects until on or after July 2009, when

he began investigating rumors about the Loan and problems with GSM development.
Byers did not discover the Cash Out Scheme until on or after May 2010, when more
information on the Loan became available.

148.  Plaintiffs Bailey, Beachfront, Bredahl, Card, Clear Reef, Crawford Group,
Domnick, Jackson Group, Kalil and Ponsler did not discover the Loan Effects until on or
after March 2010, when they began investigating rumors about the Loan and problems
with GSM development.  Those Plaintiffs did not discover the Cash Out Scheme until on
or after May 2010, when more information on the Loan began to emerge.

149.  Plaintiffs Carell Group, Clemmons Group, Fresonke Group, Hoyer Group,
Maciag, Smith and Taliaferro did not discover the Cash Out Scheme or Loan Effects until
on or after January 2011, when they began investigating rumors about the Loan and
problems with GSM development.

150.  Plaintiffs Taglia Group, Cappuccino Group and Verhees did not discover the Cash
Out Scheme or Loan Effects until on or after March 2012, when they began investigating
rumors about the Loan and problems with GSM development.

151.  All Plaintiffs have discovered additional material facts about the Cash Out
Scheme as those facts were made public by the bankruptcy Trustee for the Tesoro and
Quail West Projects, beginning in May 2010 and continuing to the present.

152.  If Plaintiffs had earlier learned the Loan Effects, they would have earlier stopped
payments on their GSM lot purchases and initiated legal action.

153.  Lubert/Ginn continue to hide material facts concerning the Loan Effects.  This
fraudulent concealment continues to the present and is likely to continue in the future.
Plaintiffs remain unaware of the full impact of the Cash Out Scheme on GSM or their lot

purchases, including Lubert/Ginn's continued looting of GSM, setting up holding

companies to buy and sell different parcels within the resort core.

### XV.    Lubert/Ginn's Use of Attorneys in Connection with the Cash Out Scheme and the Purported Joint Defense Agreement

154.    As alleged above and in Predicate Acts L1, L3, L10, L11, L12, L15, L23, L24,

L25, L26, L28, L29-31, L41-43, L57-59, L62, L71 and L73, Lubert/Ginn sought the

advice of their attorneys as they carried out the Cash Out Scheme.

155.    In addition, on May 1, 2008, Lubert/Ginn caused seventeen entities (eleven Ginn

entities and six LA entities) to enter into a Joint Defense, Common Interest and

Information Sharing Agreement ("JDA").  Bobby Masters signed as President for all

eleven Ginn entities.  The JDA was signed in anticipation of bankruptcy filings for Tesoro

and Quail West.  It purported to protect all applicable privileges "even if an adversity of

interests may subsequently be discerned or arise between or among JDA Parties."

156.    After the Loan default, Tesoro and Quail West filed for bankruptcy protection,

and the Trustee sought to set aside Lubert/ Ginn's $333 million Loan distribution.  During

the bankruptcy proceedings, defendants including Lubert/Ginn aggressively fought

disclosure of facts underlying the Loan transaction, citing the JDA as justification for their

refusal to produce certain documents requested by the Trustee.

157.    On November 11, 2010, the bankruptcy court held the JDA was void *ab initio*,

making the following findings in support of its ruling:

a.    Morris, Manning & Martin jointly represented all the Ginn JDA parties in

connection with the Loan and after 2007 jointly represented all the JDA parties,

including the LA defendants.

b.    "[T]he drafting of any agreement in contemplation of bankruptcy whose

purpose is to protect a debtor's adverse insider's prepetition communications makes the facts of this matter . . . egregious . . . ."

c.  "Enforcement of such an agreement violates public policy."

d.  "[I]t is undeniable that the entire [Loan] transaction has the potential to be a fraudulent conveyance from the start."  (*In re Ginn-LA St. Luci LTD., LLLP, et al.*, Case No. 08-29769-BKC-PGH, S.D. Fla., Docket No. 572.)

158.  The court noted the "potential for abuse" evidenced by Lubert/Ginn's attempt to retroactively apply the JDA to documents shared prior to its execution.

**XVI.  GSM was Immediately Ruined the Moment the Loan Closed**

159.  Before the Loan closed, the Tesoro and Quail West Projects were already failing in the wake of the U.S. market collapse, with hundreds of sales cancellations.  Before the Loan closed, Lubert/Ginn knew a Loan default was likely, triggering the lenders right to foreclose on GSM.

160.  By the time the Loan closed, the Cash Out Scheme had looted GSM, crippled it with crushing debt and left no money for development.  The Loan Effects irreparably ruined GSM as of June 8, 2006.  In the words of Bobby Masters, "please prepare the deed in lieu."  GSM had been sacrificed to foreclosure.

161.  But for the Loan, the Credit Suisse lenders would not have foreclosed on GSM when Tesoro and Quail West predictably failed to meet Sales Projections.

162.  But for the Loan, GSM would not have been liable for a $675 million Loan, from which it received no benefits.  But for the Loan, GSM could have used its lot sale proceeds (at least $210 million as of 3Q 2008) for development instead of making Loan payments.

163.  But for the Loan and despite the U.S. market collapse, GSM was thriving:

a. GSM sold more than 220 lots between 2006 and 2008, with several price increases during that period.

b. The February/March 2008 *Ginn Sur Mer Living* publication reported investors were buying Bahamas real estate to shield their investments from U.S. market declines.  VP of Sales Greg Ulmer said,

> "The Caribbean market is on the verge of exploding…. Not just here at Ginn sur Mer, but all over the islands.  With the U.S. market a little soft, there's been a big upsurge in the number of people looking here to find a safe haven for their real estate investments."

c. In the Spring 2008 *Ginn Sur Mer Living*, Bobby Ginn said GSM was not subject to U.S. market declines:  "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas…."

d. The same publication reported GSM had its best sales month ever in January 2008, in what VP of Sales Ulmer characterized as a "buying frenzy."

164.  GSM lot sales stopped in late 2008, but only because HUD, citing the Loan, revoked the ability of GSM's developer to market and sell lots in the U.S.  If Lubert/Ginn had not included GSM in the Loan, HUD would not have halted GSM lot sales.

## XVII.  Plaintiffs Were Damaged by the Cash Out Scheme The Moment They Closed Their GSM Lot Purchases

165.  The U.S. market collapse began in late 2005, and Bobby Ginn described early 2006 as "brutal," "as big a falloff in housing as [he had] ever seen in 40 years," "like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall…."  Against this backdrop and for this reason, LA devised the Cash Out Scheme.

166.  Tesoro and Quail West were already failing before the Loan closed, with hundreds of sales cancellations in the wake of the U.S. market collapse.  It was against this backdrop and for this reason that LA recommended the Loan to its Advisory Group, because without

the Loan, LA would not meet near-term profit goals.

167.  Plaintiffs closed on their GSM lot purchases beginning in December 2006, on the specific dates set forth in Paragraphs 5-31, above.

168.  Before the end of 2006:

    a.  The U.S. market collapsed had begun.

    b.  Total net revenues for Tesoro and Quail West were at 3% of forecast.

    c.  The borrowers and subsidiary guarantors under the Loan had a combined balance sheet deficit of $227.6 million.

    d.  A Loan default was imminent and Lubert/Ginn were already in discussions with Credit Suisse about restructuring the Loan.

169.  Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Smith, Taglia Group, Taliaferro, Van, Verhees, Webb and Willis were unaware of the Cash Out Scheme, Loan Effects or the facts in Paragraph 168 when they bought GSM lots.  If those Plaintiffs had known about the Cash Out Scheme, the Loan Effects or the facts in Paragraph 168, none of them would have purchased GSM lots.

170.  Plaintiffs' damages from the Cash Out Scheme were not caused by an unexpected market crash following their lot purchases.  The U.S. market crash occurred long before Plaintiffs' lot purchases.  Nor were Plaintiffs' damages caused by an unexpected Loan default.  Lubert/Ginn knew the default was imminent when Plaintiffs bought their lots.

171. Plaintiffs' were damaged because Lubert/Ginn used the Loan to loot GSM and

sacrificed GSM to foreclosure. When Plaintiffs bought their lots beginning in December

2006, the default was imminent, triggering the lenders right to foreclose on GSM.

172. As a result of the Cash Out Scheme, Plaintiffs were damaged in a sum including,

but not limited to, amounts they paid for and owe on their lots (including down payments,

amounts paid at closing, mortgage payments and amounts still owed), tax stamps, loan

fees, closing costs and property taxes paid to date and still owed. The elements and

amounts of Plaintiffs' damages for each lot purchase will be established at trial.

173. But for the Cash Out Scheme and Lubert/Ginn's concealment of the Loan Effects,

Plaintiffs would not have suffered these damages.

**XVIII.   The Cash Out Scheme:  Violations of RICO by LA Partners, Dean Adler,
ERG and Bobby Ginn**

**A.  The Enterprise**

174. From at least March 2005 and continuing to the present, in Florida and elsewhere,

Defendants LA Partners, Dean Adler, ERG and Bobby Ginn ("CO Defendants"), including

their agents and employees, collectively constituted an "enterprise" as defined in 18 U.S.C.

§ 1961(4) ("Cash Out Enterprise").

175. The Cash Out Enterprise is an ongoing organization that engages in, with activities

affecting, interstate and foreign commerce. At all relevant times, the CO Defendants

knowingly made use of the means and instruments of transportation and communications

of interstate and foreign commerce to communicate with one another, with Credit Suisse; with

GSM, with Plaintiffs and with the general public.

176. Although the CO Defendants participate in and are members and part of the Cash Out

Enterprise, each also has an existence apart from that Enterprise. At all relevant times, the

Enterprise had an ascertainable structure apart from the racketeering activity in which CO

Defendants engaged. The primary decision-makers for the Cash Out Enterprise are Dean Adler and Lubert-Adler, who direct the activities of the Enterprise.

177. The CO Defendants control and operate the Enterprise through a variety of means including, but not limited to, agreeing to commit and committing the following acts: (1) devising the Scheme; (2) creating the structure and terms of the Loan; (3) taking necessary steps to obtain the Loan; (4) providing overstated Sales Projections for Tesoro and Quail West; (5) including GSM in the collateral pool; (6) taking $333 million from Loan proceeds; (7) concealing the Loan Effects from GSM lot buyers, including Plaintiffs; and (8) making fraudulent and misleading statements in 2008 about the Loan Effects and the consequences of the Loan default for GSM.

178. The Cash Out Enterprise pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud Plaintiffs and to collect profits from those actions, which began before Plaintiffs purchased GSM lots, continue to the present and threaten to continue into the future.

**B. Predicate Acts- Mail, Wire and Bank Fraud**

179. Cash Out Defendants engaged and continue to engage in conduct violating 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1344 (bank fraud) to effectuate the Cash Out Scheme.

<u>Mail and Wire Fraud</u>

180. To execute the Cash Out Scheme, CO Defendants in violation of 18 U.S.C. §§ 1341 and 1343 transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, pictures and sounds, and caused things to be placed in a post office or authorized depository, or deposited things to be sent or delivered

by a private or commercial interstate carrier.

181. **Plaintiffs incorporate Appendix A hereto**, identifying CO Defendants' use of wire and mail communications in furtherance of the Cash Out Scheme.  To the extent Appendix A does not include the exact dates of and persons involved in each act, those details are in the exclusive control of one or more CO Defendants.

182. CO Defendants' acts of fraud and concealment were intentional and committed to deceive Plaintiffs and obtain their money for CO Defendants' gain.  CO Defendants either knew or recklessly disregarded the fact that their statements and omissions were material, and Plaintiffs would have acted differently if they had known the true facts.

183. As a result of the Cash Out Scheme, CO Defendants obtained money belonging to Plaintiffs, and Plaintiffs have been injured in their business or property by CO Defendants' overt acts of mail and wire fraud.

184. The acts in Appendix A were done intentionally and knowingly with the specific intent to advance the Cash Out Scheme, or with knowledge the use of mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not intended.  CO Defendants executed the Cash Out Scheme in different states within the United States and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

<u>Bank Fraud</u>

185. To execute the Cash Out Scheme, CO Defendants violated 18 U.S.C. § 1344 by obtaining moneys and funds under the custody or control of a financial institution by: (1) causing wire transfers taking $333 million from Loan proceeds, thereby looting GSM and leaving Tesoro and Quail West too thinly capitalized to survive; and (2) transferring Loan

proceeds between and among various Lubert/Ginn entities in an attempt to create the illusion GSM received proceeds from the Loan.

186.  **Plaintiffs incorporate Appendix B hereto**, identifying Predicate acts constituting bank fraud.  The acts in Appendix B were done intentionally and knowingly with the specific intent to advance the Cash Out Scheme.

187.  As a result of CO Defendants' fraudulent scheme, they obtained money belonging to Plaintiffs, and Plaintiffs have been injured in their business or property by CO Defendants' overt acts of bank fraud.

## C.  Pattern of Racketeering Activity

188.  CO Defendants knowingly, willfully and unlawfully conducted or participated in the affairs of the Cash Out Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  The racketeering activity was made possible by CO Defendants' regular and repeated use of the facilities and services of the Cash Out Enterprise.

189.  CO Defendants committed or aided and abetted in the commission of at least two acts of racketeering activity, set forth in Appendices A and B, in the past five years ("Racketeering Acts").  The Racketeering Acts were not isolated, but had the same or similar purpose, participants, method and victims, including Plaintiffs.

190.  Each Racketeering Act was committed pursuant to and in furtherance of the Cash Out Enterprise, including false and misleading statements, concealment and acts of bank fraud, as well as other uses of the mails and wire transmissions.

191.  CO Defendants' Racketeering Acts were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of

racketeering activity" as defined in 18 U.S.C. § 1961(5).

## FACTUAL BACKGROUND:  APPRAISAL SCHEME

**XIX.   Introduction**

192.   Lubert/Ginn, Ginn Financial and BSA engaged in a scheme to provide mortgage financing for GSM lots using fraudulently inflated appraisals ("Appraisal Scheme").

193.   Knowing U.S. buyers of Bahamian lots were unsure how to obtain mortgage financing, Lubert/Ginn caused Ginn Financial to market 80% loan-to-value ("LTV") mortgage loans to U.S. buyers of GSM lots ("GSM Mortgage Loans").  Lubert/Ginn used Ginn Financial to obtain the trust and confidence of U.S. buyers, voluntarily providing extra services and offering to help buyers navigate the financing process.

194.   Lubert/Ginn and Ginn Financial knew U.S. buyers of GSM lots wanted mortgage loans offering the protection of U.S. state and federal laws governing mortgage lending, including the Truth in Lending Act; Equal Credit Opportunity Act; Fair Debt Collection Practices Act; Real Estate Settlement Procedure Act (RESPA); and the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) ("U.S. Mortgage Laws").

195.   To entice U.S. buyers to obtain GSM Mortgage Loans, Ginn Financial created the illusion GSM mortgage loans were made by a licensed mortgage lender in compliance with U.S. Mortgage Laws.  To hide its use of inflated appraisals, Ginn Financial told borrowers it required appraisals from licensed U.S. appraisers to protect against loaning more than the value of the financed lot.

196.   Unbeknownst to U.S. buyers, Lubert/Ginn caused Ginn Financial to undermine the integrity of the appraisal process, taking steps to intimidate and control appraisers into inflating values.  Lubert/Ginn first pressured a licensed Florida appraiser to provide appraisals based on nonexistent infrastructure and resort amenities.  When the Florida

appraiser refused, Lubert/Ginn directed Ginn Financial to fire him.

197.  Lubert/Ginn then directed Ginn Financial and BSA to hire a Bahamian appraiser whose wife was on Lubert/Ginn's payroll and who had a financial interest in every GSM Mortgage Loan.  Lubert/Ginn demanded the Bahamian appraiser write inflated appraisals that did not comply with the Uniform Standards of Professional Appraisal Practice (USPAP).  Using the inflated appraisals, Lubert/Ginn formed BSA, an unlicensed shell company, to act as lender for GSM Mortgage Loans at 191% to 354% LTV.

198.  Lubert/Ginn, particularly Dean Adler and Bobby Ginn, were responsible for developing the fraudlent appraisal practices and establishing infrastructure to implement the Appraisal Scheme.  Lubert/Ginn used Ginn Financial and BSA to execute their fraudulent appraisal practices.  In carrying out the Appraisal Scheme, Lubert/Ginn directed and controlled the actions of Ginn Financial and BSA.

## XX.  The Importance of Real Property Appraisals

199.  In a legitimate mortgage loan transaction, the lender depends on independent appraisers to fairly and accurately assess the market value of property serving as collateral. The lender uses an appraisal to determine the maximum amount it can loan, based on the actual market value of real estate collateral.

200.  Because of the importance of appraisals, Florida and federal law requires licensed appraisers to comply with USPAP.  USPAP requires an appraiser to be independent:  "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  (USPAP Ethics Rule (Conduct).)  USPAP also provides, "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."  *Id.*

201.  In a legitimate mortgage loan transaction, there is an express understanding the lender will rely on the appraisal to underwrite a mortgage loan on the subject property.  In such transactions, the lender requires and expects an appraiser to comply with USPAP, applicable industry standards, and applicable state and federal laws.

202.  In a legitimate mortgage transaction, the lender is motivated to protect its interests by ensuring it does not approve a loan for more than the actual market value of real estate collateral.  It is almost axiomatic that the lender requires an appraisal reflecting actual market value.  Inflated appraisals place a legitimate lender at risk of approving a loan for more than the value of the collateral, exposing the lender to significant loss if a borrower defaults.  No legitimate lender acting reasonably to protect its interests would approve a mortgage loan for more than the value of the collateral.

## XXI.  Lubert/Ginn, Ginn Financial and BSA Had No Incentive to Act as Legitimate Mortgage Lenders

203.  Lubert/Ginn were not legitimate mortgage lenders with an incentive to protect against loaning more than the market value of GSM lots.  They were motivated to make mortgage loans for amounts far greater than market value.  Dean Adler structured the underlying funding for those loans to ensure LA profited when they went into default.

204.  In making GSM Mortgage Loans, Lubert/Ginn corrupted the appraisal process, controlled GSM lot appraisals, and demanded inflated appraised values.  Lubert/Ginn insisted on, and ultimately obtained, appraisals that failed to consider market comparables and included value for nonexistent infrastructure and resort amenities.

## XXII.  LA Partners Funded GSM Mortgage Loans, Held an Ownership Interest in BSA and Controlled BSA Appraisals

205.  LA was an active investor in GSM Mortgage Loans, providing part of the funding for those Loans through its investment funds.  From the time of its formation, both LA

Partners and Bobby Ginn were beneficial owners of BSA. LA took monthly "preferred return" equity distributions from BSA from at least 2007 to 2010.

206. As an investor in GSM Mortgage Loans and an owner of BSA, LA exercised control over the appraisal requirements for GSM lots.

**XXIII. Ginn Financial Pressured a Florida Appraiser to Provide Inflated Appraisals**

207. To create the illusion GSM Mortgage Loans were subject to a legitimate appraisal process, Lubert/Ginn initially hired licensed Florida real estate appraiser(s). Lubert/Ginn assumed they could exert sufficient control over the appraiser(s) to obtain inflated appraisals. With at least one appraiser, things did not go as planned.

208. Richard C. Allen, a principal owner of Pomeroy Appraisal Associates, was a licensed Florida appraiser retained by Lubert/Ginn in the Fall of 2006. Lubert/Ginn directed Ginn Financial to use a number of tactics in an effort to control and coerce Pomeroy to provide fraudulently inflated appraisals for GSM lots. Ginn Financial:

    a. Flew Mr. Allen and his partner to the Bahamas on Ginn's corporate jet.

    b. Told Pomeroy it would receive future business if its work was acceptable.

    c. Sent Pomeroy "Request for Appraisal" forms that included a sales price and often an "Estimated Value" figure for the subject lot.

    d. Told Pomeroy the lot sales price was the target value for its appraisals.

    e. Pressured Pomeroy not to consider comparable sales outside GSM.

    f. Pressured Pomeroy to include value for infrastructure and resort amenities that did not exist ("Nonexistent Features").

    g. Pressured Pomeroy to provide draft appraisals and delete language making the appraised value "subject to" completion of the Nonexistent Features.

