**UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF FLORIDA**

BAHAMAS SALES ASSOCIATE, LLC
                    Plaintiff,
vs.                                                          Case No. 3:08-cv-1012-J-32JRK

DONALD CAMERON BYERS,
                    Defendant.
_____

DONALD CAMERON BYERS,
                    Counterclaim Plaintiff,
vs.

BAHAMAS SALES ASSOCIATE, LLC, et al.,
                    Counterclaim Defendants,
vs.

CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY NUMBERS
MBB0651789A07, MBB0751789A08, MBB0651789A09,
MBB0751789A10, and NUTMEG INSURANCE COMPANY,
                    Third-Party Defendants.
_____

BAHAMAS SALES ASSOCIATE, LLC
                    Plaintiff,
vs.                                                          Case No. 3:08-cv-1062-J-32JRK

DARRYL WILLIS,
                    Defendant.
_____

DARRYL WILLIS,
                    Counterclaim Plaintiff,
vs.

BAHAMAS SALES ASSOCIATE, LLC, et al.,
                    Counterclaim Defendants,
vs.

CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY NUMBERS
MBB0651789A07, MBB0751789A08, MBB0651789A09,
MBB0751789A10, and NUTMEG INSURANCE COMPANY,
                    Third-Party Defendants.
_____

EDWARD R. WEBB, et al.,
                    Plaintiffs,
vs.                                                          Case No. 3:09-cv-516-J-32JRK

GINN FINANCIAL SERVICES, et al.,
                    Defendants,

1

vs.

CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY NUMBERS
MBB0651789A07, MBB0751789A08, MBB0651789A09,
MBB0751789A10, and NUTMEG INSURANCE COMPANY,
           Third-Party Defendants.

MARK F. BAILEY, et al.,
           Plaintiffs,
vs.                                        Case No. 3:10-cv-422-J-32JRK

ERG ENTERPRISES, LP, et al.,
           Defendants,
vs.

CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY NUMBERS
MBB0651789A07, MBB0751789A08, MBB0651789A09,
MBB0751789A10, and NUTMEG INSURANCE COMPANY,
           Third-Party Defendants.

TODD TALIAFERRO, et al.,
           Plaintiffs,
vs.                                        Case No. 3:11-cv-199-J-32JBT

ERG ENTERPRISES, LP, et al.,
           Defendants,
vs.

CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY NUMBERS
MBB0651789A07, MBB0751789A08, MBB0651789A09,
MBB0751789A10, and NUTMEG INSURANCE COMPANY,
           Third-Party Defendants.

R. VICTOR TAGLIA, et al.,
           Plaintiffs,
vs.                                        Case No. 3:12-cv-731-J-32JBT

ERG ENTERPRISES, LP, et al.,
           Defendants,
vs.

CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY NUMBERS
MBB0651789A07, MBB0751789A08, MBB0651789A09,
MBB0751789A10, and NUTMEG INSURANCE COMPANY,
           Third-Party Defendants.

## SECOND AMENDED MASTER COMPLAINT

PLAINTIFFS, for their Second Amended Master Complaint herein, allege as follows:

### JURISDICTION

1.   This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a) and (c).  This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state common-law claims alleged herein.

2.   This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(a) and (d).  This Court has personal jurisdiction over each Defendant because Defendants, individually or through agents, officers or representatives, engaged in business activities and maintained business offices in the State of Florida; committed statutory violations in the State of Florida; and caused injuries to Plaintiffs arising from acts or omissions occurring in the State of Florida, all as alleged herein.

### VENUE

3.   Venue is appropriate in this Court under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and division, and because several Defendants reside and/or transact business in this district and division.

### THE PARTIES

4.   Between December 2006 and February 2008, all Plaintiffs bought lots in the Ginn Sur Mer development on Grand Bahama Island ("GSM").

5.   Plaintiffs William J. Andrews, Jr. ("W. Andrews"), Mark R. Roodvoets and Jon D. Andrews ("J. Andrews") are residents of South Carolina.  Plaintiff Charles B. Lesesne is a resident of Florida.  Plaintiffs W. Andrews, Roodvoets, J. Andrews and Lesesne ("Andrews Group") bought Lot 272 on March 23, 2007.

3

6.    Plaintiffs Mark F. Bailey and Gay L. Bailey ("Bailey") are residents of Florida who bought Lot 67 on February 16, 2007.

7.    Plaintiff Beachfront Holdings & Investments, Ltd. ("Beachfront") is a Bahamian corporation formed to purchase, on February 15, 2007, Lots 43 and 44.  Plaintiffs Stephen D. Ponsler and Assed F. Kalil are residents of Indiana who entered into mortgage notes along with Beachfront to finance Lots 43 and 44.

8.    Plaintiffs Steven R. and Andrea P. Bredahl ("Bredahl") are residents of New Jersey who bought Lot 39 on December 22, 2006 and Lot 33 on March 9, 2007.

9.    Plaintiff Donald Cameron Byers ("Byers") is a resident of Texas who bought Lot 234 on December 22, 2006.

10.   Plaintiffs Joseph Cappuccino and Shelley R. Jensen ("Cappuccino Group") are residents of California who bought Lot 281 on August 10, 2007 and Lot 282 on February 25, 2008.

11.   Plaintiff James W. Carell is a resident of Tennessee.  Plaintiff Timothy Sell is a resident of Michigan.  Carell bought Lot 108 on December 13, 2006.  Sell and Carell ("Carell Group") bought Lot 312 around Feburary 2008.

12.   Plaintiff Jerry A. Cicolani, Jr. is a resident of Florida.  Plaintiff Kris Brenneman is a resident of Ohio.  Cicolani and Brenneman ("Cicolani Group") bought Lot 104 on December 13, 2006.

13.   Plaintiff Clear Reef Properties, Ltd. ("Clear Reef") is a Bahamian corporation formed to purchase, on March 13, 2007, Lot 42.  Plaintiff James A. Card is a resident of Indiana who entered into a mortgage note along with Clear Reef to finance Lot 42.

14.   Plaintiff Rickie A. Clemmons is a resident of North Carolina.  Plaintiff Timothy Sell is

a resident of Michigan.  Clemmons and Sell ("Clemmons Group") bought Lot 494 on December 13, 2006.

15.   Plaintiffs Kevin T. Crawford and David P. Jankowski ( "Crawford Group") are residents of Michigan who bought Lot 209 on February 22, 2008.

16.  Plaintiffs Troy A. Domnick and Lauren K. Domnick ("Domnick") are residents of Wisconsin who bought Lot 487 on June 22, 2007.

17.  Plaintiffs Dean A. Fresonke, Stephanie L. Fresonke, David D. Garner, Stephen M. Tormey, Denise M. Tormey, Tom G. Harvey and Sandra M. Harvey ("Fresonke Group") are residents of Florida who bought Lot 437 on March 15, 2007.

18.  Plaintiffs Thomas K. Hoyer and Caroline A. Hoyer are residents of the State of Texas. Plaintiffs Bruce L. Freeman and Jill J. Freeman are residents of North Carolina.  Hoyer and Freeman ("Hoyer Group") bought Lot 448 on February 2, 2007.

19.  Plaintiffs James W. Jackson, Bernard J. Shaughnessy Jr., and Frederick A. Reeping ("Jackson Group") are residents of Pennsylvania who bought Lot 488 on April 13, 2007.

20.  Plaintiff James Josephson ("Josephson") is a resident of New York who bought Lot 493 on December 13, 2006.

21.  Plaintiff Susan C. Kherkher ("Kherkher") is a resident of Texas who bought Lot 270 on March 20, 2007.

22.  Plaintiffs Thomas E. Lammertse and Mary L. Sipski ("Lammertse") are residents of New Jersey who bought Lot 179 on April 13, 2007.

23.  Plaintiffs Kenneth W. Liles and Patricia M. Liles ("Liles") are residents of Washington who bought Lot 46 on December 13, 2006.

24.  Plaintiffs Arthur M. and Alexandria A. Maciag ("Maciag") are residents of Michigan

who bought Lot 109 on December 13, 2006.

25.  Plaintiff Doug Smith ("Smith") is a resident of Tennessee who bought Lot 498 on December 15, 2006.

26.  Plaintiffs R. Victor Taglia and John G. Grubbs ("Taglia Group") are residents of Florida who bought Lots 220 and 429 on December 22, 2006.

27.  Plaintiffs Todd and Maureen Taliaferro ("Taliaferro") are residents of Michigan who bought Lot 208 on December 22, 2006.

28.  Plaintiffs Ronald P. Van, as trustee of the Ronald P. Van Jr. Revocable Trust u/a/d August 25, 2006 and Kathy Jo Van, as Trustee of the Kathy Jo Van Revocable Trust u/a/d August 26, 2006 ("Van") are residents of Illinois who bought Lot 203 on May 18, 2007.

29.  Plaintiff Anja M. Verhees ("Verhees") is a resident of Florida who bought Lot 79 on December 22, 2006.

30.  Plaintiff Edward R. Webb ("Webb") is a resident of Georgia who bought Lot 261 on February 2, 2007.

31.  Plaintiff Darryl Willis ("Willis") is a resident of California who bought Lot 189 on March 15, 2007.

32.  Defendant Lubert-Adler Management Company, LP d/b/a Lubert-Adler Partners, LP is a Delaware limited partnership with its principal place of business in Pennsylvania. Lubert-Adler Partners is a private-equity fund management company.  Together with Bobby Ginn, Lubert-Adler Partners finances, develops and manages luxury resort communities.

33.  Defendant Dean S. Adler is an individual who co-founded Lubert-Adler Partners with Ira M. Lubert.  Dean Adler is the Chief Executive Officer of Lubert-Adler Partners.

34.   Defendant Edward R. ("Bobby") Ginn, III is an individual specializing in luxury

resort development.

35.   Defendant ERG Enterprises, LP is a Georgia limited partnership with its principal place of business in Palm Coast, Florida.  Bobby Ginn directly or indirectly owns and controls, and served as the CEO for, Defendant ERG.

36.   Defendant Ginn Financial Services, LLC is a Georgia Limited Liability Company with its principal place of business in Palm Coast, Florida.  Ginn Financial is a wholly owned subsidiary of The Ginn Companies, LLC.

37.   Defendant Bahamas Sales Associate, LLC is a Delaware corporation with its principal place of business in Palm Coast, Florida.  Bahamas Sales Associate is a wholly owned subsidiary of The Ginn Companies, LLC.  At all times relevant to the allegations herein, Bahamas Sales Associate was a mere instrumentality and alter ego of Ginn Financial Services, sharing Ginn Financial's offices and employees, with no independent existence apart from Ginn Financial.

38.   From the time of the formation of Bahamas Sales Associate, Defendants Bobby Ginn and Lubert-Adler Partners have been its beneficial owners.  In addition, at all times relevant to the claims alleged herein, Lubert-Adler, Dean Adler, Bobby Ginn and ERG exercised management authority and control over Defendants Ginn Financial and Bahamas Sales Associate.

39.   As alleged below, Dean Adler and Lubert-Adler Partners directed, controlled, ratified and/or participated in the actions of ERG, Bobby Ginn, Ginn Financial and BSA.  At all material times, Dean Adler and Lubert-Adler Partners had actual knowledge or knowledge fairly implied on the basis of objective circumstances, of the acts of those Defendants.

40.   Each Defendant is sued individually as a primary violator and as an aider and abettor.

As alleged below, in acting to aid and abet the commission of the fraud and other wrongful conduct alleged herein, each Defendant was aware of that fraud and wrongful conduct. Each Defendant rendered substantial assistance or encouragement to the accomplishment of the fraud and was aware of its overall contribution to the conspiracy, scheme, and common course of wrongful conduct alleged.

41. Each Defendant is joined in this action as a co-conspirator. As alleged below, each Defendant entered an agreement with the other Defendants to commit or to participate in the commission of the unlawful acts and schemes to defraud alleged.

42. The following Defendants shall hereafter be referred to as set forth below:

| Defendant(s) | Herein Referred to As |
|---|---|
| Lubert-Adler Management Company, LP d/b/a Lubert-Adler Partners, LP | LA Partners |
| Collectively: Dean Adler;  LA Partners | LA |
| Edward R. ("Bobby") Ginn, III | Bobby Ginn |
| ERG Enterprises, LP | ERG |
| Collectively: Dean Adler; Lubert-Adler; Bobby Ginn; ERG | Lubert/Ginn |
| Ginn Financial Services, LLC | Ginn Financial or GFS |
| Bahamas Sales Associate, LLC | BSA |

## FACTUAL BACKGROUND:
## The Relationship Between LA and Bobby Ginn

## I.  Introduction

43. LA Partners and Bobby Ginn formed their first luxury resort development and

management company in 1998.  By 2005, LA Partners and Ginn had land holdings of approximately 38,000 acres.

44.  Acting through a fluid assortment of subsidiary and affiliate entities of The Ginn Companies, LA Partners and Bobby Ginn developed and managed luxury resort communities throughout the U.S. (collectively "GLA Projects").

## II.  Ownership and Control Over GLA Projects

45.  From at least 2006 through 2008, LA Partners classified Ginn as one of its "operating and strategic real estate partners" and worked with Ginn, "converting large land parcels into Destination Resorts."

46.  LA Partners was a primary source of capital for each GLA Project, in exchange for 80% interest and compounded priority return.  Entities owned or controlled by Bobby Ginn held the remaining 20% interest.

47.  The antithesis of a passive investor, LA Partners (acting through Dean Adler and others including Stuart Margulies and Amy Wilde) managed and controlled all aspects of GLA Projects.

48.  LA structured the operative agreements for each GLA Project to provide LA Partners with ultimate control and management authority.  For example, the Limited Partnership Agreement for Ginn-LA West End Ltd., LLLP (the ultimate parent of the GSM developer entity), identifies an entity owned by Bobby Ginn as the General Partner and certain Lubert-Adler inverstment funds as Limited Partners.  While the Agreement allows Bobby Ginn the "day-to-day management" of Partnership business, this authority is qualified by restrictions and/or requirements for prior written approval of the Lubert-Adler Limited Partners.

49.  In contrast with the limited authority given Bobby Ginn, the Agreement vests the Lubert-Adler Limited Partners with "the right to substantially influence the conduct of the

management of the Partnership," including discretion to remove the General Partner for failure to perform under the Agreement, and the unilateral right to sell all the GSM land or terminate the development agreement with the GSM developer.

## III.   The Reputation of Ginn Clubs & Resorts

50.   Ginn Clubs & Resorts ("Ginn Clubs") developed a reputation for what internal documents boasted were "the finest leisure lifestyle and resort communities across the United States."

51.   Bobby Ginn was the public face for Ginn Clubs, ballyhooed as a visionary developer and operator of luxury resorts, with a track record of projects offering exceptional amenities and service.

52.   Ginn Clubs differentiated itself by offering its customers more than a lot in a luxury development.  Offering its customers  "a total lifestyle" experience was critical to the strategy for GLA Projects.  Internal documents describe this strategy:  "We offer a total lifestyle package"; "We deliver total lifestyles"; "Our club memberships are always in demand"; "We're there for the long haul."

53.   Lubert/Ginn knew customers buying lots in GLA Projects, including GSM, wanted the "total lifestyle package" those projects offered.  Internal documents acknowledge this as a critical selling feature: "people don't just buy the property for the location and the home – they buy it for the ease of use, the amenities and the experience"; "all the properties – they deliver a lifestyle that Ginn customers are looking for with unmatched amenities and service"; "We operate what we build which gives buyers confidence in the continuity of the Ginn experience."

# FACTUAL BACKGROUND:

## Cash Out Scheme

**IV.   Summary of the Cash Out Scheme**

54.   After the U.S. real estate market collapsed beginning in late 2005, Dean Adler and Lubert-Adler orchestrated a scheme to loot GSM in order to obtain a $675 million loan ("Loan"), which they used to eliminate their investment risk and harvest unearned profits from unfinished resort projects ("Cash Out Scheme").

55.   By late 2005, LA was heavily invested in GLA Projects in the United States.  After the U.S. market began to collapse in late 2005, LA wanted to cash out its investments in several GLA Projects before they turned to losses.  In addition, because LA's reputation depended on its ability to deliver return on investment to blue-chip investors in its real estate funds, LA devised a scheme to extract unearned future profits from the U.S. GLA Projects, notwithstanding market declines.

56.   To meet its objectives for the Cash Out Scheme, LA needed a massive loan.  So LA combined GSM with four U.S. Projects into a large collateral pool.

57.   While the Cash Out Scheme was extraordinarily complex, LA's goals were simple.  Dean Adler secretly disclosed LA's objectives in a memo to its Advisory Group:

   a.   Pull its investments from four U.S. projects without showing losses.

   b.   Eliminate its liability for existing debt in the four U.S. projects.

   c.   Take unearned future profits from GSM and the U.S. projects.

58.   Dean Adler convinced ERG and Bobby Ginn to participate in the Cash Out Scheme, enticing Bobby Ginn with a chance to eliminate his liability for project debt and obtain part of the Loan proceeds.  Nothwithstanding ERG and Bobby Ginn's participation, LA masterminded and controlled the Cash Out Scheme.

59.  Lubert/Ginn sacrificed GSM as fodder for the Cash Out Scheme to boost the Loan size and the amount they took from Loan proceeds.  LA structured the Loan to "harvest" future profits from GSM and the U.S. Projects, make GSM lot sale proceeds available to fund Tesoro and Quail West operating costs, make GSM liable for the entire Loan, and make GSM subject to foreclosure when the Loan defaulted – all without giving GSM any benefit from the Loan.

60.  Lubert/Ginn used the Cash Out Scheme to loot GSM months before any lots were sold.  Because they knew potential GSM lot buyers would never purchase lots if they knew about the Cash Out Scheme, LA concealed the Scheme from the GSM sales team and potential GSM buyers.

61.  Even after the Loan went into default and its existence became public knowledge, Lubert/Ginn mischaracterized the Loan, its purpose, and its devastating impact on GSM.  Lubert/Ginn continues to the present to conceal material facts concerning the Loan.

## V.   The Problem: LA was Heavily Invested In U.S. Resort Developments When the U.S. Market Collapsed

62.  In late 2005, the U.S. real estate market began a decline that Bobby Ginn would later describe as brutal and unprecedented:

> "The market crash[] from the end of 2005 . . . to July of 2006 was as big a falloff in housing as I have ever seen in 40 years.  And it hasn't gotten better, it's gotten a little worse . . . . The market was going bad from the end of 2005 through the entire year of 2006, but the first six months of 2006 was brutal.  I mean it's like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall…." (Transcript of 07/23/08 Ginn Resorts Conf. Call.)

63.  At the time of the market collapse, LA had a problem:

a.  LA was heavily invested in GLA Projects throughout the U.S., many of which were still in the early stages of development.

b.  Some U.S. Projects were in trouble, with hundreds of lot sales that failed to close.

   c.  LA had liability for debt in the U.S. Projects.

  64.  LA was unwilling to accept the risk it might not recoup its investments and earn

profits from the U.S. Projects.

## VI.  The Solution:  LA Devised a Scheme to Cash Out with Record Profits

The Credit Suisse Syndicated Term Loan

  65.  In 2005, Credit Suisse marketed a new loan product to owners of luxury resorts.  As

U.S. Bankruptcy Judge Ralph B. Kirshner explained of a Credit Suisse loan to the owner of

the Yellowstone Mountain Club:

> In 2005, Credit Suisse was offering a new financial product for sale.  It was offering
> the owners of luxury second-home developments *the opportunity to take their profits
> up front by mortgaging their development projects to the hilt*.... The development
> *owners would take most of the money out as a profit dividend*, leaving their
> developments saddled with enormous debt.... Numerous entities that received Credit
> Suisse's syndicated loan product have failed financially, including ... Ginn.  If the
> foregoing developments were anything like this case, they were *doomed to failure
> once they received their loans*.

*In re Yellowstone Mtn. Club, LLC,* Case No. 08-61570-11, Adv. Pro. No. 09-00014, Dk. 289,

Partial & Interim Order, 2009 WL 3094930, at *3-4 (Bank. D. Mont. May 13, 2009); Mem. of

Decision, 436 B.R. 598, 609, 655-60 (Bank. D. Mont. Aug. 16, 2010) (avoiding $209 million

fraudulent transfer) (emphasis added).

  66.  LA saw a solution to its problem.  In 2005, Dean Adler began working on the complex

transaction to obtain a massive $675 million Credit Suisse loan ("Loan").  LA wanted the

Loan to be as large as possible, initially hoping for as much as $800 million.  Even at $675

million, an internal document boasted the Loan was "the largest syndicated land loan

financing ever completed."

  67.  Dean Adler was only able to obtain the massive Loan amount with a risky cross-

collateralization plan.  Whereas all the other Credit Suisse Syndicated Term Loans were

secured by a single luxury resort, the Lubert/Ginn Loan was secured by a collateral pool comprised of five (formerly) separate resorts ("Loan Collateral Projects").

68. The Loan Collateral Projects included GSM and four GLA Projects in the U.S.

   a. Tesoro (Florida)

   b. Quail West (Florida)

   c. Hammock Beach River Club (Florida)

   d. Laurelmor (North Carolina)

69. Even before the Loan closed, the Tesoro and Quail West Projects in Florida were already failing, with hundreds of lot sale cancellations.

70. LA used Loan proceeds to cash out of the U.S. Loan Collateral Projects after the market collapse, recoup its invested capital, eliminate liability for existing debt and "harvest" future profits it would not have realized, if at all, for many years.

71. In a secret memo to LA Advisory Boards, Dean Adler explained the goals of the Loan, including:

   a. "[i]mmediate mitigation of 100% of the capital risk" for LA and "removal of all guarantee exposure" for LA and Ginn by "paying off all existing recourse debt" and replacing it with debt recourse to the Projects.

   b. "[a]n immediate dividend of $333,125,000" for "the harvesting of profits with no risk of capital loss" to "provide an earlier than anticipated profit distribution."

72. In addition, Dean Adler enticed ERG and Bobby Ginn to participate in the Cash Out Scheme with the opportunity to elimate Bobby Ginn's personal liability for debt in the Projects and obtain a slice, albeit small, of Loan proceeds.

73. Nothwithstanding ERG and Bobby Ginn's participation, Dean Adler directed and

14

controlled the Cash Out Scheme.  One internal email reveals Dean Adler told Bobby Ginn and the transaction team in March 2006 the Loan was "the single most important task that the LA Fund (and [Ginn]) has before it in the next 60 days."  Another email from an LA Partners executive to a Morris, Manning and Martin attorney forwards instructions on the Loan from Dean Adler with the message, "More input from the chairman."

74.  As the U.S. market was collapsing and the Tesoro and Quail West Projects were failing, LA used the Loan to emerge with record profits for investors, burnishing LA Partners' reputation and enhancing the financial performance of its investment funds.

LA's Complex Loan Transaction

75.  The $675 million Loan transaction was extraordinarily complex, requiring 8,250 pages of closing documents.

76.  Lubert/Ginn benefited immensely from the Cash-Out Scheme, receiving more than $488 million from initial Loan proceeds:

   a.  The day the Loan closed, LA immediately siphoned over $330 million from Loan proceeds, giving Bobby Ginn more than $7 million.

   b.  Lubert/Ginn used $158 million from Loan proceeds to pay off existing debt in the Loan Collateral Projects – debt that would otherwise have been recourse to Lubert-Adler and/or Bobby Ginn.

77.  Of the $488 million Lubert/Ginn obtained from initial Loan proceeds, nearly $231 million was attributed to return of Lubert-Adler equity, payoff of recourse debt and "harvested" profits for the failing Tesoro and Quail West Projects.

78.  To ensure they had no liability for Loan debt, Lubert/Ginn were neither borrowers nor guarantors of the Loan.  Instead, Lubert/Ginn directed the formation of two shell companies (Ginn-LA Conduit Lender and Ginn-LA CS Borrower) to serve as borrowers and conduits to

transfer Loan proceeds.

79.  As the market fell around them, Lubert/Ginn emerged unscathed, with record profits for LA Partners, return of all LA Partners' equity and removal of all liability for Project debt.

Lubert/Ginn Sacrificed GSM to Obtain the Loan

80.  Lubert/Ginn knew the U.S. Loan Collateral Projects did not provide enough value to obtain the $675 million Loan.  So they used GSM as the largest piece of the collateral pool, providing 41% of the total Loan collateral.

81.  Lubert/Ginn also knew lot sales in the U.S. Loan Collateral Projects could not service the massive Loan debt, largely because Tesoro and Quail West had already suffered hundreds of lot sales cancellations after the market collapse.  Lubert/Ginn needed GSM lot sales as the primary source for Loan repayment.

