# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

_____

BAHAMAS SALES ASSOCIATE, LLC

                  Plaintiff,                           Case No. 3:08-cv-1012-J-32JRK

        v.

DONALD CAMERON BYERS

                  Defendant.

_____

DONALD CAMERON BYERS

                  Counterclaim Plaintiff,

        v.

BAHAMAS SALES ASSOCIATE, LLC, et al.

                  Counterclaim Defendants.

_____

BAHAMAS SALES ASSOCIATE, LLC

                  Plaintiff,                           Case No. 3:08-cv-1062-J-32JRK

        v.

DARRYL WILLIS

                  Defendant.

_____

DARRYL WILLIS

                  Counterclaim Plaintiff,

        v.

BAHAMAS SALES ASSOCIATE, LLC, et al.

                  Counterclaim Defendants.

_____

_____

EDWARD R. WEBB, et al.

                 Plaintiffs,                              Case No. 3:09-cv-516-J-32JRK

       v.

GINN FINANCIAL SERVICES, et al.

                 Defendants.
_____

MARK F. BAILEY, et al.

                 Plaintiffs,                              Case No. 3:10-cv-422-J-32JRK

       v.

ERG ENTERPRISES, LP, et al.

                 Defendants.
_____

TODD TALIAFERRO, et al.

                 Plaintiffs,                              Case No. 3:11-cv-199-J-32JBT

       v.

ERG ENTERPRISES, LP, et al.

                 Defendants.
_____

R. VICTOR TAGLIA, et al.

                 Plaintiffs,                              Case No. 3:12-cv-731-J-32JBT

       v.

ERG ENTERPRISES, LP, et al.

                 Defendant.
_____

**DEFENDANTS' RESPONSE IN OPPOSITION TO BALLINGER LAW PLAINTIFFS' MOTION TO EXCLUDE TESTIONY OF EXPERT WITNESSES IAN RATNER, JOSHUA HARRIS AND ROSEMARY NICHOLLS**

Defendants respectfully submit this Response in Opposition to Ballinger Law Plaintiffs' Motion to Exclude Testimony of Expert Witnesses Ian Ratner, Joshua Harris and Rosemary Nicholls [Dkt. 558].[1]

## I.     Introduction

Plaintiffs move to exclude the testimony of Joshua Harris, Ian Ratner, and Rosemary Nicholls, three of defendants' four highly qualified experts, pursuant to Rule 37 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  These experts will offer important testimony that, in the cases of Dr. Harris and Mr. Ratner, is unrebutted.  The Court should deny plaintiffs' motion for four reasons.

*First*, the Court should strike the motion because plaintiffs did not satisfy the mandatory meet and confer requirements of Local Rule 3.01(g).  Plaintiffs are serial offenders of this Rule and have previously received notice that failure to abide by it will result in dismissal of future motions.  Plaintiffs seek to exclude these experts under Rule 37 because their reports supposedly do not contain all of the disclosures required under Rule 26(a).  But despite having had months to do so, plaintiffs never contacted defendants to resolve their discovery concerns, instead pocketing the issue to unveil in this attempt to strike the largely unrebutted, on-point reports by concededly qualified experts.

*Second*, while plaintiffs raise a potpourri of supposed violations of Rule 26(a), they focus primarily on the alleged failure of the reports to identify all materials each expert considered.  These belated challenges have no merit.  The thoroughness of the expert reports

---

[1] The motion was filed by those plaintiffs represented by Dana Ballinger, Esq., and not joined by the other plaintiffs in the action.

and full documentation of the analysis therein is self-evident from each report.  Each report identifies the basis for every fact and opinion offered.  While plaintiffs cherry-pick excerpts from the reports in their motion, reference to the full, detailed texts rebuts plaintiffs' assertions.   Moreover, defendants (1) produced the expert reports by the deadline; (2) provided all reliance materials as agreed; (3) produced additional documents provided to experts long before the reports were due; and (4) made the experts available for depositions. And plaintiffs ignore that they received much of what they claim is missing (*e.g.*, the documents provided to Mr. Ratner by counsel and the binders he brought to his deposition).

*Third*, even when faced with severe violations of Rule 26(a) of a nature that unquestionably did not occur in this case, courts decline to exclude experts when, as here, the movant took no steps to remedy them and, instead, moved to exclude the experts as its first and only resort.  That is particularly true when, as here, there is no evidence of bad faith by the disclosing party.

*Fourth*, while acknowledging the qualifications of Dr. Harris and Mr. Ratner, plaintiffs challenge aspects of their reports as unreliable under *Daubert* (but do not raise a *Daubert* challenge to Ms. Nicholls).  Plaintiffs attack Dr. Harris largely by questioning the words he used to describe his findings and challenge Mr. Ratner for offering "unsupported narrative."  In doing so, plaintiffs focus on semantics, not substance.  Dr. Harris's and Mr. Ratner's findings are supported by a wealth of clearly-identified data that each expert has analyzed and distilled.  Essentially, plaintiffs simply hope to exclude experts whose unrebutted findings contradict their theory of the case, but there is no basis to do so.

For these reasons, the Court should deny the motion.

## II.    Defendants' Experts

### A.    Joshua Harris

Joshua Harris, Ph.D., CRE, CAIA, is the Director of the Dr. P. Phillips Institute for

Research and Education in Real Estate at the University of Central Florida, where he engages

in scholarship focused on the real estate market and related economic issues.   J. Harris

Report, Appendix A (Ex. 1).  He also serves as Managing Partner of the Lakemont Group, a

real estate and economic consulting firm with expertise in economic development, market

research, and real estate project consulting.  *Id.* Dr.  Harris has been actively involved in the

real estate industry since 2002 as a commercial real estate broker focusing on the

Southeastern U.S., as an analyst for a private equity fund, as a consultant specializing in real

estate market dynamics and macroeconomic forces affecting real estate, and as an academic

researcher investigating forces affecting the real estate market, including the impact of the

Great Recession.   *Id.*  Dr. Harris's expert report offers opinions on the macroeconomic and

real estate market forces impacting Ginn Sur Mer during the relevant time period.  *See*

*generally* J. Harris Report (Ex. 1).  Plaintiffs deposed Dr. Harris on July 8, 2016 and did not

retain a rebuttal expert.  J. Harris dep., Cover Page (Ex. 2); Igoe Dec. ¶ 2.

### B.    Ian Ratner

Mr. Ratner is a forensic accountant with more than 25 years of experience in

corporate and internal investigations, business valuations, crisis management, and corporate

restructuring.  I. Ratner Report ¶¶ 9-10 (Ex. 3). [2]  The U.S. Department of Justice has

---

[2] In addition to being a CPA, Mr. Ratner is a Certified Fraud Examiner (Association of Certified
Fraud Examiners), an Accredited Senior Appraiser (American Society of Appraisers"), and is
Accredited in Business Valuation (American Institute of CPAs).  I. Ratner Report ¶ 9.

engaged Mr. Ratner as a testifying expert (in the *Deepwater Horizon* litigation), as have

many public corporations and private parties. *Id.*, Appendix 1.  In his detailed report, Mr.

Ratner relies on transactional documents, bank statements, and accounting records to analyze

the structure of the Credit Suisse loan (the "Loan"); the proceeds used for development and

operations at Ginn Sur Mer; and the $297 million investment the LA Funds[3] made in the

Communities[4] after the Loan closed.  *See generally* I. Ratner Report*.*  Mr. Ratner also

explains that, by virtue of the Loan and the LA Funds' post-Loan investment in Ginn Sur

Mer, Ginn Sur Mer used far more proceeds on development than would have been available

to it under the alternative financing methods suggested by plaintiffs.  *Id.* ¶¶ 102-109.

Plaintiffs acknowledge Mr. Ratner's "clear qualifications" to analyze these matters.  Motion,

21.  Plaintiffs deposed Mr. Ratner on July 19, 2016 and did not retain a rebuttal expert.  I.

Ratner dep., Cover Page (Ex. 4); Igoe Dec. ¶ 3.