209. Pomeroy warned Ginn Financial it was demanding appraisals that violated

USPAP and sound appraisal practices, and that such appraisals would be rejected by U.S. lenders.  More specifically, Pomeroy told Ginn Financial:

    a.  Closed GSM sales did not provide true comparables because Ginn flew buyers into the private GSM airstrip, discouraging them from pricing lots outside of GSM.

    b.  GSM lot prices were significantly higher than comparable sales outside GSM.

    c.  Any U.S. lender required appraisals based on comparable sales outside of GSM.

    d.  A USPAP compliant appraisal could not value the Nonexistent Features.

210.  Ginn Financial CFO William McCracken attempted to pressure and intimidate Pomeroy, but ultimately, Pomeroy refused to submit to the demands for inflated appraisals:

    a.  Allen told Ginn Financial Pomeroy's appraisals would not be based on any predetermined target value, estimate or contract price.

    b.  Pomeroy refused to limit its analysis of comparables to closed GSM lot sales and insisted on using comparable sales outside of GSM.

    c.  Pomeroy refused to include value for the Nonexistent Features without stating the value was "subject to" their completion.

211.  Around a month after hiring Pomeroy, Lubert/Ginn directed Ginn Financial to fire Pomeroy when it refused to provide ininflated appraisals.  On November 2, 2006, Ginn Financial sent Pomeroy a two-sentence email: "Please cancel all the orders for Bahama Appraisals.  We have run it by our investors and a 'Subject to' valuation is unacceptable."

## XXIV.  Lubert/Ginn Hired a Bahamian Appraiser with a Financial Motive to Maximize the Size of Each Mortgage Loan

212.  With Pomeroy out of the picture, Lubert/Ginn directed Ginn Financial and BSA to hire a Bahamian surveyor, W. Carver Grant & Co. Ltd., to provide GSM lot appraisals. Carver Grant was not licensed in the U.S. as a real estate appraiser.

213.  Real estate appraisals are expected to provide lenders with independent evaluation of the market value of collateral, unaffected by any interest in the underlying transaction. In addition, because collateral valuation is integral to the underwriting process, an appraiser must be isolated from influence by the mortgage lender.  Carver Grant failed both these requirements and was far from independent.

214.  Carver Grant had a financial interest in every GSM lot sale.  He was and is married to Veronica Grant, a Bahamian attorney in the employ of Lubert/Ginn.  Veronica Grant wore many hats for Lubert/Ginn, and she received compensation from Lubert/Ginn on the same GSM lot purchases for which Carver Grant provided appraisals:

    a.  She was Bahamian closing coordinator and recording agent for GSM lot sales, entitled to statutory fees up to 2% of the transaction amount.

    b.  She was authorized agent for Stewart Title, issuing title insurance policies on each GSM lot, with a commission dependent on the lot sales price.

215.  Veronica Grant had a financial interest in every GSM lot sale, with compensation based on the lot price.  Veronica Grant's compensation, and Carver Grant's economic interests, were therefore dependent on the appraised value he assigned to GSM lots:  higher appraised values meant increased compensation for Veronica and Carver Grant.

216.  In addition to his direct financial interest in each lot sale, Carver Grant could not be isolated from influence by Ginn Financial and BSA because Veronica Grant received millions of dollars in compensation from Lubert/Ginn as the recording agent for the Credit Suisse Loan, entitled to statutory fees up to 2% of the $675 million Loan amount.

217.  Veronica Grant's brother, Sir Orville Turnquest, also received compensation from Lubert/Ginn over many years.  His law firm (Dupuch & Turnquest) represents Ginn in the

Bahamas.  Attorney Terence R. H. Gape, Managing Partner of Dupuch & Turnquest, has represented Ginn on various matters since 2004, including Bobby Ginn's early negotiations with the Bahamian government on GSM development and Lubert/Ginn's Cash Out Scheme involving the Credit Suisse Loan.  Terrence Gape also served as the Assistant Secretary for BSA.  Terrence Gape's brother, Derek Gape, worked as the GSM Senior Project Manager.

218.  Given the multiple layers of insiders connecting Carver Grant with Lubert/Ginn, Ginn Financial and BSA, Carver Grant could not have been isolated from their influence.

**XXV.   The Carver Grant Appraisals Were Deficient**

219.  Carver Grant grew up on the West End of Grand Bahama.  Long before Lubert/Ginn purchased the GSM land in late 2005, he knew there was no market for lots on that land.  Those lots that were sold commanded just a few thousand dollars.

220.  To conduct appraisals for Lubert/Ginn, Carver Grant ignored his prior knowledge and experience.  He also abandoned the standard of care he used for previous appraisals.

221.  The W. Carver Grant Appraisals of GSM lots ("WCG Appraisals") failed to comply with USPAP or any generally accepted appraisal standard.  In addition, they failed to follow the practices Carver Grant used for other appraisals.

222.  The WCG Appraisals failed to detail his appraisal procedures and offered no reasoning at all to support his conclusions.  While the WCG Appraisals referenced "a careful inspection" of "the subject property," they did not include photos, nor any analysis of the size or location, for each lot.

223.  Most significantly, the WCG Appraisals described planned GSM amenities and "anticipated" infrastructure, without making the appraised value "subject to" their completion.  Lubert/Ginn knew, and Ginn Financial was warned by Pomeroy, that USPAP

imposes specific requirements for appraisals of property with proposed improvements that don't exist at the time of the valuation. Intentionally ignoring these requirements, Ginn Financial instructed Carver Grant to value the Nonexistent Features.

224. Lubert/Ginn also knew, and were told by Pomeroy, that USPAP imposes specific requirements for evaluation of market comparables. Notably, the WCG Appraisals don't identify any comparables used to determine the market value of the GSM lots. Instead they refer to a range of prices for which lots were "scheduled to sell."

225. The WCG Appraisals provide no support for the valuations because Lubert/Ginn required no support. In reality, each WCG Appraisal was pre-textual, intended to provide an appraised value just over the contract price for the subject lot.

**XXVI.  The WCG Appraisals were Vastly Inflated**

226. The WCG Appraisals were vastly inflated. Plaintiffs commissioned USPAP-compliant appraisals from Pomeroy for several lots, retroactive to their dates of purchase ("Pomeroy Retroactive Appraisals"). Based on analysis of comparable sales outside GSM, Pomeroy determined the market value of a GSM lot was significantly less than the WCG Appraisal values. The vast difference in value between the WCG Appraisals (with value for Nonexistent Features) and the Pomeroy Retroactive Appraisals (without value for Nonexistent Features) is shocking.

| Lot Number | WCG Appraisal | GSM Mortgage Loan | Pomeroy Retroactive Appraisal | **Loan-to-value** |
|---|---|---|---|---|
| Byers Lot 234 | $1,300,000 | $976,720 | $405,000 | **241%** |
| Andrews Lot 272 | $1,000,000 | $774,247 | $405,000 | **191%** |

| Lot Number | WCG Appraisal | GSM Mortgage Loan | Pomeroy Retroactive Appraisal | **Loan-to-value** |
|---|---|---|---|---|
| Cicolani Lot 104 | $1,020,000 | $814,998 | $405,000 | **201%** |
| Josephson Lot 493 | $750,000 | $460,720 | $130,000 | **354%** |
| Kherkher Lot 270 | $1,356,000 | $1,084,720 | $405,000 | **268%** |
| Liles Lot 46 | $1,000,000 | $795,120 | $405,000 | **196%** |
| Webb Lot 261 | $1,400,000 | $1,096,720 | $405,000 | **271%** |
| Willis Lot 189 | $735,000 | $585,396 | $300,000 | **195%** |

227.  This comparison sample reveals Lubert/Ginn used WCG Appraisals to justify GSM Mortgage Loans with actual LTV ratios ranging from 191% to 354%.

**XXVII.      Appraisal Requirements for the Plaintiff Loans**

228.  Under U.S. Mortgage Laws, appraisals used to underwrite mortgage loans must comply with USPAP.  Mortgage loans offered by Ginn Financial, a licensed Florida mortgage lender, were subject to these requirements.  As alleged below, Ginn Financial created the illusion GSM Mortgage Loans complied with U.S. Mortgage Laws.

229.  For the reasons set forth in Paragraphs 212-225, above, the WCG Appraisals did not comply with USPAP or with U.S. Mortgage Laws.

**XXVIII.   Plaintiffs Obtained GSM Mortgage Loans**

230.   Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford

Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis ( "Note Plaintiffs") all applied for GSM Mortgage Loans ("Plaintiff Loans") with Ginn Financial and entered into 5-Year Adjustable Rate Balloon Notes ("Plaintiff Notes") with BSA.  Ginn Financial and/or BSA maintains fully executed copies of the Plaintiff Notes, including any allonges thereto.

| Date | Note | Lot | Note Amount |
|------|------|-----|-------------|
| December 13, 2006 | Cicolani Note | Lot 104 | $814,998.00 |
| December 13, 2006 | Clemmons Note | Lot 494 | $508,720.00 |
| December 13, 2006 | Josephson Note | Lot 493 | $460,720.00 |
| December 13, 2006 | Liles Note | Lot 46 | $795,120.00 |
| December 13, 2006 | Maciag Note | Lot 109 | $795,120.00 |
| December 22, 2006 | Bredahl Note I | Lot 39 | $755,364.00 |
| December 22, 2006 | Byers Note | Lot 234 | $976,720.00 |
| December 22, 2006 | Taglia Note I | Lot 220 | $952,720.00 |
| December 22, 2006 | Taglia Note II | Lot 429 | $628,720.00 |
| December 22, 2006 | Taliaferro Note | Lot 208 | $993,900.00 |
| December 22, 2006 | Verhees Note | Lot 79 | $814,998.00 |
| February 2, 2007 | Hoyer Note | Lot 448 | $269,950.00 |
| February 2, 2007 | Webb Note | Lot 261 | $1,096,720.00 |
| February 15, 2007 | Beachfront Note I | Lot 43 | $755,364.00 |
| February 15, 2007 | Beachfront Note II | Lot 44 | $755,364.00 |
| February 16, 2007 | Bailey Note | Lot 67 | $795,120.00 |
| March 9, 2007 | Bredahl Note II | Lot 33 | $795,120.00 |

| Date | Note | Lot | Note Amount |
|---|---|---|---|
| March 13, 2007 | Clear Reef Note | Lot 42 | $755,364.00 |
| March 15, 2007 | Fresonke Note | Lot 437 | $689,520.00 |
| March 15, 2007 | Willis Note | Lot 189 | $585,396.00 |
| March 20, 2007 | Kherkher Note | Lot 270 | $1,084,900.00 |
| March 23, 2007 | Andrews Note | Lot 272 | $774,247.00 |
| April 13, 2007 | Jackson Note | Lot 488 | $492,720.00 |
| April 13, 2007 | Lammertse Note | Lot 179 | $708,720.00 |
| June 22, 2007 | Domnick Note | Lot 487 | $528,720.00 |
| August 10, 2007 | Cappuccino Note I | Lot 282 | $1,096,720.00 |
| February 2008 | Carell Note | Lot 312 | |
| February 22, 2008 | Crawford Note | Lot 209 | $795,120.00 |
| February 25, 2008 | Cappuccino Note II | Lot 281 | $1,096,720.00 |

231.  Lubert/Ginn, Ginn Financial and BSA used WCG Appraisals for all of the Note Plaintiffs' lots.  Although Ginn Financial sent Pomeroy a Request for Appraisal for the Liles, Maciag and Cicolani Group lots, it cancelled those orders when it fired Pomeroy.

**XXIX.   Representations by Lubert/Ginn and Ginn Financial Induced Plaintiffs to Obtain GSM Mortgage Loans**

232.  Lubert/Ginn caused Ginn Financial to solicit U.S. buyers to finance their lot purchases with GSM Mortgage Notes.  In its marketing and during the loan application process, Ginn Financial made the following representations to Note Plaintiffs:

Representation 1: Ginn Financial Negotiated a Specialized
Mortgage Loan Program for GSM Lots

233.  Lubert/Ginn and Ginn Financial knew U.S. buyers of GSM lots were concerned about navigating the loan process with Bahamian banks and wanted mortgage loans on

terms comparable to U.S. mortgage financing.  To convince U.S. buyers to repose trust and
confidence in it, Ginn Financial represented it had negotiated a specialized mortgage loan
program for GSM lots, offering terms "generally not available in the Bahamas."

234.  Ginn Financial sent a letter to U.S. buyers, via U.S. mail or Federal Express.
Signed by William McCracken ("McCracken Letter"), the letter included the statement:
"As you may know, financing options are different in the Bahamas, than in the United
States.  Ginn Financial Services (GFS) has negotiated special commitments to provide
capital on terms generally not available in the Bahamas."

    a.   Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steven Bredahl,
Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick
Clemmons, Kevin Crawford, Lauren and Troy Domnick, Dean and Stephanie
Fresonke, Tom Hoyer, James Jackson, David Jankowski, James Josephson, Ozzie
Kalil, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, Alexandria Maciag,
Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy,
Vic Taglia, Anja Verhees, Richard Webb and Darryl Willis received and read the
McCracken Letter.  Plaintiffs Maureen and Todd Taliaferro may have received the
McCracken Letter and recall receiving the representation in the letter.

235.  Ginn Financial sent a fact sheet to U.S. buyers entitled, "Specialized Loan
Programs for Ginn Sur Mer" ("Loan Fact Sheet"), which described GSM Mortgage Loans,
identified Ginn Financial as "the preferred lender for GSM buyers," and pledged "in-house
financing eliminates communication issues and expedites the closing process."

    a.   Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steven Bredahl,
Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick

Clemmons, Kevin Crawford, Lauren and Troy Domnick, Tom Hoyer, James

Jackson, David Jankowski, James Josephson, Ozzie Kalil, Susan Kherkher,

Thomas Lammertse, Brian Lesesne, Ken and Pat Liles, Alexandria Maciag, Steve

Ponsler, Fred Reeping, Tim Sell, Bernard Shaughnessy, Vic Taglia, Maureen and

Todd Taliaferro, Anja Verhees, Richard Webb and Darryl Willis received and read

the Loan Fact Sheet.

236.  In addition, Ginn Financial and BSA voluntarily provided extra services for Note

Plaintiffs, which were not required by the Plaintiff Notes.

    a.  Ginn Financial offered to hand-deliver closing documents to Plaintiffs Andrews

Group, Bailey, Beachfront, Cappuccino Group, Card, Clear Reef, Crawford

Group, Hoyer Group, Jackson Group, Josephson, Kherkher, Lammertse, Liles,

Maciag, Ponsler, Taglia Group, Taliaferro Group, Verhees, Webb and Willis, so

those Plaintiffs would not have to travel to the Bahamas to close their loans.

    b.  Ginn Financial and/or BSA sent closing documents to Plaintiffs Andrews Group,

Bailey, Beachfront, Bredahl, Byers, Card, Carell Group, Cicolani Group, Clear

Reef, Clemmons Group,  Crawford Group, Domnick, Fresonke Group, Hoyer

Group, Jackson Group, Josephson, Kalil, Kherkher, Liles, Maciag, Ponsler,

Taliaferro Group, Verhees, Webb and Willis via FedEx, so those Plaintiffs would

not have to travel to the Bahamas to close their loans.

237.  As a result of the representations and conduct of Ginn Financial and BSA set forth

in Paragraphs 233-236, Note Plaintiffs placed their trust and confidence in Ginn

Financial and BSA and relied on Ginn Financial and BSA to comply with U.S.

Mortgage Laws.

238.  Lubert/Ginn, Ginn Financial and BSA intended for Note Plaintiffs to repose their trust and confidence in Ginn Financial and BSA.  They were aware of or should have reasonably anticipated Note Plaintiffs' beliefs, as alleged in Paragraph 237.

<u>Representation 2:  Ginn Financial Was the Lender for the Plaintiff Loans</u>

239.  Both the McCracken Letter and the Loan Fact Sheet said Ginn Financial was the lender for GSM Mortgage Loans.  In addition, the Loan Fact Sheet represented, "Ginn Financial Services is a licensed mortgage lender in the State of Florida; License # L100000558788."  Ginn Financial's website included an identical statement.

    a.  Plaintiffs Mark Bailey, Steven Bredahl, Joseph Cappuccino, Andy Card, Clear Reef, Rick Clemmons, Jerry Cicolani, Kevin Crawford, Tom Hoyer, James Jackson, David Jankowski, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, James Josephson, Alexandria Maciag, Fred Reeping, Bernard Shaughnessy, Vic Taglia, Maureen Taliaferro, Anja Verhees, Richard Webb and Darryl Willis visited the Ginn Financial website.

    b.  Those Plaintiffs who received the McCracken Letter and the Loan Fact Sheet and visited the Ginn Financial website relied on the representations that Ginn Financial, a licensed mortgage lender, was the lender for GSM Mortgage Loans.

240.  During the application process, Ginn Financial sent Note Plaintiffs loan applications, federally mandated mortgage disclosures and other loan documents required by U.S. Mortgage Laws ("Loan Disclosures").  Ginn Financial maintains a record and copies of the Loan Disclosures sent to Note Plaintiffs, most of which identified Ginn Financial as lender.  The Loan Disclosures reinforced Note Plaintiffs' beliefs that Ginn Financial was the lender for GSM Mortgage Loans.

241.  Ginn Financial's representations that it was the mortgage lender for the Plaintiff

Loans were false and misleading because it was not the lender for the Plaintiff Loans. Ginn Financial's representations that it was a licensed mortgage lender were also misleading because the Plaintiff Loans were closed by BSA, an unlicensed shell company.

242.  BSA was a mere instrumentality and alter ego of Ginn Financial, sharing Ginn Financial's offices and employees, with no independent existence apart from Ginn Financial.  Lubert/Ginn directed Ginn Financial and BSA to blur the distinction between themselves in their dealings with Note Plaintiffs.

243.  There was one important difference between Ginn Financial and BSA.  While Ginn Financial was a Florida licensed mortgage lender, BSA was never a licensed lender in any state.  Lubert/Ginn and Ginn Financial used BSA to circumvent U.S. Mortgage Laws, as well as prudential norms governing mortgage lending and appraisal practice.

244.  As a result of the conduct of Ginn Financial set forth in Paragraphs 239-240 and Predicate Acts A49-50, A54, A59-60, A64, A69-70, A74, A82, A87-88, A92, A99, A103-104, A108, A112-113, A117, A124, A127-128, A132, A136-137, A141, A145-146, A150, A155-156, A160, A164-165, A169, A174-175, A179, A182, A186, A190-191, A195, A200-201, A205, A210-211, A215, A220-221, A225, A230, A234, A238-239, A243, A248-249, A253, A258-259, A263, A270, A275-276, A280, A285-286, A290, A295-296, A300, A305-306 and A310, Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis reasonably believed Ginn Financial was the mortgage lender for their Lot Loans.  Those Plaintiffs were unaware Lubert/Ginn had substituted BSA for Ginn

Financial as the "lender" until they closed on their GSM lot purchases.

245.  Those Plaintiffs also reasonably believed they were dealing with a licensed
mortgage lender.  If those Plaintiffs had known they were entering into the Plaintiff Loans
with an unlicensed entity that was being used to circumvent U.S. Mortgage Laws, they
would not have closed on the Plaintiff Loans.