## VII.   Effects of the Loan on GSM

82.  When the Loan closed, the effects on GSM ("Loan Effects") were devastating.  GSM received no benefit from the Loan, yet it was ruined:

The Loan Looted GSM and Left it With a Crushing Debt Load

83.  Lubert/Ginn used the Loan to extract every dime of future value from GSM, prior to development and months before a single lot was sold.

84.  GSM land was purchased just months earlier for $24 million, and GSM had few other assets at the time of the Loan.  Nevertheless, LA used the Loan to extract $618 million in projected future value from GSM.

85.  As soon as the Loan closed, GSM was crippled with a massive debt load.  Before the Loan closed, the March 31, 2006 balance sheet for the ultimate parent company of the GSM developer (Ginn-LA West End Ltd., LLLP) showed a $12 million liability for "Notes Payable."  As a result of the Loan, the "Notes Payable" liability (as of December 31, 2006)

had increased to $581 million.

The Loan Mortgaged GSM to the Hilt

86.  Lubert/Ginn mortgaged GSM to the hilt in order to boost the Loan amount, before development started and months before a single lot was sold.

87.  Before the Loan, GSM had a $12 million mortgage.  To obtain the Loan, Lubert/Ginn replaced GSM's $12 million mortgage with a $276 million mortgage.  In addition, Lubert/Ginn gave the Credit Suisse Lenders a lien on substantially all GSM assets and land.

88.  Lubert/Ginn also gave the Credit Suisse Lenders a lien on ownership of and control over GSM development.  Long before they sold any lots, Lubert/Ginn mortgaged what they knew customers would want from GSM:  a Bobby Ginn development with unmatched amenities, a "total lifestyle package" and "the continuity of the Ginn experience."

GSM Was Liable for Massive Loan Payments and the Entire Loan Debt

89.  Even though it got no benefit from the Loan, Lubert/Ginn made GSM liable for the entire Loan debt.  Following Lubert/Ginn's aggressive use of the credit line portion of the Loan, the Loan debt grew to more than $850 million.

90.  Before the Loan, GSM was independently capitalized, responsible only for its own debt.  To secure a larger Loan amount, Lubert/Ginn made GSM fully liable for the massive payments required to service the Loan debt.

The Loan Left No Money for GSM Development

91.  Before the Loan, internal documents reveal lot sales were "by far [the] largest source of funds for development expenses" for GLA Projects, and Lubert/Ginn intended to use GSM lot sale proceeds to fund GSM development.

92.  Under the Loan, 100% of GSM lot sale proceeds were allocated to Loan payments,

and GSM could not take out additional debt to fund development.

93.  Quite simply, the Loan left GSM with no money, making development impossible.

GSM Was Sacrificed to Likely Default and Foreclosure

94.  Before the Loan, Lubert/Ginn intended that GSM would be an independent Project, subject to its own market conditions on Grand Bahama Island.  To obtain the Loan, LA's cross-collateralization scheme handcuffed GSM to the failing Tesoro and Quail West Projects.

95.  Even before the Loan closed, Lubert/Ginn knew a Loan default was likely due to Tesoro and Quail West lot sales cancellations.  For this reason, they knew the cross-collateralization scheme put GSM at serious risk of foreclosure when Tesoro and Quail West did not sell sufficient lots to repay the Loan.

96.  In a pre-Loan disclosure Memo to LA Advisory Boards, Dean Adler explained the main risk of "cross-collateralizing" five separate Projects:

> [T]he principal risk of any cross-collateralized financing is that Project A (e.g., Tesoro), though highly successful on its own, could nevertheless be lost to foreclosure in the event that Project B (e.g., Laurelmor) or Project C (e.g., Grand Bahamas-West End) do not perform well, thereby causing the Credit Suisse loan to go into default.

97.  Dean Adler knew this was the script for a Loan default.  And even though Adler transposed Project names in his example, he knew the U.S. market was in free-fall and the Tesoro and Quail West Projects would not meet sales projections.  As a result, the risk of foreclosure disproportionately fell to GSM.

98.   Indeed, less than a month before the Loan closed, Morris Manning & Martin attorney Sonny Morris told the transaction team Dean Adler was "greatly concerned that a failure to meet projections will result in a default" due to lot sale cancellations.

99.  Dean Adler knew the risks of cross-collateralization were material and very real.  For

this reason, he provided LA's Advisory Board with a detailed explanation of the Loan, including the risks of cross-collateralization.

100.  Lubert/ Ginn provided no similar disclosure to GSM buyers.  Instead, they intentionally concealed from GSM lot buyers the collateralization of GSM with the failing Tesoro and Quail West Projects, and the likelihood of default and GSM foreclosure.

## VIII.   Lubert/Ginn Maximized the Loan Size with Inflated Lot Sales Projections

### Cushman & Wakefield's TNV Appraisal Method

101.  The Loan size depended on the value of the five Projects LA included in the collateral pool.  To determine the value of the Projects, Credit Suisse used Cushman & Wakefield to perform Total Net Value ("TNV") appraisals.

102.  Cushman defined TNV as "the sum of the market value of the bulk lots of the entire planned community, as if all of the bulk lots were complete ... and available for sale ... as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

103.  Cushman's TNV was "subject to the completion" of GSM infrastructure and "a $230 million upscale amenity package."  As a result, Lubert/Ginn knew Cushman's TNV far exceeded the Projects' actual market value.  For example:

   a.   A county appraiser valued Tesoro real and tangible property in 2006 at $74.9 million.  Yet Cushman's April 2006 TNV for unsold Tesoro lots was $210 million.

   b.   Ginn bought the GSM land in August 2005 for $24.5 million.  Yet Cushman's June 2006 TNV for GSM, before any development, was $618 million.

104.  Internal documents show LA principals (including Dean Adler, Robert Rosenberg and Stuart Marguilies) acknowledged Cushman's TNV overstated the Projects' fair-market value by several hundred million dollars.

105.  Lubert/Ginn also knew Credit Suisse's use of the TNV valuation allowed them to increase the Loan size beyond what was reasonable given the actual value of the Projects.

106.  Lubert/Ginn knew because the Loan size was based on TNV, it did not comply with U.S. banking laws, including the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which required an "As Is" or "Market Value" appraisal.  Lubert/Ginn knew this was why Credit Suisse coordinated the Loan through its "Cayman Islands Branch," an off-shore "affiliate" with a New York address and no actual physical presence in the Cayman Islands, syndicating the Loan to non-regulated entities, such as hedge funds.

Lubert/Ginn Used Inflated Lot Sales Projections to Boost the Loan Size

107.  Cushman's TNV was based on Lubert/Ginn's projections of future lot sales in the Loan Collateral Projects ("Sales Projections").  Higher Sales Projections meant a bigger Loan.

108.  Lubert/Ginn's Sales Projections for Tesoro and Quail West ignored hundreds of sales cancellations for those Projects in the fourth quarter of 2005.  Internal documents reveal LA principals (including Dean Adler, Robert Rosenberg and Stuart Marguilies) and others on the transaction team discussed how to increase Sales Projections despite the Tesoro and Quail West cancellations:  by manipulating sales, costs and absorption rates over the long projection period.

109.  Sales Projections forecast the sale of 397 lots in Tesoro by 2009 and 290 lots in Quail West by 2008.  Lubert/Ginn knew the Projections were inflated for at least the following reasons:

    a.  Ginn held launch events for Tesoro in October 2005 and Quail West in December 2005.  The Tesoro launch generated sales reservations or contracts for nearly 450 residential lots and 50 condominium units.  The Quail West launch generated sales reservations or contracts for nearly 450 lots.

    b.  In the wake of the collapsing U.S. market, the majority of Tesoro and Quail West contracts and reservations were either cancelled or failed to close.

    c.  At the time of the Sales Projections, there were only 11 Tesoro lots and 25 Quail West lots under contract.

110.   The Tesoro situation was so bad by May 2006 that LA principal Robert Rosenberg recommended Dean Adler use Tesoro sales cancellations as a reason for LA Advisory Boards to approve the Loan.  Without the Loan, Rosenber advised, LA would not reach profit goals in the near-term.

## IX.  Lubert/Ginn Knew The Loan was Likely to Default

111.   Lubert/Ginn knew their Sales Projections for Tesoro and Quail West made a Loan default likely, and they engaged their attorneys to evaluate default risks in light of the Tesoro and Quail West cancellations.  An internal email reveals that less than a month before closing, Lubert/Ginn and their lawyers discussed:

    a.  Whether Loan terms allowed use of the Loan credit line for Loan repayment.

    b.  Whether they could use the credit line if they were out of compliance with Loan terms for failing to meet Sales Projections.

112.   Less than a month before closing, Morris, Manning & Martin lawyer Sonny Morris advised that Dean Adler was concerned the failure to meet Sales Projections would result in a Loan default.

113.   Dean Adler's concern shows in his May 22, 2006 draft disclosure memo to LA Advisory Boards, which proposed that $75 million of the $333 million distribution to LA would be held "[in] reserve…as sort of a contingency fund that could be used to 'balance' the loans in the event that the Projects collectively fail to perform as anticipated."  Ultimately, however, Adler set his concerns aside and Lubert/Ginn proceeded with the Loan, without

taking any reserve to protect against default.

114.  Just hours after the Loan closed and LA cashed-out, Ginn executive Bobby Masters joked with Morris, Manning & Martin attorney Sonny Morris and LA Partners executive Neill Faucett about the likelihood of default and foreclosure:

> June 8, 2006 (5:25 p.m.) email from Bobby Masters to Sonny Morris and Neill B. Faucett:  "The Credit Suisse deal has closed.  Wires on the way.  Sonny, please prepare the deed-in-lieu."
> 06/08/2006 Reply from Neill Faucett, 6:31 p.m.:  "Well said."

Not only was Masters Bobby Ginn's right-hand-man, he single-handedly executed the Loan documents for multiple GLA entities controlled by Lubert/Ginn.

115.  Soon after the Loan closed, Quail West and Tesoro lot sales predictably fell far short of Sales Projections, with 3Q 2006 total net revenues for those Projects at 3% of forecast.

116.  Sales did not improve.  Lubert/Ginn forecast 74 Tesoro lot and condo closings for 2006, with 290 more through 2008.  Yet there were fewer than 40 Tesoro lot closings (and no condo closings) through 2008.  Lubert/Ginn forecast 66 Quail West lot closings for 2006, with 224 more through 2008.  Yet there were only 21 Quail West lot closings through 2008.

## X.   The Loan's Size and Terms were Highly Unusual

117.  The Loan was not routine financing.  The Credit Suisse Syndicated Term Loan ("CS STL") was first marketed in 2005 to resort owners, offering a loan size that was previously unavailable.  A key feature of the STL allowed owners to take massive distributions from loan proceeds without using the money for development.

118.  In this way, the CS STL allowed developers to cash out of their investments, saddling the projects with liability for the loan and a crushing debt load.  By mid-2009, eight resorts that obtained the CS STL (including GSM) were either in foreclosure, bankruptcy or liquidation.  Around the same time, Credit Suisse stopped offering the STL.

119.   If the CS STL was unique, Lubert/Ginn's Loan was one-of-a-kind.  The Loan was the largest CS STL and the only one that cross-collateralized five separate developments.  The Lubert/Ginn Loan was the antithesis of routine financing.

## XI.   Lubert/Ginn Concealed the Cash Out Scheme and Loan Effects

120.   Lubert/Ginn closed the Loan before any GSM lots were sold.  Because they knew no one would buy GSM lots if they knew the Loan Effects, they concealed those facts.

121.   Lubert/Ginn commanded a small team to close the Loan deal, keeping the Loan Effects a secret outside the transaction team.  They prohibited those with knowledge of the Loan Effects from disclosing material facts – even to the sales force selling GSM lots.

122.   Lubert/Ginn were obligated by Loan terms to submit the shell companies set up as borrowers to a ratings analysis by Standard and Poor's.  While Lubert/Ginn provided S&P with information on Loan terms, they did not report several material facts, including that GSM received no benefit under the Loan; that TNV overstated the Projects' fair-market value by several hundred million dollars; that Sales Projections for Tesoro and Quail West did not account for hundreds of sales cancellations; that they anticipated those Projects would not meet Sales Projections; that the $333 they took from Loan proceeds left Tesoro and Quail West too thinly capitalized to survive; and that Dean Adler was "greatly concerned" the failure to meet Sales Projections would cause a Loan default.

123.   Plaintiffs were not S&P subscribers, and they did not see any S&P ratings reports on the Loan borrowers until after they sought legal advice on the Cash Out Scheme.

## XII.   Lubert/Ginn Had a Duty to Disclose the Loan Effects to GSM Buyers

Bobby Ginn's Prior Statements About GSM Development

124.   Before the Cash Out Scheme, Bobby Ginn dedicated years preparing to develop GSM.  He purchased land, designed the resort and amenities, negotiated with the Bahamian

government on development scope and timing, and obtained significant concessions from the government to build GSM and sell lots.  GSM was to have been Bobby Ginn's crowning achievement.

125.   Created before Lubert/Ginn obtained the Loan, a GSM marketing book described Bobby Ginn's elaborate plans to develop GSM as "a $4.9 billion world-class resort community" featuring:  4,400 condominium and hotel units around a 20-story "grand palace," 1,800 residential homesites, signature golf courses by Jack Nicklaus and Arnold Palmer, a private airport, "mega-yacht marina," "Monte Carlo-style casino" to be "the premier casino in the islands," swim pavilions, a beach club, a world-class salon and spa, nightclubs, restaurants, "world-class shopping," a "grand canal" connecting resort areas, and elaborate gardens, fountains and pools throughout.

126.   The GSM marketing book identified Bobby Ginn as the visionary behind these grand plans.  Describing King Louis XIV (the Sun King) and his vision for Versailles, the book cast GSM (originally "Versailles sur Mer") as Bobby Ginn's tribute to Versailles:

> . . . The influence of the Sun King and his vision began with a palace, embraced a city and then rippled throughout the countryside of Europe.  The power elite created their own tributes to Versailles with sumptuous castles and fountain-filled gardens.  Today a new tribute is being created across the sea on the island of Grand Bahama.  This new vision belongs to Bobby Ginn (Ginn Clubs & Resorts Founder) and, like Louis XIV, he will compromise nothing to see it fulfilled.

> . . . [T]he West End of Grand Bahama Island offers the ideal location on which to realize this heroic vision. . . . It is the canvas on which Ginn will create a resort masterpiece. . . .

> . . . Like the Sun King, Bobby Ginn is very present when it comes to bringing his visions to life.  He sets the tone, approves the plans and ensures that what is created is what he intended.

127.   The first page of the GSM marketing book was a signed letter from Bobby Ginn ("Bobby Ginn Letter"), which also appeared on the GSM website:

It's been a few years since we first announced plans for a new Club & Resort on Grand Bahama Island.  Since then, we've envisioned and re-envisioned.  We've worked very closely with the Bahamian government to develop an agreement that would benefit all those involved.  The goal throughout it all was to perfect the conditions that would allow us to envision, develop and operate the largest and finest resort destination in the islands.  It wasn't easy – if it was, anyone could do it – but we got there.  This vision will have a major impact on The Bahamas and all of the Caribbean.  <u>The fact is, we would not have compromised the integrity of our vision, nor would we have shared any plans that we weren't 100% certain we could both develop and operate to the level you've come to expect from the Ginn Clubs & Resorts team.</u>  After reaching an agreement with the Bahamian government, we have perfected a destination of such grand pageantry and breathtaking awe, that we were compelled to name it for arguably the greatest palace ever conceved and realized… the Palace at Versaille.  The following pages outline the details and opportunity of this vision.  We are happy to share it with you.  (Emphasis added.)

128.  As soon as the Loan closed and in light of the Tesoro and Quail West sales cancellations, Lubert/Ginn knew the Bobby Ginn Letter was false and misleading because the Loan had looted GSM, crippled it with crushing debt, left no money for development and exposed it to likely foreclosure.

129.  After the Loan closed and before a single GSM lot was sold, Lubert/Ginn knew a Loan default and GSM foreclosure were likely:

   a.  Tesoro and Quail West total net revenues for 3Q 2006 were at 3% of forecast.

   b.  The borrowers and subsidiary guarantors under the Loan had a combined net balance sheet deficit of $124.7 million as of June 30, 2006.

   c.  The balance sheet deficit was $154.2 million as of September 30, 1996.

   d.  The balance sheet deficit was $227.6 million as of December 31, 2006.

130.  Before the end of 2006, default was imminent and Lubert/Ginn were already in discussions with Credit Suisse about restructuring the Loan.

131.  Plaintiffs purchased their GSM lots beginning in December 2006.  By that time, Lubert/Ginn knew a Loan default was imminent.  Against this background and with this

knowledge, Lubert/Ginn had a duty to correct the misleading statements in the Bobby Ginn letter and the GSM marketing book.

132.   After the Loan closed and before their lot purchases, Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steve Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick Clemmons, Kevin Crawford, Lauren and Troy Domnick, Dean and Stephanie Fresonke, Tom Hoyer, James Jackson, David Jankowski, Shelley Jensen, James Josephson, Ozzie Kalil, Susan Kherkher, Tom Lammertse, Brian Lesesne, Ken and Pat Liles, Art and Alexandria Maciag, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Doug Smith, Vic Taglia, Maureen and Todd Taliaferro, Ron Van, Anja Verhees, Richard Webb and Darryl Willis each received and read the marketing book and the Bobby Ginn Letter.

133.   Based on the Bobby Ginn Letter and the GSM Marketing book, those Plaintiffs reasonably believed Bobby Ginn intended to develop and operate GSM and that Bobby Ginn was not aware of anything that might interfere with his ability to do so.

134.   Lubert/Ginn knew those Plaintiffs had no knowledge of the Cash Out Scheme, the Loan Effects or the imminent Loan default prior to their GSM lot purchases.  Lubert/Ginn knew any reasonably prudent GSM buyer would consider the Loan Effects and the imminent default important and would not buy a GSM lot if they knew those facts.

135.   Once the Loan closed, Lubert/Ginn had a duty to correct prior statements in the Bobby Ginn Letter and inform Plaintiffs of the Loan Effects and imminent default.  Instead, Lubert/Ginn intentionally concealed those facts.

136.   Lubert/Ginn also had a duty to disclose the Loan Effects and imminent default based on the parties' relative access to information, the importance of those facts to Plaintiffs' GSM

26

lot purchase decisions, and Lubert/Ginn's awareness that Plaintiffs could not with reasonable diligence learn those facts.

## XIII.   The Loan Default

137.   When the Loan went into default in early-2007, Lubert/Ginn negotiated a restructuring agreement allowing them (under the name of a new company) to obtain title and development rights for several of the most valuable parcels within GSM, including the "resort core" and a golf course ("GLA OBB Parcels").

138.   While Lubert/Ginn's new company focused on completing infrastructure that would largely serve the GLA OBB Parcels, the borrowers once again defaulted on the Loan in mid-2008.  In December 2009, the Credit Suisse lenders filed a lawsuit to foreclose on GSM (but not the GLA OBB Parcels).

139.   After years of secret negotiations, backroom deals and legal proceedings, in November 2011 the Credit Suisse Lenders obtained title and development rights to large parts of GSM containing a mix of sold and unsold lots ("CS Lender Parcels"), while Lubert/Ginn's new company kept the valuable GLA OBB Parcels.  LA continues to loot GSM to the present, attempting to negotiate deals involving the GLA Parcels.

140.   The Loan default was not caused by meager GSM lot sales:  at least 194 sales closed through 2007 and at least 215 by mid-2008.  Nor was the default unexpected.  Lubert/Ginn knew a default was likely due to their massive $333 million distribution and the Tesoro and Quail West sales cancellations.

141.   Even though GSM lot sales were thriving, LA's cross-collateralization of GSM with Tesoro and Quail West allowed the Credit Suisse Lenders to foreclose on GSM.  Dean Adler's risk disclosure to the LA Advisory Board became reality:  Project A (GSM) though highly successful on its own, was nevertheless lost to foreclosure when Project B (Tesoro)

and Project C (Quail West) did not perform well, thereby causing the Loan to go into default.

## XIV.   Lubert/Ginn's Fraudulent Statements Before the Loan Became Public

142.   By Spring 2008, Lubert/Ginn knew the Loan default and some Loan terms would become public knowledge.  In an effort to conceal the Loan Effects, Lubert/Ginn caused editions of the *Ginn Sur Mer Living* publication to be sent to GSM lot owners, which offered assurances on GSM development and the Bahamas real estate market.

Spring 2008:  Bahamian Real Estate is Safe

143.   Lubert/Ginn caused a February/March 2008 edition of *Ginn Sur Mer Living* to be sent to GSM lot owners.  The publication reported investors were buying Bahamas real estate to shield their investments from U.S. market declines.  Sales VP Greg Ulmer said, "The Caribbean market is on the verge of exploding, not just here at Ginn sur Mer, but all over the islands.  With the U.S. market a little soft, there's been a big upsurge in the number of people looking here to find a safe haven for their real estate investments."

144.   While this statement was true, it was misleading because it failed to disclose the Loan Effects, Lubert/Ginn's knowledge that default was likely even before the Loan closed, Lubert/Ginn's knowledge that default and GSM foreclosure were imminent before any Plaintiffs bought GSM lots and the 2007 Loan default.

145.   After their lot purchases, Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steven Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Kevin Crawford, Lauren and Troy Domnick, Tom Hoyer, James Jackson, David Jankowski, James Josephson, Ozzie Kalil, Susan Kherkher, Ken and Pat Liles, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Vic Taglia, Anja Verhees, Richard Webb and Darryl Willis received and read the February/March 2008 edition of *Ginn sur Mer Living*.  It reinforced their belief at the time of purchase that GSM would not be

28

subject to U.S. market declines.

146.  The February/March 2008 *Ginn sur Mer Living* also concealed the Loan Effects, preventing them from becoming public knowledge and preventing all Plaintiffs from learning about the Loan Effects and the 2007 default.  As a result, all Plaintiffs did not take earlier steps to mitigate their losses or initiate legal action.

Bobby Ginn in Spring 2008:  GSM is Moving Full Speed Ahead

147.  Lubert/Ginn caused a Spring 2008 edition of *Ginn Sur Mer Living* to be sent to GSM lot owners, including Plaintiffs.  The publication included an article entitled, "Full Speed Ahead for Ginn sur Mer," which reported, "Construction on the $4.9 billion Ginn sur Mer mega-mix resort on the western tip of the island is moving full speed ahead and President and CEO Bobby Ginn is certain that money is in place to see the project through."  The article included Bobby Ginn's assurances about GSM development:

   a.  "I would say we're on schedule, I think we're probably a little ahead of schedule in what we initially set out to do."

   b.   "We've done everything we can do to be sure that when we're talking with our customer, they have the assurance that what they're buying is going to be developed with the quality and standards that our company is known for."

148.  These statements were false and misleading because Bobby Ginn failed to disclose the Loan Effects and the 2007 default.

149.  In the same publication, Bobby Ginn said GSM was not subject to U.S. market declines:  "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas…."

150.  While this statement was true, it was misleading because Bobby Ginn failed to

disclose Loan Effects, Lubert/Ginn's knowledge that default was likely even before the Loan closed, Lubert/Ginn's knowledge that default and GSM foreclosure were imminent before any Plaintiffs bought GSM lots and the 2007 Loan default.

151.  After their lot purchases, Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steven Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Lauren and Troy Domnick, Dean and Stephanie Fresonke, Tom Hoyer, James Jackson, David Jankowski, James Josephson, Ozzie Kalil, Susan Kherkher, Ken and Pat Liles, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Vic Taglia, Anja Verhees, Richard Webb and Darryl Willis received and read the Spring 2008 *Ginn sur Mer Living*.

152.  The publication reinforced their belief at the time of purchase that GSM would not be subject to U.S. market declines and reassured them that GSM development was proceeding on schedule.  It also concealed the Loan Effects, preventing them from becoming public knowledge and preventing all Plaintiffs from learning about the Loan Effects.  As a result, all Plaintiffs did not take earlier steps to mitigate their losses or initiate legal action.

## XV.   Lubert/Ginn's Fraudulent Statements After the Loan Became Public

153.  When the Loan and some of its terms became public in July 2008, Lubert/Ginn caused and made public statements mischaracterizing the Loan Effects.  These statements were intended to conceal the true facts about the Cash Out Scheme, the Loan Effects and the 2007 default in order to prevent GSM lot owners from initiating legal action based on the Cash Out Scheme.