### C.    Rosemary Nicholls

Rosemary Nicholls, BSc (Hons) MRICS appraised the 31 Ginn Sur Mer lots

purchased by plaintiffs.  Ms. Nicholls has over 17 years of valuation-related experience,

including significant experience in the Caribbean.  R. Nicholls Report (Ex. 5) & Curriculum

Vitae (Ex. 6).[5]  Among many other projects, Ms. Nicholls has appraised luxury residences in

Turks & Caicos, hotel properties in Belize and St. Lucia, and commercial properties in

Antigua.  R. Nicholls Curriculum Vitae (Ex. 6).  Ms. Nicholls has also appraised and

---

[3] "LA Funds" refers to investment funds managed by Lubert-Adler.

[4] "Communities" refers to the five Ginn developments that received proceeds from the Loan: Ginn Sur Mer; Laurelmor; The Gardens at Hammock Beach; Quail West; and Tesoro.

[5] Defendants provided plaintiffs a copy of Ms. Nicholls's curriculum vitae when they produced her report.  Igoe Dec.  ¶ 6.

conducted market analyses for resort properties in the Bahamas.  R. Nicholls dep., 23:17-

25:4 (Ex. 7).  Ms. Nicholls's report combines this experience with her review and research of

materials specific to Ginn Sur Mer and on-site inspection of the development.  *See id.*

Plaintiffs deposed Ms. Nicholls on June 30, 2016, proceeding by telephone at plaintiffs'

request.  *See id.*, Cover Page; Igoe Dec. ¶ 7.

### III.    The Court Should Deny Plaintiffs' Motion to Exclude Pursuant to Rule 37

The Court should deny plaintiffs' Rule 37 motion for the three independently

sufficient reasons identified in the Introduction regarding Rule 37.

#### A.    Plaintiffs' Motion Should Be Stricken for Failure To Comply With Local Rule 3.01(g)

The Court should deny the motion because plaintiffs made no effort to comply with

the meet and confer requirements of Local Rule 3.01(g), despite knowing of the supposed

deficiencies in the reports months before discovery ended.  Local Rule 3.01(g) provides:

> Before filing any motion in a civil case, except a motion for injunctive relief, for
> judgment on the pleadings, for summary judgment, to dismiss or to permit
> maintenance of a class action, to dismiss for failure to state a claim upon which relief
> can be granted, or to involuntarily dismiss an action, the moving party **shall** confer
> with counsel for the opposing party in a good faith effort to resolve the issues raised
> by the motion, and **shall** file with the motion a statement (1) certifying that the
> moving counsel has conferred with opposing counsel and (2) stating whether counsel
> agree on the resolution of the motion.

M.D. Loc. Rule 3.01(g) (emphasis added).  "Rule 3.01(g) is strictly enforced."  M.D.

Discovery Manual § I.A.3.  A Rule 37 motion will be stricken when its proponent has not

engaged in the meet and confer process.  *See, e.g., Maryland Cas. Co. v. Earth Inspired

Living, LLC*, 2013 WL 1687681, at *1 (M.D. Fla. 2013) (denying Rule 37(c) motion to

exclude plaintiff's expert due to "counsel's failure to comply with Local Rule 3.01(g)");

*Esrick v. Mitchell,* 2008 WL 5111246, at *1 (M.D. Fla. 2008) (denying Rule 37(c) motion for

sanctions when proponent failed to meet and confer regarding initial disclosure requirements

of Rule 26(a)); *Doe v. Kearney*, 2001 WL 36097844, at *1 (M.D. Fla. 2001) (denying motion

to exclude testimony of expert witnesses based in part on Rule 26 for failure to comply with

Local Rule 3.01(g)).

     Plaintiffs took the expert depositions that revealed the supposed deficiencies in the

experts' reports in June and July.[6]  Discovery closed on September 30, 2016, but plaintiffs

never attempted to address the alleged defects that they supposedly uncovered months earlier

(except during Mr. Ratner's deposition solely with respect to his unrelated publications).

Igoe Dec. ¶ 8.  Plaintiffs never asked defendants to fix the purported shortcomings or sought

to re-depose the experts due to "surprises" supposedly discovered in the depositions.  *Id.*[7]

     Striking plaintiffs' motion is especially warranted because Judge Klindt and Special

Master DeVault have already cautioned plaintiffs about the requirements of Local Rule 3.01,

and plaintiffs – before and after consolidation of these actions – have had prior motions

stricken for violating it.  *Webb v. Ginn Fin. Services*, No. 3:09-cv-516, 11/24/2010 Order

[Dkt. 94] (striking motion because "the Court cannot find that the efforts by Plaintiffs

constituted a 'good faith' attempt to resolve the issues prior to seeking assistance from the

Court" and ordering the parties to confer by telephone with respect to all future discovery

issues); 5/12/16 Order [Dkt. 460] (plaintiffs' motion to compel "is stricken for failure to

---

[6] Ms. Nicholls's deposition took place on June 30, 2016, *see* R. Nicholls dep., Cover Page (Ex. 6); Dr. Harris's on July 8, 2016, *see* J. Harris dep., Cover Page (Ex. 2); and Mr. Ratner's on July 19, 2016, *see* I. Ratner dep., Cover Page (Ex. 4).

[7] For that reason, plaintiffs do not certify that they complied with Local Rule 3.01.

comply with the meet and confer requirements of Local Rule 3.01(g)").  In his May 12, 2016

Order, Special Master DeVault outlined these duties in detail, explaining that, "before filing

any discovery-related motion, the moving party must meet in person or by telephone with the

adverse party in a good faith effort to resolve the issues raised by the motion," and further

requiring that the certification of such efforts include the dates of the conferral(s) and the

names of the attorneys who met.  5/12/16 Order [Dkt. 460].

Despite repeated warning, plaintiffs ignored Rule 3.01(g).  The Court should deny

their motion on that basis alone.

### B.   The Reports Comply With Rule 26(a)

A testifying expert's report must contain the following: (i) a complete statement of all

opinions the witness will express and the basis and reasons for them; (ii) the facts or data

considered by the witness in forming the opinions; (iii) any exhibits that will be used to

summarize or support the opinions; (iv) the witness's qualifications, including a list of all

publications authored in the previous 10 years; (v) a list of all other cases in which, during

the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a

statement of the compensation to be paid for the study and testimony in the case.  Fed. R.

Civ. P. 26(a)(2)(B).  "The purpose of the rule governing expert witness disclosures is to

safeguard against unfair surprise."  *Kendall Lakes Towers Condo. Ass'n, Inc. v. Pacific Ins.*

*Co., Ltd.*, 2011 WL 6372198, at *3 (S.D. Fla. 2011).

### 1.   Dr. Harris's Report Complies With Rule 26(a)

In large part, plaintiffs' disclosure objections to Dr. Harris's report focus on his use of

the terms "believed" and "consensus" when referring to market participants, economists, or

commentators.  Motion, 4.  According to plaintiffs, Dr. Harris's report is deficient because he does not identify "all of the materials he relied upon, and any of the data he considered" in making these statements.  *Id*.  Plaintiffs' grievance, however, is premised on a mischaracterization of Dr. Harris's opinion and report.  Dr. Harris extensively analyzes and cites economic and financial data and research in reaching his opinions on the macroeconomic and real estate market forces impacting Ginn Sur Mer.  *See generally* J. Harris Report (Ex. 1).  Among other things, he analyzes data reflecting employment rates, retail sales, gross domestic product, corporate profits, stock prices, home prices, and mortgage statistics.  *See id.*  He also cites and analyzes myriad publications and research on the topics addressed in his report.  *See id.*

Yet, plaintiffs argue that, when he uses the terms "believed" and "consensus," Dr. Harris is offering an opinion about the subjective beliefs of market participants, economists, and commentators.  But that misstates the vast majority of Dr. Harris's report, which explains in detail how objective evidence and data (*e.g*., retail sales; loan volume; home prices) reflect broader developments in the market.  When Dr. Harris refers in his report to "beliefs" or a "consensus" view, these are done, as Dr. Harris explained at length during his deposition, to summarize generally the more specific opinions and analysis detailed in his report.  J. Harris dep., 63:22-64:6; 65:21-22; 88:17-22; 90:13-15; 93:7-13; 329:11-13 (Ex. 2).  Indeed, at least three of the statements plaintiffs fault are included in the "Summary of Findings and Expert Opinions" section of his report.  J. Harris Report, 4-5 (Ex. 1); *see also* J. Harris dep., 93:7-13 (testifying about one of the sentences plaintiffs complain about, that "that sentence is the – a summation of my analysis of all the data and research presented herein").  During his

deposition, Dr. Harris identified for plaintiffs the specific portions of his report that contain the data summarized in these statements.  J. Harris dep., 59:9-69:23 (Ex. 2).