246.  Lubert/Ginn, Ginn Financial and BSA were aware of or should have reasonably
anticipated Note Plaintiffs' beliefs, as alleged in Paragraphs 244-245.

<u>Representation 3: GSM Lots Were Appraised by a U.S. Licensed Appraiser</u>

247.  Ginn Financial represented it was using U.S. licensed real estate appraisers to
appraise GSM lots.  Ginn Financial sent U.S. borrowers an "Affiliated Business
Arrangement Disclosure Statement Notice," which identified U.S. licensed real estate
appraisers "that we, as your lender, will require you to use, as a condition of your loan on
this property, to represent our interests in the transaction."  This Notice was false and
misleading because Carver Grant was not licensed in the U.S. as a real estate appraiser.

248.  Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino
Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford
Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil,
Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb
and Willis received and read the Affiliated Business Arrangement Disclosure Statement
Notice and relied on the representation that a U.S. licensed real estate appraiser would
provide the appraisals of GSM lots.  Those Plaintiffs would not have closed on the Plaintiff
Loans if they had known the appraiser used by the lender was not licensed in the U.S.

249.  Lubert/Ginn, Ginn Financial and BSA were aware of or should have reasonably
anticipated Note Plaintiffs' beliefs, as alleged in Paragraphs 248.

Representation 4: The Plaintiff Loans Complied with U.S. Mortgage Laws

250.  Lubert/Ginn and Ginn Financial knew U.S. buyers wanted mortgage loans offering the protection U.S. Mortgage Laws.  To market GSM Mortgage Loans to U.S. buyers, Ginn Financial made repesentations intended to create the illusion those Loans were made in compliance with and offered the protections of U.S. Mortgage Laws.

251.  As alleged in Paragraph 239, Ginn Financial represented in the GSM Loan Fact Sheet and on its website that it was a licensed mortgage lender in the State of Florida.

252.  In addition, Ginn Financial and BSA sent Note Plaintiffs federally mandated Loan Disclosures, including a HUD Form Good Faith Estimate, a Truth in Lending Disclosure Statement, an Affiliated Business Arrangement Disclosure Statement Notice, and other notices required by the Fair Credit Reporting Act, Financial Privacy Act, Equal Credit Opportunity Act, Patriot Act and Real Estate Settlement Procedures Act (RESPA).

253.  As a result of the conduct of Ginn Financial set forth in Paragraphs 239-240 and Predicate Acts A49-50, A54, A59-60, A64, A69-70, A74, A82, A87-88, A92, A99, A103-104, A108, A112-113, A117, A124, A127-128, A132, A136-137, A141, A145-146, A150, A155-156, A160, A164-165, A169, A174-175, A179, A182, A186, A190-191, A195, A200-201, A205, A210-211, A215, A220-221, A225, A230, A234, A238-239, A243, A248-249, A253, A258-259, A263, A270, A275-276, A280, A285-286, A290, A295-296, A300, A305-306 and A310, Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro Group, Verhees, Webb and Willis reasonably believed the Plaintiff Loans were made in compliance with and offered the protections of U.S. Mortgage Laws and, therefore, were

safer than loans from Bahamian banks.

254.  In reality, however, as a result of the facts alleged in Paragraphs 203-229 ("Appraisal Facts"), the Plaintiff Loans did not comply with U.S. Mortgage Laws.

255.  Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis were unaware that GSM Mortgage Loans did not comply with U.S. Mortgage Laws before they closed on the Plaintiff Loans.

256.  Not surprisingly, it was critical to Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro Group, Verhees, Webb and Willis that mortgage financing for their GSM lots offered the protection of U.S. Mortgage Laws.  If those Plaintiffs had known the Plaintiff Loans did not comply with and offer the protections of U.S. Mortgage Laws, they would not have closed on those Loans.

257.  Lubert/Ginn, Ginn Financial and BSA were aware of or should have reasonably anticipated Note Plaintiffs' beliefs, as alleged in Paragraphs 255-256.

Representation 5: Ginn Financial Required Independent
Appraisals to Protect Itself as Lender

258.  Ginn Financial represented it required an independent appraisal of Note Plaintiffs' lots, prepared by a licensed Florida real estate appraiser, to protect itsef as a lender.

259.  The Affiliated Business Arrangement Disclosure Statement Notice received by

those Plaintiffs identified in Paragraph 248 represented that Ginn Financial required an appraisal by one of the licensed real estate appraisers listed, "as a condition of" the Loan and to protect itself as a lender.

260.  In light of the Affiliated Business Arrangement Disclosure Statement Notice and the required appraisal of their lot, Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis reasonably believed Ginn Financial required a legitimate appraisal to ensure it did not loan more than the market value of the collateral lot.

261.  In addition, in light of commonly accepted practice for U.S. mortgage lending and appraisals, those Plaintiffs reasonably believed Ginn Financial was a legitimate lender acting rationally to protect its interests that would not, by design, loan more more than the actual market value of the lot serving as collateral.  In reality, as shown by the Appraisal Facts, Ginn Financial did not require independent and legitimate appraisals to protect itself as lender.

262.  Those Plaintiffs were unaware of the Appraisal Facts when they closed on the Plaintiff Loans.  If those Plaintiffs had known the Appraisal Facts, they would not have entered closed on those Loans.

263.  Lubert/Ginn, Ginn Financial and BSA were aware of or should have reasonably anticipated Note Plaintiffs' beliefs, as alleged in Paragraphs 260-262.

<u>Representation 6: The Plaintiff Notes Say the Associated Mortgage<br>is Intended to Protect the Note Holder</u>

264.  The Plaintiff Notes say the associated mortgage on the GSM lot is intended to

protect the Note Holder in the event the borrower defaults:

> an Indenture of Mortgage (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.

265.   Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis entered into Notes containing this language and reasonably believed the mortgage was intended to protect the lender on their Loan.  In reality, as shown by the Appraisal Facts, Ginn Financial and BSA were not using the mortgage on Note Plaintiffs' GSM lots to protect from default.

266.  Those Plaintiffs were unaware of the Appraisal Facts when they closed on the Plaintiff Loans.  If those Plaintiffs had known the Appraisal Facts, they would not have entered closed on those Loans.

267.  Lubert/Ginn, Ginn Financial and BSA were aware of or should have reasonably anticipated Note Plaintiffs' beliefs, as alleged in Paragraph 266.

<u>Representation 7: The Plaintiff Loans Were for 80% Loan-To-Value</u>

268.  Lubert/Ginn and Ginn Financial knew U.S. buyers wanted mortgage loans with terms comparable to U.S. mortgage financing.  To market GSM Mortgage Loans to U.S. buyers, the McCracken Letter stated Ginn Financial had negotiated a specialized mortgage loan program for GSM lots offering terms "generally not available in the Bahamas."  The Letter said, "For U.S. domestic clients, Ginn Financial Services will offer 1st mortgage financing up to 80% of the purchase price of your lot in Ginn Sur Mer."

269.  In addition, the first term on the GSM Loan Fact Sheet stated:  "80% Loan to

Value Available for Qualified Buyers."

270.   Those Plaintiffs who received the McCracken Letter and the Loan Fact Sheet reasonably believed GSM Mortgage Loans were made for 80% LTV.

271.   In addition, in light of commonly accepted practice for U.S. mortgage lending, Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis reasonably believed Ginn Financial would not approve mortgage financing for more than 80% of the value of the corresponding collateral.

272.   Those Plaintiffs could not have reasonably anticipated they would need to obtain their own appraisal to prevent Ginn Financial from approving mortgage financing for more than the value of their lot.  No rational borrower, including those Plaintiffs, would expect a legitimate mortgage lender would approve mortgage financing for more than the market value of the corresponding collateral.

273.   Those Plaintiffs were unaware Lubert/Ginn, Ginn Financial and BSA used WCG Appraisals to justify GSM Mortgage Loans with actual LTV ratios ranging from 191% to 354%.  If those Plaintiffs had known the actual LTV for the Plaintiff Loans, they would not have closed on those Loans.

274.   Lubert/Ginn, Ginn Financial and BSA were aware of or should have reasonably anticipated Note Plaintiffs' beliefs, as alleged in Paragraphs 270-273.

**XXX.  Lubert/Ginn, Ginn Financial and BSA Continue to Conceal the True Facts about the Appraisal Scheme**

275.   Lubert/Ginn, Ginn Financial and BSA know that if the Appraisal Facts become

public knowledge, other U.S. buyers may stop paying their Notes and initiate legal action.

276.  Those Defendants continue to conceal the Appraisal Facts to prevent Note Plaintiffs and other U.S. buyers from learning the truth about the appraisals used for GSM Mortgage Loans, and this concealment threatens to continue into the future.

277.  Ginn Financial and BSA refuse, despite repeated requests by Note Plaintiffs, to identify the current note holder for the Plaintiff Notes.

278.  To avoid discovery of the Appraisal Facts, Lubert/Ginn, Ginn Financial and BSA took steps to prevent the current note holder from notifying borrowers, including Note Plaintiffs, on the maturity date and requiring payment of the balance due at maturity.

279.  To this date, Note Plaintiffs remain unaware of the full impact of the Appraisal Scheme or or the Appraisal Facts.

**XXXI.   Plaintiffs Discovery of the Appraisal Scheme**

280.  Plaintiffs Andrews Group, Cicolani Group, Josephson, Kherkher, Lammertse, Liles and Webb did not discover the Appraisal Scheme until on or after January 2010 and did not discover LA's involvement in the Scheme until November 2010.

281.  Plaintiff Willis did not discover the Appraisal Scheme until on or after June 2009 and did not discover LA's involvement until November 2010.

282.  Plaintiff Byers did not discover the Appraisal Scheme until on or after July 2009 and did not discover LA's involvement until November 2010.

283.  Plaintiffs Bailey, Beachfront, Bredahl, Card, Clear Reef, Crawford Group, Domnick, Jackson Group, Kalil and Ponsler did not discover the Appraisal Scheme until on or after March 2010 and did not discover LA's involvement until November 2010.

284.  Plaintiffs Carell Group, Clemmons Group, Fresonke Group, Hoyer Group, Maciag and Taliaferro did not discover the Appraisal Scheme or LA's involvement until on or after

until on or after January 2011.

285.  Plaintiffs Taglia Group, Cappuccino Group and Verhees did not discover the Appraisal Scheme or LA's involvement until on or after March 2012.

286.  If Note Plaintiffs had earlier learned of the Appraisal Scheme, they would have immediately stopped making payments on their GSM lots and considered initiating legal action as a result of the Appraisal Scheme.

287.  LA caused Ginn Financial and BSA to conceal LA Partners' ownership and control over Ginn Financial and BSA, as well as LA's involvement in the Appraisal Scheme, by serving equivocal responses and refusing to produce responsive documents to Note Plaintiffs' discovery served beginning January 2010. This concealment prevented Note Plaintiffs from discovering LA's involvement in the Appraisal Scheme.

288.  Note Plaintiffs did not learn of LA's involvement in the Appraisal Scheme until they settled their claims against former Ginn Financial CFO William McCracken in November 2010.  Pursuant to the settlement, McCracken provided a declaration revealing LA Partners was an active investor in the GSM Mortgage Notes.

289.  If Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Card, Cicolani Group, Clear Reef, Crawford Group, Domnick, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Ponsler, Webb and Willis had learned earlier of LA's involvement in the Appraisal Scheme, they would have joined LA Partners and Dean Adler as defendants in their earlier-filed claims based on that Scheme.

**XXXII.  Note Plaintiffs Were Damaged by the Appraisal Scheme**

290.  Even though appraisals are conducted to protect legitimate lenders, fair market value appraisals also benefit mortgage borrowers by ensuring loan sizes remain reasonable in relation to the value of the real property collateral.

291.  No person would knowingly and willingly agree to enter into a mortgage loan with LTV ratios ranging from 191% to 354%.  If Note Plaintiffs had known the Appraisal Facts, or if a valid appraisal had been done for the Note Plaintiff lots, those Plaintiffs would not have closed on their GSM lot purchases for prices that were slightly more than the appraised value.

292.  Because Note Plaintiffs were unaware of the Appraisal Facts, they lacked a meaningful choice whether to enter into the Plaintiff Notes.

293.  As a result of the Appraisal Scheme, Note Plaintiffs were damaged in a sum that includes, but is not limited to, the amounts they paid for and owe on their lots (including down payments, amounts paid at closing, mortgage payments and amounts still owed), tax stamps, loan fees, closing costs and property taxes paid to date and still owed.  The elements and the exact amount of each Plaintiff's damages will be established at trial.

294.  At the moment Note Plaintiffs closed on the Plaintiff Loans, they were saddled with mortgage loans with LTV ratios ranging from 191% to 354%.  From the moment Note Plaintiffs closed on the Plaintiff Loans, the Plaintiff Notes began to accrue interest on the inflated loan amounts and that interest accrual continues to the present.

295.  Ginn Financial failed to call the Plaintiff Notes on their respective maturity dates.  Instead, Ginn Financial unlawfully continues to charge Note Plaintiffs interest on the Plaintiff Notes after their respective maturity dates.

296.  The Plaintiff Notes are "Balloon Notes" requiring Note Plaintiffs, within five years, to refinance the loan or repay the outstanding balance.  No other legitimate lender would be willing to refinance mortgage loan with LTV ratios ranging from 191% to 354%.

297.  When Plaintiffs became aware, *inter alia*, of the Appraisal Facts, Plaintiffs

discontinued making payments on their Notes.  Even even though Lubert/Ginn, Ginn

Financial and BSA know that Note Plaintiffs dispute the validity of their Notes, Ginn

Financial and BSA continue to report, or to cause their agents to report, the Plaintiff Notes

as delinquent to credit agencies.  As a result of these continuing false reports, Note

Plaintiffs' credit ratings have been and continue to be damaged.

## XXXIII.  The Appraisal Scheme:  Violations of RICO by LA Partners, Dean Adler, ERG, Bobby Ginn, Ginn Financial and BSA

### A.  The Enterprise

298.  From at least June 2006 and continuing to the present, in Florida and elsewhere,

Defendants LA Partners, Dean Adler, ERG, Bobby Ginn, Ginn Financial and BSA

("Appraisal Defendants"), including their agents and employees, collectively constituted

an "enterprise" as defined in 18 U.S.C. § 1961(4) ("Appraisal Enterprise").

299.   The Appraisal Enterprise is an ongoing organization that engages in, with

activities affecting, interstate and foreign commerce.  At all relevant times, the Appraisal

Defendants knowingly made use of the means and instruments of transportation and

communications of interstate and foreign commerce to communicate with one another, with

CapitalSource International, and with Plaintiffs.

300.   Although the Appraisal Defendants participate in and are members and part of the

Appraisal Enterprise, each also has an existence apart from that Enterprise.  At all relevant

times, the Enterprise had an ascertainable structure apart from the racketeering activity in which

Appraisal Defendants engaged.  The primary decision-makers for the Appraisal Enterprise are

Dean Adler, Lubert-Adler and Bobby Ginn, who direct the activities of the Enterprise.

301.   The Appraisal Defendants control and operate the Enterprise through a variety of

means including, but not limited to, agreeing to commit and committing the following acts:

(1) devising the Scheme; (2) marketing GSM Mortgage Loans at 80% LTV with Ginn Financial as a licensed mortgage lender; (3) creating the illusion the Plaintiff Loans were made in compliance with U.S. Mortgage Laws; (4) creating the illusion Ginn Financial required appraisals from licensed U.S. appraisers to protect itself from loaning more than the value of the collateral; (5) forming BSA to circumvent U.S. Mortgage Laws; (6) pressuring a U.S. licensed appraiser to violate USPAP by providing fraudulently inflated appraisals based on Nonexistent Features; (7) hiring a Bahamian appraiser with a financial interest in each lot sale and no independence from Lubert/Ginn; (8) using the WCG Appraisals, which violated USPAP and valued the Nonexistent Features; (9) closing the Note Plaintiff Loans at 191% to 354% LTV; (10) concealing the Appraisal Facts from Note Plaintiffs; and (11) continuing to charge interest on the Plaintiff Notes after their maturity dates.

302.  The Appraisal Enterprise pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud Note Plaintiffs and to collect profits from those actions, which began before Note Plaintiffs purchased GSM lots, continue to the present and threaten to continue into the future.

**A.  Predicate Acts- Mail, Wire and Bank Fraud**

303.  Appraisal Defendants engaged and continue to engage in conduct violating 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1344 (bank fraud) to effectuate the Appraisal Scheme.

<u>Mail and Wire Fraud</u>

304.  To execute the Appraisal Scheme, Appraisal Defendants in violation of 18 U.S.C. § 1341 and 1343 transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, pictures and sounds, and

caused things to be placed in a post office or authorized depository, or deposited things to be sent or delivered by a private or commercial interstate carrier.

305.  **Plaintiffs incorporate Appendix C hereto**, identifying Appraisal Defendants' use of wire and mail communications in furtherance of the Appraisal Scheme.  To the extent Appendix C does not include the exact dates of and persons involved in each act, those details are in the exclusive control of one or more Appraisal Defendants.

306.  Appraisal Defendants' acts of fraud and concealment were intentional and committed to deceive Plaintiffs and obtain their money for Appraisal Defendants' gain. Appraisal Defendants either knew or recklessly disregarded the fact that their statements and omissions were material, and Plaintiffs would have acted differently if they had known the true facts.

307.  As a result of the Appraisal Scheme, Appraisal Defendants obtained money belonging to Plaintiffs, and Plaintiffs have been injured in their business or property by Appraisal Defendants' overt acts of mail and wire fraud.

308.  To the extent Appendix C does not include details concerning the exact dates of and persons involved in sending the preceding matters or things, those details are in the exclusive control of one or more of the Appraisal Defendants, and/or other persons presently unknown to Note Plaintiffs.

309.   The acts in Appendix C were done intentionally and knowingly with the specific intent to advance the Appraisal Scheme, or with knowledge the use of mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not intended.  Appraisal Defendants executed the Appraisal Scheme in different states within the United States and could not have done so unless they used the

Postal Service or private or commercial interstate carriers.

Bank Fraud

310.  To execute the Appraisal Scheme, Appraisal Defendants violated 18 U.S.C. § 1344 by obtaining moneys and funds under the custody or control of a financial institution by: (1) inducing Note Plaintiffs to make wire transfers of funds needed to close on their GSM lot purchases; (2) inducing certain Note Plaintiffs authorize automatic withdrawl of monthly payments on their Notes from bank accounts owned by those Plaintiffs; and (3) inducing certain Note Plaintiffs to send monthly payment checks on their Notes.

311.  **Plaintiffs incorporate Appendix D hereto**, identifying Predicate acts constituting bank fraud.  The acts in Appendix D were done intentionally and knowingly with the specific intent to advance the Appraisal Scheme.

312.  As a result of Appraisal Defendants' fraudulent scheme, they obtained money belonging to Note Plaintiffs, and Note Plaintiffs have been injured in their business or property by Appraisal Defendants' overt acts of bank fraud.

**C.  Pattern of Racketeering Activity**

313.  Appraisal Defendants knowingly, willfully and unlawfully conducted or participated in the affairs of the Appraisal Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  The racketeering activity was made possible by Appraisal Defendants' regular and repeated use of the facilities and services of the Appraisal Enterprise.

314.  Appraisal Defendants committed or aided and abetted the commission of at least two acts of racketeering activity, set forth in Appendices C and D, in the past five years. The Racketeering Acts were not isolated, but had the same or similar purpose, participants,

method and victims, including Note Plaintiffs.

315.  Each Racketeering Act was committed pursuant to and in furtherance of the Appraisal Enterprise, including false and misleading statements, concealment and acts of bank fraud, as well as other uses of the mails and wire transmissions.