<u>2008 Robert Gidel Statement</u>

154.  On July 1, 2008, LA directed Ginn President Robert Gidel to issue a statement about the Loan that included fraudulent representations, concealed the Loan Effects and concealed

the 2007 default and restructure:

    a.   The Gidel Statement described the Loan as "a non-recourse $675 million credit facility."  This was false and misleading.  While the Loan was non-recourse for Lubert/Ginn, GSM was fully liable for the Loan and mortgaged to the hilt.  In addition, the default had already triggered the Lenders' right to foreclose on GSM.

    b.   The Gidel Statement pledged, "…there will be no disruption to the continued development of the Ginn sur Mer project …."  This was false and misleading.  From the moment it closed, the Loan looted GSM and left no money for development.  In addition, the default had already triggered a GSM foreclosure and the 2007 restructure had carved GSM into separate parcels, some of which were owned by the Credit Suisse Lenders.

155.  After their GSM lot purchases, Plaintiffs Jones Andrews, Beachfront, Steven Bredahl, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick Clemmons, Dean Fresonke, James Jackson, Shelley Jensen, James Josephson, Ozzie Kalil, Susan Kherkher, Tom Lammertse, Brian Lesesne, Ken and Pat Liles, Art and Alexandria Maciag, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Vic Taglia, Maureen and Todd Taliaferro, Ron Van, Richard Webb and Darryl Willis read a July 1, 2008 Go Toby article entitled, "Florida Real Estate Developer, Ginn Clubs and Resorts, Misses Principal and Interest Payment," which reprinted the Gidel Statement.

156.  The Gidel Statement reassured those Plaintiffs the Loan would not impact GSM, and GSM development was proceeding on schedule.  It also concealed the Loan Effects, preventing them from becoming public knowledge and preventing all Plaintiffs from learning about the Loan Effects.  As a result, all Plaintiffs did not take earlier steps to mitigate their

losses or initiate legal action.

2008 Bobby Ginn Press Conference

157.  On August 6, 2008, Bobby Ginn appeared at a press conference to reassure GSM lot

owners the 2008 Loan default would not affect GSM.  Bobby Ginn's statements at the press

conference were false and misleading because he concealed the Loan Effects, the 2007 default

and restructure and pledged:  the Loan did not affect GSM; GSM was not in danger; all the

money to develop GSM was in an escrow account; he could back up his prior promises about

GSM development; money existed to guarantee completion; and he was unaware of anything

to prevent him from developing and operating GSM.  Predicte Act L68 includes excerpts of

Bobby Ginn's statements.

158.  Plaintiffs Liles watched a web video of the Bobby Ginn press conference in August

2008.  Plaintiffs Jones Andrews, Mark Bailey, Beachfront, Steven Bredahl, Cameron Byers,

Andy Card, Jerry Cicolani, Clear Reef, James Jackson, Ozzie Kalil, Susan Kherkher, Brian

Lesesne, Ken and Pat Liles, Art and Alexandria Maciag, Steve Ponsler, Fred Reeping, Mark

Roodvoets, Tim Sell, Bernard Shaughnessy, Vic Taglia, Maureen and Todd Taliaferro, Anja

Verhees, Ron Van, Richard Webb and Darryl Willis read an August 7, 2008 *Freeport News

Reporter* article entitled, "Bobby Ginn Gives Assurances that Grand Bahama Project is Safe,"

which included statements from the press conference.

159.  Plaintiffs Jones Andrews, Mark Bailey, Steven Bredahl, Andy Card, Jerry Cicolani,

Clear Reef, James Jackson, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, Art and

Alexandria Maciag, Fred Reeping, Tim Sell, Bernard Shaughnessy, Vic Taglia, Maureen and

Todd Taliaferro, Ron Van, Richard Webb and Darryl Willis read an August 7, 2008 Jones

Bahamas article entitled, "Ginn Project 'Safe,'" which included statements from the Bobby

Ginn press conference.

160.  As a result of Bobby Ginn's August 2008 press conference, Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Jackson Group, Kalil,  Kherkher, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Van, Verhees, Webb and Willis reasonably believed the Loan would not impact GSM, and GSM development was proceeding on schedule.  Bobby Ginn's statements at the press conference also prevented the Loan Effects from becoming public knowledge and preventing all Plaintiffs from learning about the Loan Effects.  As a result all Plaintiffs did not take earlier steps to mitigate their losses or to initiate legal action.

<u>January 2010 Bobby Ginn Letter to GSM Lot Owners</u>

161.  On January 2, 2010, Bobby Ginn sent a letter to GSM lot owners, including Plaintiffs.  The letter was intended to convince lot owners GSM development was proceeding on schedule.  In the letter, Bobby Ginn made fraudulent representations and failed to disclose the Loan Effects, the 2007 default and restructure, and the Credit Suisse lenders' foreclosure on GSM.  Predicate Act L76 includes excerpts from the letter.

162.  The Bobby Ginn letter was false and misleading because he failed to disclose that GSM development had come to a standstill, HUD had prohibited GSM lot sales in the U.S. since October 2008, and the Credit Suisse lenders on December 23, 2009 had obtained a $495 million foreclosure judgment against GSM.

163.  Plaintiffs Jones Andrews, Beachfront, Steven Bredahl, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Lauren Domnick, Dean and Stephanie Fresonke, Tom Hoyer, James Josephson, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, Steve Ponsler, Mark Roodvoets, Tim Sell, Vic Taglia, Maureen and Todd Taliaferro, Anja Verhees, Ron

Van, Richard Webb and Darryl Willis received and read the 2010 Bobby Ginn Letter to lot owners after they made their GSM lot purchases.  Plaintiff Mark Bailey may have received and read the 2010 Bobby Ginn Letter.

164.  As a result of the 2010 Bobby Ginn letter, Plaintiffs Andrews Group, Beachfront, Bredahl, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Domnick, Fresonke Group, Hoyer Group, Kalil, Kherkher, Liles, Maciag, Ponsler, Smith, Taglia Group, Taliaferro, Van, Verhees, Webb and Willis reasonably believed GSM development was on schedule.  The letter also prevented the Loan Effects from becoming public knowledge and prevented all Plaintiffs from learning the Loan Effects.  As a result, Plaintiffs did not take earlier steps to mitigate their losses or take legal action.

## XVI.  Lubert/Ginn's Misrepresentations Concealed the Loan Effects

165.  The statements described in Paragraphs 154, 157 and 161 – 162,  were intended to conceal material facts about the Cash Out Scheme, the Loan Effects, the 2007 default and restructure, and the 2008 default and foreclosure.  By making these fraudulent representations and concealing material facts, Lubert/Ginn prevented Plaintiffs from learning about the Cash Out Scheme and its impact on GSM.

166.  Plaintiffs Andrews Group, Cicolani Group, Josephson, Kherkher, Lammertse, Liles, Van and Webb did not discover the Loan Effects until on or after October of 2008, when they began investigating rumors about the Loan and problems with GSM development.  Those Plaintiffs did not discover the Cash Out Scheme until on or after May 2010, when more information on the Loan became available.

167.  Plaintiff Willis did not discover the Loan Effects until on or after June 2009, when he began investigating rumors about the Loan and problems with GSM development.  Willis did not discover the Cash Out Scheme until on or after May 2010, when more information on the

Loan became available.

168.  Plaintiff Byers did not discover the Loan Effects until on or after July 2009, when he began investigating rumors about the Loan and problems with GSM development.  Byers did not discover the Cash Out Scheme until on or after May 2010, when more information on the Loan became available.

169.  Plaintiffs Bailey, Beachfront, Bredahl, Card, Clear Reef, Crawford Group, Domnick, Jackson Group, Kalil and Ponsler did not discover the Loan Effects until on or after March 2010, when they began investigating rumors about the Loan and problems with GSM development.  Those Plaintiffs did not discover the Cash Out Scheme until on or after May 2010, when more information on the Loan began to emerge.

170.  Plaintiffs Carell Group, Carell, Clemmons Group, Fresonke Group, Hoyer Group, Maciag, Smith and Taliaferro did not discover the Cash Out Scheme or Loan Effects until on or after January 2011, when they began investigating rumors about the Loan and problems with GSM development.

171.  Plaintiffs Taglia Group, Cappuccino Group and Verhees did not discover the Cash Out Scheme or Loan Effects until on or after March 2012, when they began investigating rumors about the Loan and problems with GSM development.

172.  All Plaintiffs have discovered additional material facts about the Cash Out Scheme as those facts were made public by the bankruptcy Trustee for the Tesoro and Quail West Projects, beginning in May 2010 and continuing to the present.

173.  If Plaintiffs had earlier learned the Loan Effects or the impact of the Cash Out Scheme on GSM, they would have earlier stopped payments on their GSM lot purchases and initiated legal action.

174.  Lubert/Ginn continue to hide material facts concerning the Loan Effect and the impact of the Cash Out Scheme on GSM.  This fraudulent concealment continues to the present and is likely to continue in the future.

## XVII.  Lubert/Ginn's Use of Attorneys in Connection with the Cash Out Scheme and the Purported Joint Defense Agreement

175.  As alleged above and in Predicate Acts L1, L3, L10, L11, L12, L15, L23, L24, L25, L26, L28, L29-31, L41-43, L57-59, L62, L71 and L73, Lubert/Ginn sought the advice of their attorneys to carry out the Cash Out Scheme.

176.  On May 1, 2008, Lubert/Ginn caused eleven Ginn entities and six LA entities to enter into a Joint Defense, Common Interest and Information Sharing Agreement ("JDA").  Bobby Masters signed as President for all eleven Ginn entities.  Signed in anticipation of bankruptcy filings for Tesoro and Quail West, the JDA purported to protect all applicable privileges "even if an adversity of interests may subsequently be discerned or arise between or among JDA Parties."

177.  After the Loan default, Tesoro and Quail West filed for bankruptcy, and the Trustee sought to set aside Lubert/ Ginn's $333 million Loan distribution.  Defendants in the bankruptcy proceedings, including Lubert/Ginn, aggressively fought disclosure of facts underlying the Loan transaction, citing the JDA as justification for their refusal to produce documents requested by the Trustee.

178.  On November 11, 2010, the bankruptcy court held the JDA was void *ab initio*, making the following findings:

   a.  Morris, Manning & Martin jointly represented all the Ginn JDA parties in connection with the Loan and after 2007 jointly represented all the JDA parties, including the LA defendants.

b. "[T]he drafting of any agreement in contemplation of bankruptcy whose purpose is to protect a debtor's adverse insider's prepetition communications makes the facts of this matter . . . egregious . . . ."

c. "Enforcement of such an agreement violates public policy."

d. "[I]t is undeniable that the entire [Loan] transaction had the potential to be a fraudulent conveyance from the start." (*In re Ginn-LA St. Luci LTD., LLLP, et al.*, Case No. 08-29769-BKC-PGH, S.D. Fla., Docket No. 572.)

179.  The court noted the "potential for abuse" evidenced by Lubert/Ginn's attempt to retroactively apply the JDA to documents shared prior to its execution.

## XVIII.   GSM was Immediately Ruined the Moment the Loan Closed

180.  Before the Loan closed, the Tesoro and Quail West Projects were already failing and Lubert/Ginn knew a Loan default was likely.

181.  By the time the Loan closed, the Cash Out Scheme had looted GSM, crippled it with crushing debt and left no money for development.  The Loan Effects irreparably ruined GSM as of June 8, 2006.  In the words of Bobby Masters, "please prepare the deed in lieu."  Lubert/ Ginn had sacrificed GSM to foreclosure.

182.  But for the Loan, the Credit Suisse lenders would not have foreclosed on GSM after the Tesoro and Quail West Projects predictably failed to meet Sales Projections.

183.  But for the Loan, GSM would not have been liable for a $675 million Loan, from which it received no benefits.  But for the Loan, GSM could have used its lot sale proceeds (at least $210 million as of 3Q 2008) for development instead of making Loan payments.

184.  But for the Loan and despite the U.S. market collapse, GSM lot sales were thriving:

a. GSM sold more than 220 lots between 2006 and 2008, with several price increases during that period.

b. As alleged in Paragraph 143, the February/March 2008 *Ginn Sur Mer Living* publication reported investors were buying Bahamas real estate to shield their investments from U.S. market declines.

c. As alleged in Paragraph 149, in the Spring 2008 *Ginn Sur Mer Living*, Bobby Ginn said GSM was not subject to U.S. market declines.

d. The same publication reported GSM had its best sales month ever in January 2008, in what VP of Sales Ulmer characterized as a "buying frenzy."

185. GSM lot sales stopped in late 2008, but only because HUD (citing the Loan) revoked the ability of GSM's developer to market and sell lots in the U.S. If Lubert/Ginn had not included GSM in the Loan, HUD would not have halted GSM lot sales.

## XIX. Plaintiffs Were Damaged by the Cash Out Scheme The Moment They Closed Their GSM Lot Purchases

186. The U.S. market collapse began in late 2005, and Bobby Ginn described early 2006 as "brutal," "as big a falloff in housing as [he had] ever seen in 40 years," "like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall…." Against this backdrop and for this reason, LA devised the Cash Out Scheme.

187. Tesoro and Quail West were already failing before the Loan closed, with hundreds of sales cancellations in the wake of the U.S. market collapse. It was against this backdrop and for this reason that LA recommended the Loan to its Advisory Group, because without the Loan, LA would not meet near-term profit goals.

188. Plaintiffs closed on their GSM lot purchases beginning in December 2006, on the specific dates set forth in Paragraphs 5 – 31, above.

189. Before the end of 2006:

a. The U.S. market collapse had begun.

    b.  Total net revenues for Tesoro and Quail West were at 3% of forecast.

    c.  The borrowers and subsidiary guarantors under the Loan had a combined balance sheet deficit of $227.6 million.

    d.  A Loan default was imminent and Lubert/Ginn were already in discussions with Credit Suisse about restructuring the Loan.

190.  Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Carell, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Smith, Taglia Group, Taliaferro, Van, Verhees, Webb and Willis were unaware of the Cash Out Scheme, Loan Effects or the facts in Paragraph 189 when they bought GSM lots.  If those Plaintiffs had known about the Cash Out Scheme, the Loan Effects or the facts in Paragraph 189, none of them would have purchased GSM lots.

191.  Plaintiffs' damages from the Cash Out Scheme were not caused by an unexpected market crash following their lot purchases.  The U.S. market crash occurred long before Plaintiffs' lot purchases.  Nor were Plaintiffs' damages caused by an unexpected Loan default. Lubert/Ginn knew the default was imminent when Plaintiffs bought their lots.

192.  Plaintiffs' were damaged because Lubert/Ginn used the Loan to loot GSM and sacrificed GSM to foreclosure.  When Plaintiffs bought their lots beginning in December 2006, the default was imminent, triggering the lenders right to foreclose on GSM.

193.  As a result of the Cash Out Scheme, Plaintiffs were damaged in a sum including, but not limited to, amounts they paid for and owe on their lots (including down payments, amounts paid at closing, mortgage payments and amounts still owed), tax stamps, loan fees, closing costs and property taxes paid to date and still owed, along with other costs associated

with their lot purchases.  The elements and amounts of Plaintiffs' damages for each lot purchase will be established at trial.

194.  But for the Cash Out Scheme and Lubert/Ginn's concealment of the Loan Effects, Plaintiffs would not have suffered these damages.

## XX.   The Cash Out Scheme:  Violations of RICO by LA Partners, Dean Adler, ERG and Bobby Ginn

### A.  The Enterprise

195.  From at least March 2005 and continuing to the present, in Florida and elsewhere, Defendants LA Partners, Dean Adler, ERG and Bobby Ginn ("CO Defendants"), including their agents and employees, collectively constituted an "enterprise" as defined in 18 U.S.C. § 1961(4) ("Cash Out Enterprise").

196.  The Cash Out Enterprise is an ongoing organization that engages in, with activities affecting, interstate and foreign commerce.  At all relevant times, the CO Defendants knowingly made use of the means and instruments of transportation and communications of interstate and foreign commerce to communicate with one another, with Credit Suisse, with GSM, with Plaintiffs and with the general public.

197.  Although the CO Defendants participate in and are members and part of the Cash Out Enterprise, each also has an existence apart from that Enterprise.  At all relevant times, the Enterprise had an ascertainable structure apart from the racketeering activity in which CO Defendants engaged.  The primary decision-makers for the Cash Out Enterprise are Dean Adler and Lubert-Adler, who direct the activities of the Enterprise.

198.  The CO Defendants control and operate the Enterprise through a variety of means including, but not limited to, agreeing to commit and committing the following acts: (1) devising the Scheme; (2) creating the structure and terms of the Loan; (3) taking necessary

steps to obtain the Loan; (4) providing overstated Sales Projections for Tesoro and Quail West; (5) including GSM in the collateral pool; (6) taking $333 million from Loan proceeds; (7) concealing the Loan Effects from GSM lot buyers, including Plaintiffs; and (8) making fraudulent and misleading statements in 2008 about the Loan Effects and the consequences of the Loan default for GSM.

199.   The Cash Out Enterprise pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud Plaintiffs and to collect profits from those actions, which began before Plaintiffs purchased GSM lots, continue to the present and threaten to continue into the future.

## B.   Predicate Acts- Mail and Wire Fraud

200.   Cash Out Defendants engaged and continue to engage in conduct violating 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) to effectuate the Cash Out Scheme.

<u>Mail and Wire Fraud</u>

201.   To execute the Cash Out Scheme, CO Defendants in violation of 18 U.S.C. §§ 1341 and 1343 transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, pictures and sounds, and caused things to be placed in a post office or authorized depository, or deposited things to be sent or delivered by a private or commercial interstate carrier.

202.   **Plaintiffs incorporate Appendix A hereto**, identifying CO Defendants' use of wire and mail communications in furtherance of the Cash Out Scheme.  To the extent Appendix A does not include the exact dates of and persons involved in each act, those details are in the exclusive control of one or more CO Defendants.

203.   CO Defendants' acts of fraud and concealment were intentional and committed to

deceive Plaintiffs and obtain their money for CO Defendants' gain.  CO Defendants either knew or recklessly disregarded the fact that their statements and omissions were material, and Plaintiffs would have acted differently if they had known the true facts.

204.  As a result of the Cash Out Scheme, CO Defendants obtained money belonging to Plaintiffs, and Plaintiffs have been injured in their business or property by CO Defendants' overt acts of mail and wire fraud.

205.  The acts in Appendix A were done intentionally and knowingly with the specific intent to advance the Cash Out Scheme, or with knowledge the use of mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not intended.  CO Defendants executed the Cash Out Scheme in different states within the United States and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

**C.  Pattern of Racketeering Activity**

206.  CO Defendants knowingly, willfully and unlawfully conducted or participated in the affairs of the Cash Out Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  The racketeering activity was made possible by CO Defendants' regular and repeated use of the facilities and services of the Cash Out Enterprise.

207.  CO Defendants committed or aided and abetted in the commission of at least two acts of racketeering activity, set forth in Appendix A, in the past five years ("Racketeering Acts").  The Racketeering Acts were not isolated, but had the same or similar purpose, participants, method and victims, including Plaintiffs.

208.  Each Racketeering Act was committed pursuant to and in furtherance of the Cash

Out Enterprise, including false and misleading statements and concealment, as well as other uses of the mails and wire transmissions.

209.   CO Defendants' Racketeering Acts were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## FACTUAL BACKGROUND:
## MORTGAGE FINANCING USING INFLATED GSM LOT APPRAISALS

210.   Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis ("Note Plaintiffs") applied for GSM mortgage loans ("Plaintiff Loans") with Ginn Financial, signing 5-Year Adjustable Rate Balloon Notes ("Plaintiff Notes") with BSA.

| Date | Note | Lot | Note Amount |
|---|---|---|---|
| December 13, 2006 | Cicolani Note | Lot 104 | $814,998.00 |
| December 13, 2006 | Clemmons Note | Lot 494 | $508,720.00 |
| December 13, 2006 | Josephson Note | Lot 493 | $460,720.00 |
| December 13, 2006 | Liles Note | Lot 46 | $795,120.00 |
| December 13, 2006 | Maciag Note | Lot 109 | $795,120.00 |
| December 22, 2006 | Bredahl Note I | Lot 39 | $755,364.00 |
| December 22, 2006 | Byers Note | Lot 234 | $976,720.00 |
| December 22, 2006 | Taglia Note I | Lot 220 | $952,720.00 |
| December 22, 2006 | Taglia Note II | Lot 429 | $628,720.00 |
| December 22, 2006 | Taliaferro Note | Lot 208 | $993,900.00 |

| Date | Note | Lot | Note Amount |
|---|---|---|---|
| December 22, 2006 | Verhees Note | Lot 79 | $814,998.00 |
| February 2, 2007 | Hoyer Note | Lot 448 | $269,950.00 |
| February 2, 2007 | Webb Note | Lot 261 | $1,096,720.00 |
| February 15, 2007 | Beachfront Note I | Lot 43 | $755,364.00 |
| February 15, 2007 | Beachfront Note II | Lot 44 | $755,364.00 |
| February 16, 2007 | Bailey Note | Lot 67 | $795,120.00 |
| March 9, 2007 | Bredahl Note II | Lot 33 | $795,120.00 |
| March 13, 2007 | Clear Reef Note | Lot 42 | $755,364.00 |
| March 15, 2007 | Fresonke Note | Lot 437 | $689,520.00 |
| March 15, 2007 | Willis Note | Lot 189 | $585,396.00 |
| March 20, 2007 | Kherkher Note | Lot 270 | $1,084,900.00 |
| March 23, 2007 | Andrews Note | Lot 272 | $774,247.00 |
| April 13, 2007 | Jackson Note | Lot 488 | $492,720.00 |
| April 13, 2007 | Lammertse Note | Lot 179 | $708,720.00 |
| June 22, 2007 | Domnick Note | Lot 487 | $528,720.00 |
| August 10, 2007 | Cappuccino Note I | Lot 282 | $1,096,720.00 |
| March 20, 2008 | Carell Note | Lot 312 | $960,000.00 |
| February 22, 2008 | Crawford Note | Lot 209 | $795,120.00 |
| February 25, 2008 | Cappuccino Note II | Lot 281 | $1,096,720.00 |

211.  Ginn Financial, BSA and/or another entity known to those Defendants maintain fully executed copies of the Plaintiff Notes, including any alloges thereto.

## XXI.  Lubert/Ginn Control Over GSM Mortgage Financing

212.  Ownership and Control Over BSA and Ginn Financial:  Lubert/Ginn directed and

controlled all actions of Ginn Financial and BSA.  Dean Adler, Ira Lubert and Bobby Ginn constituted the Board of Directors for The Ginn Companies, LLC, which controlled and owned 100% of Ginn Financial.  Ginn Financial owned 100% of BSA.  Internal documents identify LA Partners and Bobby Ginn as the beneficial owners of BSA.

213.  On November 10, 2010, certain Ginn and Lubert-Adler entities entered into a "Partnership Restructure Agreement."  On information and belief, the Partnership Restructure Agreement, *inter alia*, identified at least 200 entities formerly owned and controlled by Lubert/Ginn that would thereafter be owned and controlled solely by LA Partners, acting through entities including Legacy Resort Assets, LLC.

214.  Beginning in 2011 and continuing to the present, corporate filings with the State of Florida for both BSA and Ginn Financial were signed by Lubert-Adler executives and identify Legacy Resort Assets, LLC as the Manager of BSA and Ginn Financial.  Legacy Resort Assets is directly owned and controlled by LA Partners.

215.  Control Over GSM Mortgage Financing:  Beginning in Fall 2006, Lubert/Ginn caused Ginn Financial to market 80% loan-to-value ("LTV") GSM mortgage loans to U.S. buyers, including Note Plaintiffs.  Lubert/Ginn, exercised complete control over GSM Mortgage financing and directed the actions of Ginn Financial and BSA.

216.  LA Partners Funding for BSA/Ginn Financial Operations:  LA Partners funded BSA/Ginn Financial operations with a $20 million credit line.  Upon request, LA Partners wired funds to BSA/Ginn Financial for operations, payroll and day-to-day expenses.

217.  LA Partners Funding for GSM Mortgage Loans:  LA Partners provided full funding for the Plaintiff Loans to Byers and Willis and partial funding for the Plaintiff Loans to all other Note Plaintiffs.

45

218.  <u>LA Partners Role in Obtaining Additional Funding</u>:  Lubert/Ginn and BSA obtained a $100 million credit line from CapitalSource International, LLC to help fund GSM mortgage loans.  Dean Adler was personally involved in negotiations with CapitalSource.  During those negotiations, CapitalSource insisted that Lubert-Adler and Bobby Ginn maintain ultimate control of The Ginn Companies.