Moreover, plaintiffs' contention that, for "brevity" purposes, Dr. Harris did not identify all of the materials used to make statements about the "beliefs" or "consensus" views of market participants, economists, or commentators ignores Dr. Harris's testimony and the reality of his experience.  When questioned about the basis for the statements of which plaintiffs complain, Dr. Harris testified that his opinions are also based on "[r]eview of the documents and of… news articles, reports, and forecasts that I have referenced and reported herein, as well as my own personal work and experience during the time." *Id.*, 52:16-19; *id.*, 63:22-64:1 ("the third bullet point on Page 4 is my summation of all the data, articles, everything I read, as well as personal experience at the time"); *id.*, 108:18-21 ("[t]he overall research activities I completed, prior history, and my own personal experience, as well as all the data and everything that I [reported] in this report.").  As Dr. Harris explained, "every piece of data reported things I've read over this time period, since then, informed – has influenced the totality of my experience and my opinions thereof." *Id.*, 323:1-4.  It would be neither possible nor desirable for Dr. Harris to identify every single article or commentary that, as an active participant, researcher and academic in the real estate economics field, he has read about the market dynamics relevant to the Great Recession – a topic that has spawned countless articles and commentary.  The only reasonable way for Dr. Harris to present his opinions was to identify those materials he considered in forming the specific opinions he offers.  Dr. Harris's report includes everything "necessary to support the conclusions offered." *Id.*, 323:7-8; *see also id.*, 323:14-17 ("Q:  Did you include in your

report all of the data that formed the basis for your conclusions in the report?  A:  Yes.").
This is the "brevity" Dr. Harris describes.

Plaintiffs' argument that they were prejudiced by Dr. Harris not identifying every article he has ever read regarding the real estate market is unfounded.  Dr. Harris's report includes at least 91 citations to research and commentary relating to the real estate market crisis and Great Recession, constituting "all of the data that formed the basis for the conclusions in [his] report." *Id.*, 323:14-17.  With these citations – as well as the panoply of publicly-available resources on these topics – plaintiffs had more than ample fodder for cross-examination.  Indeed, plaintiffs' counsel extensively cross-examined Dr. Harris on the data he relied on in reaching his conclusions, including exhaustively challenging whether Dr. Harris's opinions relied on any "large-scale" surveys of market participants or economists being asked their views on the direction of the market.  *Id.*, 53:23-94:5.  Nor were plaintiffs prejudiced in their cross-examination of the specific sales data cited by Dr. Harris.  Plaintiffs queried Dr. Harris at length as to whether should have cited the Case-Shiller Home Price Index, *id.*, 208:1-218:10, and extensively challenged Dr. Harris's reliance on median price data using a Florida Association of Realtors' white paper titled, "Florida Realtors' Residential Price Index, 1995-2013, Rise, Fall and Recovery." *Id.*, 219:6-250:9.

Plaintiffs' additional alleged deficiencies fare no better.  For example, plaintiffs cite materials Dr. Harris "reviewed to prepare for his deposition" as among those that should have been identified but cite no authority.  And there is nothing in the record to suggest that materials Dr. Harris reviewed only to prepare for his deposition were considered in forming his opinions, changed his opinions, or are relevant to those opinions he would testify to at

trial.  *Weaver v. Lexington Ins. Co.*, 2006 WL 3147655, at *1 (M.D. Fla. 2006) (denying

motion to compel production of post-report communications that were not considered in

forming opinion and were not pertinent to opinions expert would render at trial).

Plaintiffs also claim that Dr. Harris's report "fails to identify materials he received

from Defendants' counsel."  Motion, 4.  As Dr. Harris testified, however, he received

documents from counsel both in connection with his work on his report and following

submission of his report for purposes of preparing for his deposition.  J. Harris Dep., 16:11-

14 (Ex. 2).  As explained above, plaintiffs offer no support for this argument, while, in

contrast, Dr. Harris testified that his report sets forth a complete statement of the basis for the

opinions he offers in this case, including the reasons for those opinions and all of the facts

and data considered in reaching them.  *Id.*, 10:6-17.

Accordingly, plaintiffs' sweeping request to exclude Dr. Harris's report is unfounded.

### 2. Mr. Ratner's Report Complies With Rule 26(a)

Plaintiffs, who did not retain an accounting expert, attack Mr. Ratner's report,

deposition testimony, and even his powers of recall.  Each challenge fails.

#### a. Mr. Ratner's Report is Thoroughly Supported

Plaintiffs first challenge Mr. Ratner's report for "fail[ing] to identify the basis for

many of his assertions."  Motion, Section C.1.  This argument requires plaintiffs to ignore the

voluminous citation material in the body of the report, the footnotes, and the appendices.

Mr. Ratner's report sets forth in detail the key financial information regarding the

Loan and development at Ginn Sur Mer.  In Appendix 2 to his report (Ex. 3), Mr. Ratner

identified all of the documents relied on for the facts and opinions offered.  *See* I. Ratner

dep., 89:16-22 ("any number or data point that we picked up from a specific document we listed as a reliance") (Ex. 4); *id.*, 11:6-15 ("just so that there's no confusion, we did present to you a list of documents relied on. And that has a full list of the documents we were – that we did rely on"). The purpose of doing so was "to be very specific about where the information in our report comes from." *Id.*, 90:11-13. As plaintiffs acknowledge, defendants provided copies of the material listed in Appendix 2 on June 15, 2016, as agreed. Motion, 6; Igoe Dec. ¶ 4. As discussed below, on April 4, 2016 – more than three months before Mr. Ratner's deposition – defendants produced to plaintiffs all of the data and factual information Mr. Ratner received from counsel. Igoe Dec. ¶ 5.

Plaintiffs find fault with the way Mr. Ratner cited the findings in his report. Without analysis, plaintiffs offer a one-page list of information they claim lacks a citation. Motion, 5-6. Plaintiffs point to no authority holding that a report is defective unless the citations are made in a particular way. But more importantly, plaintiffs ignore the report.

In most instances, the supporting information for each point is identified in the body of the report or the footnotes to it.[8] Elsewhere, a chart or paragraph may summarize information that is contained in the ensuing paragraphs. For example, plaintiffs complain that two critical tables, Table 9 (components of the LA Funds' $297 million post-Loan investment in the Communities) and Table 10 (components of the July 2007 restructure of the Loan), lack supporting citations. But the supporting analysis is in the paragraphs and footnotes that immediately follow them. *See* I. Ratner Report ¶¶ 60-87 (Ex. 3). Those paragraphs identify and analyze, among other things, a June 21, 2007 memorandum setting

---

[8] The body of the report and the footnotes contain 106 specific references to source material.

forth the components and purposes of the July 2007 restructure (footnotes 59 & 60); the closing statement for the sale of The Gardens at Hammock Beach (footnotes 62 & 63); the Cushman & Wakefield appraisals (footnotes 66 & 67); agreements reflecting the assumption of development obligations for the Ginn Sur Mer golf course (footnotes 70 & 71); the 2008 Loan Restructure Closing Binder (footnote 75); other agreements reflecting the investments (footnotes 74, 77, 84); and budgets and general ledgers (footnotes 76, 85, 86).  And even if the body of the report did not contain this information, Appendix 2 does.  For example, Appendix 2 identifies the sales contracts and closing statements for the parcel purchases listed in Tables 9 and 10 by date, amount, and party – information that plaintiffs, who have been litigating this case for eight years, can easily locate.

Similarly, plaintiffs assert that Table 12, which summarizes cash flow at Ginn Sur Mer and the LA Funds' investments in it, lacks citation.  But the source is identified as "the GSM Development's Income Statements" in a footnote to the immediately preceding paragraph, which introduces Table 12.  I. Ratner Report ¶ 91 n.93; *see also* Tables 16 and 17 (citing information in previous charts and paragraphs).