316.  Appraisal Defendants' Racketeering Acts were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## COUNT I

### Violation of 18 U.S.C. § 1962(c):  RICO – Cash Out Scheme

**(All Plaintiffs Against Dean Adler, LA Partners, ERG and Bobby Ginn)**

317.  Plaintiffs re-allege the allegations set forth in Paragraphs 4 to 40 and 42 to 191 and Predicate Acts L1 to L94, as though fully set forth below.

318.  CO Defendants violated 18 U.S.C. §§ 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Cash Out Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§134l and 1343.

319.  As a direct and proximate result, Plaintiffs have been injured in their business or property by the predicate acts that make up CO Defendants' pattern of racketeering activity through the Cash Out Enterprise.

## COUNT II

### Violation of 18 U.S.C. § 1962(d): RICO – Cash Out Scheme
**(All Plaintiffs Against Dean Adler, LA Partners, ERG and Bobby Ginn)**

320.  Plaintiffs re-allege the allegations set forth in Paragraphs 4 to 40, 42 to 191 and 317 to 319 and Predicate Acts L1 to L94, as though fully set forth below.

321.  In violation of 18 U.S.C. § 1962(d) CO Defendants have, as alleged above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced at least as early as March 2006 and continues to the present.  The object of the conspiracy was to loot GSM to obtain the $675 million Loan to eliminate their investment risk and harvest future profits from the Projects.

322.  Each CO Defendant knowingly, willfully and unlawfully agreed and combined to conduct or participate in, directly or indirectly, the conduct of the affairs and activities of the Cash Out Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343, in violation of 18 U.S.C. § 1962(c).

323.  Dean Adler and Lubert-Adler agreed to orchestrate the Cash Out Scheme, devise the Loan terms, control the Sales Projections and conceal the Loan Effects.  ERG and Bobby Ginn agreed to the Loan terms and amount and agreed to sacrifice GSM in order to obtain the Loan, to conceal the Loan Effects, and to make false statements about the Loan Effects and, beginning in August 2008, about the impact of the Loan default on GSM.

324.  CO Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of said conspiracy, set forth in Predicate Acts L1 to L94.

325.  The purpose of the acts that caused injury to Plaintiffs was to advance the overall objective of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of CO Defendants' scheme.

326.  As a direct and proximate result, Plaintiffs have been injured in their business or property by CO Defendants' conspiracy and by the predicate acts that make up CO Defendants' pattern of racketeering activity through the Cash Out Enterprise.

## COUNT III

### Violation of 18 U.S.C. § 1962(c):  RICO – Appraisal Scheme

**(Note Plaintiffs against Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and Bahamas Sales)**

327.  Note Plaintiffs re-allege the allegations set forth in Paragraphs 4 - 40 and 192 - 316 and Predicate Acts A1 - A375, as though fully set forth below.

328.  Appraisal Defendants violated 18 U.S.C. §§ 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Appraisal Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§134l and 1343.

329.  As a direct and proximate result, Note Plaintiffs have been injured in their business or property by the predicate acts that make up Appraisal Defendants' pattern of racketeering activity through the Appraisal Enterprise.

## COUNT IV

### Violation of 18 U.S.C. § 1962(d): RICO – Appraisal Scheme
**(Note Plaintiffs against Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and BSA)**

330.  Note Plaintiffs re-allege the allegations set forth in Paragraphs 4 - 40, 192 - 316 and 327 - 329 and Predicate Acts A1 - A375, as though fully set forth below.

331.  In violation of 18 U.S.C. § 1962(d) Appraisal Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced at least as early as June 2006 and continues to the present.  The object of the conspiracy was to provide mortgage financing for GSM lots using fraudulently inflated appraisals,

resulting in increased profits for Appraisal Defendants.

332.  Each Appraisal Defendant knowingly, willfully and unlawfully agreed and combined to conduct or participate in, directly or indirectly, the conduct of the affairs and activities of the Appraisal Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343, in violation of 18 U.S.C. § 1962(c).

333.  Dean Adler and Lubert-Adler agreed to orchestrate the Appraisal Scheme, develop fraudlent appraisal practices and establish infrastructure to implement the Appraisal Scheme, provide funding for GSM Mortgage Loans, control the appraisal process and pressure appraisers to provide appraisals that valued the Nonexistent Features. ERG and Bobby Ginn agreed to oversee the Scheme, develop fraudulent appraisal practices and establish infrastructure to implement the Appraisal Scheme, form BSA to serve as lender on GSM Mortgage Loans and circumvent U.S. Mortgage Laws, use Ginn Financial to offer U.S. buyers 80% LTV financing, and pressure appraisers to provide appraisals that valued the Nonexistent Features.  Ginn Financial agreed to offer U.S. buyers 80% LTV financing, create the impression GSM Mortgage Loans were made in compliance with U.S. Mortgage Laws, obscure the distinction between itself and BSA, pressure appraisers to provide appraisals that valued the Nonexistent Features, hire Carver Grant to provide appraisals, and use the WCG Appraisals to support GSM Mortgage Loans.  BSA agreed to serve as the lender for the Plaintiff Loans, hire Carver Grant to provide appraisals, and use the WCG Appraisals to support GSM Mortgage Loans.

334.  Appraisal Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of said conspiracy, set forth in Predicate Acts A1 to

A375.

335.  The purpose of the acts that caused injury to Note Plaintiffs was to advance the overall objective of the conspiracy, and the harm to Note Plaintiffs was a reasonably foreseeable consequence of Appraisal Defendants' scheme.

336.  As a direct and proximate result, Note Plaintiffs were injured in their business or property by Appraisal Defendants' conspiracy and by the predicate acts that make up Appraisal Defendants' pattern of racketeering activity through the Appraisal Enterprise.

## COUNT V

## Breach of Fiduciary Duty

## (Note Plaintiffs against Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and BSA)

337.  Note Plaintiffs re-allege the allegations set forth in Paragraphs 4 – 40 and 192 - 316 and Predicate Acts A1 - A375, as though fully set forth below.

338.  Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and BSA stood to benefit from the financing of the Plaintiff Loans using fraudulently inflated appraisals – and at the expense of Note Plaintiffs.

339.  Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and BSA exercised extensive control over Note Plaintiffs' Loans by virtue of the actions described in Paragraphs 192 and 316.

340.  Dean Adler, LA Partners, ERG and Bobby Ginn directed Ginn Financial and BSA to take on extra services for Note Plaintiffs beyond the performance of Ginn Financial's and BSA's duties under the Plaintiff Notes, as set forth in Paragraphs 233-238.

341.  By taking the actions described in Paragraphs 239-240 and Predicate Acts A49-50, A54, A59-60, A64, A69-70, A74, A82, A87-88, A92, A99, A103-104, A108, A112-

113, A117, A124, A127-128, A132, A136-137, A141, A145-146, A150, A155-156, A160,

A164-165, A169, A174-175, A179, A182, A186, A190-191, A195, A200-201, A205,

A210-211, A215, A220-221, A225, A230, A234, A238-239, A243, A248-249, A253,

A258-259, A263, A270, A275-276, A280, A285-286, A290, A295-296, A300, A305-306

and A310, Appraisal Defendants encouraged Note Plaintiffs to place trust and

confidence in Ginn Financial and BSA to provide mortgage financing with protections

customary in the U.S., including a licensed U.S. mortgage lender and a licensed U.S.

appraiser obligated to follow the USPAP.

342.  Note Plaintiffs placed their confidence and trust in Ginn Financial and BSA,

and relied on them to provide guidance in connection with the financing of property in

the Bahamas.  Note Plaintiffs relied on Ginn Financial and BSA to close their GSM

mortgage loans and to appraise their GSM lots using a licensed appraiser.

343.  Appraisal Defendants knew or had reason to know Plaintiffs were placing their

trust and confidence in Ginn Financial and BSA.

344.  Ginn Financial and BSA assumed a duty to Note Plaintiffs to disclose

information material to the Plaintiffs Notes, which information was peculiarly within

the knowledge of Ginn Financial and BSA and not available to Note Plaintiffs.

345.  Appraisal Defendants had knowledge of and participated in the appraisal fraud

being perpetrated upon Note Plaintiffs, and entered into the Plaintiff Loans in

furtherance of the appraisal fraud.

346.  Lubert/Ginn caused Ginn Financial and BSA to breach their fiduciary duty to

Note Plaintiffs by not acting in their best interests.

347.  Lubert/Ginn caused Ginn Financial and BSA to breach their fiduciary duty to

Note Plaintiffs by suborning fraudulently inflated appraisals from Pomeroy.

348.  Lubert/Ginn caused Ginn Financial and BSA to breach their fiduciary duty to
Note Plaintiffs by suborning and utilizing the WCG Appraisals.

349.  Lubert/Ginn caused Ginn Financial and BSA to breach their fiduciary duty to
Note Plaintiffs by concealing the Appraisal Facts.

350.  Because Note Plaintiffs were unaware of the Appraisal Facts, they were damaged
from the moment they closed on the Plaintiff Loans, as set forth in Paragraphs 290-297.

351.  Note Plaintiffs' damages occurred as a direct and proximate result of the
breach of fiduciary duty by Ginn Financial and BSA (as directed by Lubert/Ginn)
because Note Plaintiffs would not have closed the Plaintiff Loans if they had known the
Appraisal Facts.

## COUNT VI

### Fraud in the Inducement

**(Note Plaintiffs against Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn
Financial and BSA)**

352.  Note Plaintiffs re-allege the allegations set forth in 4 – 40 and 192 - 316 and
Predicate Acts A1 - A375, as though fully set forth below.

353.  Appraisal Defendants concealed the Appraisal Facts to induce Note Plaintiffs'
to enter into the Plaintiff Notes.

354.  Appraisal Defendants knew the Appraisal Facts were material to Note
Plaintiffs' decisions to enter into the Plaintiff Notes.  They also knew if Note Plaintiffs'
learned the Appraisal Facts, they would not have closed on the Plaintiff Loans.

355.  Appraisal Defendants intended for their concealment of the Appraisal Facts to
induce Note Plaintiffs to close on the Plaintiff Loans.

356.  Note Plaintiffs would not have closed on the Plaintiff Loans if they had known the Appraisal Facts.

357.  Note Plaintiffs were damaged from the moment they closed on the Plaintiff Loans, as set forth in Paragraphs 290-297.

## **PRAYER FOR RELIEF**

A.  As to Counts I - IV, a determination that Defendants have violated 18 U.S.C. §§ 1962(c) and (d);

B.  As to Count V, a determination that Defendants Ginn Financial and BSA (as directed by Lubert/Ginn) breached their implied fiduciary duty to Note Plaintiffs;

C.  As to Count VI, a determination that Defendants Ginn Financial and BSA (as directed by Lubert/Ginn) fraudulently induced Note Plaintiffs to enter into the Plaintiff Notes;

D.  As to Counts I - IV, an injunction prohibiting Defendants from further violations of 18 U.S.C. §§ 1962(c) and (d);

E.  As to all Counts, an order that Defendants pay damages in an amount to be determined at trial;

F.  As to Counts I and II, an order that Loan Defendants pay treble the amount of damages suffered by Plaintiffs under 18 U.S.C. § 1964(c);

G.  As to Counts III and IV, an order that Appraisal Defendants pay treble the amount of damages suffered by Note Plaintiffs under 18 U.S.C. § 1964(c);

H.  As to Counts III - VI, a determination that the Plaintiff Notes and associated mortgages should be declared null and void as a consequence of the Appraisal

Scheme, Breach of Fiduciary Duty and Fraudulent Inducement;

I.    As to Counts III - VI, an order of restitution of all payments and charges that Appraisal Defendants improperly collected from Note Plaintiffs;

J.    As to Counts V and VI, leave of court to seek to plead punitive damages at the appropriate time;

H.    A determination that Loan Defendants are jointly and severally liable as to Counts I and II;

I.    A determination that Appraisal Defendants are jointly and severally liable as to Counts III, IV, V and VI;

K.    An award to Plaintiffs of the costs and disbursements incurred in connection will this action, including reasonable attorneys' fees under 18 U.S.C. § 1964(c);

J.    An award to Plaintiffs of prejudgment interest;

K.    Trial by jury of all issues triable as of right by a jury; and

L.    Such other and, further relief as the Court may deem just and proper.


August 29, 2013                          _____s/ Dana L. Ballinger_____

                                         Dana L. Ballinger – Trial Counsel
                                         Attorney for Plaintiffs
                                         Florida Bar No. 35278
                                         BALLINGER LAW OFFICE
                                         747 Windlass Way
                                         Sanibel, Florida 33957
                                         (239) 395-7672
                                         dballinger@ballingerlawoffice.com