219.  LA secured the $100 million credit line from CapitalSource by, *inter alia*, agreeing LA Partners would repurchase any GSM mortgage loans that were 60 days past due.

220.  <u>Underwriting for GSM Mortgage Loans</u>:  Lubert/Ginn set underwriting requirements for GSM mortgage loans and, acting through Ginn Financial and BSA, controlled underwriting for those loans, including the Plaintiff Loans.

221.  <u>GSM Lot Appraisals</u>:  Lubert/Ginn, acting through Ginn Financial and BSA, hired the appraiser for GSM lots, controlled the appraisal process and had ultimate authority to reject or accept the appraisal for each Plaintiff lot.

222.  <u>Loan Documents</u>:  Lubert/Ginn, acting through Ginn Financial and BSA, drew up loan documents for the Plaintiff Loans; controlled the content of those documents; sent those documents to Note Plaintiffs; transported Loan documents to the Bahamas; controlled the closing process; and controlled the process for executing/witnessing Loan documents in the Bahamas.

223.  <u>Recording Documents in the Bahamas</u>:  Lubert/Ginn, Ginn Financial and BSA controlled the process for recording Note Plaintiffs' Conveyance Deeds and Mortgages in the Bahamas.

224.  <u>LA Partners Benefitted from GSM Mortgage Loans</u>:  LA Partners received financial benefits from GSM mortgage loans.  LA Partners took monthly "preferred return" equity

distributions from BSA from at least 2007 to 2010.  In addition, LA structured the underlying funding for GSM mortgage loans so LA Partners profited even when loans went into default.

## XXII.    The Importance of Real Property Appraisals Conducted in Compliance with USPAP

225.  In a mortgage loan transaction, the lender depends on independent appraisers to fairly and accurately assess the market value of property serving as collateral.  The lender uses an appraisal to determine the maximum amount it can loan, based on the actual market value of real estate collateral.  Because of the importance of appraisals, Florida and federal laws require licensed appraisers to comply with USPAP.

226.  USPAP requires an appraiser to be independent:  "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  (USPAP Ethics Rule (Conduct).)

227.  USPAP prohibits appraisers from accepting "an assignment that includes the reporting of predetermined opinions and conclusions."  *Id.*

228.  USPAP requires a market value appraisal to be substantiated by data on comparable sales.

229.  An appraisal of current market value under USPAP, to the extent it includes value for planned improvements that do not exist, must make the appraised value "subject to" their completion.

## XXIII.   Appraisal Requirements for the Plaintiff Loans

230.  Mortgage loans offered by Ginn Financial, a licensed Florida mortgage lender, were subject to U.S. Mortgage Laws.  Under U.S. Mortgage Laws, appraisals used to underwrite mortgage loans must comply with USPAP.

231.  In connection with the $100 million credit line it provided for GSM mortgage loans, CapitalSource required those loans ("CapitalSource Funded Loans") to comply with U.S. Mortgage Laws, as well as state and local laws governing mortgage lending.

232.  As alleged in Paragraphs 236 – 242, 244 and 249 – 259, Lubert/Ginn caused Ginn Financial and BSA to obtain appraisals for Note Plaintiffs' GSM lots did not comply with USPAP or U.S. Mortgage Laws, using the appraisals to underwrite Plaintiff Loans with LTV ratios of 191% to 354%.

## XXIV.   When a Florida Appraiser Refused to Provide Inflated GSM Lot Appraisals, Lubert/Ginn Directed Ginn Financial to Fire Him

233.  In Fall 2006, Lubert/Ginn directed Ginn Financial to hire Richard C. Allen, a licensed Florida appraiser and a principal owner of Pomeroy Appraisal Associates.

234.  When Ginn Financial hired Pomeroy to conduct GSM lot appraisals, the GSM Project was in the earliest stages of development.  The infrastructure (including access roads or utilities) and amenities Lubert/Ginn had planned for GSM ("Planned Features") did not exist.  Indeed, Lubert/Ginn had not even begun construction on the planned amenities.

235.  Lubert/Ginn, Ginn Financial and BSA knew GSM lot appraisals were governed by USPAP.  They also knew the USPAP requirements summarized in Paragraphs 226 – 229.

236.  Notwithstanding their knowledge of the applicability and requirements of USPAP, Lubert/Ginn directed Ginn Financial to pressure Pomeroy to provide GSM lot appraisals for a predetermined target amount, to include value for the Planned Features without making the appraised value "subject to" their completion, and to ignore comparable sales outside GSM.

237.  To this end, Ginn Financial:

a.  Sent Pomeroy "Request for Appraisal" forms that included a sales price and often an "Estimated Value" figure for the subject lot.

    b.  Told Pomeroy the lot sales price was the target value for its appraisals.

    c.  Instructed Pomeroy not to consider comparable sales outside GSM.

    d.  Instructed Pomeroy to include value for the Planned Features.

    e.  Asked Pomeroy to provide draft appraisals and then demanded Pomeroy delete

        language making the appraised value "subject to" completion of the Planned Features.

238.  Pomeroy told Ginn Financial the appraisals it was demanding violated USPAP and

would be rejected by U.S. lenders because, under USPAP:

    a.  Closed GSM sales could not provide true comparables.  Because Ginn flew buyers

        into a private GSM airstrip, those buyers were unlikely to price lots outside GSM.

    b.  GSM lot prices were significantly higher than comparable sales outside GSM.

    c.  Any U.S. lender would require appraisals based on comparable sales outside GSM.

    d.  A USPAP appraisal could not value the Planned Features without making the

        appraised value "subject to" their completion.

239.  Pomeroy refused to provide appraisals that violated USPAP.  More specifically:

    a.  Allen told Ginn Financial Pomeroy's appraisals would not be based on any

        predetermined target value, estimate or contract price.

    b.  Pomeroy refused to limit its analysis of comparables to closed GSM lot sales and

        insisted on using comparable sales outside of GSM.

    c.  Pomeroy refused to include value for the Planned Features without stating the

        appraised value was "subject to" their completion.

240.  When Pomeroy refused to provide the inflated appraisals Ginn Financial demanded,

Lubert/Ginn directed Ginn Financial to fire Pomeroy.  On November 2, 2006, Ginn Financial

sent Rich Allen a two-sentence email: "Please cancel all the orders for Bahama Appraisals.

We have run it by our investors and a 'Subject to' valuation is unacceptable."

## XXV.   Lubert/Ginn Directed Ginn Financial to Hire a Bahamian Appraiser

241.  Lubert/Ginn directed Ginn Financial and BSA to hire a Bahamian surveyor, W. Carver Grant & Co. Ltd., to provide GSM lot appraisals.  Carver Grant was not licensed in the U.S. as a real estate appraiser.

242.  Lubert/Ginn, Ginn Financial and BSA used Carver Grant appraisals ("WCG Appraisals") to underwrite all the Plaintiffs Loans.  Although Ginn Financial had already sent Pomeroy Request for Appraisal forms for the Liles, Maciag and Cicolani Group lots, it cancelled those orders when it fired Pomeroy.

## XXVI.   Lubert/Ginn's Bahamian Appraiser had a Financial Interest in Each GSM Mortgage Loan

243.  Real estate appraisals are expected to provide lenders with an independent evaluation of the market value of collateral, unaffected by any interest in the underlying transaction. Because collateral valuation is integral to the underwriting process, USPAP and sound appraisal practices require that an appraiser must be isolated from influence by the mortgage lender.  Carver Grant failed to meet either of these requirements.

244.  Carver Grant had a financial interest in every GSM lot sale.  He was and is married to Veronica Grant, a Bahamian attorney in the employ of Lubert/Ginn who received compensation from the same GSM lot sales for which Carver Grant provided appraisals.

245.  Veronica Grant had a financial interest in every GSM lot sale, and the amount of her compensation was based on the lot price.  She was Bahamian closing coordinator and recording agent for GSM lot sales, entitled to statutory fees up to 2% of each transaction amount.  She was also an authorized agent for Stewart Title, issuing title insurance policies on each GSM lot, with her commission derived from the sales price.

246.  In addition to his direct financial interest in each lot sale, Carver Grant could not be isolated from influence by Ginn Financial and BSA because Veronica Grant received millions in compensation from Lubert/Ginn in connection with the Credit Suisse Loan.  As the recording agent for the Loan, Veronica Grant was entitled to statutory fees up to 2% of the $675 million Loan amount.

247.  Veronica Grant's brother, Sir Orville Turnquest, also received compensation from Lubert/Ginn over many years.  His law firm (Dupuch & Turnquest) represented Lubert/Ginn in the Bahamas.  Attorney Terrence R. H. Gape (Managing Partner of Dupuch & Turnquest) represented Ginn since 2004, including on Lubert/Ginn's Cash Out Scheme.  Terrence Gape served as the Assistant Secretary for BSA, while his brother, Derek Gape, worked as the GSM Senior Project Manager.

248.  Given the multiple layers of insiders connecting Carver Grant with Lubert/Ginn, Ginn Financial and BSA, as well as Carver Grant's financial interest in each GSM lot sale, those Defendants knew Carver Grant could not act as an independent appraiser.

## XXVII.   The WCG Appraisals Were Deficient

249.  The WCG Appraisals failed to follow sound appraisal practices and failed to comply with USPAP or any other generally accepted appraisal standard.

250.  The WCG Appraisals failed to detail the appraisal procedures or provide any substantiation for his valuation.  While the Appraisals referenced "a careful inspection" of "the subject property," they did not include photos or analysis of size/location for each lot.

251.  Valuation of Non-Existent Features:  In violation of USPAP, the WCG Appraisals included value for the Planned Features, without making the appraised value "subject to" their completion.

252.  Lubert/Ginn and BSA knew Ginn Financial had been warned by Pomeroy about this

51

USPAP requirement.  Nevertheless, Lubert/Ginn required appraisals from Carver Grant that omitted the "subject to" qualification.

253.  <u>Use of Comparable Sales</u>:  The WCG Appraisals violated USPAP by failing to identify comparable sales Carver Grant relied upon to support the appraised values.

254.  <u>Using Cash Sales with Insiders to Create Comparable Sales</u>:

    a.  Lubert/Ginn directed Ginn Financial and BSA to control the order in which GSM lot sales were permitted to close, to ensure that cash sales would close first.

    b.  Ginn Financial/BSA employees were instructed not to order appraisals for GSM mortgage loans until enough GSM cash sales had closed to serve as comparables. Finally, after the first 5 GSM cash sales were closed ("Early Cash Sales"), Ginn Financial/BSA employees were told the Early Cash Sales should be used as comparables for later appraisals.

    c.  Included in the Early Cash Sales were transaction(s) that one of more of Bobby Ginn, Dean Adler and/or Lubert Adler arranged with insiders.

    d.  Bobby Ginn boasted that the practice of closing initial cash sales with insiders to create comparables allowed GLA to obtain high appraised values for lots in the Hammock Beach Project:

> Getting appraisals – every closing we had here, we had to find somebody that would buy it for cash, to creat the comp to get an appraisal on the next lot to close.... Every one of them!  I mean, I got my father-in-law to close on the first lot down here, and he did it, so we could get comps on the rest of them....

255.  Lubert/Ginn, Ginn Financial and BSA knew from their extensive real estate experience (and warnings from Pomeroy Appraisal), that the WCG Appraisals were deficient, violated USPAP, and would not be accepted by any legitimate U.S. lender.

256.  Those defendants also knew the practice of controlling the order of GSM lot closings

– so that cash sales to insiders would close first and serve as comparables for later appraisals –
fraudulently inflated the appraised values for GSM lots.

## XXVIII.   The WCG Appraisals were Inflated

257.  The WCG Appraisals of Note Plaintiffs' lots were grossly inflated.  Note Plaintiffs
commissioned USPAP-compliant appraisals from Pomeroy for several Note Plaintiff lots,
retroactive to their dates of purchase ("Pomeroy Retroactive Appraisals").  Analyzing
comparable sales outside GSM and excluding value for non-existent improvements, Pomeroy
determined the market value of a GSM lot was significantly less than the WCG Appraisals.

258.  Both the Pomeroy Retroactive Appraisals and the WCG Appraisals set forth a
determination of market value for each GSM lot at the time of purchase.  Yet the vast
difference between the WCG Appraisals (which included value for Planned Features) and the
Pomeroy Retroactive Appraisals (which did not value Planned Features) is shocking:

| Lot Number | WCG Appraisal | GSM Mortgage Loan | Pomeroy Retroactive Appraisal | Loan-to-value |
|---|---|---|---|---|
| **Byers Lot 234** | $1,300,000 | $976,720 | $405,000 | **241%** |
| **Andrews Lot 272** | $1,000,000 | $774,247 | $405,000 | **191%** |
| **Cicolani Lot 104** | $1,020,000 | $814,998 | $405,000 | **201%** |
| **Josephson Lot 493** | $750,000 | $460,720 | $130,000 | **354%** |
| **Kherkher Lot 270** | $1,356,000 | $1,084,720 | $405,000 | **268%** |
| **Liles Lot 46** | $1,000,000 | $795,120 | $405,000 | **196%** |

| Lot Number | WCG Appraisal | GSM Mortgage Loan | Pomeroy Retroactive Appraisal | Loan-to-value |
|---|---|---|---|---|
| **Webb Lot 261** | $1,400,000 | $1,096,720 | $405,000 | **271%** |
| **Willis Lot 189** | $735,000 | $585,396 | $300,000 | **195%** |

259.  This comparison sample reveals that the Plaintiff Loans, which Lubert/Ginn, Ginn Financial and BSA underwrote using WCG Appraisals, had actual LTV ratios ranging from 191% to 354%.

260.  Lubert/Ginn, Ginn Financial and BSA were fully aware the WCG Appraisals resulted in a gross inflation of LTV ratios for GSM mortgage loans.

## XXIX.  Representations That Induced Note Plaintiffs to Obtain GSM Mortgage Loans

261.  Lubert/Ginn caused Ginn Financial and BSA to make the following representations to Note Plaintiffs, which were intended to induce Note Plaintiffs to obtain GSM mortgage loans:

### Representation 1:  The Plaintiff Loans Complied with U.S. Mortgage Laws

262.  Lubert/Ginn, Ginn Financial and BSA knew U.S. buyers of GSM lots wanted mortgage loans offering the protection of U.S. state and federal laws governing mortgage lending ("U.S. Mortgage Laws").  To induce Note Plaintiffs to obtain the Plaintiff Loans, Lubert/Ginn caused Ginn Financial and BSA to provide Note Plaintiffs with loan documents intended to created the impression the Plaintiff Loans complied with U.S. Mortgage Laws.

263.  During the loan application process and at closing, Lubert/Ginn caused Ginn Financial and BSA to provide Note Plaintiffs with loan disclosures and other documents

54

required under U.S. Mortgage Laws, including a HUD Form Good Faith Estimate, Truth in

Lending Disclosure Statement, Affiliated Business Arrangement Disclosure Statement Notice,

and other notices required by the Fair Credit Reporting Act, Financial Privacy Act, Equal

Credit Opportunity Act, Patriot Act and Real Estate Settlement Procedures Act (RESPA)

(collectively "U.S. Mortgage Disclosures").

264.   As a result of the U.S. Mortgage Disclosures, Note Plaintiffs Andrews Group,

Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group,

Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group,

Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia

Group, Taliaferro Group, Verhees, Webb and Willis reasonably believed the Plaintiff Loans

were made in compliance with and offered the protections of U.S. Mortgage Laws.

265.   Lubert/Ginn, Ginn Financial and BSA knew and intended that the U.S. Mortgage

Disclosures would cause Note Plaintiffs to believe the Plaintiff Loans complied with and

offered the protections of U.S. Mortgage Laws.

266.   Those Note Plaintiffs were unaware that for the reasons set forth in Paragraphs 244,

249 – 254 and 257 – 259, the Plaintiff Loans did not comply with U.S. Mortgage Laws.

267.   If those Note Plaintiffs had known the Plaintiff Loans did not comply with and offer

the protections of U.S. Mortgage Laws, they would not have closed on those Loans.

### Representation 2:  Ginn Financial, a Licensed Mortgage Lender, was the Lender for the Plaintiff Loans

268.   Though the following communications, Lubert/Ginn caused Ginn Financial to

represent that it was a licensed mortgage lender and that it would serve as the lender for the

Plaintiff Loans.

269.   McCracken Letter:  Lubert/Ginn directed Ginn Financial to send a letter, signed by

Ginn Financial CFO William McCracken, soliciting U.S. buyers to obtain GSM lot financing through Ginn Financial ("McCracken Letter").  The McCracken Letter identified Ginn Financial as the lender for GSM Mortgage Loans.

    a.   Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steven Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick Clemmons, Kevin Crawford, Lauren and Troy Domnick, Dean and Stephanie Fresonke, Tom Hoyer, James Jackson, David Jankowski, James Josephson, Ozzie Kalil, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, Alexandria Maciag, Steve Ponsler, Fred Reeping, Mark Roodvoets, Tim Sell, Bernard Shaughnessy, Vic Taglia, Anja Verhees, Richard Webb and Darryl Willis received and read the McCracken Letter.  Plaintiffs Maureen and Todd Taliaferro may have received the McCracken Letter and recall receiving the representation in the letter.  Those Plaintiffs believed, based in part on the letter, that they were obtaining GSM mortgage financing from Ginn Financial.

270.  <u>Loan Fact Sheet</u>:  Lubert/Ginn directed Ginn Financial to send U.S. buyers a fact sheet entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage loans ("Loan Fact Sheet") offered by Ginn Financial.  The Loan Fact Sheet identified Ginn Financial as "the preferred lender for GSM buyers," stating, "Ginn Financial Services is a licensed mortgage lender in the State of Florida.  License # L100000558788."

    a.   Plaintiffs Jones Andrews, Jon Andrews, Mark Bailey, Beachfront, Steven Bredahl, Cameron Byers, Joseph Cappuccino, Andy Card, Jerry Cicolani, Clear Reef, Rick Clemmons, Kevin Crawford, Lauren and Troy Domnick, Tom Hoyer, James Jackson, David Jankowski, James Josephson, Ozzie Kalil, Susan Kherkher, Thomas

Lammertse, Brian Lesesne, Ken and Pat Liles, Alexandria Maciag, Steve Ponsler, Fred Reeping, Tim Sell, Bernard Shaughnessy, Vic Taglia, Maureen and Todd Taliaferro, Anja Verhees, Richard Webb and Darryl Willis received and read the Loan Fact Sheet.  Those Plaintiffs believed, based in part on these statements, that they were obtaining GSM mortgage financing from Ginn Financial, a licensed mortgage lender

271.  Ginn Financial Website:  Ginn Financial's website also stated, "Ginn Financial Services is a licensed mortgage lender in the State of Florida.  License # L100000558788."

    a.  Plaintiffs Mark Bailey, Steven Bredahl, Joseph Cappuccino, Andy Card, Clear Reef, Rick Clemmons, Jerry Cicolani, Kevin Crawford, Tom Hoyer, James Jackson, David Jankowski, Susan Kherkher, Brian Lesesne, Ken and Pat Liles, James Josephson, Alexandria Maciag, Fred Reeping, Bernard Shaughnessy, Vic Taglia, Maureen Taliaferro, Anja Verhees, Richard Webb and Darryl Willis visited the Ginn Financial website and believed, based in part on this statement, that they were obtaining GSM mortgage financing from a licensed mortgage lender.

272.  U.S. Mortgage Disclosures:  Many of the U.S. Mortgage Disclosures described in Paragraph 263 designated Ginn Financial as the lender on the Plaintiff Loans.

    a.  The Note Plaintiffs identified in Paragraph 264 received U.S. Mortgage Disclosures, which caused them to believe they were obtaining GSM mortgage financing from Ginn Financial.

273.  As a result of the representations described in Paragraphs 268-272, Note Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group,

Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag,

Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis reasonably believed Ginn

Financial was the lender for their Plaintiff Loans.  They also reasonably believed they were

dealing with a licensed mortgage lender.

274.  Lubert/Ginn, Ginn Financial and BSA knew and intended that the representations

described in Paragraphs 268-272 would cause those Note Plaintiffs to believe Ginn Financial,

a licensed mortgage lender, was the lender for the Plaintiff Loans.

275.  Those Note Plaintiffs were unaware that BSA, an unlicensed entity, was actually

serving as the "lender" on their Loans until they closed on their GSM lot purchases.

276.  If those Note Plaintiffs had known they were entering into the Plaintiff Loans with

BSA, an unlicensed entity, they would not have closed on the Plaintiff Loans.

<u>**Representation 3:  Note Plaintiffs' GSM Lots Were Appraised by a U.S. Licensed
Appraiser in Compliance with U.S. Mortgage Laws**</u>

277.  Lubert/Ginn directed Ginn Financial and BSA to represent the lender on the Plaintiff

Loans was using U.S. licensed real estate appraisers to appraise GSM lots.

278.  <u>U.S. Mortgage Disclosures</u>:  The Note Plaintiffs identified in Paragraph 264 received

U.S. Mortgage Disclosures described in Paragraph 263, which caused them to believe the

lender on the Plaintiff Loans was using a U.S. licensed real estate appraiser in order to comply

with U.S. Mortgage Laws.

279.  <u>Affiliated Business Arrangement Disclosure Statement</u>:  Lubert/Ginn directed Ginn

Financial to send U.S. borrowers an "Affiliated Business Arrangement Disclosure Statement

Notice," which identified U.S. licensed real estate appraisers "that we, as your lender, will

require you to use, as a condition of your loan on this property, to represent our interests in

the transaction."

a.   Note Plaintiffs Andrews Group, Bailey, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kherkher, Lammertse, Liles, Maciag, Taglia Group, Taliaferro, Verhees, Webb and Willis received and read the Affiliated Business Arrangement Disclosure Statement Notice and relied on the representation that a U.S. licensed real estate appraiser would provide the appraisals of their GSM lots.

280.   Those Note Plaintiffs reasonably believed the lender on the Plaintiff Loans was using a U.S. licensed appraiser to provide appraisals of their GSM lots.

281.   Lubert/Ginn, Ginn Financial and BSA knew and intended that the representations described in Paragraphs 278 – 279 would cause those Note Plaintiffs to believe the lender was using a U.S. licensed appraiser in order to comply with U.S. Mortgage Laws.

282.   If those Note Plaintiffs had known the appraiser used by the lender was not licensed in the U.S. and was unable to provide appraisals that would comply with U.S. Mortgage Laws, they would not have closed on the Plaintiff Loans.

**Representation 4:  The Plaintiff Loans Were for 80% Loan-To-Value**

283.   Lubert/Ginn directed Ginn Financial to make the following representations to Note Plaintiffs, which were intended to convince Note Plaintiffs Ginn Financial was not offering mortgage loans for more than 80% Loan-To-Value.

284.   McCracken Letter:  The McCracken Letter stated that Ginn Financial had negotiated a specialized mortgage loan program for GSM, offering terms "generally not available in the Bahamas."  The Letter said, "For U.S. domestic clients, Ginn Financial Services will offer 1st mortgage financing up to 80% of the purchase price of your lot in Ginn Sur Mer."

285.   Loan Fact Sheet:  The first term on the GSM Loan Fact Sheet stated:  "80% Loan to

Value Available for Qualified Buyers."

286.  The Note Plaintiffs identified in Paragraphs 269 and 270 who received the McCracken Letter and the Loan Fact Sheet reasonably believed Ginn Financial would not make GSM Mortgage Loans for more than 80% Loan-To-Value.

287.  In addition, in light of commonly accepted practice for U.S. mortgage lending, Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Cappuccino Group, Card, Carell Group, Cicolani Group, Clear Reef, Clemmons Group, Crawford Group, Domnick, Fresonke Group, Hoyer Group, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Maciag, Ponsler, Taglia Group, Taliaferro, Verhees, Webb and Willis reasonably believed Ginn Financial would not approve mortgage financing for more than 80% of the value of the corresponding collateral.

288.  Those Note Plaintiffs could not have reasonably anticipated they would need to obtain their own appraisals to ensure Plaintiff Loans were not underwritten using inflated appraisals for more than the value of the collateral GSM lots.

289.  Lubert/Ginn and Ginn Financial knew and intended that the representations described in Paragraphs 284 – 285, along with commonly accepted practice for U.S. mortgage lending, would cause Note Plaintiffs to believe Ginn Financial would not make GSM Mortgage Loans for more than 80% Loan-To-Value.

290.  Note Plaintiffs were unaware that, as shown in Paragraph 258, the inflated WCG Appraisals caused the Plaintiff Loans to have LTV ratios from 191% to 354%.

291.  If Note Plaintiffs had known the actual LTV for the Plaintiff Loans that were underwritten using the inflated WCG Appraisals, they would not have closed on those Loans.