A few of the Tables do not expressly identify the source of the information, but the reference to them in Appendix 2 is clear.  For example, Table 2 identifies the pre-Loan debt on the Communities by amount and lender.  Appendix 2 lists each supporting document by date, amount, name of the lender, and name of the Community – the same information that appears in Table 2.  Similarly, plaintiffs complain that Tables 4 and 5, which identify the structure of the Loan and the sources and uses of Loan proceeds, lack citation information. Again, Appendix 2 identifies the June 8, 2006 Loan agreements and the Confidential

Information Memorandum, which contain that information.  Having litigated this case for eight years, plaintiffs cannot claim any surprise when they know exactly which information in Appendix 2 supports these tables (all of which has been produced).  Moreover, were plaintiffs truly confused, a meet and confer could have clarified matters quickly.

Next, plaintiffs list certain sentences and phrases (some as short as three words) that they claim lack citations.  Motion, 6.  Again, there is no requirement that every sentence in a report, let alone every phrase, contain a pinpoint citation.  In most instances, the point made in each such sentence or phrase flows logically from the fact that immediately precedes it.[9] *See Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 989-991 (11th Cir. 2016) (an expert may make "reasonable inference[s]" from facts).  There is no surprise or prejudice because the report identifies the basis for every fact found and conclusion drawn.

Finally, although plaintiffs claim the deficiencies in Mr. Ratner's report forced them to "abandon several lines of questioning," Motion, 14, they spent 6 hours and 11 minutes of the maximum 7 hours deposing him on the record.  Igoe Dec. ¶ 9.  Plaintiffs had every opportunity to ask Mr. Ratner the basis for his opinions (and did).  Even if the report was insufficiently cited – and it is not – Mr. Ratner's deposition cured any "surprise."  *Bowers v. Northern Telecom., Inc.*, 905 F. Supp. 1004, 1008 (N.D. Fla. 1995) ("any surprise or prejudice created by the 'rebuttal experts' was cured by NTI's subsequent depositions").

---

[9] By way of example only, the three words phrase – "benefitting the Properties" – that appears in paragraphs 59(a)-(c), 62, and 76 is preceded immediately by a description of an investment made to benefit the Communities.

Given the thoroughness of Mr. Ratner's report and the identification of every fact supporting his findings, this challenge is baseless.[10]

      b.  Defendants Produced Every Document Mr. Ratner and His Team Received From Counsel

Next, plaintiffs assert that, during Mr. Ratner's deposition, they learned for the first time that he received "hundreds" of additional documents beyond what is listed in Appendix 2, which plaintiffs claim still have not been produced.  This attack fails for several reasons.

First, as discussed above, Mr. Ratner's report identifies every document supporting the facts and opinions in his report.

Second, on April 4, 2016, the Ginn defendants produced all documents that counsel sent to Mr. Ratner and his firm.  Igoe Dec. ¶ 5 (Bates labeled "Ginn_Bal_Supp0398390-0407002").  The production included materials such as bank records, general ledgers, budgets, and contracts.  *Id.*  Plaintiffs used some of these documents at Mr. Ratner's deposition.  *See* I. Ratner dep., 27:9-28:19 (questioning Mr. Ratner about Ginn_Bal_Supp0403185 and  Ginn_Bal_Supp0403398) (Ex. 4).

Third, plaintiffs fault Mr. Ratner because, during his deposition, he could not recall every document his team received.  As plaintiffs acknowledge, Mr. Ratner identified the categories of documents his team received.  Motion, 9.  An expert deposition is not a memory test.  Plaintiffs cite no authority for the proposition that an inability to recite from

---

[10] Plaintiffs seek to hold Mr. Ratner's report to a standard their experts did not attempt to meet.  Unlike Mr. Ratner's report, plaintiffs' appraisal reports contain lengthy sections without a single citation.  *See* Andrews Report (Ex. 8) and Lowe Report (Ex. 9) (Sections titled "Bahamas Area Analysis;" "Grand Bahama and Freeport Economic Analysis;" "Overview of the Former Ginn Sur Mer Development;" "Analysis of Sales Data;" and "Final Value Conclusions.").

memory every document received disqualifies an expert.  In any case, plaintiffs have had all documents Mr. Ratner received from counsel – and the ability to identify each one – since April 4, 2016.[11]

### c.   Mr. Ratner's Binders Were Not "Undisclosed"

On the one hand, plaintiffs criticize Ms. Nicholls for not bringing notes to her deposition to help smooth it along, yet, on the other hand, complain that Mr. Ratner brought four binders to his for that purpose.  There is nothing inappropriate about Mr. Ratner's use of binders at the deposition, which is his standard practice.  I. Ratner dep., 60:7-12.  To the contrary, they helped him answer questions regarding "data-dense" subjects.  *See* Motion, 14.

Plaintiffs' contend they were prejudiced because they did not have "advance copies" of the binders.  This assertion falls flat because, not only did they have the materials in the binders months before the deposition, but all of the documents contained in them were identified in Appendix 2 to Mr. Ratner's report.  Three of the binders contain the supporting information for the 117 footnotes in Mr. Ratner's report.  Of the 117 footnotes, 62 cite to either the Fourth Amended Master Complaint, to produced documents by Bates number, or to websites with addresses.[12]  Another 16 explicitly reference other documents in Appendix 2 (even when not including the Bates number).[13]  Two reference undisputed facts, the sources

---

[11] Plaintiffs note that Mr. Ratner undertook "independent research," but ignore his explanation of what that means.  Mr. Ratner testified that the "independent" work primarily meant "independent analysis" of documents provided by counsel, which is precisely what an expert is charged with doing.  The only other "independent materials" included websites relating to Mr. Ginn's background (cited at notes 12, 17, 18 & 24), an article about "different financing sources" (cited at note 27), and Mr. Ratner's extensive work experience relating to the real estate market crash.  I. Ratner dep., 98:11-101:2.

[12] *See* notes 4-38, 40-41, 45, 49, 52, 55, 57-60, 64-65, 70-71, 73-77, 90-92, 97, and 105-108.

[13] *See* notes 42, 46, 53-54, 62-63, 66-67, 72, 83-86, 89, 100, and 105.

of which plaintiffs know well.[14]  Those 80 footnotes reflect the only documents included in

Mr. Ratner's footnote binders, *i.e.*, there are no documents associated with the other 37

footnotes.[15]  Thus, plaintiffs knew and had access to the exact documents contained in the

footnote binders long before Mr. Ratner's deposition and had every opportunity to ask Mr.

Ratner about them (and did).  Mr. Ratner had no obligation to make plaintiffs binders of

materials expressly referenced in the report.

The fourth binder contains the materials supporting the tables in Mr. Ratner's report,

all of which are listed in Appendix 2.[16]  Plaintiffs have had these documents for months and

could have used them to depose Mr. Ratner (and did).

Finally, plaintiffs assert that "Mr. Ratner did not bring a copy of his Binders to

produce."  Motion, 7.  That is false.  Plaintiffs' counsel marked the binders at Mr. Ratner's

deposition as Exhibits 9-12.  I. Ratner dep., 152:14-153:6 (Ex. 4); cover pages to Ratner dep.

exhibits 9-12 (Ex. 10).  The stenographer kept the binders after the deposition and attached

all exhibits, including the contents of the binders, to the transcript, which was completed on

August 2, 2016.  *See id.*, Stenographer's Sig. Page (Ex. 4) & Igoe Dec. ¶ 10.  Plaintiffs had

---

[14] *See* notes 56 and 109.

[15] Of the footnotes without accompanying documents, two are definitions (notes 1, 2), four reference other sections of the report (notes 3, 51, 113, 114), six contain calculations (notes 47, 94-96, 115, 117), two note assumptions Mr. Ratner made for hypotheticals described in the report (110, 111), and 23 are comments that flow from the text (39, 43-44, 48, 50, 61, 68-69, 78-82, 87-88, 93, 98-99, 101-104, 112, 116).  Mr. Ratner's binders include tabs to mark these 37 footnotes, but behind each such tab, there is only a single page that reads "Comment Only" or "Calculation Only."