## APPENDIX A – Cash Out Scheme: Mail and Wire Fraud Predicate Acts

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L1 | LA Partners; Dean Adler; Bobby Ginn; ERG | Around 03/00/2006 | Engaged in communications by mail and wire among themselves and their attorneys concerning whether and on what terms to obtain a Credit Suisse syndicated term loan. |
| L2 | LA Partners; ERG | 03/30/2006 | Directed Ginn-LA LLLP to sign an engagement letter with Credit Suisse for senior secured credit facilities up to $800 million, which was sent to Credit Suisse. |
| L3 | LA Partners; Dean Adler; Bobby Ginn | 03/00/2006 to 06/00/2006 | Engaged in communications by mail and wire among themselves and their attorneys concerning projections of future lot sales in the Projects ("Lot Sales Projections") to be used by Cushman & Wakefield to prepare a TNV appraisal of the Projects. |
| L4 | LA Partners; Dean Adler; Bobby Ginn | Prior to 03/31/2006 | Prepared and circulated among themselves various draft Lot Sales Projections. |
| L5 | LA Partners; ERG | Prior to 03/31/2006 | Directed transmittal of Lot Sales Projections to Cushman & Wakefield for use in preparing a TNV appraisal of the Projects. |
| L6 | Dean Adler | 03/03/2006 | Spoke by telephone with Bobby Masters and others.  Said the Loan was the single most important task LA and Ginn had before it in the next 60 days. |
| L7 | LA Partners; ERG | 04/14/2006 | Emails between Ralph Zeigler, Bobby Masters, John Klumph and Steve Griessel discussed how to deal with hundreds of Quail West sales cancellations in the Lot Sales Projections. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L8 | LA Partners; ERG | 04/15/2006 | Emails between John Klumph, Vinod Paidipalli and Steve Griessel discussed how to deal with hundreds of Quail West sales cancellations in the Lot Sales Projections. |
| L9 | LA Partners; ERG | 04/18/2006 | Directed information be sent to Delaware Division of Corporations for the formation of Ginn-LA CS Borrower to act as borrower under the Loan. |
| L10 | LA Partners; Dean Adler; Bobby Ginn | 03/00/2006 to 06/07/2006 | Engaged in communications by mail and wire among themselves and their attorneys concerning the likelihood of default under the Loan in light of Tesoro and Quail West sales cancellations. |
| L11 | LA Partners; Dean Adler; Bobby Ginn; ERG | 04/19/2006 | Morris, Manning & Martin attorney John "Sonny" Morris sent a memo to Bobby Ginn, Dean Adler et al., "CSFB Financing/Concerns About Repayment and Presales," which listed problems the Borrowers could expect given the Loan size and terms. (MMMTQW01-024197 – 024201) |
| L12 | Dean Adler, LA Partners | 04/24/2006 | Dean Adler and Stuart Margulies prepared a draft Memo to Advisory Boards for Lubert-Adler Funds III and IV that summarized goals and risks of the Loan, knowing the draft would be sent to others, including attorneys, for review. |
| L13 | LA Partners; Bobby Ginn | 05/01/2006 | Email from Vinod Paidipalli to Bobby Masters, Steve Griessel, John Klumph, Ralph Zeigler and Bobby Ginn reported Cushman & Wakefield determined GSM TNV: "CS just [sic] word from Cushman and their appraisal was 'over $600M' so we are good on that one." |
| L14 | LA Partners | 05/02/2006 | Email from Vinod Paidipalli to Bobby Masters, Steve Griessel, John Klumph, Ralph Zeigler and Credit Suisse representatives discussed manipulation of Sales Projections to increase TNV. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L15 | Dean Adler, LA Partners | 05/03/06 | LA principal Robert Rosenberg emailed Dean Adler and others suggesting LA use the Tesoro sales cancellations to obtain Loan approval from LA Advisory Boards:  "we could point out that the pace of sales at Tesoro has recently begun to slow, thereby making it increasingly likely that the Fund III investors will not get to a $36M profit point in the near-term future [absent the Loan]."<br><br>The email was subsequently forwarded to Morris, Manning & Martin attorney Sonny Morris.  (MMMTQW01_024124 -024125.) |
| L16 | LA Partners; ERG | 05/05/06 | Directed information be sent to Delaware Division of Corporations for the formation of Defendant Ginn-LA Conduit Lender to act as a borrower under the Loan. |
| L17 | LA Partners; ERG | Prior to 05/10/2006 | Directed communications be sent to Credit Suisse Securities (USA) LLC authorizing it to act as sole arranger for the Loan. |
| L18 | Bobby Ginn | 05/10/2006 | As Chairman, CEO and President of Ginn-LA CS Borrower and Ginn-LA Conduit Lender, executed Company Authorization Letter to Credit Suisse Securities (USA) LLC, for Confidential Information Memorandum on the Loan. |
| L19 | LA Partners; ERG | Prior to 05/10/2006 | Directed information be sent to Credit Suisse Securities (USA) LLC, for inclusion in Confidential Information Memorandum on the Loan. |
| L20 | LA Partners; ERG | 05/10/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to request Credit Suisse distribute the Confidential Information Memorandum "to such financial institutions as you may deem appropriate to include in the Credit Facilities." |
| L21 | LA Partners; ERG | Prior to 05/16/2006 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L22 | LA Partners; ERG | Shortly after 05/16/2006 | Received Standard & Poor's rating report, "Research Update: Issuer Credit, Bank Loan Ratings Assigned to Ginn-LA CS Borrower and Ginn-LA Conduit Lender." |
| L23 | LA Partners | 05/20/2006 | LA principal Robert Rosenberg emailed Stuart Margulies and Morris, Manning & Martin attorney Sonny Morris:  "Stuart - Do you recall whether the revolver can be drawn to provide funds with which to service and/or pay down the term facilities? Even if the revolver is theoretically available for such purposes, would we be permitted to draw on the revolver if we were out of compliance with our financial covenants at the time of the proposed drawing?  Would we be inherently likely to be out of compliance with those covenants in a situation where our sales have fallen short of the mark – thereby making it necessary to "feed" the term loans?  Is our only true cushion here the $75MM of reserved proceeds?"  (MMMTQW01_009984 – 009985.) |
| L24 | Dean Adler; LA Partners | 05/22/2006 | Dean Adler and Stuart Margulies prepared revised version of the draft Memo to LA Advisory Boards summarizing goals and risks of the Loan.<br><br>LA's Robert Rosenberg transmitted the draft to Morris, Manning & Martin attorney Sonny Morris for review. |
| L25 | Dean Adler | 05/26/2006 | Spoke via telephone with Morris, Manning & Martin attorney Sonny Morris about potential for default under the Loan. |
| L26 | Dean Adler; ERG | 05/26/2006 | After speaking with Dean Adler, Morris, Manning & Martin attorney Sonny Morris emailed members of the Loan transaction team, including Bobby Masters at Ginn: "[Adler] is greatly concerned that a failure to meet projections will result in a default." (MMMTQW01 - 0224495) |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L27 | Lubert-Adler; Dean Adler | 06/02/2006 | Dean Adler, Stuart Margulies and Robert Rosenberg prepared and transmitted a final version of the Memo to LA Advisory Boards summarizing goals and risks of the Loan. |
| L28 | Dean Adler; LA Partners; Bobby Ginn | 06/02/2006 | Exchanged emails stating Credit Suisse was anxious about market conditions and strenuously advised against "any material change in structure [that] may cause us to have to go back out to investors and reconfirm their orders" or would otherwise result in "any kind of delay."  (MMMTQW01_024460-024467)<br><br>The emails were sent to one or more attorneys at Morris, Manning & Martin. |
| L29 | Bobby Ginn | On/before 06/06/2006 | Spoke with Morris, Manning & Martin attorney Jeanne Brannon about his meeting with the Bahamian Attorney General on the Loan. |
| L30 | Lubert-Adler; Dean Adler | 06/06/2006 | Morris, Manning & Martin attorney Jeanne Brannon emailed LA principal Robert Rosenberg summarizing Bobby Ginn's meeting with the Bahamian Attorney General:<br><br>• The biggest issue for the Bahamian government is "what happens to the Bahamas project if there is a default under the CS loan by another project."<br>• The AG asked to review the Loan documents but Brannon recommends against it.<br>• Instead, Brannon will draft talking points "to try to get the AG comfortable without the documents."<br>• The talking points will, "tell[] about all of the good provisions which are in the documents which will help prevent a default." (LA048225 – 048226) |
| L31 | Dean Adler; LA Partners; ERG; Bobby Ginn | 06/06/2006 | Dean Adler emailed LA principal Robert Rosenberg about Bobby Ginn's meeting with the Bahamian AG:  "I would also point out that the 4 [U.S.] properties are giving the necessary credit to get a loan for [Ginn sur Mer] – there are no stand-alone lenders for the Bahamas.  The reality is [] that we are taking the risk by taking 4 financeable properties and using them as fodder in order to get financing for the Bahamas. . . ." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | (Email, D. Adler to R. Rosenberg, 06/06/06, forwarded to J. Brannon, 06/06/06, LA048225 – 048226) |
| L32 | Dean Adler | 06/08/2006 | Executed Unanimous Written Consent of the Board of Directors of Lubert-Adler Group III, LLC for assignment agreements entered into as part of the Loan transaction, knowing it would be sent to Credit Suisse. |
| L33 | Dean Adler | 06/08/2006 | Executed Unanimous Written Consent of the Board of Managers of Lubert-Adler Group IV, LLC for assignment agreements entered into as part of the Loan transaction, knowing it would be sent to Credit Suisse. |
| L34 | Dean Adler; Bobby Ginn | 06/08/2006 | Executed Joint Unanimous Written Consent of The Board of Directors and The Sole Shareholder of Ginn-LA West End, Limited, approving and authorizing the Loan, knowing it would be sent to Credit Suisse. |
| L35 | LA Partners; ERG | 06/08/2006 | Directed GSM developer to execute Amendment to the Heads of Agreement with Bahamian government, knowing it would be transmitted to other signatories.  The Amendment increased the number of lots from 870 to 1,890 and condominium units from 4,400 to 4,900 to match GSM Sales Projections. |
| L36 | LA Partners; ERG | 06/08/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute $525 Million Senior First Lien Credit Facility with Credit Suisse, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, knowing it would be sent to Credit Suisse. |
| L37 | LA Partners; ERG | 06/08/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute $150 Million Senior Second Lien Credit Facility with Credit Suisse, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, knowing it would be sent to Credit Suisse. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L38 | LA Partners; ERG | 06/08/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute Disbursement Authorization letter sent to Credit Suisse Cayman Islands.  Letter instructed Credit Suisse to disburse $510 million via wire to banks in the U.S., Bahamas and the Caribbean, including $333 million to ERG and LA Partners' investment funds. |
| L39 | LA Partners; ERG | 06/08/2006 | Directed Ginn West End to execute Pledge Agreement and Limited Recourse Guaranty (First Lien) causing Ginn-LA West End LLLP to guarantee Loan obligations, knowing it would be sent to Credit Suisse. |
| L40 | LA Partners; ERG | 06/08/2006 | Directed Ginn West End to execute a Pledge Agreement and Limited Recourse Guaranty (Second Lien) causing Ginn-LA West End LLLP to guarantee Loan obligations, knowing it would be sent to Credit Suisse. |
| L41 | Dean Adler; LA Partners; Bobby Ginn | 06/08/2006 | Emails between Ginn executive Robert Masters, Morris, Manning & Martin attorney Sonny Morris and LA principal Neill B. Faucett.<br><br>Email from Bobby Masters, 06/08/06 at 5:25 pm: "The Credit Suisse deal has closed. Wires on the way.  Sonny, please prepare the deed-in-lieu."<br><br>Reply from Neill Faucett, 06/08/06, 6:31 pm:  "Well said."<br><br>(MMMTQW01_176536) |
| L42 | LA Partners; Dean Adler; Bobby Ginn | 06/08/2006 and After | Engaged in communications by mail and wire among themselves and their attorneys concerning likelihood of default under the Loan. |
| L43 | LA Partners; Dean Adler; Bobby Ginn | 06/08/2006 and After | Engaged in communications by mail and wire among themselves and their attorneys on whether the Credit Suisse lenders could question the accuracy of the Sales |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | Projections given the failure to account for Tesoro and Quail West sales cancellations. |
| L44 | LA Partners; ERG | 06/09/2006 | Directed to be sent to Bahamas for recording a Supplemental Debenture for $276,750,000 between Ginn-LA West End Ltd and Ginn-LA Conduit Lender, which mortgaged GSM land as collateral for the Loan. |
| L45 | LA Partners; ERG | 06/09/2006 | Directed to be sent to Bahamas for recording a Promissory Note for $276,750,000 between Ginn-LA West End Limited and Ginn-LA Conduit Lender. |
| L46 | LA Partners | 06/20/2006 | Prepared a draft letter to LA Fund III investors announcing wiring of their share of $98.3 million distribution, "generated by the following profitable investments," namely the $333 distribution taken from the Loan.  Transmitted to others for review. |
| L47 | LA Partners | 06/22/2006 | Prepared draft letter to LA Fund IV investors announcing wiring of their share of $160 million distribution, funded by the Loan.  Distribution included $77.5 million attributed to GSM, described as "return on more than our invested equity" of $50 million.  Transmitted to others for review. |
| L48 | LA Partners; ERG | Prior to 03/27/2007 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L49 | LA Partners; ERG | After 03/27/2007 | Received Standard & Poor's rating report, "Ginn-LA Ratings on Watch Neg; Exposure to Florida's Soft Resort Real Estate Market Cited." |
| L50 | Dean Adler; LA Partners; ERG; Bobby Ginn | 04/23/2007 | Made a presentation to the lender on the Loan default, knowing it would be sent to others, stating: "The slowdown in the residential real estate markets has adversely impacted the Borrower's project sales and, as a result, its ability to comply with the terms of the existing credit agreements."  (LA053007 – 053042) |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L51 | LA Partners; ERG | Prior to 05/01/2007 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L52 | LA Partners; ERG | After 05/01/2007 | Received Standard & Poor's rating report "Ginn-LA Ratings Lowered on Weak Sales and Diminished Recovery Prospects; Still on Watch Neg." |
| L53 | LA Partners; ERG | Prior to 01/11/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L54 | LA Partners; ERG | After 01/11/2008 | Received Standard & Poor's rating report, "Ginn-LA Corporate Credit and Bank Loan Ratings Lowered and Off Watch; Outlook Negative." |
| L55 | LA Partners; ERG | Prior to 01/14/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L56 | LA Partners; ERG | After 01/14/2008 | Received Standard & Poor's rating report, "Ginn-LA's Secured Financings." |
| L57 | Dean Adler; LA Partners; ERG; Bobby Ginn | 03/28/2008 to 04/08/2008 | Ginn and LA executives emailed attorneys to discuss potential bankruptcy filings for the Projects, including whether bankruptcy trustee could set aside the $333 million distribution to LA and ERG as a fraudulent conveyance.  (MMMTQW01 _ 031126, 031120 – 031125, 031295, 031103) |
| L58 | Ginn-LA CS Borrower; Ginn-LA Conduit Lender | 04/29/2008 | CFO for Loan borrowers John P. Klumph emailed three partners of Morris, Manning & Martin attorney Sonny Morris:  "Would you gentlemen please check and see what *solvency certificates* I have signed for [Credit Suisse] and if there may be *any individual liability* that could possibly accrue? |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | "Cass" – a.k.a. Cassady V. Brewer –replied: "Roger.  I am escalating the subject (again)."  (MMMTQW01_026618) |
| L59 | Ginn-LA CS Borrower; Ginn-LA Conduit Lender | 04/29/2008 | Morris, Manning & Martin attorney Cassady Brewer forwarded the Klumph email to attorney Sonny Morris, with a message:  "John wants the Rob Gidel strength agreement.  He has a normal indemnity agreement from [Ginn Development Company], but it is not guaranteed by Lubert-Adler like Rob's.  *I do not think we can duck this issue any longer.*"  (MMMTQW01_026619) |
| L60 | LA Partners; ERG | February/ March 2008 | Directed February/March 2008 *Ginn Sur Mer Living* publication to be sent to GSM lot owners.  Publication reported investors were buying Bahamas real estate to shield their investments from U.S. market declines.  VP of Sales Greg Ulmer said, "The Caribbean market is on the verge of exploding…. Not just here at Ginn sur Mer, but all over the islands.  With the U.S. market a little soft, there's been a big upsurge in the number of people looking here to find a safe haven for their real estate investments." |
| L61 | LA Partners; ERG | Spring 2008 | Directed Spring 2008 *Ginn Sur Mer Living* publication to be sent to GSM lot owners. Publication included article entitled, "Full Speed Ahead for Ginn sur Mer," in which Bobby Ginn made false and misleading statements about GSM:<br><br>• "Construction on the $4.9 billion Ginn sur Mer mega-mix resort on the western tip of the island is moving full speed ahead and President and CEO Bobby Ginn is certain that money is in place to see the project through."<br>• Bobby Ginn:  "I would say we're on schedule, I think we're probably a little ahead of schedule in what we initially set out to do."<br>• Bobby Ginn:  "We've done everything we can do to be sure that when we're talking with our customer, they have the assurance that what they're buying is going to be developed with the quality and standards that our company is known |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | for.” |
| | | | • "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas, and we feel like this project is just hitting the market that still wants oceanfront and all of the other services that come along with it." |
| L62 | LA Partners; ERG | 05/01/2008 | Directed their attorneys to create and parties related to the Loan to enter a Joint Defense, Common Interest and Information Sharing Agreement ("JDA"), which was transmitted to other signatories. |
| L63 | LA Partners; ERG | Prior to 06/24/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L64 | LA Partners; ERG | After 06/24/2008 | Received Standard & Poor's rating report, "Ginn-LA Credit Ratings Lowered to 'CC' On Near-Term Liquidity Pressure." |
| L65 | LA Partners; ERG | 07/01/2008 | Directed Ginn President Robert Gidel to issue a false and misleading statement on the Loan default, with knowledge it would be transmitted to the public and GSM lot owners.  Gidel said: *Today, Standard & Poor's will release a statement that indicates two Ginn affiliated companies, Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. did not make a principal and interest payment on a non-recourse $675 million credit facility led by Credit Suisse. It also stated that we have reached a 30-day forbearance agreement and are actively negotiating with our lenders….* *Due to the ongoing slowdown in the residential real estate market, it became clear that it would not be possible to meet the homesite sales objectives necessary to make* |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | *payments due under the credit facility.*<br><br>*We have been discussing these issues with the lenders for the purpose of seeking ways to restructure the terms of the credit facility. This announcement of the forbearance provides an environment for both us as borrowers and the lenders to continue to work toward a restructuring of the credit facility, which we believe will occur in the next 30 days and will permit each of the communities to be completed as planned....*<br><br>*Ginn-LA West End Limited previously set up accounts which contain the funds necessary to complete the infrastructure and the initial 18-hold golf course at Ginn sur Mer. These funds are not subject to the credit facility and are unaffected by the current situation, which means there will be no disruption to the continued development of the Ginn sur Mer project or the operation and development of Old Bahama Bay. The properties that are owned by Ginn-LA OBB, including the resort core of the Ginn sur Mer project, are not subject to this or any other credit facility....*<br><br>*This situation has no impact on our ongoing business operations throughout the company.* |
| L66 | LA Partners; ERG | Prior to 07/02/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L67 | LA Partners; ERG | After 07/02/2008 | Received Standard & Poor's rating report, "Ginn-LA Ratings cut to 'D' on Missed Principal and Interest Payments." |
| L68 | LA Partners; ERG; Bobby Ginn | 08/06/2008 | Directed Bobby Ginn to make false and misleading statements at a press conference on the Loan and GSM development, with knowledge it would be transmitted to the public and GSM lot owners. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | Bobby Ginn described the Loan as "non-recourse" and made the following statements:<br><br>• *"There is a lot of uncertainty and a lot of rumours and what we are going to try to do today is divide the rumors from the fact."*<br>• *"A hundred percent of the proceeds of the loan go to pay off Credit Suisse. So they are going to be fine. This loan is going to be fine."*<br>• *"If something goes wrong, and we're continuing to assume that it's not, all the money to develop all of the facilities is in place. It's there now. It's in an escrow account. You can't get any safer than that."*<br>• *"[R]egardless of what happens in the economy, the Grand Bahama Project is not in danger."*<br>• *"We never want to say something that we can't back up and we never want to sell someone something that we can't back up. We're out of business if we ever do that."*<br>• *"(The West End property) can't get any more secure. I don't know what one could do to put a project in a more secure position than to have the company assets either with no mortgage on it and hundreds of millions of dollars worth of equity, and have anything that has a loan on it separate from that have an escrow account to be sure that regardless of that loan, that those assets got built."*<br>• *"It's a tough time in the business and if you're not good and you're not well heeled, and you don't have good people with you, you won't make it. But I wouldn't be standing here if I weren't confident that we were going to make it."*<br>• *"We wanted to be sure that regardless of what the economic conditions were, or the economy at the time, or how fast sales were or didn't go, that the money was there to guarantee completion at the quality level we envisioned was going to be there."*<br>• *"Up until now, it's been clean up and dig up. We've moved dirt ... and moved debris for two and a half years now... That's now coming to an end ... and we're* |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | *going to shut up the naysayers when we put the buildings up here and move forward with that as the next phase."*<br>• *"Business is business and tough times are tough times and naysayers are going to say what they are going to say but at the end of the day, we're going to be in The Bahamas and we're going to be on this property for many generations to come and there is virtually nothing that I can see now that would stop us from making that goal a reality."* |
| L69 | Dean Adler; LA Partners; ERG; Bobby Ginn | 09/00/2008 | Received directive from U.S. Department of Housing and Urban Development ("HUD") that due to the Loan it would administratively suspend ILSA registrations for GSM and other Loan Projects, unless Ginn voluntarily suspended the registrations. |
| L70 | LA Partners; ERG | 09/10/2008 | Directed a request for suspension of the Statements of Record for GSM be sent to HUD, prohibiting sale of GSM lots in the U.S. |
| L71 | LA Partners; ERG | 10/02/2008 | Morris, Manning & Martin attorney Jeanna Brannon had a telephone conference with counsel for the Borrowers.  Her handwritten notes from the call:  "Fraudulent conveyance claim agst LA & ERG on dividend.  Co left insolvent by dividend." (MMMTQW01_031409) |
| L72 | LA Partners; ERG | 10/03/2008 | Received a letter from Credit Suisse Cayman Islands with notice of "outstanding Defaults and Events of Default with respect to certain obligations" under the Loan. |
| L73 | LA Partners; ERG | 12/19/2008 | Entered Master Restructuring Agreement negotiated by their attorneys, agreeing the Loan was in default, the lenders would foreclose on GSM, and there was no defense to foreclosure.  The Agreement was transmitted to other signatories and Credit Suisse. |
| L74 | LA Partners; ERG | 05/22/2009 | Received a copy of the lawsuit filed by Credit Suisse in the Supreme Court of the |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | State of New York to foreclose on GSM. |
| L75 | LA Partners; ERG | 12/23/2009 | Received Order and Judgment of Foreclosure and Sale, entered in the GSM Foreclosure setting agreed Aggregate Indebtedness of $ 495,095,611.77. |
| L76 | Bobby Ginn | 01/02/2010 | Sent a false and misleading letter to GSM lot owners that stated: *While we have not released a formal communication in quite some time, we have made substantial progress at Ginn Sur Mer.* *To date, we have spent more than $200 million on everything from clearing the site, to dredging the marina, building an 18-hole Arnold Palmer Signature golf course, constructing infrastructure (including roads, water and sewer}, and installing power and telecommunications.* *As a result, we are pleased to provide you formal notice that Ginn-LA West End, Limited ("the Seller") has completed the "Promised Improvements" listed on page 9 of the Property Report filed by the Seller on October 2, 2007 with the Department of Housing and Urban Development, and in accordance with Section 10 of your Contract for Lot Purchase. Please be advised, however, that the Seller has accrued eighty-two (82) days of Excusable Delay (as defined in your contract).* *Nevertheless, the requirements of the laws on The Commonwealth of The Bahamas have been satisfied as of December 18, 2009, such that you may apply for a permit to begin construction of a dwelling on your lot.* *This is a significant milestone for the project and for you as a lot owner. We are hopeful you will schedule a visit soon and are confident you will be as thrilled as we* |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | *are with the entire project. Please schedule this visit thru Cindy Cecil at 386-246-6619 or ccecil@ginncompany.com.*<br><br>The Bobby Ginn letter was false and misleading because he failed to disclose the Loan Effects, as well as the facts that GSM development had come to a standstill, HUD had prohibited GSM lot sales in the U.S. since October 2008, and Credit Suisse had obtained a $495 million foreclosure judgment against GSM. |

## APPENDIX B – Cash Out Scheme: Bank Fraud Predicate Acts

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L77 | Dean Adler; LA Partners; ERG | 06/08/2006 | Used the Cash Out Scheme to obtain a wire transfer of $89,961,281.49 to Colonial Bank account number 8044845538 (held in the name of Ginn-LA Conduit Lender). |
| L78 | Dean Adler; LA Partners; ERG | 06/12/2006 | Used the Cash Out Scheme to direct Ginn-LA Conduit Lender to wire $89,961,281.49 from Colonial Bank account number 8044845538 to account number 200599960 at an unidentified bank (held in the name of Ginn-LA West End Limited). |
| L79 | Dean Adler; LA Partners; ERG | 06/08/2006 | Used the Cash Out Scheme to obtain a wire transfer of $238,300,700.71 to Colonial Bank account number 8044845512 (held in the name of Ginn-LA CS Borrower). |
| L80 | Dean Adler; LA Partners; ERG | 06/12/2006 | Used the Cash Out Scheme to direct Ginn-LA CS Borrower to wire $37,550,700.71 from Colonial Bank account number 8044845512 to Colonial Bank account number 8044845520 (held in the name of Ginn LA CS Holding Company). |
| L81 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn-LA CS Borrower to wire $200,000,000.00 from Colonial Bank account number 8044845512 to Colonial Bank account number 8044845520 (held in the name of Ginn LA CS Holding Company). |
| L82 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn LA CS Holding Company to wire $133,572,899.09 from Colonial Bank account number 8044845520 to an LA Partners investment fund. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L83 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn LA CS Holding Company to wire $64,730,051.12 from Colonial Bank account number 8044845520 to an LA Partners investment fund. |
| L84 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn LA CS Holding Company to wire $18,760,038.98 from Colonial Bank account number 8044845520 to an LA Partners investment fund. |
| L85 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn LA CS Holding Company to wire $4,249,574.00 from Colonial Bank account number 8044845520 to an LA Partners investment fund. |
| L86 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn LA CS Holding Company to wire $2,860,051.61 from Colonial Bank account number 8044845520 to an LA Partners investment fund. |
| L87 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn LA CS Holding Company to wire $1,987,359.44 from Colonial Bank account number 8044845520 to an LA Partners investment fund. |
| L88 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn-LA West End Ltd to wire $8,074,964.92 from account number 200599960 in an unidentified bank to Colonial Bank account number 8044845199 (held in the name of Ginn-LA West End Limited). |
| L89 | Dean Adler; LA Partners; ERG | 06/13/2006 | Used the Cash Out Scheme to direct Ginn-LA West End Ltd to wire $67,381,751.71 from number 200599960 in an unidentified bank to Colonial Bank account number 8044845199 (held in the name of Ginn-LA West End Limited). |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L90 | Dean Adler; LA Partners; ERG | 06/14/2006 | Used the Cash Out Scheme to direct Ginn-LA West End Ltd to wire $14,504,864.86 from account number 200599960 in an unidentified bank to Colonial Bank account number 8044845512 (held in the name of Ginn-LA CS Borrower). |
| L91 | Dean Adler; LA Partners; ERG | 06/23/2006 | Used the Cash Out Scheme to direct Ginn-LA West End Ltd to wire $1,000,100.00 from account number 200599960 in an unidentified bank to an LA Partners investment fund. |
| L92 | Dean Adler; LA Partners; ERG | 06/14/2006 | Used the Cash Out Scheme to direct Ginn-LA West End Limited to wire $5,386,971.50 from Colonial Bank account number 8044845199 to an LA Partners investment fund. |
| L93 | Dean Adler; LA Partners; ERG | 06/14/2006 | Used the Cash Out Scheme to direct Ginn-LA West End Limited to wire $2,519,275.72 from Colonial Bank account number 8044845199 to an LA Partners investment fund. |
| L94 | Dean Adler; LA Partners; ERG | 06/15/2006 | Used the Cash Out Scheme to direct Ginn-LA West End Limited to wire $67,632,780.64 from Colonial Bank account number 8044845199 to an LA Partners investment fund. |