**Representation 5:  Ginn Financial Required Legitimate Appraisals to Protect Itself**

292.  Lubert/Ginn directed Ginn Financial and BSA to make the following representations,

which were intended to convince Note Plaintiffs that the lender on the Plaintiff Loans required legitimate appraisals to protect itself from loaning more than the market value of the GSM lot serving as collateral.

293.   <u>Affiliated Business Arrangement Disclosure Statement</u>:  The "Affiliated Business Arrangement Disclosure Statement Notice" stated that the lender was requiring Note Plaintiffs to use the identified appraisers "as a condition of your loan on this property, to represent our interests in the transaction."  Those Note Plaintiffs identified in Paragraph 279 reasonably believed this representation.

294.   <u>Plaintiff Notes</u>:  The Plaintiff Notes say the associated mortgage on the GSM lot is intended to protect the Note Holder in the event of a default:

> an Indenture of Mortgage (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.

295.   As a result of these representations and in light of commonly accepted practice for U.S. mortgage lending, all Note Plaintiffs reasonably believed the following:

a.   No financial institution acting reasonably to protect its interests would provide a mortgage loan for more than the value of the corresponding collateral.

b.   The lender for the Plaintiff Loans required a legitimate appraisal of each Note Plaintiff's lot, to ensure it would provide sufficient collateral for the corresponding Plaintiff Loan.

c.   The lender for the Plaintiff Loans required a legitimate appraisal to ensure it did not loan more than the market value of the collateral lot.

d.   The lender for the Plaintiff Loans was relying on appraisals of Note Plaintiffs' lots, conducted in accordance with generally accepted appraisal standards, to protect its interests as the Lender.

e.  The lender for the Plaintiff Loans was a legitimate lender acting rationally to protect its interests, which lender would not, by design, loan more more than the actual market value of the lot serving as collateral.

296.  Lubert/Ginn, Ginn Financial and BSA knew and intended that the representations in Paragraphs 293 – 294, along with commonly accepted practice for U.S. mortgage lending, would cause Note Plaintiffs' beliefs as set forth in Paragraph 295.

297.  Lubert/Ginn, Ginn Financial and BSA knew Note Plaintiffs were unaware of the following with respect to the lender for the Plaintiff Loans:

a.  It did not require legitimate appraisals to protect itself from loaning more than the value of the corresponding collateral.

b.  It demanded inflated appraisals that included value for the Planned Features without making that value subject to their completion.

c.  It demanded inflated appraisals that were not based on legitimate comparables outside of GSM.

d.  It demanded appraisals that were so inflated that the Plaintiff Loans underwritten with those appraisals carried LTV ratios from 191% to 354%.

298.  If Note Plaintiffs had known any of the facts set forth in Paragraph 297, they would not have closed on the Plaintiff Loans.

## XXX.  Concealment of the Appraisal Facts

299.  Lubert/Ginn, Ginn Financial and BSA concealed the facts alleged in Paragraphs 236-240; 244; 249-254 and 257-259 ("Appraisal Facts") to induce Note Plaintiffs to finance their GSM lot purchases with BSA.

300.  If Note Plaintiffs had known the Appraisal Facts, or if a valid appraisal had been done for the Note Plaintiff lots, those Plaintiffs would not have closed on the Plaintiff Loans.

301.  Because Note Plaintiffs were unaware of the Appraisal Facts, they lacked a meaningful choice whether to enter into the Plaintiff Notes.

## XXXI.   Efforts by LA Partners and Dean Adler to Conceal their Role in the Appraisal Scheme

302.  LA caused Ginn Financial and BSA to conceal LA Partners' ownership and control over Ginn Financial and BSA, as well as LA's involvement in the Appraisal Scheme, by serving equivocal responses and refusing to produce responsive documents to Note Plaintiffs' discovery served beginning January 2010.  This concealment prevented Note Plaintiffs from discovering LA's involvement in the Appraisal Scheme.

303.  LA's involvement in the Appraisal Scheme was partially revealed when certain Note Plaintiffs settled claims against former Ginn Financial CFO William McCracken in November 2010.  Pursuant to the settlement, McCracken provided a declaration revealing LA Partners was an active investor in the GSM Mortgage Notes, as alleged in Paragraphs 217 and 219.

## XXXII.   Note Plaintiffs' Discovery of the Appraisal Facts

304.  Note Plaintiffs Andrews Group, Cicolani Group, Josephson, Kherkher, Lammertse, Liles and Webb did not discover the Appraisal Facts until on or after January 2010 and did not discover LA's control over all aspects of the Plaintiff Loans until November 2010.

305.  Note Plaintiff Willis did not discover the Appraisal Facts until on or after June 2009 and did not discover LA's control over all aspects of the Plaintiff Loans until November 2010.

306.  Note Plaintiff Byers did not discover the Appraisal Facts until on or after July 2009 and did not discover LA's control over all aspects of the Plaintiff Loans until November 2010.

307.  Note Plaintiffs Bailey, Beachfront, Bredahl, Card, Clear Reef, Crawford Group, Domnick, Jackson Group, Kalil and Ponsler did not discover the Appraisal Facts until on or after March 2010 and did not discover LA's control over all aspects of the Plaintiff Loans

until November 2010.

308.  Note Plaintiffs Carell Group, Clemmons Group, Fresonke Group, Hoyer Group, Maciag and Taliaferro did not discover the Appraisal Facts or LA's control over all aspects of the Plaintiff Loans until on or after January 2011.

309.  Note Plaintiffs Taglia Group, Cappuccino Group and Verhees did not discover the Appraisal Facts or LA's control over all aspects of the Plaintiff Loans until on or after March 2012.

310.  If Note Plaintiffs had earlier learned of the Appraisal Facts, they would have immediately stopped making payments on the Plaintiff Notes and considered initiating legal action as a result of the those facts.

311.  If Note Plaintiffs Andrews Group, Bailey, Beachfront, Bredahl, Byers, Card, Cicolani Group, Clear Reef, Crawford Group, Domnick, Jackson Group, Josephson, Kalil, Kherkher, Lammertse, Liles, Ponsler, Webb and Willis had learned earlier of LA's control over all aspects of the Plaintiff Loans, they would have joined LA Partners and Dean Adler as defendants at the time they first filed their claims based on the Appraisal Facts.

## XXXIII.   Note Plaintiffs Were Damaged by the Inflated Appraisals

312.  Even though appraisals are conducted to protect lenders, fair market value appraisals also benefit mortgage borrowers by ensuring loan sizes remain reasonable in relation to the value of the real property collateral.  No person, including Note Plaintiffs, would knowingly and willingly agree to enter into a mortgage loan with LTV ratios from 191% to 354%.

313.  As a result of the inflated GSM appraisals, Note Plaintiffs were damaged in a sum that includes, but is not limited to:  the amounts they paid for and owe on their lots (including down payments, amounts paid at closing, mortgage payments and amounts still owed), tax stamps, loan fees, closing costs, property taxes paid to date and still owed, and other costs

associated with their lot purchases.  The elements and the exact amount of each Plaintiff's damages will be established at trial.

314.  At the moment Note Plaintiffs closed on the Plaintiff Loans, they were saddled with mortgage loans with LTV ratios from 191% to 354%.

315.  From the moment Note Plaintiffs closed on the Plaintiff Loans:

   a.  The Plaintiff Notes began to accrue interest on the inflated loan amounts, and that interest accrual continues to the present.

   b.  Plaintiffs became responsible for Bahamas property taxes based on the inflated appraised value of their GSM lots.

316.  The Plaintiff Notes are "Balloon Notes" requiring Note Plaintiffs, within five years, to refinance the loan or repay the outstanding balance.  No legitimate lender would be willing to refinance a mortgage loan with LTV ratios from 191% to 354%.

317.  When Note Plaintiffs became aware, *inter alia*, of the Appraisal Facts, Note Plaintiffs discontinued making payments on their Notes.  Even even though Lubert/Ginn, Ginn Financial and BSA know Note Plaintiffs dispute the validity of their Notes, Ginn Financial and BSA continue to report, or to cause their agents to report, the Plaintiff Notes as delinquent to credit agencies.  As a result of these continuing reports, Note Plaintiffs' credit ratings have been and continue to be damaged.

**FACTUAL BACKGROUND:**
**RICO APPRAISAL SCHEME**

318.  Note Plaintiffs re-allege the allegations set forth in Paragraphs 210-317, as though fully set forth below.

319.  Lubert/Ginn, Ginn Financial and BSA engaged in a scheme to provide mortgage financing for GSM lots using fraudulently inflated appraisals ("Appraisal Scheme").

65

320.   To entice U.S. buyers to obtain GSM Mortgage Loans, Ginn Financial and BSA created the illusion GSM mortgage loans were made by a licensed mortgage lender in compliance with U.S. Mortgage Laws.  To hide the use of inflated appraisals, Ginn Financial and BSA told borrowers their lender required appraisals to protect against loaning more than the value of the GSM lot serving as collateral.

321.   Unbeknownst to U.S. buyers, including Note Plaintiffs, Lubert/Ginn caused Ginn Financial and BSA to undermine the integrity of the appraisal process, demanding that appraisers provide inflated appraisals in violation of USPAP, U.S. Mortgage Laws and generally accepted appraisal practices.

322.   As alleged in Paragraphs 236- 242 and 244-303, Lubert/Ginn, Ginn Financial and BSA engaged in a scheme to obtain inflated appraisals they used to underwrite GSM mortgage loans with LTV ratios from 191% to 354% and then concealed that scheme from Note Plaintiffs.

323.   Lubert/Ginn, particularly Dean Adler and Bobby Ginn, were responsible for developing the fraudlent appraisal practices and establishing infrastructure to implement the Appraisal Scheme.  Lubert/Ginn used Ginn Financial and BSA to execute their fraudulent appraisal practices.  In carrying out the Appraisal Scheme, Lubert/Ginn directed and controlled the actions of Ginn Financial and BSA.

## XXXIV.   Lubert/Ginn, Ginn Financial and BSA Had No Incentive to Act as Legitimate Mortgage Lenders

324.   In a legitimate mortgage transaction, the lender is motivated to protect its interests by ensuring it does not approve a loan for more than the actual market value of real estate collateral.  It is almost axiomatic that the lender requires an appraisal reflecting actual market value.  Inflated appraisals place a legitimate lender at risk of approving a loan for more than

the value of the collateral, exposing the lender to significant loss if a borrower defaults.  No legitimate lender acting reasonably to protect its interests would approve a mortgage loan for more than the value of the collateral.

325.  Lubert/Ginn, Ginn Financial and BSA were not legitimate mortgage lenders with an incentive to protect against loaning more than the market value of GSM lots.  They were motivated to make mortgage loans for amounts far greater than market value.

326.  Dean Adler structured the underlying funding for GSM mortgage loans, including the Plaintiff Loans, to ensure LA profited if they went into default.

327.  In making the Plaintiff Loans, Lubert/Ginn, Ginn Financial and BSA corrupted the appraisal process, controlled GSM lot appraisals, and demanded inflated appraised values. Lubert/Ginn, Ginn Financial and BSA insisted on, and ultimately obtained, appraisals that failed to consider market comparables and improperly included value for nonexistent planned features.

## XXXV.    Lubert/Ginn, Ginn Financial and BSA Continue to Conceal the True Facts about the Appraisal Scheme

328.  Lubert/Ginn, Ginn Financial and BSA know that if the Appraisal Facts become public knowledge, other U.S. buyers may stop paying their GSM mortgage notes and initiate legal action.

329.  Those Defendants continue to conceal the Appraisal Facts to prevent Note Plaintiffs and other U.S. buyers from learning the truth about the appraisals used for GSM Mortgage Loans, and this concealment threatens to continue into the future.

330.  Ginn Financial and BSA refuse, despite repeated requests by Note Plaintiffs since 2010, to identify the current owner of the Plaintiff Notes.

331.  To avoid discovery of the Appraisal Facts, Lubert/Ginn, Ginn Financial and BSA

took steps to prevent the current note owner from notifying borrowers, including Note

Plaintiffs, on the maturity date and requiring payment of the balance due at maturity.

332.  To this date, Note Plaintiffs remain unaware of the full impact of the Appraisal

Scheme or of the Appraisal Facts.

## XXXVI.   The Appraisal Scheme:  Violations of RICO by LA Partners, Dean Adler, ERG, Bobby Ginn, Ginn Financial and BSA

### A.  The Enterprise

333.  From at least June 2006 and continuing to the present, in Florida and elsewhere,

Defendants LA Partners, Dean Adler, ERG, Bobby Ginn, Ginn Financial and BSA

("Appraisal Defendants"), including their agents and employees, collectively constituted an

"enterprise" as defined in 18 U.S.C. § 1961(4) ("Appraisal Enterprise").

334.   The Appraisal Enterprise is an ongoing organization that engages in, with activities

affecting, interstate and foreign commerce.  At all relevant times, the Appraisal Defendants

knowingly made use of the means and instruments of transportation and communications of

interstate and foreign commerce to communicate with one another, with CapitalSource

International, and with Plaintiffs.

335.  Although the Appraisal Defendants participate in and are members and part of the

Appraisal Enterprise, each also has an existence apart from that Enterprise.  At all relevant times,

the Enterprise had an ascertainable structure apart from the racketeering activity in which Appraisal

Defendants engaged.  The primary decision-makers for the Appraisal Enterprise are Dean Adler,

Lubert-Adler and Bobby Ginn, who direct the activities of the Enterprise.

336.  The Appraisal Defendants control and operate the Enterprise through a variety of means

including, but not limited to, agreeing to commit and committing the following acts: (1)

devising the Scheme; (2) marketing GSM Mortgage Loans at 80% LTV with Ginn Financial

as a licensed mortgage lender; (3) creating the illusion the Plaintiff Loans were made in compliance with U.S. Mortgage Laws; (4) creating the illusion Ginn Financial required appraisals from licensed U.S. appraisers to protect itself from loaning more than the value of the collateral; (5) forming BSA to circumvent U.S. Mortgage Laws; (6) pressuring a U.S. licensed appraiser to violate USPAP by providing fraudulently inflated appraisals based on Nonexistent Features; (7) hiring a Bahamian appraiser with a financial interest in each lot sale and no independence from Lubert/Ginn; (8) using the WCG Appraisals, which violated USPAP and valued the Nonexistent Features; (9) closing the Note Plaintiff Loans at 191% to 354% LTV; (10) concealing the Appraisal Facts from Note Plaintiffs; and (11) continuing to charge interest on the Plaintiff Notes after their maturity dates.

337.  The Appraisal Enterprise pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud Note Plaintiffs and to collect profits from those actions, which began before Note Plaintiffs purchased GSM lots, continue to the present and threaten to continue into the future.

## A.  Predicate Acts- Mail and Wire Fraud

338.  Appraisal Defendants engaged and continue to engage in conduct violating 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) to effectuate the Appraisal Scheme.

<u>Mail and Wire Fraud</u>

339.   To execute the Appraisal Scheme, Appraisal Defendants in violation of 18 U.S.C. § 1341 and 1343 transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, pictures and sounds, and caused things to be placed in a post office or authorized depository, or deposited things to be sent or delivered by a private or commercial interstate carrier.

340.  **Note Plaintiffs incorporate Appendix B hereto**, identifying Appraisal Defendants'

use of wire and mail communications in furtherance of the Appraisal Scheme.  To the extent Appendix B does not include the exact dates of and persons involved in each act, those details are in the exclusive control of one or more Appraisal Defendants.

341.  Appraisal Defendants' acts of fraud and concealment were intentional and committed to deceive Note Plaintiffs and obtain their money for Appraisal Defendants' gain.  Appraisal Defendants either knew or recklessly disregarded the fact that their statements and omissions were material, and Note Plaintiffs would have acted differently if they had known the true facts.

342.  As a result of the Appraisal Scheme, Appraisal Defendants obtained money belonging to Note Plaintiffs, and Note Plaintiffs have been injured in their business or property by Appraisal Defendants' overt acts of mail and wire fraud.

343.  To the extent Appendix B does not include details concerning the exact dates of and persons involved in sending the preceding matters or things, those details are in the exclusive control of one or more of the Appraisal Defendants, and/or other persons presently unknown to Note Plaintiffs.

344.  The acts in Appendix B were done intentionally and knowingly with the specific intent to advance the Appraisal Scheme, or with knowledge the use of mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not intended.  Appraisal Defendants executed the Appraisal Scheme in different states within the United States and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

**C.   Pattern of Racketeering Activity**

345.  Appraisal Defendants knowingly, willfully and unlawfully conducted or

participated in the affairs of the Appraisal Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  The racketeering activity was made possible by Appraisal Defendants' regular and repeated use of the facilities and services of the Appraisal Enterprise.

346.   Appraisal Defendants committed or aided and abetted the commission of at least two acts of racketeering activity, set forth in Appendix B, in the past five years.  The Racketeering Acts were not isolated, but had the same or similar purpose, participants, method and victims, including Note Plaintiffs.

347.   Each Racketeering Act was committed pursuant to and in furtherance of the Appraisal Enterprise, including false and misleading statements and concealment, as well as other uses of the mails and wire transmissions.

348.   Appraisal Defendants' Racketeering Acts were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## COUNT I

## Violation of 18 U.S.C. § 1962(c):  RICO – Cash Out Scheme

### (All Plaintiffs Against Dean Adler, LA Partners, ERG and Bobby Ginn)

349.   Plaintiffs re-allege the allegations set forth in Paragraphs 4 - 41 and 43 - 209, as well as Predicate Acts L1 - L94, as though fully set forth below.

350.   CO Defendants violated 18 U.S.C. §§ 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Cash Out Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§134l and 1343.

351.   As a direct and proximate result, Plaintiffs have been injured in their business or

property by the predicate acts that make up CO Defendants' pattern of racketeering activity through the Cash Out Enterprise.

## COUNT II

### Violation of 18 U.S.C. § 1962(d): RICO – Cash Out Scheme
**(All Plaintiffs Against Dean Adler, LA Partners, ERG and Bobby Ginn)**

352.  Plaintiffs re-allege the allegations set forth in Paragraphs 4 - 41, 43 - 209 and 349 - 351, as well as Predicate Acts L1 - L94, as though fully set forth below.

353.  In violation of 18 U.S.C. § 1962(d) CO Defendants have, as alleged above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced at least as early as March 2006 and continues to the present.  The object of the conspiracy was to loot GSM to obtain the $675 million Loan to eliminate their investment risk and harvest future profits from the Projects.

354.  Each CO Defendant knowingly, willfully and unlawfully agreed and combined to conduct or participate in, directly or indirectly, the conduct of the affairs and activities of the Cash Out Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343, in violation of 18 U.S.C. § 1962(c).

355.  Dean Adler and Lubert-Adler agreed to orchestrate the Cash Out Scheme, devise the Loan terms, control the Sales Projections and conceal the Loan Effects.  ERG and Bobby Ginn agreed to the Loan terms and amount and agreed to sacrifice GSM in order to obtain the Loan, to conceal the Loan Effects, and to make false statements about the Loan Effects and, beginning in August 2008, about the impact of the Loan default on GSM.

356.  CO Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of said conspiracy, set forth in Predicate Acts L1 to L94.

357.  The purpose of the acts that caused injury to Plaintiffs was to advance the overall

objective of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of CO Defendants' scheme.

358.  As a direct and proximate result, Plaintiffs have been injured in their business or property by CO Defendants' conspiracy and by the predicate acts that make up CO Defendants' pattern of racketeering activity through the Cash Out Enterprise.

## COUNT III

### Violation of 18 U.S.C. § 1962(c):  RICO – Appraisal Scheme

**(Note Plaintiffs against Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and Bahamas Sales)**

359.  Note Plaintiffs re-allege the allegations set forth in Paragraphs 4 - 41, 210 - 317, and 319 - 348, as well as Predicate Acts A1 - A375, as though fully set forth below.

360.  Appraisal Defendants violated 18 U.S.C. §§ 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Appraisal Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§134l and 1343.

361.  As a direct and proximate result, Note Plaintiffs have been injured in their business or property by the predicate acts that make up Appraisal Defendants' pattern of racketeering activity through the Appraisal Enterprise.

## COUNT IV

### Violation of 18 U.S.C. § 1962(d): RICO – Appraisal Scheme
**(Note Plaintiffs against Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and BSA)**

362.  Note Plaintiffs re-allege the allegations set forth in Paragraphs 4 - 41, 210 - 317, 319 - 348 and 359 - 361, as well as Predicate Acts A1 - A375, as though fully set forth below.

363.  In violation of 18 U.S.C. § 1962(d) Appraisal Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced at least as early as June 2006 and continues to the present.  The object of the conspiracy was to provide mortgage financing for GSM lots using fraudulently inflated appraisals, resulting in increased profits for Appraisal Defendants.

364.  Each Appraisal Defendant knowingly, willfully and unlawfully agreed and combined to conduct or participate in, directly or indirectly, the conduct of the affairs and activities of the Appraisal Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343, in violation of 18 U.S.C. § 1962(c).

365.  Dean Adler and Lubert-Adler agreed to orchestrate the Appraisal Scheme, develop fraudlent appraisal practices and establish infrastructure to implement the Appraisal Scheme, provide funding for GSM Mortgage Loans, control the appraisal process and pressure appraisers to provide appraisals that valued the Nonexistent Features.  ERG and Bobby Ginn agreed to oversee the Scheme, develop fraudulent appraisal practices and establish infrastructure to implement the Appraisal Scheme, form BSA to serve as lender on GSM Mortgage Loans and circumvent U.S. Mortgage Laws, use Ginn Financial to offer U.S. buyers 80% LTV financing, and pressure appraisers to provide appraisals that valued the Nonexistent Features.  Ginn Financial agreed to offer U.S. buyers 80% LTV financing, create the impression GSM Mortgage Loans were made in compliance with U.S. Mortgage Laws, obscure the distinction between itself and BSA, pressure appraisers to provide appraisals that valued the Nonexistent Features, hire Carver Grant to provide appraisals, and use the WCG Appraisals to support GSM Mortgage Loans.  BSA agreed to serve as the lender for the Plaintiff Loans, hire Carver Grant to provide inflated appraisals, and use the WCG Appraisals

to support GSM Mortgage Loans.

366.  Appraisal Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of said conspiracy, set forth in Predicate Acts A1 to A375.

367.  The purpose of the acts that caused injury to Note Plaintiffs was to advance the overall objective of the conspiracy, and the harm to Note Plaintiffs was a reasonably foreseeable consequence of Appraisal Defendants' scheme.

368.  As a direct and proximate result, Note Plaintiffs were injured in their business or property by Appraisal Defendants' conspiracy and by the predicate acts that make up Appraisal Defendants' pattern of racketeering activity through the Appraisal Enterprise.

## COUNT V

## Fraud in the Inducement

**(Note Plaintiffs against Dean Adler, LA Partners, ERG, Bobby Ginn, Ginn Financial and BSA)**

369.  Note Plaintiffs re-allege the allegations set forth in 4 – 41 and 210 – 317, as though fully set forth below.

370.  Lubert/Ginn directed Ginn Financial and BSA to make the false and misleading representations alleged in Paragraphs 262 – 263, 268 – 272, 277 – 279, 283 – 285 and 292 – 294 to induce Note Plaintiffs to close on the Plaintiff Loans.

371.  Appraisal Defendants concealed the Appraisal Facts alleged in Paragraphs 236 – 240, 244, 249 – 254 and 257 – 259 to induce Note Plaintiffs' to enter into the Plaintiff Notes.

372.  Note Plaintiffs would not have closed on the Plaintiff Loans if they had known the Appraisal Facts.

373.  Appraisal Defendants knew the Appraisal Facts were material to Note Plaintiffs' decisions to enter into the Plaintiff Notes.  They also knew if Note Plaintiffs' learned the Appraisal Facts, they would not have closed on the Plaintiff Loans.

374.  Note Plaintiffs were damaged from the moment they closed on the Plaintiff Loans, as set forth in Paragraphs 312 – 317.