[16] In addition to source data, the documents behind the tabs for Tables 12 and 14 include "bridge tables" created by Mr. Ratner and his firm, which reflects their work product used to convert source data into Tables 12 and 14.  I. Ratner dep., 151:19-152:3.  As explained in Section III.B.2.d, Rule 26(a) does not require production of an expert's work product, only underlying facts or data, all of which has been produced.

the binders more than three months before filing their motion (and the documents in them long before that).[17]

### d. Mr. Ratner's Report Includes All Required Materials

Plaintiffs assert that Mr. Ratner's report is defective because it does not include the engagement letter; emails between team members at his firm; emails to counsel requesting materials; and internal work product used to create certain tables in the report. Motion, 8. Rule 26(a) requires the expert to include the "facts or data" considered in forming the opinion. It does not mandate the engagement letter, provided that, as here, it does not include such "facts or data." Igoe Dec. ¶ 11. Nor does it require production of correspondence among team members[18] or with counsel.[19] And the "facts or data" used to create the tables in the report have been provided.[20] Plaintiffs chose not to hire an expert to analyze these facts and data themselves. The rules do not require defendants' expert to do it for them. *See, e.g.,*

---

[17] Plaintiffs apparently used the binders appended to Mr. Ratner's deposition transcript to count the number of pages in each binder. *See* Motion, 7 n.6, and Ballinger Dec. ¶ 5.

[18] The sole basis for plaintiffs' implication that Mr. Ratner withheld "facts or data" in emails is Mr. Ratner's affirmative response when asked if "you and other members of the team e-mailed one another in connection with your work on this case." Motion, 8 (citing I. Ratner dep., 65:15-19).

[19] Rule 26(b)(4)(C) provides that attorney-expert communications are privileged except those that relate to compensation; identify facts or data provided to the expert; and identify assumptions that the attorney provided and that the expert relied on in forming his or her opinion. While the disclosures mandated by Rule 26(a) are self-executing, those categories of permissible discovery listed in Rule 26(b)(4)(C) are not, *i.e.*, a party must request them. Plaintiffs never served discovery seeking attorney communications with Mr. Ratner or his team. Igoe Dec. ¶ 12.

[20] Again, plaintiffs seek to hold defendants to a standard they did not meet. Plaintiffs' reports did not attach the engagement letters, but provided that they would be "furnished upon request." *See* Andrews Report, p. 70 (Ex. 8); Lowe Report, p. 69 (Ex. 9). Plaintiffs' reports did not attach or identify any communications with counsel; any communications among Messrs. Lowe and Andrews, who work for the same company and jointly prepared the appraisals; or any work product, such as notes of their conversations with Bahamian real estate brokers referenced in the reports or sketches of or notes from Mr. Lowe's site inspection at Ginn Sur Mer.

*Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 35 (1st Cir. 2004) (Rule 26(a) "does not require that the expert report contain, or be accompanied by, all working notes").[21]

### e.   Defense Counsel Inadvertently Omitted Four Prior Ratner Publications

Mr. Ratner's report included a partial list of his publications over the last 10 years. *See* I. Ratner Report ¶ 9 (Ex. 3).  Defendants' counsel inadvertently omitted four publications from this list.  Igoe Dec. ¶ 13.  On November 16, 2016, counsel provided plaintiffs with the complete list, which included the four omitted publications.  *Id.*  In his deposition, Mr. Ratner noted that he could "remember most of" the publications.  I. Ratner dep., 46:5-47:16 (Ex. 4). Plaintiffs did not ask Mr. Ratner to identify them or question him about the publications identified in his report.  *See id.*  They do not assert they were prejudiced by the inadvertent omission of those four publications.

### f.   A Discrete Error in the Report Was Corrected Through Discovery

During discovery, plaintiffs identified an error in Mr. Ratner's report pertaining to Table 6, which relates to draws from and repayments made to the credit revolver component of the Loan.  *See* I. Ratner Report, Table 6.  Rule 26(e)(1) requires a party who has made a disclosure under Rule 26(a) to "supplement or correct that disclosure if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).

---

[21] "[T]here is no requirement that the expert produce working notes or recordings as part of the report requirement," but those materials may be "subject to document request or subpoena." *Moore's Federal Practice*, 3d ed. (2016) § 26.23[2][b].  Plaintiffs never served discovery seeking Mr. Ratner's notes or the work product used to convert source data into tables.  Igoe Dec. ¶ 12.

Plaintiffs themselves identified this potential discrepancy, which caused Mr. Ratner, at the request of defendants' counsel, to investigate.  In his deposition, Mr. Ratner acknowledged the mistake in Table 6.  I. Ratner dep., 166:16-169:16 (Ex. 4).  In discovery, defendants produced contemporaneous documents showing the amounts drawn from and repayments made to the revolver.  *See* Klumph dep., 49:18-74:9 (Ex. 11) & Klumph. dep. Exhibits 246-262 (Ex. 12).  Plaintiffs, who had this information well in advance of the fact depositions they took, marked these documents as exhibits during Ginn CFO John Klumph's deposition and questioned him at length about them.  *Id.*

Because Mr. Ratner acknowledged the mistake and the "corrective information has…been made known" to plaintiffs "during the discovery process," defendants have satisfied their obligations under Rule 26(e).

### 3.      Ms. Nicholls' Report Complies With Rule 26(a)

Plaintiffs complain that Rosemary Nicholls's expert report does not properly disclose all of the materials considered and relied upon to reach her opinion.  As noted in Section III.A, prior to filing this motion, plaintiffs did not object to the materials disclosed in connection with Ms. Nicholls's report.  Igoe Dec ¶ 8.  Nor did plaintiffs request – either during Ms. Nicholls's deposition or after – that defendants produce any of the documents Ms. Nicholls identified at her deposition.  *Id.*  Tellingly, although plaintiffs now complain that Ms. Nicholls did not disclose her hard copy files, counsel for plaintiffs did not request that Ms. Nicholls retrieve them after Ms. Nicholls explained during her deposition that they were located in her nearby office.  R. Nicholls dep., 149:23-150:3 (Ex. 7).  There is nothing to suggest that Ms. Nicholls or defendants intentionally withheld any materials or that

defendants would not have negotiated in good faith to remedy any inadvertent deficiency in the materials produced.

Even putting aside that any disputes could have been addressed months ago, plaintiffs' alleged grievances with Ms. Nicholls' report strain credulity. For example, plaintiffs identify "emails with and work product of an attorney [that Ms. Nicholls] retained to conduct property searches" as a category of documents not included in Ms. Nicholls' report. Motion, 3. Yet Ms. Nicholls testified that all of the results of these searches were appended to her report and that her report noted those lots for which searches were still outstanding. R. Nicholls dep., 136:13-137:3. And Ms. Nicholls' testimony makes clear that the emails with Candice Hepburn, the attorney retained, were administrative in nature, pertaining to the status of the searches and identifying who would forward the search results. *Id.*, 36:24-37:1. Plaintiffs also take issue with Ms. Nicholls' deletion of photographs taken during her on-site visit to Ginn Sur Mer. Motion, 3 n. 3. Ms. Nicholls explained that she deleted duplicate and near-duplicate photographs because of limited storage capacity on her company's network. R. Nicholls dep., 193:16-22. There is no suggestion that Ms. Nicholls considered the deleted photographs in forming her opinions. Nor is there any basis to conclude that plaintiffs could have suffered any prejudice from deleting duplicates or near-duplicates of other photos.

Plaintiffs also cite several examples purporting to show that Ms. Nicholls could not answer questions without the notes taken during her visit to Ginn Sur Mer.[22] Motion, 3. For the majority of plaintiffs' examples, however, the questioning related to a minor detail on the

---

[22] As explained above, Rule 26 does not require production of all working notes of an expert absent a discovery request. *See* Section III.B.2.d.

fringe of the opinions Ms. Nicholls is offering.  Moreover, Ms. Nicholls often did answer the

question posed but stated she could confirm using with her notes.  For example, when asked

what specific structures were in the vicinity of the reverse osmosis plant at Ginn Sur Mer,

Ms. Nicholls testified that the area contained water bladders, electrical machinery, warehouse

sheds, and storage bins, and that she could confirm with her notes.  R. Nicholls dep., 156:6-

23.  Plaintiffs also cite a line of questioning about which entity owns various portions of the

Ginn Sur Mer.  Motion, 3 (citing R. Nicholls dep., 149:7-22).  But Ms. Nicholls explained

that this topic falls outside the scope of her appraisal and, therefore, she has limited

knowledge.  R. Nicholls dep., 146:7-12.  After responding based on her understanding, she

testified that she would have to refer to her notes to answer definitively.  *Id.*, 149:9-18.  The

fact that Ms. Nicholls might have been able to confirm answers to questions that fall outside

the scope of her expert opinions through review of her notes neither suggests Ms. Nicholls

was unprepared for her deposition nor prejudices plaintiffs.[23]

To the extent Ms. Nicholls's report contained any minor deficiencies in the materials

provided to plaintiffs, striking her report would not be appropriate, as explained below.