## APPENDIX C – Appraisal Scheme: Mail and Wire Fraud Predicate Acts

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A1 | LA Partners; ERG; Ginn Financial | 06/22/2006 | Directed Ginn Financial to enter into A term letter with CapitalSource for partial underlying funding for GSM Mortgage Loans. |
| A2 | LA Partners; ERG; Ginn Financial | 06/00/2006 through 10/00/2008 | Directed Ginn Financial to offer GSM lot buyers 80% loan-to-value financing. |
| A3 | Ginn Financial | Beginning 08/00/2006 | Ginn Financial's website marketed GSM Mortgage Loans, representing:<br>• Ginn Financial is "the preferred lender for Ginn buyers,"<br>• Ginn Financial has "specialized loan programs for Ginn Sur Mer."<br>• Ginn Financial's "in-house financing eliminates communications issues and expedites the closing process."<br>• Ginn Financial offered "80% Loan to Value" "Stated Income" mortgage loans for qualified GSM lot purchasers.<br>• Ginn Financial is "a licensed mortgage lender in the State of Florida; License # L100000558788."<br>• Because "financing options are different in the Bahamas than in the United States," Ginn Financial would assist GSM lot buyer through the mortgage process. |
| A4 | LA Partners; ERG | 08/07/2006 | Directed filing of Certificate of Formation with the Delaware Division of Corporations for Bahamas Sales Associate, LLC. |
| A5 | Ginn Financial | 09/00/2006 | CEO William McCracken contacted Richard Allen of Pomeroy Appraisal Associates |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | by telephone and told Allen:<br><br>• Ginn Financial was looking for a firm to provide appraisals of GSM lots.<br>• If Pomeroy provides satisfactory services, it could receive significant additional business for appraisal work other Ginn developments. |
| A6 | Ginn Financial | 09/00/2006 | CEO McCracken spoke by telephone with Richard Allen about scope of engagement for Pomeroy to provide GSM lot appraisals and agreed to Pomeroy's fees. |
| A7 | LA Partners; ERG; Ginn Financial | 09/00/2006 | Directed Ginn Financial to retain Pomeroy Appraisal to provide GSM lot appraisals. |
| A8 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 90, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A9 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 97, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A10 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 133, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A11 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 190, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A12 | Ginn Financial | Fall 2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 18, to be used as a basis for Pomeroy's appraisals for other GSM lots. |
| A13 | Ginn Financial | 09/25/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 98, which included a sales price |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | and an "Estimated Value" figure for the lot. |
| A14 | Ginn Financial | 09/25/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 146, which included a sales price and an "Estimated Value" figure for the lot. |
| A15 | Ginn Financial | 09/25/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 109, **being purchased by Plaintiffs Maciag,** which included a sales price and an "Estimated Value" figure. |
| A16 | Ginn Financial | 09/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 103, which included a sales price. |
| A17 | Ginn Financial | 09/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 104, **being purchased by Plaintiffs Cicolani Group,** which included a sales price and an "Estimated Value" figure. |
| A18 | Ginn Financial | 09/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 45, which included a sales price. |
| A19 | Ginn Financial | 09/29/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 38, which included a sales price. |
| A20 | Ginn Financial | 10/02/2006 | Received from Pomeroy a Proposal for Real Estate Appraisal Services, stating the appraisals will conform to all USPAP Appraisal Standards. |
| A21 | Ginn Financial | 10/03/2006 | Emails with Pomeroy regarding arrangements to fly Richard Allen and his partner to Grand Bahama on a Ginn corporate jet. |
| A22 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 194, which included a sales price. |
| A23 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 37, which included a sales price. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A24 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 46, **being purchased by Plaintiffs Liles,** which included a sales price and an "Estimated Value" figure. |
| A25 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 136, which included a sales price. |
| A26 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 89, which included a sales price and an "Estimated Value" figure. |
| A27 | Ginn Financial | 10/04/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 80, which included a sales price and an "Estimated Value" figure. |
| A28 | Ginn Financial | 10/05/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 56, which included a sales price. |
| A29 | Ginn Financial | 10/11/2006 | Received from Pomeroy a revised Proposal for Real Estate Appraisal Services, stating the appraisals will conform to all USPAP Appraisal Standards. |
| A30 | Ginn Financial | 10/11/2006 | Tom Howarth telephoned Richard Allen with questions about Pomeroy's revised Proposal for Appraisal Services.  Allen returned Howarth's call and left a voicemail answering the questions. |
| A31 | Ginn Financial | 10/12/2006 | Joan Wilms faxed Pomeroy's revised Proposal for Appraisal Services to Richard Allen with proposed revision. |
| A32 | Ginn Financial | 10/13/2006 | Exchanged emails with Pomeroy regarding arrangements to fly to Grand Bahama on the Ginn corporate jet. |
| A33 | Ginn Financial | 10/16/2006 | Received emails from Richard Allen regarding arrangements to fly to Grand Bahama on Ginn corporate jet. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A34 | Ginn Financial | 10/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 88, which included a sales price and an "Estimated Value" figure. |
| A35 | Ginn Financial | 10/30/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 432, which included a sales price. |
| A36 | Ginn Financial | 09/20/2006 to 10/27/2006 | CEO McCracken and CFO Mark Cook had a series of telephone conversations with Richard Allen of Pomeroy Appraisal Associates:<br><br>• McCracken told Richard Allen the lot sales price was the target value for Pomeroy's appraisals.<br>• Richard Allen said he would not base Pomeroy's analysis on a predetermined target value.  Allen said the market value in Pomeroy's appraisals would only be based on Pomeroy's investigation and analysis.<br>• Allen discussed how lot prices in GSM measured against comparable sales on Grand Bahama Island but outside GSM ("Bahamas Comparables").  Allen told McCracken GSM lot prices were much higher than prices for Bahamas Comparables.<br>• Allen told McCracken Pomeroy was required to include Bahamas Comparables in its appraisal analysis.  McCracken and Cook pressured Allen not to do so, telling him to use only GSM lot sales as comparables.<br>• McCracken pressured Pomeroy to provide appraisals quickly, without undertaking a complete investigation and analysis of Bahamas Comparables.<br>• Allen said that using only GSM comparable sales was problematic because many GSM buyers were flown into the private GSM airstrip on Ginn's private jet and did not have an opportunity to compare GSM prices with lot prices outside GSM.<br>• Allen warned that any U.S. lender would want an appraisal that analyzed comparable sales outside GSM.<br>• McCracken screamed at Allen, insisting Pomeroy should not consider comparable |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | sales outside GSM.<br>• Allen said Pomeroy's appraisals must state the appraised value was "subject to" completion of infrastructure and amenities that were planned and marketed for GSM. McCracken asked Allen to provide draft appraisals so Ginn Financial could decide whether they were acceptable. |
| A37 | Ginn Financial | 10/27/2006 | Received from Pomeroy a DRAFT Land Appraisal Report for GSM Lot 74, which stated the appraised value was subject to completion of infrastructure and amenities described in a detailed "Project Amenity Description." |
| A38 | Ginn Financial | 10/27/2006 | Received from Pomeroy a DRAFT Land Appraisal Report for GSM Lot 80, which stated the appraised value was subject to completion of infrastructure and amenities described in a detailed "Project Amenity Description." |
| A39 | Ginn Financial | 10/27/2006 | Received from Pomeroy a DRAFT Land Appraisal Report for GSM Lot 103, which stated the appraised value was subject to completion of infrastructure and amenities described in a detailed "Project Amenity Description." |
| A40 | Ginn Financial | 10/27/2006 to 11/02/2006 | CEO McCracken and CFO Cook spoke by telephone with Richard Allen:<br>• After Pomeroy gave Ginn Financial several draft appraisals, McCracken asked Allen to remove the "subject to" language from the drafts.<br>• When Allen refused, McCracken said he would get back to Allen.<br>• Less than an hour later, McCracken called Allen to say Ginn Financial was "going to go in another direction." |
| A41 | LA Partners; ERG; BSA | 10/31/2006 | Directed BSA to enter into Receivables Loan and Security Agreement with CapitalSource International Inc. for partial funding of GSM Mortgage Loans. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A42 | LA Partners; ERG; Bobby Ginn | Around 10/31/2006 | Directed Bobby Ginn to execute a Limited Guarantee of BSA's obligations under the October 31, 2006 Receivables Loan and Security Agreement with CapitalSource. |
| A43 | LA Partners; ERG; Ginn Financial | 10/00/2006 | Directed Ginn Financial to enter into Bahamas Fund Loan(s) with certain LA Partners investment funds, to provide partial underlying financing for GSM Mortgage Loans. |
| A44 | LA Partners; ERG; BSA | 10/00/2006 | Directed BSA to enter into a Fund Loan with certain LA Partners investment funds, to provide underlying financing for GSM Mortgage Loans. |
| A45 | LA Partners; ERG; BSA | 11/01/2006 | Directed BSA to enter into CapSource Supplemental Financing Agreement with Ginn-LA West End Ltd., LLLP |
| A46 | LA Partners; ERG; Ginn Financial | 11/01/2006 | Directed Ginn Financial to enter into Bahamas (Non-CapSource) Supplemental Financing Agreement with Ginn-LA West End Ltd., LLLP |
| A47 | LA Partners; ERG; Ginn Financial | 11/02/2006 | Directed Ginn Financial to email Richard Allen at Pomeroy: "Please cancel all the orders for Bahama Appraisals. We have run it by our investors and a 'Subject to' valuation is unacceptable." |
| A48 | LA Partners; ERG; Ginn Financial; BSA | 11/11/2006 | Directed Ginn Financial and BSA to hire W. Carver Grant, via mail or wire communications, to provide GSM lot appraisals. |
| A49 | Ginn Financial | After 10/23/2006 | Sent a letter, signed by CEO McCracken, to Andrews Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A50 | Ginn Financial | After 10/23/2006 | Sent a Loan Fact Sheet to Andrews Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A51 | Ginn Financial | After 10/23/2006 | Sent Plaintiffs Andrews Group a Uniform Residential Loan Application for Lot 272, identifying itself as the lender. |
| A52 | Ginn Financial; BSA | Between 10/23/2006 and 03/23/2007 | Sent a request to W. Carver Grant for an appraisal of Andrews Group Lot 272. |
| A53 | Ginn Financial; BSA | Between 10/23/2006 and 03/23/2007 | Received, via mail or wire, an appraisal for Andrews Group Lot 272 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A54 | Ginn Financial | Between 10/23/2006 and 03/23/2007 | Sent Plaintiffs Andrews Group federally mandated mortgage disclosures and other loan documents required by U.S. Mortgage Laws ("Loan Disclosures") including:<br><br>• HUD Form Good Faith Estimate<br>• Truth in Lending Disclosure Statement ("Notice to Borrower(s) Required by Federal Law and Federal Reserve Board Regulation Z")<br>• Disclosure Notices as required by the following U.S. laws:<br>　○ Fair Credit Reporting Act<br>　○ Right to Financial Privacy Act of 1978<br>　○ Equal Credit Opportunity Act |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | o   Patriot Act<br>o   Real Estate Settlement Procedures Act (RESPA) |
| A55 | Ginn Financial | Between 10/23/2006 and 03/23/2007 | Sent Plaintiffs Andrews Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A56 | Ginn Financial | Between 10/23/2006 and 03/23/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Andrews Group so they would not have to travel to the Bahamas to close their loan for Lot 272. |
| A57 | Ginn Financial; BSA | Just Before 03/23/2007 | Sent mortgage closing documents to Plaintiffs Andrews Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 272. |
| A58 | LA Partners; ERG; Ginn Financial; BSA | 03/23/2007 | Directed BSA, acting as lender, to close on the Andrews Group mortgage loan for Lot 272, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A59 | Ginn Financial | After 11/03/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Bailey that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A60 | Ginn Financial | After 11/03/2006 | Sent a Loan Fact Sheet to Plaintiffs Bailey entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | communication issues and expedites the closing process." |
| A61 | Ginn Financial | After 11/03/2006 | Sent Plaintiffs Bailey a Uniform Residential Loan Application for Lot 67 identifying itself as the lender. |
| A62 | Ginn Financial; BSA | Between 11/03/2006 and 02/16/2007 | Sent a request to W. Carver Grant for an appraisal of Bailey Lot 67. |
| A63 | Ginn Financial; BSA | Between 11/03/2006 and 02/16/2007 | Received, via mail or wire, an appraisal for Bailey Lot 67 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A64 | Ginn Financial | Between 11/03/2006 and 02/16/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Bailey for the financing of Lot 67. |
| A65 | Ginn Financial | Between 11/03/2006 and 02/16/2007 | Sent Plaintiffs Bailey an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A66 | Ginn Financial | Between 11/03/2006 and | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Bailey so they would not have to travel to the Bahamas to close their loan for Lot 67. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 02/16/2007 | |
| A67 | Ginn Financial; BSA | Just Before 02/16/2007 | Sent mortgage closing documents to Plaintiffs Bailey via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 67. |
| A68 | LA Partners; ERG; Ginn Financial; BSA | 02/16/2007 | Directed BSA, acting as lender, to close on the Bailey mortgage loan for Lot 67, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A69 | Ginn Financial | After 08/29/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Beachfront, Ponsler and Kalil that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A70 | Ginn Financial | After 08/29/2006 | Sent a Loan Fact Sheet to Plaintiffs Beachfront, Ponsler and Kalil entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A71 | Ginn Financial | After 08/29/2006 | Sent Plaintiffs Beachfront, Ponsler and Kalil a Uniform Residential Loan Application for Lot 43 identifying itself as the lender. |
| A72 | Ginn Financial; BSA | Between 08/29/2006 and 02/15/2007 | Sent a request to W. Carver Grant for an appraisal of Beachfront Lot 43. |
| A73 | Ginn Financial; | Between | Received, via mail or wire, an appraisal for Beachfront Lot 43 from W. Carver Grant |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 08/29/2006 and 02/15/2007 | & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A74 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Beachfront, Ponsler and Kalil for the financing of Lot 43. |
| A75 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent Plaintiffs Beachfront, Ponsler and Kalil an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A76 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil so they would not have to travel to the Bahamas to close their loan for Lot 43. |
| A77 | Ginn Financial; BSA | Just Before 02/15/2007 | Sent mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 43. |
| A78 | LA Partners; ERG; Ginn Financial; BSA | 02/15/2007 | Directed BSA, acting as lender, to close on the Beachfront mortgage loan for Lot 43, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A79 | Ginn Financial | After 08/29/2006 | Sent Plaintiffs Beachfront, Ponsler and Kalil a Uniform Residential Loan Application for Lot 44 identifying itself as the lender. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A80 | Ginn Financial; BSA | Between 08/29/2006 and 02/15/2007 | Sent a request to W. Carver Grant for an appraisal of Beachfront Lot 44. |
| A81 | Ginn Financial; BSA | Between 08/29/2006 and 02/15/2007 | Received, via mail or wire, an appraisal for Beachfront Lot 44 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A82 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Beachfront, Ponsler and Kalil for the financing of Lot 44. |
| A83 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent Plaintiffs Beachfront, Ponsler and Kalil an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A84 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil so they would not have to travel to the Bahamas to close their loan for Lot 44. |
| A85 | Ginn Financial; BSA | Just Before 02/15/2007 | Sent mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 44. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A86 | LA Partners; ERG; Ginn Financial; BSA | 02/15/2007 | Directed BSA, acting as lender, to close on the Beachfront mortgage loan for Lot 44, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A87 | Ginn Financial | After 08/07/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Bredahl that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A88 | Ginn Financial | After 08/07/2006 | Sent a Loan Fact Sheet to Plaintiffs Bredahl entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A89 | Ginn Financial | After 08/07/2006 | Sent Plaintiffs Bredahl a Uniform Residential Loan Application for Lot 39 identifying itself as the lender. |
| A90 | Ginn Financial; BSA | Between 08/07/2006 and 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Bredahl Lot 39. |
| A91 | Ginn Financial; BSA | Between 08/07/2006 and 12/22/2006 | Received, via mail or wire, an appraisal for Bredahl Lot 39 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A92 | Ginn Financial | Between 08/07/2006 and 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Bredahl for the financing of Lot 39. |
| A93 | Ginn Financial | Between 08/07/2006 and 12/22/2006 | Sent Plaintiffs Bredahl an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A94 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Bredahl via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 39. |
| A95 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Bredahl mortgage loan for Lot 39, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A96 | Ginn Financial | After 12/14/2006 | Sent Plaintiffs Bredahl a Uniform Residential Loan Application for Lot 33 identifying itself as the lender. |
| A97 | Ginn Financial; BSA | Between 12/14/2006 and 03/09/2007 | Sent a request to W. Carver Grant for an appraisal of Bredahl Lot 33. |
| A98 | Ginn Financial; BSA | Between 12/14/2006 and | Received, via mail or wire, an appraisal for Bredahl Lot 33 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 03/09/2007 | the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A99 | Ginn Financial | Between 12/14/2006 and 03/09/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Bredahl for the financing of Lot 33. |
| A100 | Ginn Financial | Between 12/14/2006 and 03/09/2007 | Sent Plaintiffs Bredahl an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A101 | Ginn Financial; BSA | Just Before 03/09/2007 | Sent mortgage closing documents to Plaintiffs Bredahl via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 33. |
| A102 | LA Partners; ERG; Ginn Financial; BSA | 03/09/2007 | Directed BSA, acting as lender, to close on the Bredahl mortgage loan for Lot 33, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A103 | Ginn Financial | After 08/15/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Byers that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A104 | Ginn Financial | After 08/15/2006 | Sent a Loan Fact Sheet to Plaintiff Byers entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A105 | Ginn Financial | After 08/15/2006 | Sent Plaintiff Byers a Uniform Residential Loan Application for Lot 234 identifying itself as the lender. |
| A106 | Ginn Financial; BSA | Between 08/15/2006 and 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Byers Lot 234. |
| A107 | Ginn Financial; BSA | Between 08/15/2006 and 12/22/2006 | Received, via mail or wire, an appraisal for Byers Lot 234 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A108 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiff Byers for the financing of Lot 234. |
| A109 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent Plaintiff Byers an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A110 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiff Byers via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 234. |
| A111 | LA Partners; ERG; Ginn Financial; | 12/22/2006 | Directed BSA, acting as lender, to close on the Byers mortgage loan for Lot 234, knowing the closing documents would be transmitted to other signatories and an agent |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | | for filing in the Bahamas. |
| A112 | Ginn Financial | After 12/12/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Cappuccino Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A113 | Ginn Financial | After 12/12/2006 | Sent a Loan Fact Sheet to Plaintiffs Cappuccino Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A114 | Ginn Financial | After 12/12/2006 | Sent Plaintiffs Cappuccino Group a Uniform Residential Loan Application for Lot 282 identifying itself as the lender. |
| A115 | Ginn Financial; BSA | Between 12/12/2006 and 08/10/2007 | Sent a request to W. Carver Grant for an appraisal of Cappuccino Group Lot 282. |
| A116 | Ginn Financial; BSA | Between 12/12/2006 and 08/10/2007 | Received, via mail or wire, an appraisal for Cappuccino Group Lot 282 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A117 | Ginn Financial | Between 12/12/2006 and | Sent federally mandated Loan Disclosures to Plaintiffs Cappuccino Group for the financing of Lot 282. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 08/10/2007 | |
| A118 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Sent Plaintiffs Cappuccino Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A119 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Cappuccino Group so they would not have to travel to the Bahamas to close their loan for Lot 282. |
| A120 | LA Partners; ERG; Ginn Financial; BSA | 08/10/2007 | Directed BSA, acting as lender, to close on the Cappuccino Group mortgage loan for Lot 282, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A121 | Ginn Financial | After 10/31/2007 | Sent Plaintiffs Cappuccino Group a Uniform Residential Loan Application for Lot 281 identifying itself as the lender. |
| A122 | Ginn Financial; BSA | Between 10/31/2007 and 02/25/2008 | Sent a request to W. Carver Grant for an appraisal of Cappuccino Group Lot 281. |
| A123 | Ginn Financial; BSA | Between 10/31/2007 and 02/25/2008 | Received, via mail or wire, an appraisal for Cappuccino Group Lot 281 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A124 | Ginn Financial | Between 10/31/2007 and 02/25/2008 | Sent federally mandated Loan Disclosures to Plaintiffs Cappuccino Group for the financing of Lot 281. |
| A125 | Ginn Financial | Between 10/31/2007 and 02/25/2008 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Cappuccino Group so they would not have to travel to the Bahamas to close their loan for Lot 282. |
| A126 | LA Partners; ERG; Ginn Financial; BSA | 02/25/2008 | Directed BSA, acting as lender, to close on the Cappuccino Group mortgage loan for Lot 281, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A127 | Ginn Financial | Before 02/00/2008 | Sent a letter, signed by CEO McCracken, to Plaintiffs Carell Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A128 | Ginn Financial | Before 02/00/2008 | Sent a Loan Fact Sheet to Plaintiffs Carell Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A129 | Ginn Financial | Before 02/00/2008 | Sent Plaintiffs Carell Group a Uniform Residential Loan Application for Lot 312 identifying itself as the lender. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A130 | Ginn Financial; BSA | Before 02/00/2008 | Sent a request to W. Carver Grant for an appraisal of Carell Group Lot 312. |
| A131 | Ginn Financial; BSA | Before 02/00/2008 | Received, via mail or wire, an appraisal for Carell Group Lot 312 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A132 | Ginn Financial | Before 02/00/2008 | Sent federally mandated Loan Disclosures to Plaintiffs Carell Group for the financing of Lot 312. |
| A133 | Ginn Financial | Before 02/00/2008 | Sent Plaintiffs Carell Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A134 | Ginn Financial; BSA | Just Before 02/00/2008 | Sent mortgage closing documents to Plaintiffs Carell Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 312. |
| A135 | LA Partners; ERG; Ginn Financial; BSA | 02/00/2008 | Directed BSA, acting as lender, to close on the Carell Group mortgage loan for Lot 312, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A136 | Ginn Financial | After 10/05/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Cicolani Group that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A137 | Ginn Financial | After 10/05/2006 | Sent a Loan Fact Sheet to Plaintiffs Cicolani Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A138 | Ginn Financial | After 10/05/2006 | Sent Plaintiffs Cicolani Group a Uniform Residential Loan Application for Lot 104 identifying itself as the lender. |
| A139 | Ginn Financial; BSA | Between 10/05/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Cicolani Group Lot 104. |
| A140 | Ginn Financial; BSA | Between 10/05/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Cicolani Group Lot 104 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A141 | Ginn Financial | Between 10/05/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Cicolani Group for the financing of Lot 104. |
| A142 | Ginn Financial | Between 10/05/2006 and 12/13/2006 | Sent Plaintiffs Cicolani Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A143 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Cicolani Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 104. |
| A144 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Cicolani Group mortgage loan for Lot 104, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A145 | Ginn Financial | After 11/12/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Clear Reef and Card that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A146 | Ginn Financial | After 11/12/2006 | Sent a Loan Fact Sheet to Plaintiffs Clear Reef and Card entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A147 | Ginn Financial | After 11/12/2006 | Sent Plaintiffs Clear Reef and Card a Uniform Residential Loan Application for Lot 42 identifying itself as the lender. |