## **PRAYER FOR RELIEF**

A.  As to Counts I and III, a determination that Defendants have violated 18 U.S.C. §§ 1962(c);

B.  As to Counts II and IV, a determination that Defendants have violated 18 U.S.C. §§ 1962(d) and (d);

C.  As to Count V, a determination that Defendants Ginn Financial and BSA (as directed by Defendants Lubert/Ginn) fraudulently induced Note Plaintiffs to enter into the Plaintiff Notes;

D.  As to Counts I - IV, an injunction prohibiting Defendants from further violations of 18 U.S.C. §§ 1962(c) and (d);

E.  As to all Counts, an order that Defendants pay damages in an amount to be determined at trial;

F.  As to Counts I and II, an order that Loan Defendants pay treble the amount of damages suffered by Plaintiffs under 18 U.S.C. § 1964(c);

G.  As to Counts III and IV, an order that Appraisal Defendants pay treble the amount of damages suffered by Note Plaintiffs under 18 U.S.C. § 1964(c);

H.  As to Counts III and IV, a determination that the Plaintiff Notes and associated mortgages should be declared null and void as a consequence of the Appraisal

Scheme;

I.  As to Count V, a determination that the Plaintiff Notes and associated mortgages should be declared null and void as a consequence of the fraud;

J.  As to Counts III - V, an order rescinding the Plaintiff Notes;

K.  As to Counts III - V, an order of restitution of all payments and charges that Appraisal Defendants improperly collected from Note Plaintiffs;

L.  As to Count V, leave of court to seek to plead punitive damages at the appropriate time;

H.  A determination that Loan Defendants are jointly and severally liable as to Counts I and II;

I.  A determination that Appraisal Defendants are jointly and severally liable as to Counts III, IV and V;

M.  An award to Plaintiffs of the costs and disbursements incurred in connection with this action, including reasonable attorneys' fees under 18 U.S.C. § 1964(c);

J.  An award to Plaintiffs of pre- and post-judgment interest;

K.  Trial by jury of all issues triable as of right by a jury; and

L.  Such other and further relief as the Court may deem just and proper.


April 3, 2015                      s/ Dana L. Ballinger

                                   Dana L. Ballinger – Trial Counsel
                                   Attorney for Plaintiffs
                                   Florida Bar No. 35278

                                   BALLINGER LAW OFFICE
                                   747 Windlass Way
                                   Sanibel, Florida 33957
                                   (239) 395-7672
                                   dballinger@ballingerlawoffice.com

# APPENDIX A – Cash Out Scheme: Mail and Wire Fraud Predicate Acts

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L1 | LA Partners; Dean Adler; Bobby Ginn; ERG | Around 03/00/2006 | Engaged in communications by mail and wire among themselves and their attorneys concerning whether and on what terms to obtain a Credit Suisse syndicated term loan. |
| L2 | LA Partners; ERG | 03/30/2006 | Directed Ginn-LA LLLP to sign an engagement letter with Credit Suisse for senior secured credit facilities up to $800 million, which was sent to Credit Suisse. |
| L3 | LA Partners; Dean Adler; Bobby Ginn | 03/00/2006 to 06/00/2006 | Engaged in communications by mail and wire among themselves and their attorneys concerning projections of future lot sales in the Projects ("Lot Sales Projections") to be used by Cushman & Wakefield to prepare a TNV appraisal of the Projects. |
| L4 | LA Partners; Dean Adler; Bobby Ginn | Prior to 03/31/2006 | Prepared and circulated among themselves various draft Lot Sales Projections. |
| L5 | LA Partners; ERG | Prior to 03/31/2006 | Directed transmittal of Lot Sales Projections to Cushman & Wakefield for use in preparing a TNV appraisal of the Projects. |
| L6 | Dean Adler | 03/03/2006 | Spoke by telephone with Bobby Masters and others.  Said the Loan was the single most important task LA and Ginn had before it in the next 60 days. |
| L7 | LA Partners; ERG | 04/14/2006 | Emails between Ralph Zeigler, Bobby Masters, John Klumph and Steve Griessel discussed how to deal with hundreds of Quail West sales cancellations in the Lot Sales Projections. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L8 | LA Partners; ERG | 04/15/2006 | Emails between John Klumph, Vinod Paidipalli and Steve Griessel discussed how to deal with hundreds of Quail West sales cancellations in the Lot Sales Projections. |
| L9 | LA Partners; ERG | 04/18/2006 | Directed information be sent to Delaware Division of Corporations for the formation of Ginn-LA CS Borrower to act as borrower under the Loan. |
| L10 | LA Partners; Dean Adler; Bobby Ginn | 03/00/2006 to 06/07/2006 | Engaged in communications by mail and wire among themselves and their attorneys concerning the likelihood of default under the Loan in light of Tesoro and Quail West sales cancellations. |
| L11 | LA Partners; Dean Adler; Bobby Ginn; ERG | 04/19/2006 | Morris, Manning & Martin attorney John "Sonny" Morris sent a memo to Bobby Ginn, Dean Adler et al., "CSFB Financing/Concerns About Repayment and Presales," which listed problems the Borrowers could expect given the Loan size and terms. (MMMTQW01-024197 – 024201) |
| L12 | Dean Adler, LA Partners | 04/24/2006 | Dean Adler and Stuart Margulies prepared a draft Memo to Advisory Boards for Lubert-Adler Funds III and IV that summarized goals and risks of the Loan, knowing the draft would be sent to others, including attorneys, for review. |
| L13 | LA Partners; Bobby Ginn | 05/01/2006 | Email from Vinod Paidipalli to Bobby Masters, Steve Griessel, John Klumph, Ralph Zeigler and Bobby Ginn reported Cushman & Wakefield determined GSM TNV: "CS just [sic] word from Cushman and their appraisal was 'over $600M' so we are good on that one." |
| L14 | LA Partners | 05/02/2006 | Email from Vinod Paidipalli to Bobby Masters, Steve Griessel, John Klumph, Ralph Zeigler and Credit Suisse representatives discussed manipulation of Sales Projections to increase TNV. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L15 | Dean Adler, LA Partners | 05/03/06 | LA principal Robert Rosenberg emailed Dean Adler and others suggesting LA use the Tesoro sales cancellations to obtain Loan approval from LA Advisory Boards: "we could point out that the pace of sales at Tesoro has recently begun to slow, thereby making it increasingly likely that the Fund III investors will not get to a $36M profit point in the near-term future [absent the Loan]." <br><br> The email was subsequently forwarded to Morris, Manning & Martin attorney Sonny Morris.  (MMMTQW01_024124 -024125.) |
| L16 | LA Partners; ERG | 05/05/06 | Directed information be sent to Delaware Division of Corporations for the formation of Defendant Ginn-LA Conduit Lender to act as a borrower under the Loan. |
| L17 | LA Partners; ERG | Prior to 05/10/2006 | Directed communications be sent to Credit Suisse Securities (USA) LLC authorizing it to act as sole arranger for the Loan. |
| L18 | Bobby Ginn | 05/10/2006 | As Chairman, CEO and President of Ginn-LA CS Borrower and Ginn-LA Conduit Lender, executed Company Authorization Letter to Credit Suisse Securities (USA) LLC, for Confidential Information Memorandum on the Loan. |
| L19 | LA Partners; ERG | Prior to 05/10/2006 | Directed information be sent to Credit Suisse Securities (USA) LLC, for inclusion in Confidential Information Memorandum on the Loan. |
| L20 | LA Partners; ERG | 05/10/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to request Credit Suisse distribute the Confidential Information Memorandum "to such financial institutions as you may deem appropriate to include in the Credit Facilities." |
| L21 | LA Partners; ERG | Prior to 05/16/2006 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L22 | LA Partners; ERG | Shortly after 05/16/2006 | Received Standard & Poor's rating report, "Research Update: Issuer Credit, Bank Loan Ratings Assigned to Ginn-LA CS Borrower and Ginn-LA Conduit Lender." |
| L23 | LA Partners | 05/20/2006 | LA principal Robert Rosenberg emailed Stuart Margulies and Morris, Manning & Martin attorney Sonny Morris: "Stuart - Do you recall whether the revolver can be drawn to provide funds with which to service and/or pay down the term facilities? Even if the revolver is theoretically available for such purposes, would we be permitted to draw on the revolver if we were out of compliance with our financial covenants at the time of the proposed drawing? Would we be inherently likely to be out of compliance with those covenants in a situation where our sales have fallen short of the mark – thereby making it necessary to "feed" the term loans? Is our only true cushion here the $75MM of reserved proceeds?" (MMMTQW01_009984 – 009985.) |
| L24 | Dean Adler; LA Partners | 05/22/2006 | Dean Adler and Stuart Margulies prepared revised version of the draft Memo to LA Advisory Boards summarizing goals and risks of the Loan.<br><br>LA's Robert Rosenberg transmitted the draft to Morris, Manning & Martin attorney Sonny Morris for review. |
| L25 | Dean Adler | 05/26/2006 | Spoke via telephone with Morris, Manning & Martin attorney Sonny Morris about potential for default under the Loan. |
| L26 | Dean Adler; ERG | 05/26/2006 | After speaking with Dean Adler, Morris, Manning & Martin attorney Sonny Morris emailed members of the Loan transaction team, including Bobby Masters at Ginn: "[Adler] is greatly concerned that a failure to meet projections will result in a default." (MMMTQW01 - 0224495) |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L27 | Lubert-Adler; Dean Adler | 06/02/2006 | Dean Adler, Stuart Margulies and Robert Rosenberg prepared and transmitted a final version of the Memo to LA Advisory Boards summarizing goals and risks of the Loan. |
| L28 | Dean Adler; LA Partners; Bobby Ginn | 06/02/2006 | Exchanged emails stating Credit Suisse was anxious about market conditions and strenuously advised against "any material change in structure [that] may cause us to have to go back out to investors and reconfirm their orders" or would otherwise result in "any kind of delay."  (MMMTQW01_024460-024467) The emails were sent to one or more attorneys at Morris, Manning & Martin. |
| L29 | Bobby Ginn | On/before 06/06/2006 | Spoke with Morris, Manning & Martin attorney Jeanne Brannon about his meeting with the Bahamian Attorney General on the Loan. |
| L30 | Lubert-Adler; Dean Adler | 06/06/2006 | Morris, Manning & Martin attorney Jeanne Brannon emailed LA principal Robert Rosenberg summarizing Bobby Ginn's meeting with the Bahamian Attorney General:<br><br>• The biggest issue for the Bahamian government is "what happens to the Bahamas project if there is a default under the CS loan by another project."<br>• The AG asked to review the Loan documents but Brannon recommends against it.<br>• Instead, Brannon will draft talking points "to try to get the AG comfortable without the documents."<br>• The talking points will, "tell[] about all of the good provisions which are in the documents which will help prevent a default."  (LA048225 – 048226) |
| L31 | Dean Adler; LA Partners; ERG; Bobby Ginn | 06/06/2006 | Dean Adler emailed LA principal Robert Rosenberg about Bobby Ginn's meeting with the Bahamian AG:  "I would also point out that the 4 [U.S.] properties are giving the necessary credit to get a loan for [Ginn sur Mer] – there are no stand-alone lenders for the Bahamas.  The reality is [] that we are taking the risk by taking 4 financeable properties and using them as fodder in order to get financing for the Bahamas. . . ." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | (Email, D. Adler to R. Rosenberg, 06/06/06, forwarded to J. Brannon, 06/06/06, LA048225 – 048226) |
| L32 | Dean Adler | 06/08/2006 | Executed Unanimous Written Consent of the Board of Directors of Lubert-Adler Group III, LLC for assignment agreements entered into as part of the Loan transaction, knowing it would be sent to Credit Suisse. |
| L33 | Dean Adler | 06/08/2006 | Executed Unanimous Written Consent of the Board of Managers of Lubert-Adler Group IV, LLC for assignment agreements entered into as part of the Loan transaction, knowing it would be sent to Credit Suisse. |
| L34 | Dean Adler; Bobby Ginn | 06/08/2006 | Executed Joint Unanimous Written Consent of The Board of Directors and The Sole Shareholder of Ginn-LA West End, Limited, approving and authorizing the Loan, knowing it would be sent to Credit Suisse. |
| L35 | LA Partners; ERG | 06/08/2006 | Directed GSM developer to execute Amendment to the Heads of Agreement with Bahamian government, knowing it would be transmitted to other signatories.  The Amendment increased the number of lots from 870 to 1,890 and condominium units from 4,400 to 4,900 to match GSM Sales Projections. |
| L36 | LA Partners; ERG | 06/08/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute $525 Million Senior First Lien Credit Facility with Credit Suisse, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, knowing it would be sent to Credit Suisse. |
| L37 | LA Partners; ERG | 06/08/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute $150 Million Senior Second Lien Credit Facility with Credit Suisse, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, knowing it would be sent to Credit Suisse. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L38 | LA Partners; ERG | 06/08/2006 | Directed Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute Disbursement Authorization letter sent to Credit Suisse Cayman Islands.  Letter instructed Credit Suisse to disburse $510 million via wire to banks in the U.S., Bahamas and the Caribbean, including $333 million to ERG and LA Partners' investment funds. |
| L39 | LA Partners; ERG | 06/08/2006 | Directed Ginn West End to execute Pledge Agreement and Limited Recourse Guaranty (First Lien) causing Ginn-LA West End LLLP to guarantee Loan obligations, knowing it would be sent to Credit Suisse. |
| L40 | LA Partners; ERG | 06/08/2006 | Directed Ginn West End to execute a Pledge Agreement and Limited Recourse Guaranty (Second Lien) causing Ginn-LA West End LLLP to guarantee Loan obligations, knowing it would be sent to Credit Suisse. |
| L41 | Dean Adler; LA Partners; Bobby Ginn | 06/08/2006 | Emails between Ginn executive Robert Masters, Morris, Manning & Martin attorney Sonny Morris and LA principal Neill B. Faucett. Email from Bobby Masters, 06/08/06 at 5:25 pm: "The Credit Suisse deal has closed. Wires on the way.  Sonny, please prepare the deed-in-lieu." Reply from Neill Faucett, 06/08/06, 6:31 pm:  "Well said." (MMMTQW01_176536) |
| L42 | LA Partners; Dean Adler; Bobby Ginn | 06/08/2006 and After | Engaged in communications by mail and wire among themselves and their attorneys concerning likelihood of default under the Loan. |
| L43 | LA Partners; Dean Adler; Bobby Ginn | 06/08/2006 and After | Engaged in communications by mail and wire among themselves and their attorneys on whether the Credit Suisse lenders could question the accuracy of the Sales |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | Projections given the failure to account for Tesoro and Quail West sales cancellations. |
| L44 | LA Partners; ERG | 06/09/2006 | Directed to be sent to Bahamas for recording a Supplemental Debenture for $276,750,000 between Ginn-LA West End Ltd and Ginn-LA Conduit Lender, which mortgaged GSM land as collateral for the Loan. |
| L45 | LA Partners; ERG | 06/09/2006 | Directed to be sent to Bahamas for recording a Promissory Note for $276,750,000 between Ginn-LA West End Limited and Ginn-LA Conduit Lender. |
| L46 | LA Partners | 06/20/2006 | Prepared a draft letter to LA Fund III investors announcing wiring of their share of $98.3 million distribution, "generated by the following profitable investments," namely the $333 distribution taken from the Loan.  Transmitted to others for review. |
| L47 | LA Partners | 06/22/2006 | Prepared draft letter to LA Fund IV investors announcing wiring of their share of $160 million distribution, funded by the Loan.  Distribution included $77.5 million attributed to GSM, described as "return on more than our invested equity" of $50 million.  Transmitted to others for review. |
| L48 | LA Partners; ERG | Prior to 03/27/2007 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L49 | LA Partners; ERG | After 03/27/2007 | Received Standard & Poor's rating report, "Ginn-LA Ratings on Watch Neg; Exposure to Florida's Soft Resort Real Estate Market Cited." |
| L50 | Dean Adler; LA Partners; ERG; Bobby Ginn | 04/23/2007 | Made a presentation to the lender on the Loan default, knowing it would be sent to others, stating: "The slowdown in the residential real estate markets has adversely impacted the Borrower's project sales and, as a result, its ability to comply with the terms of the existing credit agreements."  (LA053007 – 053042) |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| L51 | LA Partners; ERG | Prior to 05/01/2007 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L52 | LA Partners; ERG | After 05/01/2007 | Received Standard & Poor's rating report "Ginn-LA Ratings Lowered on Weak Sales and Diminished Recovery Prospects; Still on Watch Neg." |
| L53 | LA Partners; ERG | Prior to 01/11/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L54 | LA Partners; ERG | After 01/11/2008 | Received Standard & Poor's rating report, "Ginn-LA Corporate Credit and Bank Loan Ratings Lowered and Off Watch; Outlook Negative." |
| L55 | LA Partners; ERG | Prior to 01/14/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L56 | LA Partners; ERG | After 01/14/2008 | Received Standard & Poor's rating report, "Ginn-LA's Secured Financings." |
| L57 | Dean Adler; LA Partners; ERG; Bobby Ginn | 03/28/2008 to 04/08/2008 | Ginn and LA executives emailed attorneys to discuss potential bankruptcy filings for the Projects, including whether bankruptcy trustee could set aside the $333 million distribution to LA and ERG as a fraudulent conveyance.  (MMMTQW01 _ 031126, 031120 – 031125, 031295, 031103) |
| L58 | Ginn-LA CS Borrower; Ginn-LA Conduit Lender | 04/29/2008 | CFO for Loan borrowers John P. Klumph emailed three partners of Morris, Manning & Martin attorney Sonny Morris:  "Would you gentlemen please check and see what *solvency certificates* I have signed for [Credit Suisse] and if there may be *any individual liability* that could possibly accrue? |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | "Cass" – a.k.a. Cassady V. Brewer –replied: "Roger.  I am escalating the subject (again)."  (MMMTQW01_026618) |
| L59 | Ginn-LA CS Borrower; Ginn-LA Conduit Lender | 04/29/2008 | Morris, Manning & Martin attorney Cassady Brewer forwarded the Klumph email to attorney Sonny Morris, with a message:  "John wants the Rob Gidel strength agreement.  He has a normal indemnity agreement from [Ginn Development Company], but it is not guaranteed by Lubert-Adler like Rob's.  *I do not think we can duck this issue any longer.*"  (MMMTQW01_026619) |
| L60 | LA Partners; ERG | February/ March 2008 | Directed February/March 2008 *Ginn Sur Mer Living* publication to be sent to GSM lot owners.  Publication reported investors were buying Bahamas real estate to shield their investments from U.S. market declines.  VP of Sales Greg Ulmer said, "The Caribbean market is on the verge of exploding…. Not just here at Ginn sur Mer, but all over the islands.  With the U.S. market a little soft, there's been a big upsurge in the number of people looking here to find a safe haven for their real estate investments." |
| L61 | LA Partners; ERG | Spring 2008 | Directed Spring 2008 *Ginn Sur Mer Living* publication to be sent to GSM lot owners.  Publication included article entitled, "Full Speed Ahead for Ginn sur Mer," in which Bobby Ginn made false and misleading statements about GSM:<br><br>• "Construction on the $4.9 billion Ginn sur Mer mega-mix resort on the western tip of the island is moving full speed ahead and President and CEO Bobby Ginn is certain that money is in place to see the project through."<br>• Bobby Ginn:  "I would say we're on schedule, I think we're probably a little ahead of schedule in what we initially set out to do."<br>• Bobby Ginn:  "We've done everything we can do to be sure that when we're talking with our customer, they have the assurance that what they're buying is going to be developed with the quality and standards that our company is known |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | for." |
| | | | • "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas, and we feel like this project is just hitting the market that still wants oceanfront and all of the other services that come along with it." |
| L62 | LA Partners; ERG | 05/01/2008 | Directed their attorneys to create and parties related to the Loan to enter a Joint Defense, Common Interest and Information Sharing Agreement ("JDA"), which was transmitted to other signatories. |
| L63 | LA Partners; ERG | Prior to 06/24/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L64 | LA Partners; ERG | After 06/24/2008 | Received Standard & Poor's rating report, "Ginn-LA Credit Ratings Lowered to 'CC' On Near-Term Liquidity Pressure." |
| L65 | LA Partners; ERG | 07/01/2008 | Directed Ginn President Robert Gidel to issue a false and misleading statement on the Loan default, with knowledge it would be transmitted to the public and GSM lot owners.  Gidel said:<br><br>*Today, Standard & Poor's will release a statement that indicates two Ginn affiliated companies, Ginn-LA CS Borrower, LLC and Ginn-LA Conduit Lender, Inc. did not make a principal and interest payment on a non-recourse $675 million credit facility led by Credit Suisse. It also stated that we have reached a 30-day forbearance agreement and are actively negotiating with our lenders....*<br><br>*Due to the ongoing slowdown in the residential real estate market, it became clear that it would not be possible to meet the homesite sales objectives necessary to make* |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | *payments due under the credit facility.*<br><br>*We have been discussing these issues with the lenders for the purpose of seeking ways to restructure the terms of the credit facility. This announcement of the forbearance provides an environment for both us as borrowers and the lenders to continue to work toward a restructuring of the credit facility, which we believe will occur in the next 30 days and will permit each of the communities to be completed as planned….*<br><br>*Ginn-LA West End Limited previously set up accounts which contain the funds necessary to complete the infrastructure and the initial 18-hold golf course at Ginn sur Mer. These funds are not subject to the credit facility and are unaffected by the current situation, which means there will be no disruption to the continued development of the Ginn sur Mer project or the operation and development of Old Bahama Bay. The properties that are owned by Ginn-LA OBB, including the resort core of the Ginn sur Mer project, are not subject to this or any other credit facility….*<br><br>*This situation has no impact on our ongoing business operations throughout the company.* |
| L66 | LA Partners; ERG | Prior to 07/02/2008 | Directed transmittal of Loan information to Standard & Poor's that did not include certain material facts. |
| L67 | LA Partners; ERG | After 07/02/2008 | Received Standard & Poor's rating report, "Ginn-LA Ratings cut to 'D' on Missed Principal and Interest Payments." |
| L68 | LA Partners; ERG; Bobby Ginn | 08/06/2008 | Directed Bobby Ginn to make false and misleading statements at a press conference on the Loan and GSM development, with knowledge it would be transmitted to the public and GSM lot owners. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | Bobby Ginn described the Loan as "non-recourse" and made the following statements:<br><br>• *"There is a lot of uncertainty and a lot of rumours and what we are going to try to do today is divide the rumors from the fact."*<br>• *"A hundred percent of the proceeds of the loan go to pay off Credit Suisse.  So they are going to be fine. This loan is going to be fine."*<br>• *"If something goes wrong, and we're continuing to assume that it's not, all the money to develop all of the facilities is in place.  It's there now.  It's in an escrow account.  You can't get any safer than that."*<br>• *"[R]egardless of what happens in the economy, the Grand Bahama Project is not in danger."*<br>• *"We never want to say something that we can't back up and we never want to sell someone something that we can't back up.  We're out of business if we ever do that."*<br>• *"(The West End property) can't get any more secure. I don't know what one could do to put a project in a more secure position than to have the company assets either with no mortgage on it and hundreds of millions of dollars worth of equity, and have anything that has a loan on it separate from that have an escrow account to be sure that regardless of that loan, that those assets got built."*<br>• *"It's a tough time in the business and if you're not good and you're not well heeled, and you don't have good people with you, you won't make it. But I wouldn't be standing here if I weren't confident that we were going to make it."*<br>• *"We wanted to be sure that regardless of what the economic conditions were, or the economy at the time, or how fast sales were or didn't go, that the money was there to guarantee completion at the quality level we envisioned was going to be there."*<br>• *"Up until now, it's been clean up and dig up. We've moved dirt ... and moved debris for two and a half years now... That's now coming to an end ... and we're* |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | *going to shut up the naysayers when we put the buildings up here and move forward with that as the next phase."*<br>• *"Business is business and tough times are tough times and naysayers are going to say what they are going to say but at the end of the day, we're going to be in The Bahamas and we're going to be on this property for many generations to come and there is virtually nothing that I can see now that would stop us from making that goal a reality."* |
| L69 | Dean Adler; LA Partners; ERG; Bobby Ginn | 09/00/2008 | Received directive from U.S. Department of Housing and Urban Development ("HUD") that due to the Loan it would administratively suspend ILSA registrations for GSM and other Loan Projects, unless Ginn voluntarily suspended the registrations. |
| L70 | LA Partners; ERG | 09/10/2008 | Directed a request for suspension of the Statements of Record for GSM be sent to HUD, prohibiting sale of GSM lots in the U.S. |
| L71 | LA Partners; ERG | 10/02/2008 | Morris, Manning & Martin attorney Jeanna Brannon had a telephone conference with counsel for the Borrowers.  Her handwritten notes from the call:  "Fraudulent conveyance claim agst LA & ERG on dividend.  Co left insolvent by dividend." (MMMTQW01_031409) |
| L72 | LA Partners; ERG | 10/03/2008 | Received a letter from Credit Suisse Cayman Islands with notice of "outstanding Defaults and Events of Default with respect to certain obligations" under the Loan. |
| L73 | LA Partners; ERG | 12/19/2008 | Entered Master Restructuring Agreement negotiated by their attorneys, agreeing the Loan was in default, the lenders would foreclose on GSM, and there was no defense to foreclosure.  The Agreement was transmitted to other signatories and Credit Suisse. |
| L74 | LA Partners; ERG | 05/22/2009 | Received a copy of the lawsuit filed by Credit Suisse in the Supreme Court of the |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | State of New York to foreclose on GSM. |
| L75 | LA Partners; ERG | 12/23/2009 | Received Order and Judgment of Foreclosure and Sale, entered in the GSM Foreclosure setting agreed Aggregate Indebtedness of $ 495,095,611.77. |
| L76 | Bobby Ginn | 01/02/2010 | Sent a false and misleading letter to GSM lot owners that stated: *While we have not released a formal communication in quite some time, we have made substantial progress at Ginn Sur Mer.*<br><br>*To date, we have spent more than $200 million on everything from clearing the site, to dredging the marina, building an 18-hole Arnold Palmer Signature golf course, constructing infrastructure (including roads, water and sewer}, and installing power and telecommunications.*<br><br>*As a result, we are pleased to provide you formal notice that Ginn-LA West End, Limited ("the Seller") has completed the "Promised Improvements" listed on page 9 of the Property Report filed by the Seller on October 2, 2007 with the Department of Housing and Urban Development, and in accordance with Section 10 of your Contract for Lot Purchase. Please be advised, however, that the Seller has accrued eighty-two (82) days of Excusable Delay (as defined in your contract).*<br><br>*Nevertheless, the requirements of the laws on The Commonwealth of The Bahamas have been satisfied as of December 18, 2009, such that you may apply for a permit to begin construction of a dwelling on your lot.*<br><br>*This is a significant milestone for the project and for you as a lot owner. We are hopeful you will schedule a visit soon and are confident you will be as thrilled as we* |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | *are with the entire project. Please schedule this visit thru Cindy Cecil at 386-246-6619 or* <u>*ccecil@ginncompany.com*</u>*.*<br><br>The Bobby Ginn letter was false and misleading because he failed to disclose the Loan Effects, as well as the facts that GSM development had come to a standstill, HUD had prohibited GSM lot sales in the U.S. since October 2008, and Credit Suisse had obtained a $495 million foreclosure judgment against GSM. |