**C.      Even If the Reports Do Not Comply in Full With Rule 26(a), the Court
Should Not Impose the "Extreme Sanction" of Excluding the Experts**

The expert reports comply in full with Rule 26(a) (with the exception of the four

publications inadvertently omitted from Mr. Ratner's report).  Even if they did not, the

sanction of exclusion would not be warranted because (1) any shortcoming "was

---

[23] To the extent that Ms. Nicholls' need to confirm these answers with notes reflects any
shortcomings in her analysis, the appropriate way to demonstrate that would be through "vigorous
cross examination" by opposing counsel, not excluding the report.  *Quiet Tech DC–8, Inc. v.
Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1340-41 (11th Cir. 2003).

substantially justified or is harmless" and (2) the Court has discretion to "impose other

appropriate sanctions" to address any violation.  Fed. R. Civ. P. 37(c)(1).

### 1. Any Mistake Is Substantially Justified or Harmless

If a litigant does not comply with Rule 26(a), "the party is not allowed to use that

information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).[24]  Plaintiffs assert

that a failure is "substantially justified or harmless" only when the omitted information is

known to all parties.  Motion, 2.  But this Court, noting its "broad discretion" to determine

whether a "failure was substantially justified or harmless," has identified five factors that

govern the analysis: "(1) the surprise to the party against whom the evidence would be

offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the

evidence would disrupt trial; (4) the importance of the evidence; and (5) the nondisclosing

party's explanation for its failure to disclosure the evidence."  *Collins v. U.S.*, 2010 WL

4643279, at *4 n.6 (M.D. Fla. 2010).  These factors heavily favor finding that any failure to

disclose was substantially justified or harmless.

First, to the extent plaintiffs were surprised by the supposed omissions – and it is

doubtful they were given the disclosure of many of the purportedly omitted materials – they

had the ability to cure that surprise months ago but chose not to.  Plaintiffs cannot

manufacture harm by choosing not to attempt to fix supposed deficiencies.  *Murray v.*

*Holiday Isle, LLC*, 2009 WL 1211391, at *2 (S.D. Ala. 2009) ("A litigant's unwillingness to

---

[24] As discussed below, Rule 37 provides for alternatives to exclusion even when the disclosure
violation is not substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1)(C).

take readily available steps to dispel any harm does not warrant the draconian remedy of a Rule 37(c)(1) sanction"); *Anderson v. Cagle's, Inc.*, 2005 WL 3873160, at *2 (N.D. Ga. 2005) (harmlessness found when movant did not move to compel omitted information).

Second, there is no trial date and no possible disruption to trial.

Third, the experts plaintiffs seek to exclude would provide indisputably important testimony that, in the cases of Dr. Harris and Mr. Ratner, plaintiffs did not attempt to rebut.

Fourth, any failure to disclose required information was inadvertent, as demonstrated by the fact that defendants (1) timely produced the expert reports; (2) provided back-up information as agreed; (3) produced additional documents provided to the experts; and (4) made the experts available for depositions.  Moreover, there is no evidence of bad faith.  In this litigation, defendants have produced the nearly 800,000 pages of documents demanded by plaintiffs and made available the witnesses plaintiffs sought to depose (including former employees).  Igoe Dec. ¶ 14.  Throughout this case, defendants have engaged in good faith in the meet-and-confer process and, even when defendants believed plaintiffs sought non-discoverable information, agreed to compromise.[25]  Had plaintiffs reached out regarding the issues raised for the first time in their motion, defendants would have (i) pointed plaintiffs to the materials they wrongly claim are missing (*e.g.*, the materials provided to Mr. Ratner) and (ii) engaged with plaintiffs regarding any supposedly missing information.

---

[25] *See, e.g.*, 7/10/2015 Order [Dkt. 273] (documents produced in the *Dillworth* bankruptcy action) and 5/12/16 Order [Dkt. 460] (certain documents on privilege logs).

## 2.      The Sanction of Exclusion is Not Warranted

"Even if the Court finds that [the] failure to produce an adequate report was neither

substantially justified nor harmless, the sanction of exclusion is not mandatory." *Collins*,

2010 WL 4643279, at *5; *see* Fed R. Civ. P. 37(c)(1)(C) (exclusion sanction discretionary);

*Bingham v. Baycare Health Sys.*, 2016 WL 5106946, at *4 (M.D. Fla. 2016) ("striking an

expert is a drastic remedy, particularly when other remedies are available to cure any

prejudice").  "[T]he Court vastly prefers to decide cases on the merits," and "'[w]ithout a

finding of bad faith or gamesmanship on the eve of trial, many courts are loathe to invoke the

strong medicine of precluding expert testimony.'"  *Collins*, 2010 WL 4643279, at *5.

Courts have declined to grant any sanction at all or imposed lesser sanctions when the

movant knew of grave violations of the disclosure requirements before discovery ended and,

rather than address them promptly, moved to exclude after discovery closed as its first and

only resort.  For example, then-Chief Judge Carnes of the Northern District of Georgia (now

of the Eleventh Circuit) denied defendants' motion to strike plaintiff's expert disclosures

even though they "came nowhere near" to complying with Rule 26.  *Kondragunta v. Ace*

*Doran Hauling & Rigging Co.*, 2013 WL 1189493, at *8 (N.D. Ga. 2013).  The Court wrote

that the "problem for defendants, though, is that they had the ability to complain, and thereby

cure this surprise, prior to the expiration of expert discovery, by advising plaintiff that his

disclosures did not comply with the rule and by requesting more specific disclosures," and

then moving to compel if needed.  *Id.*  The defendants there "instead laid in wait, hoping that

plaintiff's non-compliance would doom his ability to offer any expert testimony."  *Id.*; *see*

*also Catalina Rental Apartments, Inc. v. Pacific Ins. Co., Ltd.*, 2007 WL 1050634, at *2

(S.D. Fla. 2007) (defendant's failure to make timely expert disclosures was "unacceptable," but denying motion to strike when, instead of taking steps to "immediately avoid[] the alleged prejudice," plaintiff "sat on its rights" and moved exclude after discovery); *Griffith v. General Motors Corp.*, 303 F.3d 1276, 1283 (11th Cir. 2002) (affirming denial of motion to strike expert when movant "*never* mov[ed] for an order requiring a more detailed response under Rule 26") (italics in original).

Even if the Court finds a violation of Rule 26(a) that was not substantially justified or harmless, it should not exclude defendants' experts.  As noted previously, rather than attempt to cure supposed deficiencies they learned of months before discovery closed, plaintiffs chose to file this motion, hoping the Court would exclude witnesses whose testimony is damaging to their case.  And while plaintiffs seek to paint a picture of widespread failures by listing as many supposed violations as they can think of, the record reflects just the opposite. Plaintiffs have no basis to accuse defendants of "disregarding" Rule 26, particularly when plaintiffs never asked defendants to cure supposed deficiencies.[26]

---

[26] Plaintiffs cannot identify a single case in which a court excluded experts in similar circumstances. In the cases plaintiffs cite, courts struck experts when (i) the litigant failed to fix defective disclosures despite its opponent's meet and confer efforts and having been given an opportunity by the Court to amend them, *Bray & Gillespie Mgmt. v. Lexington Ins. Co.*, 2009 WL 1043974 (M.D. Fla. 2009); (ii) during trial, the expert testified to a previously unidentified testing protocol that was "completely different" from what was in his report, *Rembrandt Vision Tech., L.P. v. Johnson & Johnson*, 282 F.R.D. 655 (M.D. Fla. 2012); (iii) the litigant first disclosed the expert report seven weeks after discovery closed, *Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008); and (iv) the expert relied on materials not identified in disclosures or his deposition, but raised for the first time at the *Daubert* hearing, *Mitchell v. Ford Motor Co.*, 318 Fed. App'x 821 (11th Cir. 2009).

**IV.**     **The Court Should Deny Plaintiffs' *Daubert* Motion**

    **A.**     **The *Daubert* Standard**

Trial courts serve as gatekeepers to ensure expert opinions are reliable and relevant. *Daubert*, 509 U.S. at 589.  Courts must consider whether (1) the expert is qualified to testify competently regarding the matters she intends to address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of specialized expertise, to understand the evidence or to determine a fact in issue.  *Quiet Tech DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1340–41 (11th Cir. 2003).