| A148 | Ginn Financial; BSA | Between 12/12/2006 and 08/10/2007 | Sent a request to W. Carver Grant for an appraisal of Clear Reef Lot 42. |
| A149 | Ginn Financial; BSA | Between 12/12/2006 and | Received, via mail or wire, an appraisal for Clear Reef Lot 42 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 08/10/2007 | the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A150 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Clear Reef and Card for the financing of Lot 42. |
| A151 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Sent Plaintiffs Clear Reef and Card an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A152 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Clear Reef and Card so they would not have to travel to the Bahamas to close their loan for Lot 42. |
| A153 | Ginn Financial; BSA | Just Before 08/10/2007 | Sent mortgage closing documents to Plaintiffs Clear Reef and Card via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 42. |
| A154 | LA Partners; ERG; Ginn Financial; BSA | 08/10/2007 | Directed BSA, acting as lender, to close on the Clear Reef mortgage loan for Lot 42, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A155 | Ginn Financial | After 10/10/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Clemmons Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A156 | Ginn Financial | After 10/10/2006 | Sent a Loan Fact Sheet to Plaintiffs Clemmons Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A157 | Ginn Financial | After 10/10/2006 | Sent Plaintiffs Clemmons Group a Uniform Residential Loan Application for Lot 494 identifying itself as the lender. |
| A158 | Ginn Financial; BSA | Between 10/10/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Clemmons Group Lot 494. |
| A159 | Ginn Financial; BSA | Between 10/10/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Clemmons Group Lot 494 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A160 | Ginn Financial | Between 10/10/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Clemmons Group for the financing of Lot 494. |
| A161 | Ginn Financial | Between 10/10/2006 and 12/13/2006 | Sent Plaintiffs Clemmons Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A162 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Clemmons Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 494. |
| A163 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Clemmons Group mortgage loan for Lot 494, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A164 | Ginn Financial | After 10/19/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Crawford Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A165 | Ginn Financial | After 10/19/2006 | Sent a Loan Fact Sheet to Plaintiffs Crawford Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A166 | Ginn Financial | After 10/19/2006 | Sent Plaintiffs Crawford Group a Uniform Residential Loan Application for Lot 209 identifying itself as the lender. |
| A167 | Ginn Financial; BSA | Between 10/19/2006 and 02/22/2008 | Sent a request to W. Carver Grant for an appraisal of Crawford Group Lot 209. |
| A168 | Ginn Financial; BSA | Between 10/19/2006 and | Received, via mail or wire, an appraisal for Crawford Group Lot 209 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 02/22/2008 | USPAP. |
| A169 | Ginn Financial | Between 10/19/2006 and 02/22/2008 | Sent federally mandated Loan Disclosures to Plaintiffs Crawford Group for the financing of Lot 209. |
| A170 | Ginn Financial | Between 10/19/2006 and 02/22/2008 | Sent Plaintiffs Crawford Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A171 | Ginn Financial | Between 10/19/2006 and 02/22/2008 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Crawford Group so they would not have to travel to the Bahamas to close their loan for Lot 209. |
| A172 | Ginn Financial; BSA | Just Before 02/22/2008 | Sent mortgage closing documents to Plaintiffs Crawford Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 209. |
| A173 | LA Partners; ERG; Ginn Financial; BSA | 02/22/2008 | Directed BSA, acting as lender, to close on the Crawford Group mortgage loan for Lot 209, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A174 | Ginn Financial | After 05/07/2007 | Sent a letter, signed by CEO McCracken, to Plaintiffs Domnick that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A175 | Ginn Financial | After 05/07/2007 | Sent a Loan Fact Sheet to Plaintiffs Domnick entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A176 | Ginn Financial | After 05/07/2007 | Sent Plaintiffs Domnick a Uniform Residential Loan Application for Lot 487 identifying itself as the lender. |
| A177 | Ginn Financial; BSA | Between 05/07/2007 and 06/22/2007 | Sent a request to W. Carver Grant for an appraisal of Domnick Lot 487. |
| A178 | Ginn Financial; BSA | Between 05/07/2007 and 06/22/2007 | Received, via mail or wire, an appraisal for Domnick Lot 487 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A179 | Ginn Financial | Between 05/07/2007 and 06/22/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Domnick for the financing of Lot 487. |
| A180 | Ginn Financial | Between 05/07/2007 and 06/22/2007 | Sent Plaintiffs Domnick an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A180a | Ginn Financial; BSA | Just Before 06/22/2007 | Sent mortgage closing documents to Plaintiffs Domnick via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 487. |
| A181 | LA Partners; ERG; Ginn Financial; BSA | 06/22/2007 | Directed BSA, acting as lender, to close on the Domnick mortgage loan for Lot 487, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A182 | Ginn Financial | After 11/10/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Fresonke Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A183 | Ginn Financial | After 11/10/2006 | Sent Plaintiffs Fresonke Group a Uniform Residential Loan Application for Lot 437 identifying itself as the lender. |
| A184 | Ginn Financial; BSA | Between 11/10/2006 and 03/15/2007 | Sent a request to W. Carver Grant for an appraisal of Fresonke Group Lot 437. |
| A185 | Ginn Financial; BSA | Between 11/10/2006 and 03/15/2007 | Received, via mail or wire, an appraisal for Fresonke Group Lot 437 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A186 | Ginn Financial | Between 11/10/2006 and | Sent federally mandated Loan Disclosures to Plaintiffs Fresonke Group for the financing of Lot 437. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 03/15/2007 | |
| A187 | Ginn Financial | Between 11/10/2006 and 03/15/2007 | Sent Plaintiffs Fresonke an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A188 | Ginn Financial; BSA | Just Before 03/15/2007 | Sent mortgage closing documents to Plaintiffs Fresonke Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 437. |
| A189 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 | Directed BSA, acting as lender, to close on the Fresonke Group mortgage loan for Lot 437, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A190 | Ginn Financial | After 12/05/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Hoyer Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A191 | Ginn Financial | After 12/05/2006 | Sent a Loan Fact Sheet to Plaintiffs Hoyer Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A192 | Ginn Financial | After 12/05/2006 | Sent Plaintiffs Hoyer Group a Uniform Residential Loan Application for Lot 448 identifying itself as the lender. |
| A193 | Ginn Financial; | Between | Sent a request to W. Carver Grant for an appraisal of Hoyer Group Lot 448. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 12/05/2006 and 02/02/2007 | |
| A194 | Ginn Financial; BSA | Between 12/05/2006 and 02/02/2007 | Received, via mail or wire, an appraisal for Hoyer Group Lot 448 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A195 | Ginn Financial | Between 12/05/2006 and 02/02/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Hoyer Group for the financing of Lot 448. |
| A196 | Ginn Financial | Between 12/05/2006 and 02/02/2007 | Sent Plaintiffs Hoyer Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A197 | Ginn Financial | Between 12/05/2006 and 02/02/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Hoyer Group so they would not have to travel to the Bahamas to close their loan for Lot 448. |
| A198 | Ginn Financial; BSA | Just Before 02/02/2007 | Sent mortgage closing documents to Plaintiffs Hoyer Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 448. |
| A199 | LA Partners; ERG; | 02/02/2007 | Directed BSA, acting as lender, to close on the Hoyer Group mortgage loan for Lot |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | Ginn Financial; BSA | | 448, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A200 | Ginn Financial | After 03/08/2007 | Sent a letter, signed by CEO McCracken, to Plaintiffs Jackson Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A201 | Ginn Financial | After 03/08/2007 | Sent a Loan Fact Sheet to Plaintiffs Jackson Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A202 | Ginn Financial | After 03/08/2007 | Sent Plaintiffs Jackson Group a Uniform Residential Loan Application for Lot 488 identifying itself as the lender. |
| A203 | Ginn Financial; BSA | Between 03/08/2007 and 04/13/2007 | Sent a request to W. Carver Grant for an appraisal of Jackson Group Lot 488. |
| A204 | Ginn Financial; BSA | Between 03/08/2007 and 04/13/2007 | Received, via mail or wire, an appraisal for Jackson Group Lot 488 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A205 | Ginn Financial | Between 03/08/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Jackson Group for the financing of Lot 488. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | and 04/13/2007 | |
| A206 | Ginn Financial | Between 03/08/2007 and 04/13/2007 | Sent Plaintiffs Jackson Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A207 | Ginn Financial | Between 03/08/2007 and 04/13/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Jackson Group so they would not have to travel to the Bahamas to close their loan for Lot 488. |
| A208 | Ginn Financial; BSA | Just Before 04/13/2007 | Sent mortgage closing documents to Plaintiffs Jackson Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 488. |
| A209 | LA Partners; ERG; Ginn Financial; BSA | 04/13/2007 | Directed BSA, acting as lender, to close on the Jackson Group mortgage loan for Lot 488, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A210 | Ginn Financial | After 10/08/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Josephson that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A211 | Ginn Financial | After 10/08/2006 | Sent a Loan Fact Sheet to Plaintiff Josephson entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | communication issues and expedites the closing process." |
| A212 | Ginn Financial | After 10/08/2006 | Sent Plaintiff Josephson a Uniform Residential Loan Application for Lot 493 identifying itself as the lender. |
| A213 | Ginn Financial; BSA | Between 10/08/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Josephson Lot 493. |
| A214 | Ginn Financial; BSA | Between 10/08/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Josephson Lot 493 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A215 | Ginn Financial | Between 10/08/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiff Josephson for the financing of Lot 493. |
| A216 | Ginn Financial | Between 10/08/2006 and 12/13/2006 | Sent Plaintiff Josephson an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A217 | Ginn Financial | Between 10/08/2006 and | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Josephson so he would not have to travel to the Bahamas to close his loan for Lot 493. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 12/13/2006 | |
| A218 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiff Josephson via FedEx so he would not have to travel to the Bahamas to close his mortgage loan for Lot 493. |
| A219 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Josephson mortgage loan for Lot 493, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A220 | Ginn Financial | After 02/03/2007 | Sent a letter, signed by CEO McCracken, to Plaintiff Kherkher that stated:  "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A221 | Ginn Financial | After 02/03/2007 | Sent a Loan Fact Sheet to Plaintiff Kherkher entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A222 | Ginn Financial | After 02/03/2007 | Sent Plaintiff Kherkher a Uniform Residential Loan Application for Lot 270 identifying itself as the lender. |
| A223 | Ginn Financial; BSA | Between 02/03/2007 and 03/20/2007 | Sent a request to W. Carver Grant for an appraisal of Kherkher Lot 270. |
| A224 | Ginn Financial; | Between | Received, via mail or wire, an appraisal for Kherkher Lot 270 from W. Carver Grant |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 02/03/2007 and 03/20/2007 | & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A225 | Ginn Financial | Between 02/03/2007 and 03/20/2007 | Sent federally mandated Loan Disclosures to Plaintiff Kherkher for the financing of Lot 270. |
| A226 | Ginn Financial | Between 02/03/2007 and 03/20/2007 | Sent Plaintiff Kherkher an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A227 | Ginn Financial | Between 02/03/2007 and 03/20/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Kherkher so she would not have to travel to the Bahamas to close her loan for Lot 270. |
| A228 | Ginn Financial; BSA | Just Before 03/20/2007 | Sent mortgage closing documents to Plaintiff Kherkher via FedEx so she would not have to travel to the Bahamas to close her mortgage loan for Lot 270. |
| A229 | LA Partners; ERG; Ginn Financial; BSA | 03/20/2007 | Directed BSA, acting as lender, to close on the Kherkher mortgage loan for Lot 270, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A230 | Ginn Financial | After 02/04/2007 | Sent a Loan Fact Sheet to Plaintiffs Lammertse entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A231 | Ginn Financial | After 02/04/2007 | Sent Plaintiffs Lammertse a Uniform Residential Loan Application for Lot 179 identifying itself as the lender. |
| A232 | Ginn Financial; BSA | Between 02/04/2007 and 04/13/2007 | Sent a request to W. Carver Grant for an appraisal of Lammertse Lot 179. |
| A233 | Ginn Financial; BSA | Between 02/04/2007 and 04/13/2007 | Received, via mail or wire, an appraisal for Lammertse Lot 179 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A234 | Ginn Financial | Between 02/04/2007 and 04/13/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Lammertse for the financing of Lot 179. |
| A235 | Ginn Financial | Between 02/04/2007 and 04/13/2007 | Sent Plaintiffs Lammertse an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A236 | Ginn Financial | Between 02/04/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Lammertse so they would not have to travel to the Bahamas to close their loan for Lot |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | and 04/13/2007 | 179. |
| A237 | LA Partners; ERG; Ginn Financial; BSA | 04/13/2007 | Directed BSA, acting as lender, to close on the Lammertse mortgage loan for Lot 179, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A238 | Ginn Financial | After 07/28/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Liles that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A239 | Ginn Financial | After 07/28/2006 | Sent a Loan Fact Sheet to Plaintiffs Liles entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A240 | Ginn Financial | After 07/28/2006 | Sent Plaintiffs Liles a Uniform Residential Loan Application for Lot 46 identifying itself as the lender. |
| A241 | Ginn Financial; BSA | Between 07/28/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Liles Lot 46. |
| A242 | Ginn Financial; BSA | Between 07/28/2006 and | Received, via mail or wire, an appraisal for Liles Lot 46 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 12/13/2006 | |
| A243 | Ginn Financial | Between 07/28/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Liles for the financing of Lot 46. |
| A244 | Ginn Financial | Between 07/28/2006 and 12/13/2006 | Sent Plaintiffs Liles an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A245 | Ginn Financial | Between 07/28/2006 and 12/13/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Liles so they would not have to travel to the Bahamas to close their loan for Lot 46. |
| A246 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Liles via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 46. |
| A247 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Liles mortgage loan for Lot 46, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A248 | Ginn Financial | After 11/07/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Maciag that stated:  "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A249 | Ginn Financial | After 11/07/2006 | Sent a Loan Fact Sheet to Plaintiffs Maciag entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A250 | Ginn Financial | After 11/07/2006 | Sent Plaintiffs Maciag a Uniform Residential Loan Application for Lot 109 identifying itself as the lender. |
| A251 | Ginn Financial; BSA | Between 11/07/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Maciag Lot 109. |
| A252 | Ginn Financial; BSA | Between 11/07/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Maciag Lot 109 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A253 | Ginn Financial | Between 11/07/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Maciag for the financing of Lot 109. |
| A254 | Ginn Financial | Between 11/07/2006 and 12/13/2006 | Sent Plaintiffs Maciag an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A255 | Ginn Financial | Between 11/07/2006 and 12/13/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Maciag so they would not have to travel to the Bahamas to close their loan for Lot 109. |
| A256 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Maciag via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 109. |
| A257 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Maciag mortgage loan for Lot 109, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A258 | Ginn Financial | Before 12/22/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Taglia Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A259 | Ginn Financial | Before 12/22/2006 | Sent a Loan Fact Sheet to Plaintiffs Taglia Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A260 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group a Uniform Residential Loan Application for Lot 220 identifying itself as the lender. |
| A261 | Ginn Financial; BSA | Before 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Taglia Group Lot 220. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A262 | Ginn Financial; BSA | Before 12/22/2006 | Received, via mail or wire, an appraisal for Taglia Group Lot 220 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A263 | Ginn Financial | Before 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Taglia Group for the financing of Lot 220. |
| A264 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A265 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Taglia Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 220. |
| A266 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Taglia Group mortgage loan for Lot 220, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A267 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group a Uniform Residential Loan Application for Lot 429 identifying itself as the lender. |
| A268 | Ginn Financial; BSA | Before 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Taglia Group Lot 429. |
| A269 | Ginn Financial; | Before | Received, via mail or wire, an appraisal for Taglia Group Lot 429 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 12/22/2006 | price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A270 | Ginn Financial | Before 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Taglia Group for the financing of Lot 429. |
| A271 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A272 | Ginn Financial | Before 12/22/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Taglia Group so they would not have to travel to the Bahamas to close their loan for Lot 429. |
| A273 | Ginn Financial; BSA | Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Taglia Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 429. |
| A274 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Taglia Group mortgage loan for Lot 429, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A275 | Ginn Financial | Before 12/22/2006 | Ginn Financial may have Sent a letter, signed by CEO William McCracken, to Plaintiffs Taliaferro that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A276 | Ginn Financial | Before 12/22/2006 | Sent a Loan Fact Sheet to Plaintiffs Taliaferro entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A277 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taliaferro a Uniform Residential Loan Application for Lot 208 identifying itself as the lender. |
| A278 | Ginn Financial; BSA | Before 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Taliaferro Lot 208. |
| A279 | Ginn Financial; BSA | Before 12/22/2006 | Received, via mail or wire, an appraisal for Taliaferro Lot 208 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A280 | Ginn Financial | Before 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Taliaferro for the financing of Lot 208. |
| A281 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taliaferro an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A282 | Ginn Financial | Before 12/22/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Taliaferro so they would not have to travel to the Bahamas to close their loan for Lot 208. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A283 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Taliaferro via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 208. |
| A284 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Taliaferro mortgage loan for Lot 208, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A285 | Ginn Financial | After 08/15/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Verhees that stated:  "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A286 | Ginn Financial | After 08/15/2006 | Sent a Loan Fact Sheet to Plaintiff Verhees entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A287 | Ginn Financial | After 08/15/2006 | Sent Plaintiff Verhees a Uniform Residential Loan Application for Lot 79 identifying itself as the lender. |
| A288 | Ginn Financial; BSA | Between 08/15/2006 and 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Verhees Lot 79. |
| A289 | Ginn Financial; BSA | Between 08/15/2006 and | Received, via mail or wire, an appraisal for Verhees Lot 79 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 12/22/2006 | the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A290 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiff Verhees for the financing of Lot 79. |
| A291 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent Plaintiff Verhees an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A292 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Verhees so she would not have to travel to the Bahamas to close her loan for Lot 79. |
| A293 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiff Verhees via FedEx so she would not have to travel to the Bahamas to close her mortgage loan for Lot 79. |
| A294 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Verhees mortgage loan for Lot 79, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A295 | Ginn Financial | After 12/08/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Webb that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A296 | Ginn Financial | After 12/08/2006 | Sent a Loan Fact Sheet to Plaintiff Webb entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A297 | Ginn Financial | After 12/08/2006 | Sent Plaintiff Webb a Uniform Residential Loan Application for Lot 261 identifying itself as the lender. |
| A298 | Ginn Financial; BSA | Between 12/08/2006 and 02/02/2007 | Sent a request to W. Carver Grant for an appraisal of Webb Lot 261. |
| A299 | Ginn Financial; BSA | Between 12/08/2006 and 02/02/2007 | Received, via mail or wire, an appraisal for Webb Lot 261 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A300 | Ginn Financial | Between 12/08/2006 and 02/02/2007 | Sent federally mandated Loan Disclosures to Plaintiff Webb for the financing of Lot 261. |
| A301 | Ginn Financial | Between 12/08/2006 and 02/02/2007 | Sent Plaintiff Webb an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A302 | Ginn Financial | Between 12/08/2006 and 02/02/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Webb so he would not have to travel to the Bahamas to close his loan for Lot 261. |
| A303 | Ginn Financial; BSA | Just Before 02/02/2007 | Sent mortgage closing documents to Plaintiff Webb via FedEx so he would not have to travel to the Bahamas to close his mortgage loan for Lot 261. |
| A304 | LA Partners; ERG; Ginn Financial; BSA | 02/02/2007 | Directed BSA, acting as lender, to close on the Webb mortgage loan for Lot 261, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A305 | Ginn Financial | After 10/13/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Willis that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A306 | Ginn Financial | After 10/13/2006 | Sent a Loan Fact Sheet to Plaintiff Willis entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A307 | Ginn Financial | After 10/13/2006 | Sent Plaintiff Willis a Uniform Residential Loan Application for Lot 189 identifying itself as the lender. |
| A308 | Ginn Financial; BSA | Between 10/13/2006 and | Sent a request to W. Carver Grant for an appraisal of Willis Lot 189. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 03/15/2007 | |
| A309 | Ginn Financial; BSA | Between 10/13/2006 and 03/15/2007 | Received, via mail or wire, an appraisal for Willis Lot 189 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A310 | Ginn Financial | Between 10/13/2006 and 03/15/2007 | Sent federally mandated Loan Disclosures to Plaintiff Willis for the financing of Lot 189. |
| A311 | Ginn Financial | Between 10/13/2006 and 03/15/2007 | Sent Plaintiff Willis an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A312 | Ginn Financial | Between 10/13/2006 and 03/15/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Willis so he would not have to travel to the Bahamas to close his loan for Lot 189. |
| A313 | Ginn Financial; BSA | Just Before 03/15/2007 | Sent mortgage closing documents to Plaintiff Willis via FedEx so he would not have to travel to the Bahamas to close his mortgage loan for Lot 189. |
| A314 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 | Directed BSA, acting as lender, to close on the Willis mortgage loan for Lot 189, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A315 | LA Partners | At least 11/00/2007 and after | Directed Lubert-Adler Fund IV to take monthly equity distributions from BSA, knowing financial statements and other documents reflecting the distribution would be sent via mail or wire. |