# APPENDIX B – Appraisal Scheme: Mail and Wire Fraud Predicate Acts

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A1 | LA Partners; ERG; Ginn Financial | 06/22/2006 | Directed Ginn Financial to enter into A term letter with CapitalSource for partial underlying funding for GSM Mortgage Loans. |
| A2 | LA Partners; ERG; Ginn Financial | 06/00/2006 through 10/00/2008 | Directed Ginn Financial to offer GSM lot buyers 80% loan-to-value financing. |
| A3 | Ginn Financial | Beginning 08/00/2006 | Ginn Financial's website marketed GSM Mortgage Loans, representing:<br><br>• Ginn Financial is "the preferred lender for Ginn buyers,"<br>• Ginn Financial has "specialized loan programs for Ginn Sur Mer."<br>• Ginn Financial's "in-house financing eliminates communications issues and expedites the closing process."<br>• Ginn Financial offered "80% Loan to Value" "Stated Income" mortgage loans for qualified GSM lot purchasers.<br>• Ginn Financial is "a licensed mortgage lender in the State of Florida; License # L100000558788."<br>• Because "financing options are different in the Bahamas than in the United States," Ginn Financial would assist GSM lot buyer through the mortgage process. |
| A4 | LA Partners; ERG | 08/07/2006 | Directed filing of Certificate of Formation with the Delaware Division of Corporations for Bahamas Sales Associate, LLC. |
| A5 | Ginn Financial | 09/00/2006 | CEO William McCracken contacted Richard Allen of Pomeroy Appraisal Associates |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | by telephone and told Allen:<br>• Ginn Financial was looking for a firm to provide appraisals of GSM lots.<br>• If Pomeroy provides satisfactory services, it could receive significant additional business for appraisal work other Ginn developments. |
| A6 | Ginn Financial | 09/00/2006 | CEO McCracken spoke by telephone with Richard Allen about scope of engagement for Pomeroy to provide GSM lot appraisals and agreed to Pomeroy's fees. |
| A7 | LA Partners; ERG; Ginn Financial | 09/00/2006 | Directed Ginn Financial to retain Pomeroy Appraisal to provide GSM lot appraisals. |
| A8 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 90, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A9 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 97, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A10 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 133, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A11 | Ginn Financial | 09/00/2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 190, to be used as a basis for Pomeroy's appraisals of other GSM lots. |
| A12 | Ginn Financial | Fall 2006 | Sent Pomeroy a Final Completion Statement and closing documents for Lot 18, to be used as a basis for Pomeroy's appraisals for other GSM lots. |
| A13 | Ginn Financial | 09/25/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 98, which included a sales price |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | and an "Estimated Value" figure for the lot. |
| A14 | Ginn Financial | 09/25/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 146, which included a sales price and an "Estimated Value" figure for the lot. |
| A15 | Ginn Financial | 09/25/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 109, **being purchased by Plaintiffs Maciag,** which included a sales price and an "Estimated Value" figure. |
| A16 | Ginn Financial | 09/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 103, which included a sales price. |
| A17 | Ginn Financial | 09/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 104, **being purchased by Plaintiffs Cicolani Group,** which included a sales price and an "Estimated Value" figure. |
| A18 | Ginn Financial | 09/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 45, which included a sales price. |
| A19 | Ginn Financial | 09/29/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 38, which included a sales price. |
| A20 | Ginn Financial | 10/02/2006 | Received from Pomeroy a Proposal for Real Estate Appraisal Services, stating the appraisals will conform to all USPAP Appraisal Standards. |
| A21 | Ginn Financial | 10/03/2006 | Emails with Pomeroy regarding arrangements to fly Richard Allen and his partner to Grand Bahama on a Ginn corporate jet. |
| A22 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 194, which included a sales price. |
| A23 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 37, which included a sales price. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A24 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 46, **being purchased by Plaintiffs Liles,** which included a sales price and an "Estimated Value" figure. |
| A25 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 136, which included a sales price. |
| A26 | Ginn Financial | 10/03/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 89, which included a sales price and an "Estimated Value" figure. |
| A27 | Ginn Financial | 10/04/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 80, which included a sales price and an "Estimated Value" figure. |
| A28 | Ginn Financial | 10/05/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 56, which included a sales price. |
| A29 | Ginn Financial | 10/11/2006 | Received from Pomeroy a revised Proposal for Real Estate Appraisal Services, stating the appraisals will conform to all USPAP Appraisal Standards. |
| A30 | Ginn Financial | 10/11/2006 | Tom Howarth telephoned Richard Allen with questions about Pomeroy's revised Proposal for Appraisal Services.  Allen returned Howarth's call and left a voicemail answering the questions. |
| A31 | Ginn Financial | 10/12/2006 | Joan Wilms faxed Pomeroy's revised Proposal for Appraisal Services to Richard Allen with proposed revision. |
| A32 | Ginn Financial | 10/13/2006 | Exchanged emails with Pomeroy regarding arrangements to fly to Grand Bahama on the Ginn corporate jet. |
| A33 | Ginn Financial | 10/16/2006 | Received emails from Richard Allen regarding arrangements to fly to Grand Bahama on Ginn corporate jet. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A34 | Ginn Financial | 10/27/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 88, which included a sales price and an "Estimated Value" figure. |
| A35 | Ginn Financial | 10/30/2006 | Sent Pomeroy a Request for Appraisal for GSM Lot 432, which included a sales price. |
| A36 | Ginn Financial | 09/20/2006 to 10/27/2006 | CEO McCracken and CFO Mark Cook had a series of telephone conversations with Richard Allen of Pomeroy Appraisal Associates:<br>• McCracken told Richard Allen the lot sales price was the target value for Pomeroy's appraisals.<br>• Richard Allen said he would not base Pomeroy's analysis on a predetermined target value.  Allen said the market value in Pomeroy's appraisals would only be based on Pomeroy's investigation and analysis.<br>• Allen discussed how lot prices in GSM measured against comparable sales on Grand Bahama Island but outside GSM ("Bahamas Comparables").  Allen told McCracken GSM lot prices were much higher than prices for Bahamas Comparables.<br>• Allen told McCracken Pomeroy was required to include Bahamas Comparables in its appraisal analysis.  McCracken and Cook pressured Allen not to do so, telling him to use only GSM lot sales as comparables.<br>• McCracken pressured Pomeroy to provide appraisals quickly, without undertaking a complete investigation and analysis of Bahamas Comparables.<br>• Allen said that using only GSM comparable sales was problematic because many GSM buyers were flown into the private GSM airstrip on Ginn's private jet and did not have an opportunity to compare GSM prices with lot prices outside GSM.<br>• Allen warned that any U.S. lender would want an appraisal that analyzed comparable sales outside GSM.<br>• McCracken screamed at Allen, insisting Pomeroy should not consider comparable |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | sales outside GSM. |
| | | | • Allen said Pomeroy's appraisals must state the appraised value was "subject to" completion of infrastructure and amenities that were planned and marketed for GSM. McCracken asked Allen to provide draft appraisals so Ginn Financial could decide whether they were acceptable. |
| A37 | Ginn Financial | 10/27/2006 | Received from Pomeroy a DRAFT Land Appraisal Report for GSM Lot 74, which stated the appraised value was subject to completion of infrastructure and amenities described in a detailed "Project Amenity Description." |
| A38 | Ginn Financial | 10/27/2006 | Received from Pomeroy a DRAFT Land Appraisal Report for GSM Lot 80, which stated the appraised value was subject to completion of infrastructure and amenities described in a detailed "Project Amenity Description." |
| A39 | Ginn Financial | 10/27/2006 | Received from Pomeroy a DRAFT Land Appraisal Report for GSM Lot 103, which stated the appraised value was subject to completion of infrastructure and amenities described in a detailed "Project Amenity Description." |
| A40 | Ginn Financial | 10/27/2006 to 11/02/2006 | CEO McCracken and CFO Cook spoke by telephone with Richard Allen:<br>• After Pomeroy gave Ginn Financial several draft appraisals, McCracken asked Allen to remove the "subject to" language from the drafts.<br>• When Allen refused, McCracken said he would get back to Allen.<br>• Less than an hour later, McCracken called Allen to say Ginn Financial was "going to go in another direction." |
| A41 | LA Partners; ERG; BSA | 10/31/2006 | Directed BSA to enter into Receivables Loan and Security Agreement with CapitalSource International Inc. for partial funding of GSM Mortgage Loans. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A42 | LA Partners; ERG; Bobby Ginn | Around 10/31/2006 | Directed Bobby Ginn to execute a Limited Guarantee of BSA's obligations under the October 31, 2006 Receivables Loan and Security Agreement with CapitalSource. |
| A43 | LA Partners; ERG; Ginn Financial | 10/00/2006 | Directed Ginn Financial to enter into Bahamas Fund Loan(s) with certain LA Partners investment funds, to provide partial underlying financing for GSM Mortgage Loans. |
| A44 | LA Partners; ERG; BSA | 10/00/2006 | Directed BSA to enter into a Fund Loan with certain LA Partners investment funds, to provide underlying financing for GSM Mortgage Loans. |
| A45 | LA Partners; ERG; BSA | 11/01/2006 | Directed BSA to enter into CapSource Supplemental Financing Agreement with Ginn-LA West End Ltd., LLLP |
| A46 | LA Partners; ERG; Ginn Financial | 11/01/2006 | Directed Ginn Financial to enter into Bahamas (Non-CapSource) Supplemental Financing Agreement with Ginn-LA West End Ltd., LLLP |
| A47 | LA Partners; ERG; Ginn Financial | 11/02/2006 | Directed Ginn Financial to email Richard Allen at Pomeroy: "Please cancel all the orders for Bahama Appraisals. We have run it by our investors and a 'Subject to' valuation is unacceptable." |
| A48 | LA Partners; ERG; Ginn Financial; BSA | 11/11/2006 | Directed Ginn Financial and BSA to hire W. Carver Grant, via mail or wire communications, to provide GSM lot appraisals. |
| A49 | Ginn Financial | After 10/23/2006 | Sent a letter, signed by CEO McCracken, to Andrews Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A50 | Ginn Financial | After 10/23/2006 | Sent a Loan Fact Sheet to Andrews Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A51 | Ginn Financial | After 10/23/2006 | Sent Plaintiffs Andrews Group a Uniform Residential Loan Application for Lot 272, identifying itself as the lender. |
| A52 | Ginn Financial; BSA | Between 10/23/2006 and 03/23/2007 | Sent a request to W. Carver Grant for an appraisal of Andrews Group Lot 272. |
| A53 | Ginn Financial; BSA | Between 10/23/2006 and 03/23/2007 | Received, via mail or wire, an appraisal for Andrews Group Lot 272 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A54 | Ginn Financial | Between 10/23/2006 and 03/23/2007 | Sent Plaintiffs Andrews Group federally mandated mortgage disclosures and other loan documents required by U.S. Mortgage Laws ("Loan Disclosures") including:<br>• HUD Form Good Faith Estimate<br>• Truth in Lending Disclosure Statement ("Notice to Borrower(s) Required by Federal Law and Federal Reserve Board Regulation Z")<br>• Disclosure Notices as required by the following U.S. laws:<br>   ○ Fair Credit Reporting Act<br>   ○ Right to Financial Privacy Act of 1978<br>   ○ Equal Credit Opportunity Act |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | o   Patriot Act<br>o   Real Estate Settlement Procedures Act (RESPA) |
| A55 | Ginn Financial | Between 10/23/2006 and 03/23/2007 | Sent Plaintiffs Andrews Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A56 | Ginn Financial | Between 10/23/2006 and 03/23/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Andrews Group so they would not have to travel to the Bahamas to close their loan for Lot 272. |
| A57 | Ginn Financial; BSA | Just Before 03/23/2007 | Sent mortgage closing documents to Plaintiffs Andrews Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 272. |
| A58 | LA Partners; ERG; Ginn Financial; BSA | 03/23/2007 | Directed BSA, acting as lender, to close on the Andrews Group mortgage loan for Lot 272, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A59 | Ginn Financial | After 11/03/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Bailey that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A60 | Ginn Financial | After 11/03/2006 | Sent a Loan Fact Sheet to Plaintiffs Bailey entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | communication issues and expedites the closing process." |
| A61 | Ginn Financial | After 11/03/2006 | Sent Plaintiffs Bailey a Uniform Residential Loan Application for Lot 67 identifying itself as the lender. |
| A62 | Ginn Financial; BSA | Between 11/03/2006 and 02/16/2007 | Sent a request to W. Carver Grant for an appraisal of Bailey Lot 67. |
| A63 | Ginn Financial; BSA | Between 11/03/2006 and 02/16/2007 | Received, via mail or wire, an appraisal for Bailey Lot 67 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A64 | Ginn Financial | Between 11/03/2006 and 02/16/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Bailey for the financing of Lot 67. |
| A65 | Ginn Financial | Between 11/03/2006 and 02/16/2007 | Sent Plaintiffs Bailey an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A66 | Ginn Financial | Between 11/03/2006 and | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Bailey so they would not have to travel to the Bahamas to close their loan for Lot 67. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 02/16/2007 | |
| A67 | Ginn Financial; BSA | Just Before 02/16/2007 | Sent mortgage closing documents to Plaintiffs Bailey via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 67. |
| A68 | LA Partners; ERG; Ginn Financial; BSA | 02/16/2007 | Directed BSA, acting as lender, to close on the Bailey mortgage loan for Lot 67, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A69 | Ginn Financial | After 08/29/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Beachfront, Ponsler and Kalil that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A70 | Ginn Financial | After 08/29/2006 | Sent a Loan Fact Sheet to Plaintiffs Beachfront, Ponsler and Kalil entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A71 | Ginn Financial | After 08/29/2006 | Sent Plaintiffs Beachfront, Ponsler and Kalil a Uniform Residential Loan Application for Lot 43 identifying itself as the lender. |
| A72 | Ginn Financial; BSA | Between 08/29/2006 and 02/15/2007 | Sent a request to W. Carver Grant for an appraisal of Beachfront Lot 43. |
| A73 | Ginn Financial; | Between | Received, via mail or wire, an appraisal for Beachfront Lot 43 from W. Carver Grant |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 08/29/2006 and 02/15/2007 | & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A74 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Beachfront, Ponsler and Kalil for the financing of Lot 43. |
| A75 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent Plaintiffs Beachfront, Ponsler and Kalil an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A76 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil so they would not have to travel to the Bahamas to close their loan for Lot 43. |
| A77 | Ginn Financial; BSA | Just Before 02/15/2007 | Sent mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 43. |
| A78 | LA Partners; ERG; Ginn Financial; BSA | 02/15/2007 | Directed BSA, acting as lender, to close on the Beachfront mortgage loan for Lot 43, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A79 | Ginn Financial | After 08/29/2006 | Sent Plaintiffs Beachfront, Ponsler and Kalil a Uniform Residential Loan Application for Lot 44 identifying itself as the lender. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A80 | Ginn Financial; BSA | Between 08/29/2006 and 02/15/2007 | Sent a request to W. Carver Grant for an appraisal of Beachfront Lot 44. |
| A81 | Ginn Financial; BSA | Between 08/29/2006 and 02/15/2007 | Received, via mail or wire, an appraisal for Beachfront Lot 44 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A82 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Beachfront, Ponsler and Kalil for the financing of Lot 44. |
| A83 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Sent Plaintiffs Beachfront, Ponsler and Kalil an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A84 | Ginn Financial | Between 08/29/2006 and 02/15/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil so they would not have to travel to the Bahamas to close their loan for Lot 44. |
| A85 | Ginn Financial; BSA | Just Before 02/15/2007 | Sent mortgage closing documents to Plaintiffs Beachfront, Ponsler and Kalil via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 44. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A86 | LA Partners; ERG; Ginn Financial; BSA | 02/15/2007 | Directed BSA, acting as lender, to close on the Beachfront mortgage loan for Lot 44, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A87 | Ginn Financial | After 08/07/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Bredahl that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A88 | Ginn Financial | After 08/07/2006 | Sent a Loan Fact Sheet to Plaintiffs Bredahl entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A89 | Ginn Financial | After 08/07/2006 | Sent Plaintiffs Bredahl a Uniform Residential Loan Application for Lot 39 identifying itself as the lender. |
| A90 | Ginn Financial; BSA | Between 08/07/2006 and 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Bredahl Lot 39. |
| A91 | Ginn Financial; BSA | Between 08/07/2006 and 12/22/2006 | Received, via mail or wire, an appraisal for Bredahl Lot 39 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A92 | Ginn Financial | Between 08/07/2006 and 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Bredahl for the financing of Lot 39. |
| A93 | Ginn Financial | Between 08/07/2006 and 12/22/2006 | Sent Plaintiffs Bredahl an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A94 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Bredahl via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 39. |
| A95 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Bredahl mortgage loan for Lot 39, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A96 | Ginn Financial | After 12/14/2006 | Sent Plaintiffs Bredahl a Uniform Residential Loan Application for Lot 33 identifying itself as the lender. |
| A97 | Ginn Financial; BSA | Between 12/14/2006 and 03/09/2007 | Sent a request to W. Carver Grant for an appraisal of Bredahl Lot 33. |
| A98 | Ginn Financial; BSA | Between 12/14/2006 and | Received, via mail or wire, an appraisal for Bredahl Lot 33 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 03/09/2007 | the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A99 | Ginn Financial | Between 12/14/2006 and 03/09/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Bredahl for the financing of Lot 33. |
| A100 | Ginn Financial | Between 12/14/2006 and 03/09/2007 | Sent Plaintiffs Bredahl an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A101 | Ginn Financial; BSA | Just Before 03/09/2007 | Sent mortgage closing documents to Plaintiffs Bredahl via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 33. |
| A102 | LA Partners; ERG; Ginn Financial; BSA | 03/09/2007 | Directed BSA, acting as lender, to close on the Bredahl mortgage loan for Lot 33, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A103 | Ginn Financial | After 08/15/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Byers that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A104 | Ginn Financial | After 08/15/2006 | Sent a Loan Fact Sheet to Plaintiff Byers entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A105 | Ginn Financial | After 08/15/2006 | Sent Plaintiff Byers a Uniform Residential Loan Application for Lot 234 identifying itself as the lender. |
| A106 | Ginn Financial; BSA | Between 08/15/2006 and 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Byers Lot 234. |
| A107 | Ginn Financial; BSA | Between 08/15/2006 and 12/22/2006 | Received, via mail or wire, an appraisal for Byers Lot 234 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A108 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiff Byers for the financing of Lot 234. |
| A109 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent Plaintiff Byers an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A110 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiff Byers via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 234. |
| A111 | LA Partners; ERG; Ginn Financial; | 12/22/2006 | Directed BSA, acting as lender, to close on the Byers mortgage loan for Lot 234, knowing the closing documents would be transmitted to other signatories and an agent |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | | for filing in the Bahamas. |
| A112 | Ginn Financial | After 12/12/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Cappuccino Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A113 | Ginn Financial | After 12/12/2006 | Sent a Loan Fact Sheet to Plaintiffs Cappuccino Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A114 | Ginn Financial | After 12/12/2006 | Sent Plaintiffs Cappuccino Group a Uniform Residential Loan Application for Lot 282 identifying itself as the lender. |
| A115 | Ginn Financial; BSA | Between 12/12/2006 and 08/10/2007 | Sent a request to W. Carver Grant for an appraisal of Cappuccino Group Lot 282. |
| A116 | Ginn Financial; BSA | Between 12/12/2006 and 08/10/2007 | Received, via mail or wire, an appraisal for Cappuccino Group Lot 282 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A117 | Ginn Financial | Between 12/12/2006 and | Sent federally mandated Loan Disclosures to Plaintiffs Cappuccino Group for the financing of Lot 282. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 08/10/2007 | |
| A118 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Sent Plaintiffs Cappuccino Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A119 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Cappuccino Group so they would not have to travel to the Bahamas to close their loan for Lot 282. |
| A120 | LA Partners; ERG; Ginn Financial; BSA | 08/10/2007 | Directed BSA, acting as lender, to close on the Cappuccino Group mortgage loan for Lot 282, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A121 | Ginn Financial | After 10/31/2007 | Sent Plaintiffs Cappuccino Group a Uniform Residential Loan Application for Lot 281 identifying itself as the lender. |
| A122 | Ginn Financial; BSA | Between 10/31/2007 and 02/25/2008 | Sent a request to W. Carver Grant for an appraisal of Cappuccino Group Lot 281. |
| A123 | Ginn Financial; BSA | Between 10/31/2007 and 02/25/2008 | Received, via mail or wire, an appraisal for Cappuccino Group Lot 281 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A124 | Ginn Financial | Between 10/31/2007 and 02/25/2008 | Sent federally mandated Loan Disclosures to Plaintiffs Cappuccino Group for the financing of Lot 281. |
| A125 | Ginn Financial | Between 10/31/2007 and 02/25/2008 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Cappuccino Group so they would not have to travel to the Bahamas to close their loan for Lot 282. |
| A126 | LA Partners; ERG; Ginn Financial; BSA | 02/25/2008 | Directed BSA, acting as lender, to close on the Cappuccino Group mortgage loan for Lot 281, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A127 | Ginn Financial | Before 02/00/2008 | Sent a letter, signed by CEO McCracken, to Plaintiffs Carell Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A128 | Ginn Financial | Before 02/00/2008 | Sent a Loan Fact Sheet to Plaintiffs Carell Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A129 | Ginn Financial | Before 02/00/2008 | Sent Plaintiffs Carell Group a Uniform Residential Loan Application for Lot 312 identifying itself as the lender. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A130 | Ginn Financial; BSA | Before 02/00/2008 | Sent a request to W. Carver Grant for an appraisal of Carell Group Lot 312. |
| A131 | Ginn Financial; BSA | Before 02/00/2008 | Received, via mail or wire, an appraisal for Carell Group Lot 312 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A132 | Ginn Financial | Before 02/00/2008 | Sent federally mandated Loan Disclosures to Plaintiffs Carell Group for the financing of Lot 312. |
| A133 | Ginn Financial | Before 02/00/2008 | Sent Plaintiffs Carell Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A134 | Ginn Financial; BSA | Just Before 02/00/2008 | Sent mortgage closing documents to Plaintiffs Carell Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 312. |
| A135 | LA Partners; ERG; Ginn Financial; BSA | 02/00/2008 | Directed BSA, acting as lender, to close on the Carell Group mortgage loan for Lot 312, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A136 | Ginn Financial | After 10/05/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Cicolani Group that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A137 | Ginn Financial | After 10/05/2006 | Sent a Loan Fact Sheet to Plaintiffs Cicolani Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A138 | Ginn Financial | After 10/05/2006 | Sent Plaintiffs Cicolani Group a Uniform Residential Loan Application for Lot 104 identifying itself as the lender. |
| A139 | Ginn Financial; BSA | Between 10/05/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Cicolani Group Lot 104. |
| A140 | Ginn Financial; BSA | Between 10/05/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Cicolani Group Lot 104 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A141 | Ginn Financial | Between 10/05/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Cicolani Group for the financing of Lot 104. |
| A142 | Ginn Financial | Between 10/05/2006 and 12/13/2006 | Sent Plaintiffs Cicolani Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A143 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Cicolani Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 104. |
| A144 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Cicolani Group mortgage loan for Lot 104, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A145 | Ginn Financial | After 11/12/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Clear Reef and Card that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A146 | Ginn Financial | After 11/12/2006 | Sent a Loan Fact Sheet to Plaintiffs Clear Reef and Card entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A147 | Ginn Financial | After 11/12/2006 | Sent Plaintiffs Clear Reef and Card a Uniform Residential Loan Application for Lot 42 identifying itself as the lender. |
| A148 | Ginn Financial; BSA | Between 12/12/2006 and 08/10/2007 | Sent a request to W. Carver Grant for an appraisal of Clear Reef Lot 42. |
| A149 | Ginn Financial; BSA | Between 12/12/2006 and | Received, via mail or wire, an appraisal for Clear Reef Lot 42 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 08/10/2007 | the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A150 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Clear Reef and Card for the financing of Lot 42. |