The court's "gatekeeping function is 'is not intended to supplant the adversary system or the role of the jury." *Adams v. Lab. Corp. of America*, 760 F.3d 1322, 1334 (11th Cir. 2014).  A "court may not exclude the opinion simply because it believes that the opinion is not – in its view – particularly strong or persuasive." *Seamon*, 813 F.3d at 990.  Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (citing *Daubert*, 509 U.S. at 596).

The *Daubert* test requires the Court to undertake a "preliminary assessment" of the reliability of the expert's opinion.  *Daubert*, 509 U.S. at 591.  The analysis is case-specific and "intended to be applied in a 'flexible' manner." *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013).  In addition to methodology, an expert's experience may factor into the reliability of his or her opinion.  *Id.* at 1342 ("Dr. Clarke gave an extensive explanation of his methodology and explained how his education assisted him in

reaching his conclusions"); *Adams*, 760 F.3d at 1330 ("Dr. Rosenthal formed her opinion by using reliable tools, applying an established body of medical knowledge, and drawing on her extensive experience in the field.  That is not an *ipse dixit* assessment.").

### B.        Plaintiffs' *Daubert* Challenge To Mr. Ratner Fails

Plaintiffs do not challenge Mr. Ratner's qualifications or that his testimony would assist the trier of fact.  Instead, plaintiffs acknowledge Mr. Ratner's "clear qualifications" and that he would offer testimony regarding a "complex loan transaction."  Motion, 20-21. Plaintiffs attack the reliability of aspects of his report.  With the exception of the one point Mr. Ratner has already acknowledged, these challenges have no basis.

### 1.        Mr. Ratner's Report Is Based on Thoroughly Supported Analysis, Not "Defendants' Narrative"

Plaintiffs raise two related challenges – that Mr. Ratner should be barred from testifying as to findings for which he "cites no supporting basis" and from "serving as a conduit for an unsupported factual narrative."  Motion, 21 & 31-32.  Neither has merit.

First, as discussed in Section III.B.2, the facts and opinions in Mr. Ratner's report are thoroughly cited; all materials on which he relied have been provided; and all facts and data he considered have been produced.

Second, and similarly, the sections of Mr. Ratner's report characterized by plaintiffs as "narrative" contain unrebutted and appropriately supported factual information describing the pre-Loan financing in place for the Communities, the structure of the Loan, and the LA Funds' post-Loan investment in the Communities.  It is based on forensic analysis of the

Loan documents and financial records, not "defendants' narrative."[27]  Because Mr. Ratner's findings are thoroughly supported, there is no basis to exclude his testimony on these important subjects.

### 2.      Mr. Ratner Relied on Appropriate Records

Plaintiffs devote five pages to attacking not only Mr. Ratner's use of accounting documents labeled "LRA West End, LLC," but also his integrity for having done so. Motion, 23-28.  This argument is a red herring with no substance.

Ginn-LA West End Ltd., LLLP has been the project partnership[28] for Ginn Sur Mer since late 2005 and continues to be today.   B. Arnold Aff. ¶ 2.  In October 2010, the partners for all the Ginn developments' project partnerships entered into a Project Partnership Restructure Agreement.  *See* Project Partnership Restructure Agreement (Ex. 13).  Prior to that restructure, the Ginn project partnerships had been limited liability limited partnerships ("LLLPs").  *Id.* at LRA0002-0003 & LRA00105-00110.  In connection with the Project Partnership Restructure Agreement, many of the LLLPs were converted to limited liability companies and the prefixes to their names were changed from "Ginn-LA" to "LRA."  *Id.*[29]

Ginn-LA West End Ltd., LLLP was not converted to an LLC and its name was not changed in connection with the restructure.  *Id.* at LRA0002-0003; B. Arnold Aff. ¶ 6.  But

---

[27] The lone case plaintiffs cite in support of this argument bears no resemblance to these facts.  In *Tillman v. Bard*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015), the Court precluded expert testimony that summarized and "selectively quoted" from the litigant's internal documents and regulatory filings.  Here, Mr. Ratner based his findings on analysis of financial records and loan documents, not narrative drafted by defendants.

[28] There was a separate project partnership associated with each Ginn development.

[29] For example, the LLLP for the Hammock Beach development was converted to an LLC, and its name was changed from Ginn-LA Hammock Beach Ocean Ltd., LLLP to LRA Hammock Beach Ocean, LLC.  *Id.* at LRA00106.

when Ginn's accounting department changed the names of the other LLLPs in the Enterprise Reporting system, it mistakenly changed Ginn-LA West End Ltd., LLLP's name to LRA West End, LLC there.  B. Arnold Aff. ¶ 6.  Thus, certain records generated by the Enterprise Reporting System that pertain to Ginn Sur Mer, including some provided to Mr. Ratner, are labeled "LRA West End, LLC."  *Id.* ¶ 7.  But the data in those records is for Ginn-LA West End Ltd., LLLP.  *Id.*  In other words, the data is accurate; the label is the only thing that is wrong.  *Id.*

Mr. Ratner confirmed that he received the appropriate records with Bryan Arnold, a CPA who has performed accounting services for Ginn-LA West End Ltd., LLLP and other Ginn project partnerships from June 2005 through today, and with Stuart Margulies, Senior Managing Partner and Head of Asset Management at Lubert-Adler, including as to the LA Funds' investments in Ginn developments.  I. Ratner dep., 42:5-43:14; B. Arnold Aff. ¶ 1.[30] Because he confirmed he had the right information, Mr. Ratner explained that "what matters to me is that this is the general ledger that captured all of the results for the operations, the development, the financing transactions associated…with the project, not necessarily the naming convention of the title."  *Id.*, 40:13-15; *see also id.*, 39:9-13 ("Without regard to the

---

[30] Plaintiffs attack Mr. Ratner for confirming with Mr. Margulies that these records pertained to Ginn Sur Mer instead of "independently verif[ying] them," Motion, 28, but do not explain what additional steps Mr. Ratner should have taken or why it was inadequate to rely on Mr. Margulies, a senior partner at Lubert-Adler responsible for overseeing its investment in Ginn Sur Mer (and ignore entirely that Mr. Ratner also confirmed this information with Mr. Arnold).  In any case, it is clear that these records, in fact, contain the information Mr. Ratner sought regarding Ginn Sur Mer.

legal name of the entity, this is the entity that collects the revenues, the expenses, pays the bills, has related transactions associated with the development entity.").[31]

Thus, Mr. Ratner received the information he sought regarding Ginn Sur Mer, and his analysis is grounded in appropriate accounting and other records.[32]

### 3.      Mr. Ratner May Testify to Inferences Drawn From Facts

In his report, Mr. Ratner explained that, after the Loan closed, the LA Funds and Ginn expected Ginn Sur Mer to generate $940 million in future distributions and that the LA Funds invested $297 million in the Communities after the Loan closed.  I. Ratner Report ¶¶ 56, 60, 72 (Ex. 3).  Mr. Ratner noted that the expectation of future profits provided a "strong business motive" to ensure GSM succeeded and that the investment demonstrated a continuing commitment to Ginn Sur Mer.  *Id.*  Plaintiffs move to strike this testimony as relating to "intent and state of mind," but mischaracterize the analysis.  Motion, 28-29.

An expert may testify to "reasonable inference[s]" from facts identified in his or her report or testimony.  *Seamon*, 813 F.3d at 989-990 (district court abused its discretion when it "conflated reasonable inference with improper speculation").  Here, Mr. Ratner identified facts – the LA Funds' and Ginn's equity in the Communities and expectation of future profits; the LA Funds' post-Loan investment – and drew reasonable inferences from them. The sections plaintiffs seek to strike relate not to state of mind, but to objective inferences

---

[31] Plaintiffs also fault Mr. Ratner for not using records for the "lowest-level entity" in the Ginn Sur Mer ownership chain, which is Ginn-LA West End Limited.  Motion, 23-24. The balance sheets and income statements with the label "LRA West End, LLC" contain account information not only for Ginn-LA West End Ltd., LLLP, but also for Ginn-LA West End Limited.  B. Arnold Aff. ¶ 8.