# APPENDIX D – Appraisal Scheme: Bank Fraud Predicate Acts

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A316 | LA Partners; ERG; Ginn Financial; BSA | 03/23/2007 | Using the Appraisal Scheme, induced Plaintiffs Andrews Group to wire $187,432.54 to close the purchase of Lot 272. |
| A317 | LA Partners; ERG; Ginn Financial; BSA | 03/23/2007 to 11/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Andrews Note from a bank account owned by Mark Roodvoets.  Ginn Financial maintains records of the payments, which started at $5,564.90 and were periodically adjusted based on interest rates. |
| A318 | LA Partners; ERG; Ginn Financial; BSA | 02/16/2007 | Using the Appraisal Scheme, induced Plaintiffs Bailey to wire $147,715.08 to close the purchase of Lot 67. |
| A319 | LA Partners; ERG; Ginn Financial; BSA | 04/00/2007 to 11/00/2009 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Bailey Note from a bank account owned by Plaintiffs Bailey.  Ginn Financial maintains records of the payments, which started at $5,797.75 and were periodically adjusted based on interest rates. |
| A320 | LA Partners; ERG; Ginn Financial; BSA | 02/15/2007 | Using the Appraisal Scheme, induced Plaintiffs Beachfront, Ponsler and Kalil to wire $60,832.72 to close the purchase of Lot 43.  Ginn Financial maintains records of the payments. |
| A321 | LA Partners; ERG; Ginn | 02/15/2007 to | Using the Appraisal Scheme, received monthly payment checks on Beachfront Note I from an account in the name of Beachfront Holdings LLP.  Ginn Financial maintains |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | Financial; BSA | 04/00/2010 | records of the payments. |
| A322 | LA Partners; ERG; Ginn Financial; BSA | 02/15/2007 | Using the Appraisal Scheme, induced Plaintiffs Beachfront, Ponsler and Kalil to wire $60,832.72 to close the purchase of Lot 44. |
| A323 | LA Partners; ERG; Ginn Financial; BSA | 02/15/2007 to 04/00/2010 | Using the Appraisal Scheme, received monthly payment checks on Beachfront Note II from an account in the name of Beachfront Holdings LLP.  Ginn Financial maintains records of the payments, which started at $5,743.91 and were periodically adjusted based on interest rates. |
| A324 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Using the Appraisal Scheme, induced Plaintiffs Bredahl to wire $162,467.00 to close the purchase of Lot 39. |
| A325 | LA Partners; ERG; Ginn Financial; BSA | 02/00/2007 to 05/00/2009 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Bredahl Note I from a bank account owned by Steven Bredahl.  Ginn Financial maintains records of the payments. |
| A326 | LA Partners; ERG; Ginn Financial; BSA | 03/09/2007 | Using the Appraisal Scheme, induced Plaintiffs Bredahl to wire $148,071.96 to close the purchase of Lot 39. |
| A327 | Ginn LA Partners; ERG; Ginn Financial; BSA | 05/00/2007 to 05/00/2009 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on on Bredahl Note II from a bank account owned by Steven Bredahl.  Ginn Financial maintains records of the payments. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A328 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Using the Appraisal Scheme, induced Plaintiff Byers to wire closing funds for the purchase of Lot 234.  Ginn Financial maintains records of the payments. |
| A329 | LA Partners; ERG; Ginn Financial; BSA | 01/00/2007 to 06/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Byers Note from a bank account owned by Donald Byers.  Ginn Financial maintains records of the payments, which started at $6,918.43 and were periodically adjusted based on interest rates. |
| A330 | LA Partners; ERG; Ginn Financial; BSA | 08/10/2007 | Using the Appraisal Scheme, induced Plaintiffs Cappuccino Group to wire closing funds for the purchase of Lot 282.  Ginn Financial maintains records of the payments. |
| A331 | LA Partners; ERG; Ginn Financial; BSA | 09/00/2007 to 04/00/2012 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Cappuccino Note I.  Ginn Financial maintains records of the payments, which started at $7,768.43 and were periodically adjusted based on interest rates. |
| A332 | LA Partners; ERG; Ginn Financial; BSA | 05/00/2012 to 08/00/2013 | Using the Appraisal Scheme, received monthly $3,541.49 checks for mortgage payments on Cappuccino Note I. |
| A333 | LA Partners; ERG; Ginn Financial; BSA | 02/25/2008 | Using the Appraisal Scheme, induced Plaintiffs Cappuccino Group to wire closing funds for the purchase of Lot 281.  Ginn Financial maintains records of the payments. |
| A334 | LA Partners; ERG; Ginn | 05/00/2008 to | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Cappuccino Note II.  Ginn Financial maintains records of the payments, |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | Financial; BSA | 04/00/2012 | which started at $6,283.29 and were periodically adjusted based on interest rates. |
| A335 | LA Partners; ERG; Ginn Financial; BSA | 05/00/2012 to 08/00/2013 | Using the Appraisal Scheme, received monthly $4,226.94 checks for mortgage payments on Cappuccino Note II.  Ginn Financial maintains records of the payments. |
| A336 | LA Partners; ERG; Ginn Financial; BSA | 02/00/2008 | Using the Appraisal Scheme, induced Plaintiffs Carell Group to wire closing funds for the purchase of Lot 312.  Ginn Financial maintains records of the payments. |
| A337 | LA Partners; ERG; Ginn Financial; BSA | 02/00/2008 to 01/00/2011 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Carell Note from a bank account owned by Timothy Sell.  Ginn Financial maintains records of the payments. |
| A338 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Using the Appraisal Scheme, induced Plaintiffs Cicolani Group to wire closing funds for the purchase of Lot 104.  Ginn Financial maintains records of the payments. |
| A339 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 to Spring 2007 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Cicolani Note from a bank account owned by Jerry Cicolani.  Ginn Financial maintains records of the payments. |
| A340 | LA Partners; ERG; Ginn Financial; BSA | 08/10/2007 | Using the Appraisal Scheme, Ginn Financial and BSA induced Plaintiffs Clear Reef and Card to wire $159,962.49 to close the purchase of Lot 42. |
| A341 | LA Partners; | 08/10/2007 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | ERG; Ginn Financial; BSA | to 03/00/2010 | payments on the Clear Reef Note from a bank account in the name of Bahama Beach Properties, LLC.  Ginn Financial maintains records of the payments, which started at $5,429.18 and were periodically adjusted based on interest rates. |
| A342 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Using the Appraisal Scheme, induced Plaintiffs Clemmons Group to wire closing funds for the purchase of Lot 494.  Ginn Financial maintains records of the closing payment. |
| A343 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Clemmons Note from a bank account owned by Rick Clemmons.  Ginn Financial maintains records of the payments, which started at $3,656.44 and were periodically adjusted based on interest rates. |
| A344 | LA Partners; ERG; Ginn Financial; BSA | 02/22/2008 | Using the Appraisal Scheme, induced Plaintiffs Crawford Group to wire closing funds for the purchase of Lot 209.  Ginn Financial maintains records of the closing payment. |
| A345 | LA Partners; ERG; Ginn Financial; BSA | 02/22/2008 to 00/00/2010 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments from Plaintiffs Crawford Group on the Crawford Note.  Ginn Financial maintains records of the payments, which started at $4,555.38 and were periodically adjusted based on interest rates. |
| A346 | LA Partners; ERG; Ginn Financial; BSA | 06/22/2007 | Using the Appraisal Scheme, induced Plaintiffs Domnick to wire $96,946.21 to close the purchase of Lot 487. |
| A347 | LA Partners; ERG; Ginn | 06/22/2007 to | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Domnick Note from a bank account owned by Troy and Lauren |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | Financial; BSA | 05/00/2011 | Domnick.  Ginn Financial maintains records of the payments. |
| A348 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 | Using the Appraisal Scheme, induced Plaintiffs Fresonke Group to wire $120,679.84 to close the purchase of Lot 437. |
| A349 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 to 00/00/2011 | Using the Appraisal Scheme, obtained checks for monthly payments on the Fresonke Note.  Ginn Financial maintains records of the payments. |
| A350 | LA Partners; ERG; Ginn Financial; BSA | 02/02/2007 | Using the Appraisal Scheme, induced Plaintiffs Hoyer Group to wire closing funds for the purchase of Lot 448.  Ginn Financial maintains records of the payments. |
| A351 | LA Partners; ERG; Ginn Financial; BSA | 02/02/2007 to 02/00/2011 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Hoyer Note from a bank account owned by Tom Hoyer.  Ginn Financial maintains records of the payments. |
| A352 | LA Partners; ERG; Ginn Financial; BSA | 04/13/2007 | Using the Appraisal Scheme, induced Plaintiffs Jackson Group to wire $129,278.49 to close the purchase of Lot 488. |
| A353 | LA Partners; ERG; Ginn Financial; BSA | 07/00/2007 to 04/00/2010 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Jackson Note from an account in the name of SJS and Sons.  Ginn Financial maintains records of the payments. |
| A354 | LA Partners; ERG; Ginn | 12/13/2006 | Using the Appraisal Scheme, induced Plaintiff Josephson to wire $64,400.00 to close the purchase of Lot 493. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | Financial; BSA | | |
| A355 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 to 12/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Josephson Note from a bank account owned by James Josephson.  Ginn Financial maintains records of the payments. |
| A356 | LA Partners; ERG; Ginn Financial; BSA | 03/20/2007 | Using the Appraisal Scheme, induced Plaintiff Kherkher to wire $265,780.27 to close the purchase of Lot 270. |
| A357 | LA Partners; ERG; Ginn Financial; BSA | 03/20/2007 to 09/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Kherkher Note from a bank account owned by Susan Compton Kherkher.  Ginn Financial maintains records of the payments, which started at $7,796.43 and were periodically adjusted based on interest rates. |
| A358 | LA Partners; ERG; Ginn Financial; BSA | 04/13/2007 | Using the Appraisal Scheme, induced Plaintiffs Lammertse to wire $170,135.97 to close the purchase of Lot 179. |
| A359 | LA Partners; ERG; Ginn Financial; BSA | 04/13/2007 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments from Plaintiffs Lammertse on the Lammertse Note.  Ginn Financial maintains records of the payments, which started at $5,020.10 and were periodically adjusted based on interest rates. |
| A360 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Using the Appraisal Scheme, induced Plaintiffs Liles to wire $73,613.00 to close the purchase of Lot 46. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A361 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 to 09/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Liles Note from an account in the name of Kenneth and Patricia Liles. Ginn Financial maintains records of the payments, which started at $5,714.93 and were periodically adjusted based on interest rates. |
| A362 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Using the Appraisal Scheme, induced Plaintiffs Maciag to wire $173,648.30 to close the purchase of Lot 109. |
| A363 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 to 01/00/2011 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Maciag Note from a bank account owned by Group II Investments, LLC.  Ginn Financial maintains records of the payments. |
| A364 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Using the Appraisal Scheme, induced Plaintiffs Taglia Group to wire closing funds for the purchase of Lot 220.  Ginn Financial maintains records of the payments. |
| A365 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Taglia Note I from a bank account owned by Bayport Properties, Ltd. Ginn Financial maintains records of the payments, which started at $7,145.40 and were periodically adjusted based on interest rates. |
| A366 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Using the Appraisal Scheme, induced Plaintiffs Taglia Group to wire closing funds for the purchase of Lot 429.  Ginn Financial maintains records of the payments. |
| A367 | LA Partners; ERG; Ginn | 12/22/2006 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on Taglia Note II from a bank account owned by Yellowfin Properties, Ltd. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | Financial; BSA | | Ginn Financial maintains records of the payments, which started at $4,715.40 and were periodically adjusted based on interest rates. |
| A368 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Using the Appraisal Scheme, induced Plaintiffs Taliaferro to wire $172,847.50 to close the purchase of Lot 208. |
| A369 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 to 01/00/2011 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Taliaferro Note from a bank account owned by Group III Investments, LLC.  Ginn Financial maintains records of the payments. |
| A370 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Using the Appraisal Scheme, induced Plaintiff Verhees to wire $151,469.50 to close the purchase of Lot 79. |
| A371 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 to 08/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Verhees Note from a bank account owned by Anja Verhees.  Ginn Financial maintains records of the payments. |
| A372 | LA Partners; ERG; Ginn Financial; BSA | 02/02/2007 | Using the Appraisal Scheme, induced Plaintiff Webb to wire $268,109.67 to close the purchase of Lot 261. |
| A373 | LA Partners; ERG; Ginn Financial; BSA | 02/02/2007 to 10/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Webb Note from a bank account owned by Richard Webb.  Ginn Financial maintains records of the payments, which started at $7.996.92 and were periodically adjusted based on interest rates. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A374 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 | Using the Appraisal Scheme, induced Plaintiff Willis to wire $95,760.70 to close the purchase of Lot 189. |
| A375 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 to 07/00/2008 | Using the Appraisal Scheme, obtained authorization to automatically withdraw monthly payments on the Willis Note from a bank account owned by Darryl Willis.  Ginn Financial maintains records of the payments, which started at $4,207.53 and were periodically adjusted based on interest rates. |