| A151 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Sent Plaintiffs Clear Reef and Card an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A152 | Ginn Financial | Between 12/12/2006 and 08/10/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Clear Reef and Card so they would not have to travel to the Bahamas to close their loan for Lot 42. |
| A153 | Ginn Financial; BSA | Just Before 08/10/2007 | Sent mortgage closing documents to Plaintiffs Clear Reef and Card via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 42. |
| A154 | LA Partners; ERG; Ginn Financial; BSA | 08/10/2007 | Directed BSA, acting as lender, to close on the Clear Reef mortgage loan for Lot 42, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A155 | Ginn Financial | After 10/10/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Clemmons Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A156 | Ginn Financial | After 10/10/2006 | Sent a Loan Fact Sheet to Plaintiffs Clemmons Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A157 | Ginn Financial | After 10/10/2006 | Sent Plaintiffs Clemmons Group a Uniform Residential Loan Application for Lot 494 identifying itself as the lender. |
| A158 | Ginn Financial; BSA | Between 10/10/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Clemmons Group Lot 494. |
| A159 | Ginn Financial; BSA | Between 10/10/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Clemmons Group Lot 494 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A160 | Ginn Financial | Between 10/10/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Clemmons Group for the financing of Lot 494. |
| A161 | Ginn Financial | Between 10/10/2006 and 12/13/2006 | Sent Plaintiffs Clemmons Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A162 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Clemmons Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 494. |
| A163 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Clemmons Group mortgage loan for Lot 494, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A164 | Ginn Financial | After 10/19/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Crawford Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A165 | Ginn Financial | After 10/19/2006 | Sent a Loan Fact Sheet to Plaintiffs Crawford Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A166 | Ginn Financial | After 10/19/2006 | Sent Plaintiffs Crawford Group a Uniform Residential Loan Application for Lot 209 identifying itself as the lender. |
| A167 | Ginn Financial; BSA | Between 10/19/2006 and 02/22/2008 | Sent a request to W. Carver Grant for an appraisal of Crawford Group Lot 209. |
| A168 | Ginn Financial; BSA | Between 10/19/2006 and | Received, via mail or wire, an appraisal for Crawford Group Lot 209 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 02/22/2008 | USPAP. |
| A169 | Ginn Financial | Between 10/19/2006 and 02/22/2008 | Sent federally mandated Loan Disclosures to Plaintiffs Crawford Group for the financing of Lot 209. |
| A170 | Ginn Financial | Between 10/19/2006 and 02/22/2008 | Sent Plaintiffs Crawford Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A171 | Ginn Financial | Between 10/19/2006 and 02/22/2008 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Crawford Group so they would not have to travel to the Bahamas to close their loan for Lot 209. |
| A172 | Ginn Financial; BSA | Just Before 02/22/2008 | Sent mortgage closing documents to Plaintiffs Crawford Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 209. |
| A173 | LA Partners; ERG; Ginn Financial; BSA | 02/22/2008 | Directed BSA, acting as lender, to close on the Crawford Group mortgage loan for Lot 209, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A174 | Ginn Financial | After 05/07/2007 | Sent a letter, signed by CEO McCracken, to Plaintiffs Domnick that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A175 | Ginn Financial | After 05/07/2007 | Sent a Loan Fact Sheet to Plaintiffs Domnick entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A176 | Ginn Financial | After 05/07/2007 | Sent Plaintiffs Domnick a Uniform Residential Loan Application for Lot 487 identifying itself as the lender. |
| A177 | Ginn Financial; BSA | Between 05/07/2007 and 06/22/2007 | Sent a request to W. Carver Grant for an appraisal of Domnick Lot 487. |
| A178 | Ginn Financial; BSA | Between 05/07/2007 and 06/22/2007 | Received, via mail or wire, an appraisal for Domnick Lot 487 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A179 | Ginn Financial | Between 05/07/2007 and 06/22/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Domnick for the financing of Lot 487. |
| A180 | Ginn Financial | Between 05/07/2007 and 06/22/2007 | Sent Plaintiffs Domnick an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A180a | Ginn Financial; BSA | Just Before 06/22/2007 | Sent mortgage closing documents to Plaintiffs Domnick via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 487. |
| A181 | LA Partners; ERG; Ginn Financial; BSA | 06/22/2007 | Directed BSA, acting as lender, to close on the Domnick mortgage loan for Lot 487, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A182 | Ginn Financial | After 11/10/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Fresonke Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A183 | Ginn Financial | After 11/10/2006 | Sent Plaintiffs Fresonke Group a Uniform Residential Loan Application for Lot 437 identifying itself as the lender. |
| A184 | Ginn Financial; BSA | Between 11/10/2006 and 03/15/2007 | Sent a request to W. Carver Grant for an appraisal of Fresonke Group Lot 437. |
| A185 | Ginn Financial; BSA | Between 11/10/2006 and 03/15/2007 | Received, via mail or wire, an appraisal for Fresonke Group Lot 437 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A186 | Ginn Financial | Between 11/10/2006 and | Sent federally mandated Loan Disclosures to Plaintiffs Fresonke Group for the financing of Lot 437. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 03/15/2007 | |
| A187 | Ginn Financial | Between 11/10/2006 and 03/15/2007 | Sent Plaintiffs Fresonke an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A188 | Ginn Financial; BSA | Just Before 03/15/2007 | Sent mortgage closing documents to Plaintiffs Fresonke Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 437. |
| A189 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 | Directed BSA, acting as lender, to close on the Fresonke Group mortgage loan for Lot 437, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A190 | Ginn Financial | After 12/05/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Hoyer Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A191 | Ginn Financial | After 12/05/2006 | Sent a Loan Fact Sheet to Plaintiffs Hoyer Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A192 | Ginn Financial | After 12/05/2006 | Sent Plaintiffs Hoyer Group a Uniform Residential Loan Application for Lot 448 identifying itself as the lender. |
| A193 | Ginn Financial; | Between | Sent a request to W. Carver Grant for an appraisal of Hoyer Group Lot 448. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 12/05/2006 and 02/02/2007 | |
| A194 | Ginn Financial; BSA | Between 12/05/2006 and 02/02/2007 | Received, via mail or wire, an appraisal for Hoyer Group Lot 448 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A195 | Ginn Financial | Between 12/05/2006 and 02/02/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Hoyer Group for the financing of Lot 448. |
| A196 | Ginn Financial | Between 12/05/2006 and 02/02/2007 | Sent Plaintiffs Hoyer Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A197 | Ginn Financial | Between 12/05/2006 and 02/02/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Hoyer Group so they would not have to travel to the Bahamas to close their loan for Lot 448. |
| A198 | Ginn Financial; BSA | Just Before 02/02/2007 | Sent mortgage closing documents to Plaintiffs Hoyer Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 448. |
| A199 | LA Partners; ERG; | 02/02/2007 | Directed BSA, acting as lender, to close on the Hoyer Group mortgage loan for Lot |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | Ginn Financial; BSA | | 448, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A200 | Ginn Financial | After 03/08/2007 | Sent a letter, signed by CEO McCracken, to Plaintiffs Jackson Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A201 | Ginn Financial | After 03/08/2007 | Sent a Loan Fact Sheet to Plaintiffs Jackson Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A202 | Ginn Financial | After 03/08/2007 | Sent Plaintiffs Jackson Group a Uniform Residential Loan Application for Lot 488 identifying itself as the lender. |
| A203 | Ginn Financial; BSA | Between 03/08/2007 and 04/13/2007 | Sent a request to W. Carver Grant for an appraisal of Jackson Group Lot 488. |
| A204 | Ginn Financial; BSA | Between 03/08/2007 and 04/13/2007 | Received, via mail or wire, an appraisal for Jackson Group Lot 488 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |
| A205 | Ginn Financial | Between 03/08/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Jackson Group for the financing of Lot 488. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | and 04/13/2007 | |
| A206 | Ginn Financial | Between 03/08/2007 and 04/13/2007 | Sent Plaintiffs Jackson Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A207 | Ginn Financial | Between 03/08/2007 and 04/13/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Jackson Group so they would not have to travel to the Bahamas to close their loan for Lot 488. |
| A208 | Ginn Financial; BSA | Just Before 04/13/2007 | Sent mortgage closing documents to Plaintiffs Jackson Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 488. |
| A209 | LA Partners; ERG; Ginn Financial; BSA | 04/13/2007 | Directed BSA, acting as lender, to close on the Jackson Group mortgage loan for Lot 488, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A210 | Ginn Financial | After 10/08/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Josephson that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A211 | Ginn Financial | After 10/08/2006 | Sent a Loan Fact Sheet to Plaintiff Josephson entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | communication issues and expedites the closing process." |
| A212 | Ginn Financial | After 10/08/2006 | Sent Plaintiff Josephson a Uniform Residential Loan Application for Lot 493 identifying itself as the lender. |
| A213 | Ginn Financial; BSA | Between 10/08/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Josephson Lot 493. |
| A214 | Ginn Financial; BSA | Between 10/08/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Josephson Lot 493 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A215 | Ginn Financial | Between 10/08/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiff Josephson for the financing of Lot 493. |
| A216 | Ginn Financial | Between 10/08/2006 and 12/13/2006 | Sent Plaintiff Josephson an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A217 | Ginn Financial | Between 10/08/2006 and | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Josephson so he would not have to travel to the Bahamas to close his loan for Lot 493. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 12/13/2006 | |
| A218 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiff Josephson via FedEx so he would not have to travel to the Bahamas to close his mortgage loan for Lot 493. |
| A219 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Josephson mortgage loan for Lot 493, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A220 | Ginn Financial | After 02/03/2007 | Sent a letter, signed by CEO McCracken, to Plaintiff Kherkher that stated:  "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A221 | Ginn Financial | After 02/03/2007 | Sent a Loan Fact Sheet to Plaintiff Kherkher entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A222 | Ginn Financial | After 02/03/2007 | Sent Plaintiff Kherkher a Uniform Residential Loan Application for Lot 270 identifying itself as the lender. |
| A223 | Ginn Financial; BSA | Between 02/03/2007 and 03/20/2007 | Sent a request to W. Carver Grant for an appraisal of Kherkher Lot 270. |
| A224 | Ginn Financial; | Between | Received, via mail or wire, an appraisal for Kherkher Lot 270 from W. Carver Grant |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 02/03/2007 and 03/20/2007 | & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A225 | Ginn Financial | Between 02/03/2007 and 03/20/2007 | Sent federally mandated Loan Disclosures to Plaintiff Kherkher for the financing of Lot 270. |
| A226 | Ginn Financial | Between 02/03/2007 and 03/20/2007 | Sent Plaintiff Kherkher an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A227 | Ginn Financial | Between 02/03/2007 and 03/20/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Kherkher so she would not have to travel to the Bahamas to close her loan for Lot 270. |
| A228 | Ginn Financial; BSA | Just Before 03/20/2007 | Sent mortgage closing documents to Plaintiff Kherkher via FedEx so she would not have to travel to the Bahamas to close her mortgage loan for Lot 270. |
| A229 | LA Partners; ERG; Ginn Financial; BSA | 03/20/2007 | Directed BSA, acting as lender, to close on the Kherkher mortgage loan for Lot 270, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A230 | Ginn Financial | After 02/04/2007 | Sent a Loan Fact Sheet to Plaintiffs Lammertse entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | | preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A231 | Ginn Financial | After 02/04/2007 | Sent Plaintiffs Lammertse a Uniform Residential Loan Application for Lot 179 identifying itself as the lender. |
| A232 | Ginn Financial; BSA | Between 02/04/2007 and 04/13/2007 | Sent a request to W. Carver Grant for an appraisal of Lammertse Lot 179. |
| A233 | Ginn Financial; BSA | Between 02/04/2007 and 04/13/2007 | Received, via mail or wire, an appraisal for Lammertse Lot 179 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A234 | Ginn Financial | Between 02/04/2007 and 04/13/2007 | Sent federally mandated Loan Disclosures to Plaintiffs Lammertse for the financing of Lot 179. |
| A235 | Ginn Financial | Between 02/04/2007 and 04/13/2007 | Sent Plaintiffs Lammertse an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A236 | Ginn Financial | Between 02/04/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Lammertse so they would not have to travel to the Bahamas to close their loan for Lot |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | and 04/13/2007 | 179. |
| A237 | LA Partners; ERG; Ginn Financial; BSA | 04/13/2007 | Directed BSA, acting as lender, to close on the Lammertse mortgage loan for Lot 179, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A238 | Ginn Financial | After 07/28/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Liles that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A239 | Ginn Financial | After 07/28/2006 | Sent a Loan Fact Sheet to Plaintiffs Liles entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A240 | Ginn Financial | After 07/28/2006 | Sent Plaintiffs Liles a Uniform Residential Loan Application for Lot 46 identifying itself as the lender. |
| A241 | Ginn Financial; BSA | Between 07/28/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Liles Lot 46. |
| A242 | Ginn Financial; BSA | Between 07/28/2006 and | Received, via mail or wire, an appraisal for Liles Lot 46 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot. The appraisal was inflated, unsupported and did not comply with USPAP. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 12/13/2006 | |
| A243 | Ginn Financial | Between 07/28/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Liles for the financing of Lot 46. |
| A244 | Ginn Financial | Between 07/28/2006 and 12/13/2006 | Sent Plaintiffs Liles an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A245 | Ginn Financial | Between 07/28/2006 and 12/13/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Liles so they would not have to travel to the Bahamas to close their loan for Lot 46. |
| A246 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Liles via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 46. |
| A247 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Liles mortgage loan for Lot 46, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A248 | Ginn Financial | After 11/07/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Maciag that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A249 | Ginn Financial | After 11/07/2006 | Sent a Loan Fact Sheet to Plaintiffs Maciag entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A250 | Ginn Financial | After 11/07/2006 | Sent Plaintiffs Maciag a Uniform Residential Loan Application for Lot 109 identifying itself as the lender. |
| A251 | Ginn Financial; BSA | Between 11/07/2006 and 12/13/2006 | Sent a request to W. Carver Grant for an appraisal of Maciag Lot 109. |
| A252 | Ginn Financial; BSA | Between 11/07/2006 and 12/13/2006 | Received, via mail or wire, an appraisal for Maciag Lot 109 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A253 | Ginn Financial | Between 11/07/2006 and 12/13/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Maciag for the financing of Lot 109. |
| A254 | Ginn Financial | Between 11/07/2006 and 12/13/2006 | Sent Plaintiffs Maciag an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A255 | Ginn Financial | Between 11/07/2006 and 12/13/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Maciag so they would not have to travel to the Bahamas to close their loan for Lot 109. |
| A256 | Ginn Financial; BSA | Just Before 12/13/2006 | Sent mortgage closing documents to Plaintiffs Maciag via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 109. |
| A257 | LA Partners; ERG; Ginn Financial; BSA | 12/13/2006 | Directed BSA, acting as lender, to close on the Maciag mortgage loan for Lot 109, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A258 | Ginn Financial | Before 12/22/2006 | Sent a letter, signed by CEO McCracken, to Plaintiffs Taglia Group that stated: "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A259 | Ginn Financial | Before 12/22/2006 | Sent a Loan Fact Sheet to Plaintiffs Taglia Group entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A260 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group a Uniform Residential Loan Application for Lot 220 identifying itself as the lender. |
| A261 | Ginn Financial; BSA | Before 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Taglia Group Lot 220. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A262 | Ginn Financial; BSA | Before 12/22/2006 | Received, via mail or wire, an appraisal for Taglia Group Lot 220 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A263 | Ginn Financial | Before 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Taglia Group for the financing of Lot 220. |
| A264 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A265 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Taglia Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 220. |
| A266 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Taglia Group mortgage loan for Lot 220, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A267 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group a Uniform Residential Loan Application for Lot 429 identifying itself as the lender. |
| A268 | Ginn Financial; BSA | Before 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Taglia Group Lot 429. |
| A269 | Ginn Financial; | Before | Received, via mail or wire, an appraisal for Taglia Group Lot 429 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | BSA | 12/22/2006 | price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A270 | Ginn Financial | Before 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Taglia Group for the financing of Lot 429. |
| A271 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taglia Group an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A272 | Ginn Financial | Before 12/22/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Taglia Group so they would not have to travel to the Bahamas to close their loan for Lot 429. |
| A273 | Ginn Financial; BSA | Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Taglia Group via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 429. |
| A274 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Taglia Group mortgage loan for Lot 429, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A275 | Ginn Financial | Before 12/22/2006 | Ginn Financial may have Sent a letter, signed by CEO William McCracken, to Plaintiffs Taliaferro that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A276 | Ginn Financial | Before 12/22/2006 | Sent a Loan Fact Sheet to Plaintiffs Taliaferro entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A277 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taliaferro a Uniform Residential Loan Application for Lot 208 identifying itself as the lender. |
| A278 | Ginn Financial; BSA | Before 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Taliaferro Lot 208. |
| A279 | Ginn Financial; BSA | Before 12/22/2006 | Received, via mail or wire, an appraisal for Taliaferro Lot 208 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A280 | Ginn Financial | Before 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiffs Taliaferro for the financing of Lot 208. |
| A281 | Ginn Financial | Before 12/22/2006 | Sent Plaintiffs Taliaferro an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A282 | Ginn Financial | Before 12/22/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiffs Taliaferro so they would not have to travel to the Bahamas to close their loan for Lot 208. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A283 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiffs Taliaferro via FedEx so they would not have to travel to the Bahamas to close their loan for Lot 208. |
| A284 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Taliaferro mortgage loan for Lot 208, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A285 | Ginn Financial | After 08/15/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Verhees that stated:  "As you may know, financing options are different in the Bahamas, than in the United States. Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A286 | Ginn Financial | After 08/15/2006 | Sent a Loan Fact Sheet to Plaintiff Verhees entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A287 | Ginn Financial | After 08/15/2006 | Sent Plaintiff Verhees a Uniform Residential Loan Application for Lot 79 identifying itself as the lender. |
| A288 | Ginn Financial; BSA | Between 08/15/2006 and 12/22/2006 | Sent a request to W. Carver Grant for an appraisal of Verhees Lot 79. |
| A289 | Ginn Financial; BSA | Between 08/15/2006 and | Received, via mail or wire, an appraisal for Verhees Lot 79 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 12/22/2006 | the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A290 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent federally mandated Loan Disclosures to Plaintiff Verhees for the financing of Lot 79. |
| A291 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Sent Plaintiff Verhees an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A292 | Ginn Financial | Between 08/15/2006 and 12/22/2006 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Verhees so she would not have to travel to the Bahamas to close her loan for Lot 79. |
| A293 | Ginn Financial; BSA | Just Before 12/22/2006 | Sent mortgage closing documents to Plaintiff Verhees via FedEx so she would not have to travel to the Bahamas to close her mortgage loan for Lot 79. |
| A294 | LA Partners; ERG; Ginn Financial; BSA | 12/22/2006 | Directed BSA, acting as lender, to close on the Verhees mortgage loan for Lot 79, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A295 | Ginn Financial | After 12/08/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Webb that stated:  "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A296 | Ginn Financial | After 12/08/2006 | Sent a Loan Fact Sheet to Plaintiff Webb entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A297 | Ginn Financial | After 12/08/2006 | Sent Plaintiff Webb a Uniform Residential Loan Application for Lot 261 identifying itself as the lender. |
| A298 | Ginn Financial; BSA | Between 12/08/2006 and 02/02/2007 | Sent a request to W. Carver Grant for an appraisal of Webb Lot 261. |
| A299 | Ginn Financial; BSA | Between 12/08/2006 and 02/02/2007 | Received, via mail or wire, an appraisal for Webb Lot 261 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A300 | Ginn Financial | Between 12/08/2006 and 02/02/2007 | Sent federally mandated Loan Disclosures to Plaintiff Webb for the financing of Lot 261. |
| A301 | Ginn Financial | Between 12/08/2006 and 02/02/2007 | Sent Plaintiff Webb an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A302 | Ginn Financial | Between 12/08/2006 and 02/02/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Webb so he would not have to travel to the Bahamas to close his loan for Lot 261. |
| A303 | Ginn Financial; BSA | Just Before 02/02/2007 | Sent mortgage closing documents to Plaintiff Webb via FedEx so he would not have to travel to the Bahamas to close his mortgage loan for Lot 261. |
| A304 | LA Partners; ERG; Ginn Financial; BSA | 02/02/2007 | Directed BSA, acting as lender, to close on the Webb mortgage loan for Lot 261, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |
| A305 | Ginn Financial | After 10/13/2006 | Sent a letter, signed by CEO McCracken, to Plaintiff Willis that stated: "As you may know, financing options are different in the Bahamas, than in the United States.  Ginn Financial Services (GFS) has negotiated special commitments to provide capital on terms generally not available in the Bahamas." |
| A306 | Ginn Financial | After 10/13/2006 | Sent a Loan Fact Sheet to Plaintiff Willis entitled, "Specialized Loan Programs for Ginn Sur Mer," which described GSM mortgage financing, identified itself as "the preferred lender for GSM buyers," and pledged "in-house financing eliminates communication issues and expedites the closing process." |
| A307 | Ginn Financial | After 10/13/2006 | Sent Plaintiff Willis a Uniform Residential Loan Application for Lot 189 identifying itself as the lender. |
| A308 | Ginn Financial; BSA | Between 10/13/2006 and | Sent a request to W. Carver Grant for an appraisal of Willis Lot 189. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| | | 03/15/2007 | |
| A309 | Ginn Financial; BSA | Between 10/13/2006 and 03/15/2007 | Received, via mail or wire, an appraisal for Willis Lot 189 from W. Carver Grant & Co., which appraised the lot at a predetermined value just over the contract price for the lot.  The appraisal was inflated, unsupported and did not comply with USPAP. |
| A310 | Ginn Financial | Between 10/13/2006 and 03/15/2007 | Sent federally mandated Loan Disclosures to Plaintiff Willis for the financing of Lot 189. |
| A311 | Ginn Financial | Between 10/13/2006 and 03/15/2007 | Sent Plaintiff Willis an "Affiliated Business Arrangement Disclosure Statement Notice," identifying licensed Florida real estate appraisers "that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction." |
| A312 | Ginn Financial | Between 10/13/2006 and 03/15/2007 | Offered via mail or wire to hand-deliver mortgage closing documents to Plaintiff Willis so he would not have to travel to the Bahamas to close his loan for Lot 189. |
| A313 | Ginn Financial; BSA | Just Before 03/15/2007 | Sent mortgage closing documents to Plaintiff Willis via FedEx so he would not have to travel to the Bahamas to close his mortgage loan for Lot 189. |
| A314 | LA Partners; ERG; Ginn Financial; BSA | 03/15/2007 | Directed BSA, acting as lender, to close on the Willis mortgage loan for Lot 189, knowing the closing documents would be transmitted to other signatories and an agent for filing in the Bahamas. |

| Predicate Act Number | Defendant(s) | Date | Description |
|---|---|---|---|
| A315 | LA Partners | At least 11/00/2007 and after | Directed Lubert-Adler Fund IV to take monthly equity distributions from BSA, knowing financial statements and other documents reflecting the distribution would be sent via mail or wire. |