[32] While plaintiffs' counsel allegedly undertook "extensive efforts" to identify whether "LRA West End, LLC" existed, Ballinger Dec. ¶ 10 [Dkt. 530], those efforts did not include asking defense counsel.  Igoe Dec. ¶ 8.

drawn from specifically-identified facts by an experienced expert.  It is not speculation to note that an investor has a "strong business motive" to ensure the success of its investment.

> ### 4.      Mr. Ratner May Testify Regarding the Effects of the Market Crash on Revenues at the Communities

Mr. Ratner opines that the real estate market crash, and not actions taken by the defendants, caused projected cash flows not to be realized.  I. Ratner Report ¶¶ 6(b), 57. Plaintiffs challenge to this aspect of the report fails.

In the motion, plaintiffs glide over Mr. Ratner's extensive experience regarding the real estate market crash.  During the Great Recession, Mr. Ratner and his firm served as "one of the largest corporate receivers in the country" with approximately 200 real estate assets under management, such as hotels and golf courses; Mr. Ratner led the creditors' committee for the Fairfield Residential bankruptcy; and Mr. Ratner was involved in numerous other real estate-related restructures.  I. Ratner dep., 100:6-106:15 (Ex. 4) & I. Ratner Report, Appendix 1 (Ex. 3).  Mr. Ratner has an abundance of relevant experience relating to the crash, its aftermath, and its impact on real estate projects.

Mr. Ratner also identified the basis for finding that the crash, and not defendants' actions, caused cash flows not to be realized.  Specifically, Mr. Ratner explained Ginn had a track record of success; that the LA Funds continued to invest in the Communities; that Ginn continued to market and develop them; and that $308.4 million was spent on operations and development at Ginn Sur Mer from June 8, 2006 through December 31, 2008.  I. Ratner dep., 100:6-109:19 (Ex. 4); I. Ratner Report ¶¶ 98-101 (Ex. 3).  Finally, Mr. Ratner explained that, as reflected in his experience and widely-available information, the collapse "affected many

developers and many developments and many real estate finance projects at that time."  I.

Ratner dep., 109:11-16.

Plaintiffs quibble with Mr. Ratner's testimony because he did not identify the exact

date of the real estate market crash[33] and could not, without consulting the materials he

received, state exactly when each of the Communities first fell short of anticipated revenue.

Even if these answers reflected shortcomings in Mr. Ratner's analysis, the way to

demonstrate it would be through "vigorous cross-examination," not exclusion of this aspect

of Mr. Ratner's testimony.  *Quiet Tech.*, 326 F.3d at 1341.

### 5.      Defendants Produced Corrective Information Regarding Table 6

As noted previously, Mr. Ratner's report contains an error at Table 6.  Mr. Ratner

readily acknowledged the error at his deposition and defendants produced corrective

information to plaintiffs in discovery.  *See* Section III.C.2.f.  The Eleventh Circuit has held

that a discrete error in an expert's report does not warrant excluding testimony regarding

other issues addressed in the report.  *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d

548, 565-66 (11th Cir. 1998) (district court abused its discretion by excluding all of the

expert's testimony when "most" of the report was reliable, but "the methodology underlying

a small portion of [the expert's] data and testimony [was] fundamentally flawed"); *United

Fire*, 704 F.3d at 1341-42 (district court abused its discretion in excluding all of expert's

testimony when only one aspect of it was unreliable).

---

[33] Plaintiffs' broadly-worded questions assumed that the market collapse began (i) on a specific date,
instead of over a period of time and (ii) at the same moment in every location and for each category
of real estate.

In accordance with Rule 26(e)(2), Mr. Ratner will disclose the changes to his report necessitated by the error by the time of pre-trial disclosures.

### C.     Plaintiffs' *Daubert* Challenge to Dr. Harris Fails

Plaintiffs' *Daubert* objection to Dr. Harris's report seeks "to preclude any testimony by Dr. Harris purporting to summarize the beliefs or consensus of market participants, economists and/or commentators." Motion, 32. As explained in Section III.B.1 above and by Dr. Harris at his deposition, these statements *summarize* his specific opinions and the data and research contained in his report. In reaching his conclusions, Dr. Harris relies on myriad data and research specifically set forth in his report, including, among others, commentary by reputable and well-known economists, data on U.S. gross domestic product, employment data, retail sales data, personal income data, U.S. corporate profits data, stock prices data, housing price data, and investment data. Indeed, the very type of data plaintiffs' counsel extensively challenged Dr. Harris's report as not including is specifically contained therein: data reflecting economists' opinions and the behavior of market participants. As Dr. Harris explained, he relied, in part, on the aptly-named Anxious Index, a statistical index reported by the Federal Reserve of the opinions of notable economists on the state of the economy and the likelihood of a recession. J. Harris dep., 46:18-47:2 (Ex. 2).

Nor does Dr. Harris purport to offer an unsubstantiated opinion about the subjective beliefs of others during the relevant time frame but, instead, analyzes data reflecting market participants' conduct (*e.g.*, the volume of lending; homes sales data). The use of the term "belief" is Dr. Harris's "stylized interpretation" of the data, commentary, and research contained in his report. *Id.*, 92:24-25. For example, Dr. Harris explained that the

employment data included in his report in part reflects and informs decision-making and the status of market.  *Id.*, 61:24-64:6.  This data, along with his review of articles and commentaries and analysis of additional data mentioned above, is what he details and summarizes in his report.

While plaintiffs' argument focuses on the summarizing paragraphs, it ignores the voluminous supporting data identified in the report.  And an expert's use of the word "belief" "does not morph her opinion into mere conjecture."  *On Track Innovations Ltd. v. T-Mobile USA, Inc.,* 106 F. Supp. 3d 369, 382 (S.D.N.Y. 2015).  It is the substance of the expert's testimony that matters, not "the semantic manner in which it is conveyed."  *Id.* (citing *In re Fosamax Products Liab. Litig.,* 742 F. Supp. 2d 460 (S.D.N.Y. 2010)); *see also Edwards v. U.S.,* 519 F.2d 1137, 1143 (5th Cir. 1975) ("the weight to be given medical testimony should be determined by the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular conclusory term or phrase").

Plaintiffs are free to cross-examine Dr. Harris at trial on his choice of words – as they did extensively during his deposition.  But they have not provided a basis to exclude his testimony or opinions.

## V.     Conclusion

Plaintiffs' attempt to exclude experts whose reports and testimony would be damaging to their case, but clearly helpful to the Court and jury, fails because (i) the reports comply with Rule 26(a) and are reliable and (ii) plaintiffs made no effort to address supposed deficiencies with opposing counsel.  Accordingly, the Court should deny plaintiffs' motion.

Respectfully submitted:

By: */s/ Stephen J. Kastenberg*

BALLARD SPAHR LLP
Stephen J. Kastenberg (admitted pro hac vice)
Jessica M. Anthony (admitted pro hac vice)
William B. Igoe (admitted pro hac vice)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
*kastenberg@ballardspahr.com*
*anthonyj@ballardspahr.com*
*igoew@ballardspahr.com*

TANNER BISHOP
Michael G. Tanner (Fla. Bar No. 0261300)
Helen A. Peacock (Fla. Bar No. 0016196)
One Independent Drive, Suite 1700
Jacksonville, Florida 32202
(904) 598-0034
*mtanner@tannerbishoplaw.com*
*hpeacock@tannerbishoplaw.com*

*Attorneys for Lubert-Adler Management Co.*
*and Dean Adler*

By: */s/ Robert P. Alpert*

MORRIS, MANNING & MARTIN, LLP
Robert Alpert (admitted pro hac vice)
Lawrence H. Kunin (Fla. Bar No. 050210)
Patrick L. Lowther (admitted pro hac vice)
W. Marion Wilson (admitted pro hac vice)
Douglas Hance (admitted pro hac vice)
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000/404-365-9532
rpa@mmmlaw.com
lhk@mmmlaw.com

plowther@mmmlaw.com
mwilson@mmmlaw.com
dhance@mmmlaw.com

SMITH HULSEY & BUSEY
E. Lanny Russell
225 Water Street, suite 1800
Jacksonville, Florida 32202
(904)-359-7700
lrussell@smithhulsey.com

*Attorneys for Defendant ERG Enterprises, LP;
and Edward R. Ginn, III*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 5, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


*/s/ William Igoe*
William Igoe