

Deposition of:

# Ian Ratner

*July 19, 2016*

In the Matter of:

# Bahama Sales vs. Byers

Tiffany Alley, A Veritext Company

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-ga@veritext.com  | 770.343.9696

Case 3:08-cv-01012-TJC-JRK  Document 559-4  Filed 01/05/17  Page 2 of 15 PageID 22081

Ian Ratner
Bahama Sales vs. Byers
July 19, 2016

Page 10

1 acquired certain lots and certain property in Ginn
2 Sur Mer, so we requested those closing documents or
3 documents associated with that transaction.
4     Of course we requested the account -- I
5 see you brought some accounting records. We
6 requested the accounting records and the general
7 ledger for Timberline for the associated projects,
8 which we did get.
9     We requested bank reconciliations and bank
10 statements, which we also collected and got. We
11 requested, of course, the confidential information
12 memorandum, which gives a lot of background on the
13 project and the budgets.
14     We requested the Cushman valuations.
15 There's valuations referred to in the project. So
16 we requested the various financial records that
17 would help identify and accumulate the information
18 that we did accumulate in our report.
19   Q.  So specifically -- well, let me ask you
20 just a question. You referred to the associated
21 projects or the projects. What projects are you
22 referring to specifically that you asked for and
23 received financial records on?
24   A.  The financial statements for Ginn Sur Mer,
25 for Tesoro, Quail West, the River Club, the

Page 11

1 completion of the club, and the -- I mean, the five
2 projects. And I'm -- maybe I'm leaving one out at
3 the moment.
4   Q.  Laurelmor?
5   A.  Laurelmor. Sorry.
6   Q.  So specifically with respect to G.S.M.,
7 what financial records specifically did you
8 request?
9   A.  I just -- just so that there's no
10 confusion, we did present to you a list of
11 documents relied on. And that has a full list of
12 the documents we were -- that we did rely on. And
13 for -- of course for Ginn Sur Mer we collected the
14 financial statements from the beginning, from 2005
15 till today.
16     We requested the general ledger. And in
17 the documents we relied on certain general ledger
18 print-outs. We requested bank statements for
19 various operating accounts, bank reconciliations,
20 of course closing statements for the restructure
21 transactions.
22     We requested information on lot sales. So
23 we have documentation on lot sales and prices of
24 lot sales. You know, we were -- we have a lot of
25 financial information associated with the project.

Page 12

1   Q.  And not all of that's listed in your
2 reliance; you received more than what is listed in
3 your reliance?
4   A.  Yeah. What we have in our reliance are
5 any -- and in fact, I brought the file so to speak
6 here. Any documents that we relied on -- any
7 documents that we relied on we specifically
8 identified if there was -- you know, there's a lot
9 of information.
10     If there's a -- some piece of paper or
11 some electronic file that is either duplicative --
12 I mean, a lot of the information is contained in
13 multiple places. Right? So if there's something
14 that we had that we didn't specifically rely on, we
15 just didn't -- we didn't list it out.
16   Q.  When you say you asked for the financial
17 statements for G.S.M., specifically which entities
18 did you request financial records for?
19   A.  Well, the -- you're -- we're really
20 looking for the financial records of the
21 development entity and also for Conduit Lender is
22 the entity that was the -- was -- it's called
23 Conduit Lender, but it's the -- really the borrower
24 on the line and then the funder to the project.
25     So included in my material there was an

Page 13

1 organizational chart which has all the exact names
2 of the entities. I don't recall them all
3 specifically, but we, you know, we used that as a
4 guidepost to get to the right entity level
5 information.
6     (Whereupon, Deposition
7     Exhibit 1 was marked.)
8 BY MS. BALLINGER:
9   Q.  So let me hand you what the court
10 reporter's already marked as Exhibit 1. If you'd
11 take a look at that and, once you have, let me know
12 what it is.
13     (Whereupon, the document was
14     reviewed by the witness.)
15     THE WITNESS: So this Exhibit 1 is an
16   expert report prepared by Mr. Jim -- James
17   S. Howard of our firm.
18 BY MS. BALLINGER:
19   Q.  Whoops. Well, I am going to use that
20 later. That shouldn't have been an exhibit. But
21 I'm going to -- let me just go off the record for
22 just a minute and get the right one.
23     THE VIDEOGRAPHER: The time is 9:17
24   a.m., and we are off the record.
25     (Whereupon, a discussion ensued

4 (Pages 10 - 13)

Page 26

1 understanding of a company.
2 Q. Did you do any kind of comprehensive
3 financial analysis in connection with your opinions
4 in this case?
5 A. Well, I think we performed a lot of
6 financial analysis [sic]. It's a little bit
7 different because this is a development business,
8 so you're not really comparing it year in, year
9 out. It would -- it would depend highly on the
10 number of projects that the company has on the go
11 at a time. So it's a little bit of an apples and
12 oranges.
13 But in terms of the Ginn Sur Mer project
14 itself, we did compare the development expenses by
15 year. We did compare the development expenses
16 against the budget. We did look at the closings.
17 We did convert accrual financial statements into
18 cash statements. So we did a lot of things to
19 understand the actual project.
20 We did financial analysis around what I
21 would call the total invested capital, which is how
22 much money was either spent directly or on behalf
23 of the project.
24 So I think we performed a comprehensive
25 financial analysis that would be appropriate for

Page 27

1 this business. Right? Each business is different.
2 I mean, this is a real estate development business,
3 different than an operating company.
4 Q. All right.
5 (Whereupon, Deposition
6 Exhibits 4 and 5 were
7 marked.)
8 BY MS. BALLINGER:
9 Q. Let me hand you what's been marked as
10 Exhibits 4 and 5 right there. And once you've had
11 a chance to take a look at those, if you could tell
12 me what they are.
13 (Whereupon, the document was
14 reviewed by the witness.)
15 THE WITNESS: Okay. So these two
16 documents are financial statements that
17 would have been -- that are from the
18 Timberline accounting system. And you've
19 given me two documents that are not Bates
20 numbered.
21 But Exhibit 4 is the balance sheet
22 for the development entity as through
23 December 2005. And the second sheet
24 you've given me, which is two pages, is
25 the balance sheet through December 2006,

Page 28

1 again for the development entity.
2 I'm referring to it as a development
3 entity. That's the entity that is the,
4 let's call it the lowest level entity in
5 the Ginn Sur Mer ownership chain.
6 BY MS. BALLINGER:
7 Q. And just for a -- for the record, you did
8 point out correctly there's no Bates numbers on
9 this, but Exhibit 4 was Bates numbered
10 Ginn_Bal_Supp 0403185. And exhibit --
11 MR. IGOE: Dana, I'm sorry, would you
12 mind reading that number again?
13 MS. BALLINGER: Sure. Ginn_Bal_Supp
14 0403185.
15 BY MS. BALLINGER:
16 Q. And Exhibit 5 was numbered Ginn_Bal_Supp
17 0403398. And these -- I'll represent that I was
18 provided with a set of your reliance materials, and
19 I printed these out from that set.
20 But these do appear to be -- to you to be
21 the documents that are listed on your reliance list
22 that's part of your report; correct?
23 A. Right. And then to the extent that we --
24 to the extent that there's any particular numbers
25 or whatever, I mean, just to make sure we're using

Page 29

1 the same documents, if we have an inconsistency, I
2 would check the versions that I have. You know,
3 sometimes when you're printing, things get cut off,
4 don't get cut off, but.
5 Q. Sure. No. You're welcome to do that.
6 And I'll let you know I have magnifying glasses,
7 because I know it's a little small. So if you need
8 one, just let me know.
9 MR. ALPERT: Excuse me for a second,
10 Dana. Could you clarify something? You
11 just said these documents were Bates
12 stamped?
13 MS. BALLINGER: Well, they're Excel.
14 So the file is Bates stamped, but they
15 don't print on the Excel's part.
16 MR. ALPERT: Okay. But you're not
17 saying that there are Bates stamp numbers
18 on the pages that you just --
19 MS. BALLINGER: No.
20 MR. ALPERT: -- handed to the
21 witness?
22 MS. BALLINGER: I'm saying when I
23 received the file, they were -- they were
24 identified as having those Bates numbers.
25 BY MS. BALLINGER:

8 (Pages 26 - 29)

Case 3:08-cv-01012-TJC-JRK  Document 559-4  Filed 01/05/17  Page 4 of 15 PageID 22083

Ian Ratner                                              July 19, 2016
Bahama Sales vs. Byers

Page 38

 1    This is the entity that -- this is
 2  the general ledger account that collects
 3  the revenues, expenses, capital
 4  transactions for the development.
 5       So why it's titled L.R.A. West End, I
 6  don't know if they changed the name or if
 7  there was a restructure in the legal
 8  entity somewhere along the way, but that's
 9  the entity that has the activity for the
10  project that you're concerned about that
11  also some refer to as Grand Bahamas
12  whatever.  That's the name of the
13  development entity.
14  BY MS. BALLINGER:
15    Q.  So it's your --
16    A.  Not the legal entity.  It may be the legal
17  entity.  Maybe there was a change that I'm not
18  aware of.
19    Q.  So it's your understanding that L.R.A.
20  West End, L.L.C. is a limited liability company
21  that's somehow connected with the Ginn Sur Mer
22  transaction, you're not exactly sure how?
23    A.  No.  That's not what I said.
24       MR. ALPERT:  Object to the form of --
25       THE WITNESS:  That is --

Page 39

 1       MR. ALPERT:  -- the question.
 2    Misstates the witness's testimony.
 3  BY MS. BALLINGER:
 4    Q.  That's what I'm asking.
 5    A.  That's not what I said.  I'm going to try
 6  this again.  This financial statement that you've
 7  presented to me is -- is the general ledger detail
 8  for the development entity.
 9       Without regard to the legal name of the
10  entity, this is the entity that collects the
11  revenues, the expenses, pays the bills, has related
12  transactions associated with the development
13  entity.
14       Why the title of this file says L.R.A.
15  West End, L.L.C., I don't know.
16    Q.  Okay.  And let me -- let me try my
17  question again.  Is it your understanding that
18  L.R.A. West End, L.L.C. is a limited liability
19  company?
20    A.  I don't know that.
21    Q.  Would that be important for you to know?
22    A.  If the title of this file said anything,
23  what we were concerned about is getting the
24  financial -- the general ledger accounts that roll
25  up into the financial performance for the Ginn Sur

Page 40

 1  Mer development.
 2    Q.  But this file doesn't say anything.  It
 3  says L.R.A. West End, L.L.C., and it's on your
 4  reliance list.  So I'm just trying to understand
 5  whether it would be important for you to understand
 6  what that entity is, L.R.A. West End, L.L.C., in
 7  connection with offering the opinions in this case.
 8    A.  Yeah.  And what I'm saying is I don't
 9  recall if there was a name change or why there's
10  another title on the general ledger.  I just don't
11  recall.  It doesn't mean I didn't know or that I
12  don't -- or that -- I just don't recall.
13       What matters to me is that this is the
14  general ledger that captured all of the results for
15  the operations, the development, the financing
16  transactions associated -- associated with the
17  project, not necessarily the naming convention of
18  the title.  I don't know.
19    Q.  Okay.  And I'll admit accounting is not my
20  area.  You said general ledger.  This is a balance
21  sheet; correct?
22    A.  Yes.  It will be your area after this
23  deposition.
24    Q.  Maybe it will.
25       But there's a difference between a general

Page 41

 1  ledger and a balance sheet?
 2    A.  Yes.  The balance sheet is the summation
 3  of the general ledger.  The -- because the system
 4  that they use is so detailed, the beauty of this
 5  report is it actually gives you the general ledger
 6  accounts on the left-hand side.  So there's quite a
 7  bit of detail associated with this balance sheet.
 8    Q.  But the balance sheet does not list the
 9  general ledger detail in the way you would see on a
10  general ledger detail report; correct?
11    A.  We have it, yes.
12    Q.  But that's not -- that's not what Exhibit
13  4 and 5 are?
14    A.  No.  That -- the balance sheet, as I said,
15  is a summary of the balance sheet accounts as of a
16  point in time.  And the -- the nice thing about
17  these statements is they give you the actual
18  general ledger accounts, so it's helpful.
19    Q.  And is it your understanding that the
20  contemporaneous -- information on Exhibit 4 was
21  prepared contemporaneously or is information from
22  2005 prepared at the end of the year or throughout
23  the year?
24    A.  Yes.
25    Q.  And same question for Exhibit 5, is it

Case 3:08-cv-01012-TJC-JRK   Document 559-4   Filed 01/05/17   Page 5 of 15 PageID 22084

Ian Ratner                                                                    July 19, 2016
Bahama Sales vs. Byers

Page 42

1  your understanding that the information on that
2  exhibit was prepared contemporaneously and -- and
3  it reflects activity at the time in 2006?
4      A.  Yes.
5      Q.  What's the basis of that understanding?
6      A.  The basis of that understanding is my
7  conversations with the people that provided the
8  information to us, the -- Stuart Margulies, the
9  others that work at the company, that these are the
10  contemporaneous books and records of the company.
11      We collected this information and also
12  were -- collected the accounting system that didn't
13  go in after and entered the data that's presented
14  at the time.  In fact, through review of closings
15  and other things, you see the date on those
16  transactions.
17      We also reviewed voluminous amount of bank
18  reconciliations that are contemporaneous -- that
19  are prepared contemporaneously.  And you know, my
20  understanding and my belief from the documents that
21  I've reviewed is that these are contemporaneous
22  financial statements.
23      Q.  You referenced the people who provided you
24  with information, and I think you indicated Stuart
25  Margulies was one.  Can you identify the other

Page 43

1  folks who provided information?
2      A.  Well, all the information that we
3  collected we collected through counsel.  And we
4  submitted our requests through counsel.  And we had
5  a meeting with -- at least two meetings with
6  Mr. Margulies.  We also had collected information
7  through Mr. Brian Arnold, one of the controllers at
8  the time.
9      There was another controller present at a
10  meeting, and I can't recall her name, associated
11  with the project.  But whatever financial
12  information we needed we collected through counsel,
13  and we got what we needed.  We got whatever we
14  requested.
15      Q.  Can you remember the names of any internal
16  accounting or finance people who you spoke with
17  from the Ginn companies other than mis -- well,
18  Mr. Margulies is L.A. -- other than Brian Arnold?
19      A.  And I mentioned I can't recall this young
20  lady's name also from the property management
21  accounting side.
22      Q.  Anyone else?
23      A.  That's it.
24      Q.  We've been going about an hour.  You want
25  to keep going or you want to take a break?

Page 44

1      A.  We're -- let's keep going.
2      Q.  All right.
3      A.  Unless you want to take a --
4      Q.  No.
5      A.  -- two-minute break?
6      Q.  Let me ask you to look back at Exhibit 6,
7  which is your report.
8      A.  Thank you.
9      Q.  And as part of Exhibit 6, there is
10  Appendix 1, which is your C.V.; correct?
11      A.  Yes, ma'am.
12      Q.  And is that accurate as of today?
13      A.  Yes, ma'am.
14      Q.  It's a complete summary of your education?
15      A.  Yes.
16      Q.  A complete summary of your employment
17  history?
18      A.  Yes.
19      Q.  A list of all your certifications?
20      A.  Yes.
21      Q.  And memberships?
22      A.  Yes.
23      Q.  Is the list of your expert deposition and
24  trial testimony for the prior four years up to
25  date?

Page 45

1      A.  There's one case missing because I've
2  testified recently on a case.  I'm looking at Page
3  2.  And I was an expert in a -- I am an expert in a
4  case, and I gave a deposition on June 26th that is
5  not reflected here.
6      Q.  And what case is that?
7      A.  That is the case, the -- I can't remember
8  the exact citation of the case, but it's a
9  series -- it's the liquidators of -- it's the
10  liquidators of a company called Hellas
11  International Telecommunications versus a series of
12  private equity funds and hedge funds, T.P.G., Apex
13  and various foreign subs of those private equity
14  firms, but generally referred to as Hellas.
15      Q.  And who were you retained by in that case?
16      A.  I was retained in that case by a law firm
17  called Chadbourne & Parke.
18      Q.  On behalf of which party?
19      A.  On behalf of the liquidators.
20      Q.  Is that a case in federal or state court?
21      A.  It is a case in federal bankruptcy court.
22      Q.  Where?
23      A.  In Southern District of New York.
24      Q.  Will you provide counsel with the case
25  number?

Case 3:08-cv-01012-TJC-JRK Document 559-4 Filed 01/05/17 Page 6 of 15 PageID 22085

Ian Ratner July 19, 2016
Bahama Sales vs. Byers

Page 46

1  A.  Sure.
2      MR. IGOE:  We'll send it to you after
3  the deposition.
4  BY MS. BALLINGER:
5  Q.  Your C.V. includes a complete list of all
6  the publications you've offered in the previous ten
7  years?
8  A.  Yes.  If there -- is there a list of
9  publications here?
10  Q.  I thought there was.  Somewhere in the
11  report there should be a list of all publications.
12  So I -- I believe I saw one, but you correct me if
13  I'm wrong.
14  A.  I don't see one here.  It's -- I've only
15  published, you know, six, seven things.  So
16  whatever is here is here.  I can remember most of
17  them, but.
18  Q.  All right.
19  A.  I don't see a list here.
20      MS. BALLINGER:  I mean, I'm assuming
21  you guys will provide that if it's -- I
22  thought it was on the C.V., but maybe it's
23  not.
24      MR. IGOE:  Yes, we will.  I thought
25  it was, too, but let's see.

Page 47

1      THE WITNESS:  Maybe it is.
2      MR. ALPERT:  Have we confirmed that
3  this is a complete copy of his report?  I
4  know we kind of --
5      THE WITNESS:  I --
6      MR. ALPERT:  I know we kind of pieced
7  a few --
8      THE WITNESS:  Yeah.  It looks...
9      MR. ALPERT:  -- things together.
10      MS. BALLINGER:  Yeah.  That's what he
11  said.
12      THE WITNESS:  It looks -- I mean, the
13  report's not.  I don't remember all the
14  additions.  But you know, to the end, to
15  Page 30, you know, it's the right report.
16      MR. IGOE:  Yeah, we'll provide that.
17  BY MS. BALLINGER:
18  Q.  So looking at the report itself, that
19  report that's been marked as Exhibit 6, can you
20  confirm it in -- it includes all the opinions that
21  you intend to offer in this case?
22  A.  Yes, it does, ma'am.
23  Q.  And just so we're clear, I'm saying "this
24  case," but you understand these are consolidated
25  cases; correct?

Page 48

1  A.  Yes, ma'am.
2  Q.  So when I refer to "this case," I'll be
3  referring to all of the consolidated cases.  Okay?
4  A.  Yes, ma'am.
5  Q.  And does the report that's been marked as
6  Exhibit 6 list in the appendix all the documents
7  you relied on to reach the conclusions and the
8  opinions that are set forth in Exhibit 6?
9  A.  Yes, ma'am.
10  Q.  Have you done all the work you need to do
11  in support of the opinions that are set forth in
12  Exhibit 6, or do you still have work to do?
13  A.  No.  I believe I -- I've done the
14  necessary work to form these opinions and to
15  testify to them.
16  Q.  Do you plan to do any additional work
17  prior to trial in this case?
18  A.  Unless counsel -- unless counsel asks me
19  to or -- I don't expect to do anything new.
20  Q.  Somewhere in your report I believe it
21  lists your hourly rate at 525; is that correct?
22  A.  Yes.
23  Q.  How long has that been your hourly rate?
24  A.  Probably for the last year.
25  Q.  And has that been your hourly rate for all

Page 49

1  of the cases that are listed in your appendix as --
2  as to which you provided testimony in 2016?
3  A.  No.  I think in the -- I think my rate --
4  I think in the Hellas case my rate was 595.  But
5  you know, generally 525 is my rate.  525, I think
6  we recently -- I'm busy.  I think we recently moved
7  my rate up.
8  Q.  Let me ask you to look at Page 1 of your
9  report that is Exhibit 6, Paragraph 2.  And you
10  referenced there "Glass Ratner professionals."  And
11  can you identify the persons you're referring to in
12  that paragraph that's had experience in financial
13  analysis?
14  A.  The -- all the members of our team have
15  experience in financial analysis.  So anybody that
16  worked on this project has experience with
17  financial analysis, such as myself, Mr. Clay
18  Busker, my partner Paul Dopp.
19      We had a staff named Riley Young.  He has
20  experience in financial analysis.  I mean, it was a
21  small team.  So whoever worked on the team had
22  financial analysis experience.  And Mr. Jim Howard,
23  I believe he has financial analysis experience as
24  well.
25  Q.  What was the total number of people on the

13 (Pages 46 - 49)

Case 3:08-cv-01012-TJC-JRK   Document 559-4   Filed 01/05/17   Page 7 of 15 PageID 22086

Ian Ratner
July 19, 2016
Bahama Sales vs. Byers

Page 58

1 actually reflected in the tables or charts that are
2 in Exhibit 6?
3     A.  In some cases there's a -- something
4 that's referred to as a worksheet or a -- a middle
5 spreadsheet between the table and the documents.
6 And to the extent that we have any of that, they're
7 in the -- these binders or in our -- I have a
8 binder here that's called a table binder.
9         And in the table binder we have the
10 documents and any middle spreadsheets that would be
11 used to roll up into the tables.
12    Q.  And you've referred a couple times to your
13 binder or binders you brought with you.  How many
14 binders did you bring with you today?
15    A.  The -- I have four binders here.  Three of
16 them are something that we refer to as a footnote
17 binder, and one of them is what we refer to as a
18 table binder.
19    Q.  Tell me, what is a table binder?
20    A.  A table binder is a standard in our office
21 that, for each table, you're going to have the
22 table and you're going to have any of the documents
23 that are referred to in the table or the source for
24 the analysis.
25         Many times a table -- whether it's in this

Page 59

1 case or in any case, many times a table is a
2 summary of more detailed spreadsheets.  So we'd
3 want to have the detailed spreadsheet in the table
4 binder so that you could roll it up into the table.
5 And that's what we have.
6         And then we have the footnote binders,
7 again, as part of our process for -- there's maybe
8 a hundred footnotes in this report.  There's 117
9 footnotes in this report.
10        So then each footnote, there's a tab
11 associated with each footnote, and then we would
12 have whatever relevant information or notes or
13 nothing.  Sometimes it's just the tab says this is
14 a comment, the footnote is informational only and
15 there's nothing there.
16    Q.  And is it possible that the footnote
17 binder, that some of the tabs contain more
18 materials than are actually cited in the footnote?
19        For example, there could be something
20 cited in a footnote, and there would be that in the
21 footnote binder along with some back-up that
22 related to it?
23    A.  There might be.
24    Q.  Or is it -- okay.
25    A.  Yeah.  There might be.

Page 60

1     Q.  So there's one table binder that you
2 brought with you and how many footnote binders?
3     A.  Three.
4     Q.  And I'm correct, there's one -- just one
5 table binder?
6     A.  Yes, ma'am.
7     Q.  And did you bring those to produce or are
8 those your -- your only copies?
9     A.  Those are my only copies.  And I travel
10 with my file.  I don't know.  Typically it's -- I
11 don't know.  My practice is to have them available
12 to me.
13    Q.  Did you bring anything else with you today
14 other than those binders that you've just
15 described?
16    A.  Well, I brought a copy of this report that
17 we're using.
18    Q.  Thank you.
19    A.  And then I -- in the box I have an
20 easier-to-read version of this C.I.M.  I mean, I
21 have the C.I.M. that you have.  And then I think
22 the one I have, it's a little bit -- the writing is
23 a little bigger.  It's maybe copied larger or
24 something.
25    Q.  And by "C.I.M.," you mean the confidential

Page 61

1 information memorandum that's --
2     A.  Yes.
3     Q.  -- been marked as exhibit -- what exhibit
4 is that?
5     A.  Sorry.  Exhibit 3.
6     Q.  -- Exhibit 3.
7         I want to go back to the team members.  We
8 talked about Clay Busker.  Have you told me
9 everything he did, generally speaking, the work he
10 did on this project?
11    A.  Yeah.  I don't remember -- I mean,
12 whatever I told you, that's what he did, yeah.
13    Q.  Okay.  So I want to make sure I didn't
14 miss anything by veering off into a different
15 direction.
16        Paul Dopp, can you spell his name?
17    A.  D-O-P-P.
18    Q.  What was -- what work did he do on this
19 project?
20    A.  Paul is a lead partner in the firm.  He
21 has an extensive forensic accounting damages
22 testimony background, similar to mine.
23        And you know, he helped conceive of the --
24 how to organize our -- some of our thoughts, how to
25 structure the reports a little bit, to do some

16 (Pages 58 - 61)

Case 3:08-cv-01012-TJC-JRK   Document 559-4   Filed 01/05/17   Page 8 of 15 PageID 22087

Ian Ratner                                                                July 19, 2016
Bahama Sales vs. Byers

Page 62

1 proofreading for Mr. Howard, you know, had more of
2 an over -- overall role as a manager in the
3 project.
4  Q. Okay. Anything else?
5  A. I think that would be the best des -- I
6 mean, he did a lot of little bits and bites, but
7 I'm giving you the description of his role in the
8 project.
9  Q. Okay. Did Mr. Busker write any portion of
10 Exhibit 6, I mean, other than creating the tables
11 that we've already talked about?
12  A. Yes, I think he did.
13  Q. Could you identify for me what portions he
14 wrote?
15  A. Yeah, I don't think I could.
16  Q. Okay.
17  A. The -- I mean, the writing is a
18 combination of my writing and Mr. Dopp and
19 Mr. Busker and, you know, it's written together.
20 It's kind of an iterative process.
21  Q. Who else other than yourself, Mr. Dopp and
22 Mr. Busker contributed to writing Exhibit 6?
23  A. Nobody. And again, Mr. Dopp might have
24 been more, hey, you need to put this section over
25 there, it'll read better; Ian, this sentence needs

Page 63

1 to be moved; you know, more structural, I think.
2  Q. Riley Young is another person you
3 identified on the team. Can you spell that name?
4  A. R-I-L-E-Y, and then Young. I mean, a
5 junior, relatively junior. I don't -- I don't even
6 think he was with us at the beginning of the
7 project.
8  Q. Do you know --
9  A. I know recently he's done some collecting
10 documents and...
11  Q. What work did Mr. Young do on the project?
12  A. It would have been fairly junior work.
13  Q. Which would be?
14  A. You know, collecting documents, printing
15 out a general ledger account, making an index of
16 the bank reconciliations that we have, for example,
17 you know, relatively junior assistance, assisting
18 Mr. Busker in whatever he needed done.
19      And the same thing would be -- Mr. Hickman
20 is more senior, but the same type of thing, you
21 know, assisting in whatever Mr. Busker needed.
22  Q. Do you know if Mr. Young did any analysis
23 for Mr. Busker?
24  A. I doubt it, no.
25  Q. But you don't know for sure?

Page 64

1  A. Well, I'm -- I -- I would say no.
2  Q. And then Hickman, that's Mr. Ross Hickman?
3  A. Yes.
4  Q. What was his role on the project? What
5 did -- what work did he do?
6  A. Again, he's a C.P.A. And he might have
7 done some summation or similar things that
8 Mr. Young would have done, you know, whatever
9 Mr. Busker would have needed assistance with if --
10 if he did need assistance.
11  Q. So it's -- is it more likely that
12 Mr. Hickman would have done some of the analysis
13 for Mr. Busker?
14  A. No. I think all of the analysis was done
15 by Mr. Howard, Mr. Busker, myself, Mr. Dopp.
16  Q. And did Mr. Howard do any work on this
17 project independent of his own expert report?
18  A. No. I mean, we may have discussed
19 something. If -- if he did anything associated
20 with this project, it was very high level and
21 probably in the form of a discussion or clarifying
22 something that I might have had a question about
23 saying, hey, how did this work or such and such.
24      But I don't -- I mean, I don't think
25 Mr. Howard -- I know Mr. Howard was not involved in

Page 65

1 any of the minutia of my report.
2  Q. Is there anybody else we haven't covered
3 that did work on this project in connection with
4 the preparation of your opinions in Exhibit 6?
5  A. I don't think so.
6  Q. Would the hourly rates for each of the
7 people on the team be set forth in your engagement
8 letter for this work?
9  A. Yes.
10  Q. And you do have an engagement letter for
11 this work?
12  A. Yes, ma'am.
13  Q. Do you have a copy of that with you today?
14  A. I do not.
15  Q. Is it safe to assume that you -- you and
16 other members of the team E-mailed one another in
17 connection with your work on this case?
18  A. Yes. Probably. I doubt it would be
19 extensive, but there's probably E-mails between us.
20  Q. When was your first contact with any of
21 the attorneys in connection with your work on this
22 case?
23  A. My first contact in the case -- related to
24 this case was a -- was a call from -- from either
25 Mr. Kastenberg at Ballard Spahr or Mr. Klehr from

17 (Pages 62 - 65)

Case 3:08-cv-01012-TJC-JRK   Document 559-4   Filed 01/05/17   Page 9 of 15 PageID 22088

Ian Ratner
July 19, 2016
Bahama Sales vs. Byers

Page 86

1 testified, you requested a much larger set of
2 materials?
3     A.  Oh, we have a lot more information than
4 that's listed on this list.
5     Q.  And so when I'm asking if you requested,
6 I'm referring to that larger set of materials.  And
7 I understand you may not recall or know everything
8 you've requested, and so you can just tell me that.
9     A.  That's the clarification.  I don't want
10 to -- I don't know if we requested the general
11 ledger or not.  But I would say that whatever we
12 requested we got.  There's no specific document
13 that we requested that we were unable to get if it
14 existed.
15     Q.  Can you tell me whether you requested
16 detail from the general ledger for any of the other
17 Ginn Sur Mer entities?  I'm talking about requested
18 as opposed to relied on.
19     A.  I can't recall.
20     Q.  Is there anything in the file that might
21 re -- enable you to answer that question?
22     A.  Without going back to the office and
23 logging in to the system, I wouldn't know that.
24     Q.  In looking at Appendix 2, which is the
25 reliance list, I only saw a balance sheet for

Page 87

1 Conduit Lender for 2008.  Does that sound right to
2 you?
3     A.  No.  Because I'm pretty sure that I looked
4 at the Conduit Lender balance sheet for more than
5 2008.  Let me just see what I have here.
6         (Whereupon, the document was
7          reviewed by the witness.)
8         THE WITNESS:  Yeah.  I mean, I'm
9     pretty sure I've seen the Conduit Lender
10    balance sheet before that.  I'm not sure
11    if the listing is misstating it or -- or
12    not.  I don't know.
13 BY MS. BALLINGER:
14     Q.  Can you tell me for which years you relied
15 on and utilized Conduit Lender balance sheet?
16         MR. ALPERT:  Bless you.
17         (Whereupon, the document was
18          reviewed by the witness.)
19         THE WITNESS:  Yeah.  I mean, I
20    definitely used 2008 as a cumulative
21    total.  I think I -- I know I have it in
22    the office.  And I -- I know that I've
23    looked at it.
24         For the -- for the report I think we
25    relied on the December 31, 2008, which is

Page 88

1 cumulative.  Right?  The balance sheet is
2 cumulative.  But I think I've also looked
3 at the 2006 and '7 Conduit Lender balance
4 sheet.  I know I have them.
5 BY MS. BALLINGER:
6     Q.  And looking at Appendix 2, I believe it's
7 the second page in your copy, it has a list of
8 documents identified as Excel files at the top?
9     A.  Yes, ma'am.
10     Q.  And in that list I see three Excel files
11 that are entitled L.R.A. West End Balance Sheet,
12 one for 2006, one for 2008 and one for 2015.  Are
13 those the only L.R.A. West End balance sheets you
14 relied on?
15     A.  Again, I'm pretty sure I've used 2007,
16 unless it's a print-out from 2008 that has 2007 on
17 it.  I can check that also right now and see if
18 it's in the -- in the documents, but.
19         West End income statement '05, '06, '07.
20 Excel file.  Unless the '07 -- '08 file had '07 in
21 it as well.  But I'm pretty sure I've relied on the
22 balance sheet.
23         It's possible that the cumulative numbers
24 we took for the -- recall for the -- we used the
25 balance sheets to develop the cumulative cost in

Page 89

1 the project through the refinance transaction in
2 '06, and then we looked at all the money spent from
3 '06 till the end, and we summarized that.
4         It's possible that we used the cumulative
5 totals in '08, so we didn't need '07.  But I know
6 we have it.
7     Q.  And I marked as exhibit --
8     A.  In other words, we may have found the
9 information in a different place, but I know we
10 have it.
11     Q.  Okay.  So Exhibit 4 is the L.R.A. West End
12 balance sheet we looked at earlier for 2005.  And
13 I'll represent to you I thought I had copied --
14 printed that out from your reliance set, but I'm
15 not entirely certain I did.
16         So my question for you is, did you rely on
17 that one as well?
18     A.  Well, again, when -- how this reliance
19 works is any number or data point that we picked up
20 from a specific document we listed as a reliance.
21 It's possible that we have it and the information
22 is confirmed.
23         Like, I -- I know I've looked at the 2005
24 balance sheet, because I know for myself I
25 confirmed that there was 12 million of debt prior

23 (Pages 86 - 89)

Case 3:08-cv-01012-TJC-JRK   Document 559-4   Filed 01/05/17   Page 10 of 15 PageID 22089

Ian Ratner
July 19, 2016
Bahama Sales vs. Byers

Page 90

1  to the tran -- I mean, I just know.  I know that.
2        Why this financial statement would not be
3  on our list, if it's not, is because there's no
4  number from here that we picked up and put in any
5  of the tables or any of our spreadsheets.
6     Q.  So it's possible that you would have
7  relied on things as part of your general sort of
8  understanding of a financial transaction and what
9  took place; but unless you pulled a number from it,
10 it wouldn't be on the reliance list?
11    A.  Yeah.  I think that's a good way to say
12 it.  I mean, we're trying to be very specific about
13 where the information in our report comes from.
14       And for example, when you talked about
15 Conduit Lender, I know that I reviewed the Conduit
16 Lender financial statements.  But in our report we
17 were able to pull -- whatever we needed them for,
18 we were able to pull that data from 2008.  It's not
19 to say that we didn't look at those documents to
20 confirm other things in our report.
21       And I'll give you a perfect example like
22 that.  I mentioned before that there was a, you
23 know, a lot of bank reconciliations that were
24 performed in terms of validating the statements.  I
25 didn't list all the bank reconciliations that I

Page 91

1  looked at.  I know I looked at a lot.
2        We have a grid of all the different bank
3  recs and the period they cover and what bank
4  accounts they cover, but it's not like any specific
5  data that we pulled from that is in our report.  So
6  we didn't list them all out.
7     Q.  Okay.  Thank you.
8     A.  That -- I mean, I think -- you see the
9  different -- you see the distinction?
10    Q.  I do.  Thank you.
11       You've testified in cases just generally
12 as to whether you believed financial records were
13 well maintained.  And did you make any kind of
14 assessment like that in connection with the
15 financial records for the Ginn Sur Mer entity?
16    A.  Actually, I did.  I don't -- I didn't
17 formally opine on it, right, because it wasn't
18 necessarily my mandate.  But I did -- I do find
19 that the financial records are highly detailed.
20 And I'm going to give you an example of that,
21 ma'am.
22       The -- traditionally a balance sheet is a
23 "point in time" document and would reveal the net
24 balance of an account.  One of the nice things
25 about the financial statements that we're relying

Page 92

1  on is in many general ledger accounts they have
2  both -- it's all presented gross.
3        In other words, let's take Conduit Lender,
4  for example.  They would present both the draws and
5  the repayments every month as opposed to the net
6  amount.  Most financial statements would just
7  present the net amount.  These financial statements
8  are more detailed, and they present both sides of
9  the calculation.
10       Another indication of the level of
11 financial reporting is, if you look at the income
12 statement, the income statements for the projects
13 are prepared on an accrual basis, and they have --
14 they're relying on percentage completion
15 accounting.
16       And there's a lot of -- it's, you know,
17 it's detailed statements that show the percentage
18 of completion accruals and the reversals of the
19 accruals.  So that's a second attribute that is
20 also very detailed and helpful, as opposed to
21 needing worksheets.
22       Also the fact that the financial
23 statements list out the general ledger accounts
24 that are associated with those categories are --
25 that's a third attribute.

Page 93

1        A fourth -- and this I'm just thinking of
2  as we're going on here.  A fourth attribute that I
3  thought was very impressive is most financial
4  statements like this would group the due to, due
5  from.
6        In other words, they would take all the
7  related party loans and transactions and you would
8  put them in one line, and then you'd need
9  worksheets and general ledgers to unfold that.
10 These financial statements show them by each sub
11 account and again by gross and net.
12       Many examples -- and I'm just responding
13 to your question off the top here.  There's many
14 examples of the quality of the financial reporting
15 here, even things like one -- I'll give you a fifth
16 attribute.
17       The equity transactions that you may be
18 aware of, either the distributions from the
19 refinance or the later investments of equity,
20 they're all reflected as separate line items in the
21 equity.  That's very rare.  Usually the equity is
22 grouped together and you need work papers to unpack
23 the equity.  Okay?
24       The way these financial statements are
25 presented, the equity is -- it's evident which

Case 3:08-cv-01012-TJC-JRK  Document 559-4  Filed 01/05/17  Page 11 of 15 PageID 22090

Ian Ratner                                           July 19, 2016
Bahama Sales vs. Byers

Page 98

1  A. I think that's intended to be a
2  collective -- that's a description of Ginn as the
3  developer and what money either through equity,
4  through loans, through additional capital, through
5  the financing transactions, what has been invested
6  in this project.
7      That's getting at the, you know, 360
8  million -- 360 million or so that's been invested
9  in the project. That's what we were trying to get
10 at there.
11 Q. Okay. Turn to Page 2 of your report,
12 Paragraph 5. There's a reference there to
13 independent research. Can you just generally
14 describe the independent research you did in
15 connection with your work in this case?
16 A. I think that's a bit of a catch-all,
17 things like, you know, we -- not that I need to do
18 research, but in terms of the types of financing
19 transactions that are available. I know that we
20 looked at one data source that said there's
21 different ways to finance things.
22     I guess research would even be our own
23 independent review of these records. So just it's
24 a catch-all for our own independent analysis, own
25 independent research.

Page 99

1  Q. Can you identify for me the general topics
2  on which you did independent research in connection
3  with issuing the opinions that appear in Exhibit 6?
4  And by "you," I refer to you and anybody on the
5  team that worked on this engagement.
6  A. I think it's the word "independent" is
7  what's important. It's our own analysis, our own
8  digging that's coming up with these summaries and
9  conclusions. And the research is -- I mean,
10 research could be anything. Right?
11     Research does not have to be external. It
12 could be internal. It could be the documents. So
13 it's just a catch-all for our own independent
14 research and analysis.
15 Q. Was there any external research that was
16 done in connection with the work on this case?
17 Internet -- I think you referred earlier to
18 inter -- some Internet research --
19 A. Yeah.
20 Q. -- that was done.
21 A. I mean, we went -- we pulled the
22 description of the project. In addition from the
23 C.I.M., we got some background on Bobby Ginn and
24 the developers from the Internet.
25     We pulled some article about different

Page 100

1  financing sources, capital structure analysis where
2  we -- you know, there's a description in the report
3  that typically, you know, the land -- the cost of
4  development is either through a construction loan,
5  then you might convert it into a permanent finance
6  or you'd sell it and sell assets, your inventory
7  and repay, so some of that.
8      But I don't think there's any major
9  external research relied on in this report.
10 Q. Are there any other topics you can
11 identify in which the team did independent
12 research?
13 A. Well, there's a comment in the report
14 about the -- on Paragraph 6, Paragraph 6 (B):
15     "The real estate collapse caused
16     the project cash flows not to be
17     realized, not actions taken by L.A.
18     Partners or the Ginn companies,
19     L.L.C."
20     I've been involved in any re -- in many
21 real estate projects, and I have in -- knowledge of
22 market timing and, you know, when -- you know, what
23 was going on in the industry. And so that's
24 independent. Right? That's external but not
25 critical to the opinions.

Page 101

1      So I -- I don't know if I can -- I'm not
2  sure I could point to many other things.
3  Q. Well, let's talk about Paragraph 6 (B),
4  which refers to the real estate collapse. What are
5  you referring to when you use the term "the real
6  estate collapse"?
7  A. Well, and -- and generally the real estate
8  industry and in -- I mean, I have firsthand
9  knowledge of this, because our firm was -- we were
10 at the time one of the largest corporate receivers
11 in the country.
12     And we had something like 200 different
13 assets under -- real estate assets, hotels, golf
14 courses, multi-family assets where we acted as
15 receiver, and at one time we had 26,000 doors under
16 management. So you know, late 2007, 2008, the real
17 estate market really collapsed and there was a --
18 there was a -- a change in the fundamental market.
19     Personally I was leading the creditors
20 committee in Fairfield Residential. I was involved
21 in the Related Group restructure. I was involved
22 in Sea Island. I mean, it was a big part of my
23 practice. So you learn about demand and you learn
24 about the change in the market.
25     And there was a collapse in the real

26 (Pages 98 - 101)

Case 3:08-cv-01012-TJC-JRK Document 559-4 Filed 01/05/17 Page 12 of 15 PageID 22091

Ian Ratner July 19, 2016
Bahama Sales vs. Byers

Page 102

1 estate industry around the time of, you know, the
2 Lehman Brothers collapse, Bear Stearns, Wachovia,
3 all of those critical factors, drying up of the
4 C.M.B.S. market, all that occurs and generally
5 financial people and -- refer to that as "the
6 collapse." You know, I think it's a generally
7 accepted term.
8    Q. And you date that as late 2007 into 2008?
9    A. Yeah. 2007-ish, 2008-ish. We did work
10 for the F.D.I.C. in 2000 -- late 2007. 2007, 2008.
11    Q. So when you say "2007-ish," can you be
12 more specific --
13    A. Well --
14    Q. -- in terms of what quarter you're talking
15 about?
16    A. Yeah, I'm not talking about is it November
17 or December or is it June. It's, you know, it's --
18 it's later to -- and again, I'm not offering a
19 specific date. But it's, you know, late 2007.
20       The market really, you know, when
21 Lehman -- I think Lehman is 2008. You know,
22 there's really -- there's really a change in the
23 fundamentals.
24    Q. Do you believe that was third quarter or
25 fourth quarter of '07?

Page 103

1    A. I think Lehman might have been 2008. So.
2    Q. But I'm talking generally about your --
3 your testimony about the real estate collapse being
4 2007-ish. I'm trying to nail that down a little
5 bit if I can.
6    A. I would say late 2007, 2008 for sure.
7    Q. Right. And I'm trying to understand what
8 "late 2007" means. Are we talking quarter three?
9 Quarter four?
10    A. For sure quarter four, quarter -- it
11 may -- late in the year. I would say from my
12 personal recollection probably the rate of growth
13 slows down, you're probably in the end of 2007.
14    Q. Right. So are we talking 2007 quarter
15 three or 2007 quarter four?
16      MR. ALPERT: Object to the form of
17   the question.
18      THE WITNESS: Yeah. I think I
19   just --
20      MR. ALPERT: Asked and answered.
21      THE WITNESS: Yeah. I think I just
22   said I'm not offering an opinion. I don't
23   have my data in front of me. It's 2016
24   now, and I'm just giving you my
25   recollection from my own personal

Page 104

1 experiences.
2      And I can't recall if it's December
3 2007 when, you know, the wheels come off
4 or the collapse is in 2008, but it's --
5 that's my recollection.
6 BY MS. BALLINGER:
7    Q. And is it your opinion in this case that
8 that collapse is what caused the projected cash
9 flows for the projects that are part of the Credit
10 Suisse loan not to be realized?
11    A. Certainly.
12    Q. What is the basis for that opinion?
13    A. The basis for that opinion is the
14 fundamental change in demand for real estate in
15 2008 or -- I mean, again, I'm not offering the
16 economic opinion here of when that occurred.
17      But whenever the collapse comes to be,
18 that changes the economic framework and people's
19 investment decisions, personal people that were,
20 you know -- demand for second property, second home
21 properties and all these things changes with the
22 change in the economic climate. Right? Consumer
23 sentiment changes.
24      And when you're having a global -- Lehman
25 Brothers was one of the largest real estate

Page 105

1 investors and lenders in the world. I mean, when
2 Lehman goes out of business, that changes the --
3 that changes the economic framework that we're
4 working in.
5    Q. So at what point in time did the real
6 estate collapse cause the projected cash flows for
7 any of the loan projects not to be realized?
8    A. Yeah, I mean, I don't think I've formed an
9 opinion on the when.
10    Q. So --
11    A. You asked me a general question is it your
12 opinion that the cash flows were not obtained, not
13 realized because of the change in the -- in --
14 because of the collapse, and I said sure.
15    Q. Well, the reason I asked the question that
16 generally is because that's what Sub B to Paragraph
17 6 says, so let me just start there. Sub B to
18 Paragraph 6 says:
19      "The real estate collapse caused
20   the projected cash flows to not be
21   realized, not actions taken by L.A.
22   Partners or the Ginn companies, L.L.C.
23   (T.G.C.)."
24      Did I read that correctly?
25    A. Yes.

27 (Pages 102 - 105)

Case 3:08-cv-01012-TJC-JRK Document 559-4 Filed 01/05/17 Page 13 of 15 PageID 22092

Ian Ratner July 19, 2016
Bahama Sales vs. Byers

Page 106

1  Q. So what is the basis for that opinion?
2  A. Well, what actions would they have taken?
3  They continued to invest in the project and put
4  more money in even when there was slow sales.
5  What -- the actions -- there's been no allegation
6  of a specific action that would have caused people
7  not to buy the properties, right, buy the lots at
8  that time. It's a macroeconomic effect. In my
9  opinion, the -- the -- just like many other
10  projects.
11      I mean, for example, during that era I was
12  advising the Related Group. We have a project in
13  Miami, it was 1,800 units. And at that time the --
14  it completely dried up. I mean, it was the largest
15  condo development in the U.S. at that time.
16  Q. Focusing just on the first part of that
17  sentence, which reads, "the real estate collapse
18  caused the projected cash flows to not be
19  realized," what is the basis for that portion of
20  your opinion?
21      MR. ALPERT: Object to the form of
22      the question. Asked and answered.
23  BY MS. BALLINGER:
24  Q. You can answer.
25  A. In my opinion, the cash flows -- again,

Page 107

1  at -- that at the time that the cash flows were
2  developed, the company had a track record and they
3  did whatever due diligence they did and whatever
4  planning they did on their project. And they had
5  internal expertise in second home communities and
6  resort communities. And they developed a pro forma
7  and they developed a business plan.
8      And like many others in the real estate
9  industry, the collapse in the market is, in my view
10  from the work I've done in this case, the reason
11  that this didn't come to pass.
12  Q. Right. And I under --
13  A. I'm just saying not anything that they
14  did -- it's not like they didn't show up for work.
15  Right? They didn't -- they said, oh, we're just
16  not going to show up. So then you might say, oh,
17  they did something.
18      But they showed up for work. They did
19  whatever they were supposed to do. It's not -- no
20  one -- there's nothing -- I haven't seen anything
21  that says they did this, and that's why the project
22  didn't achieve their cash flows.
23  Q. And I understand that's your opinion.
24  A. And I --
25  Q. And --

Page 108

1  A. And just to finish my answer, and I think
2  that's a great example, they didn't show up. I
3  mean, if -- if they just didn't show up, whatever
4  that means, right, cool, you know, like, that's a
5  bit of a slang, but if -- if -- then you could say,
6  oh, well, they didn't show up. They didn't bring
7  tractors. They didn't, you know, they didn't do
8  what they were supposed to do.
9      But there's no allegation of any of that.
10  It's they had a projections, they had a financing,
11  and it didn't occur. And it -- from what I could
12  see, it didn't occur because we had the greatest
13  real estate collapse ever, which is well
14  documented.
15  Q. You've referred a couple times to what was
16  alleged and what was not alleged. And for purposes
17  of my question, I'm not limiting you to what was or
18  was not alleged.
19      I'm simply asking for all the bases for
20  that portion of your opinion that the real estate
21  collapse caused the projected cash flows to not be
22  realized. Is there anything else you haven't
23  already identified that serves as a basis for that
24  opinion?
25  A. Well, so I'll just -- let me re -- let me

Page 109

1  go backwards and make sure I've got it all. When
2  they prepared these contemporaneous projections in
3  the business plan, they had a substantial track
4  record, they had substantial expertise, and they
5  were one of the leading second home developers.
6  They had a big infrastructure. They had a sales
7  and marketing experience with developments. They
8  had the financing in place.
9      And the isolating cause and effect is
10  looking at what was the big difference, what
11  happened here. Well, there was the greatest real
12  estate collapse ever that affected many developers
13  and many developments and many real estate finance
14  projects at around that -- you know, when -- the
15  period that we're referring to. And to me
16  that's -- that's what I believe happened.
17  Q. Okay. Any other bases you haven't already
18  identified?
19  A. I don't think so.
20  Q. What's your understanding as to when the
21  projected cash flows for any of the loan projects
22  were not realized, the first point in time in which
23  they were not realized? And we can take the
24  projects one by one if that would help. You tell
25  me.

28 (Pages 106 - 109)

Case 3:08-cv-01012-TJC-JRK   Document 559-4   Filed 01/05/17   Page 14 of 15 PageID 22093

Ian Ratner
July 19, 2016
Bahama Sales vs. Byers

Page 166

1  says -- there's another row that ends with
2  2560.52, which is princ. pay slash C.S.
3  revolver. That is the 69,814,383.
4  BY MS. BALLINGER:
5    Q. Put a four next to that.
6    (Whereupon, the witness complied
7    with counsel's request.)
8    THE WITNESS: That corresponds to
9  that.
10 BY MS. BALLINGER:
11   Q. So again, I can't see these. Does that
12 adequately summarize -- you don't need to pass them
13 to me. Does that adequately summarize the -- the
14 sources of information you used to create Table 6?
15   A. Yes.
16   Q. Okay. Did you create Table 6 or did
17 Mr. Busker create Table 6?
18   A. Mr. Busker.
19   Q. Do you know if Mr. Busker did anything to
20 verify the amounts shown in the balance sheet
21 you've described and whether those are correct?
22   A. Yes. Together we did some verification
23 work after the -- after either counsel identified
24 for us a document that you presented that referred
25 to the balance being 165 at that time, and we have

Page 167

1  the net balance of 202. So we then did some
2  verification work.
3    Q. And what work did you do to verify?
4    A. After looking at that, we looked at the
5  total debt. And we looked on the -- we looked at
6  the total debt, which was about six -- 660 or so,
7  668. And if you look at the total debt, what
8  happens is the -- up until May 2008 the line of
9  credit revolver is reflected at 165 net in the
10 financial statements.
11     If you add up C.S. -- you have to take the
12 total debt, you have to add up C.S. Borrower and
13 C.S. Lender together, right, because the debts are
14 different. And what happened is the total amount
15 of debt never changed.
16     But in May 2008 there appears to be some
17 journal entry where part of the -- the balances
18 between the long-term debt and the line of credit
19 are changed a little bit, but the total amount
20 doesn't change. So the line of credit borrowing
21 and the term debt in aggregate never changes after
22 it's all drawn up.
23     So if you look back -- let's just take
24 January 2008. If you look from January 2008
25 forward it -- the aggregate debt doesn't change.

Page 168

1  But it does look like in May 2008 -- sorry. In
2  March 2008 there was some misallocation between the
3  line of credit debt and the term debt. But the
4  aggregate debt doesn't change.
5    Q. So how does that affect the numbers set
6  forth in Table 6?
7    A. Well, the numbers in Table 6 are still
8  correct according to the financial statements. But
9  it -- it's -- but there's an -- there -- the --
10 part of the difference is, between the 165 and the
11 202 net is -- should not be in the line of credit.
12     So up until May 2008, or it's -- maybe
13 it's March 2008, it's correct. It reconciles to
14 the spreadsheet that you presented. But then
15 there's a journal entry and the long-term debt
16 portion goes down and the line of credit goes up.
17     So there's some journal entry that was
18 done at that time attempting to clean up perhaps
19 some intercompanies that misallocated it.
20   Q. Let me see if I can summarize what I hear
21 you saying. And again --
22   A. Sure.
23   Q. -- correct me if I'm wrong. Table 6
24 accurately summarizes what was in the Ginn-L.A.
25 Conduit Lender and Ginn-L.A. C.S. Borrower balance

Page 169

1  sheets through 2008, but there was some
2  misallocation in those balance sheets as you've
3  described?
4    A. And that that occurred in, it's either
5  March or May 2008, I think March, in 2008. Up
6  until that time the one-six -- it is 165, the net.
7  And the total debt never changes, even after this
8  misallocation. But for some reason in that month
9  there's an entry where they're moving things
10 between the two.
11   Q. So as a result of the misallocation you've
12 described, does -- should -- should any of the
13 numbers in Table 6 be different if they are solely
14 intended to reflect total revolver borrowings and
15 repayments as of December 31, 2008?
16   A. I think so.
17   Q. Okay. Can you tell me what numbers should
18 be changed and what the change should be?
19   A. Oh, I -- I don't have that. I didn't do
20 that.
21   Q. Okay. Do you know what numbers are
22 incorrect in Table 6 as a result of the
23 misallocation you discovered on the balance sheets?
24   A. No. I don't know. I don't -- I mean,
25 it -- I don't know. I don't know if it was on the

43 (Pages 166 - 169)

Case 3:08-cv-01012-TJC-JRK   Document 559-4   Filed 01/05/17   Page 15 of 15 PageID 22094

Ian Ratner
July 19, 2016
Bahama Sales vs. Byers

Page 298

1  what --
2      THE WITNESS: Because it --
3      MR. IGOE: Yes.
4      MS. BALLINGER: -- the result of that
5  is? Okay.
6      THE WITNESS: It might be helpful for
7  me to take a cop -- because we're going to
8  give you these binders, I might want to
9  just take a copy of this tab, if I can.
10 Because we're not -- our guys are not
11 going to know what I'm talking about.
12     MS. BALLINGER: Yeah. We may have to
13 take a break before 5:00 if we want to
14 have that copied.
15     MR. IGOE: Okay.
16     THE WITNESS: Just this I --
17     MS. BALLINGER: Yeah. I can tell you
18 that I have no more questions. I don't
19 know if --
20     MR. IGOE: See if -- see if John has
21 any questions.
22 John, do you have any questions?
23     MR. POLDERMAN: I do not.
24     MR. IGOE: None here.
25     MR. ALPERT: None here.

Page 299

1      MS. BALLINGER: So we're off the
2  record.
3      THE VIDEOGRAPHER: This concludes the
4  videotaped deposition. The time is 4:43
5  p.m. We are off the record.
6      (Whereupon, a discussion ensued
7  off the record.)
8      (Whereupon, the reading and
9  signing of the deposition by the
10 witness was reserved.)
11         - - -
12     (Witness excused.)
13         - - -
14     (Deposition concluded at 4:45
15 p.m.)
16         --oOo--

Page 300

1           C E R T I F I C A T E
2  STATE OF GEORGIA  )
   COBB COUNTY       )
3
4      I, Debra M. Druzisky, a Certified Court
   Reporter in and for the State of Georgia, do hereby
5  certify:
       That prior to being examined, the witness
6  named in the foregoing deposition was by me duly
   sworn to testify to the truth, the whole truth, and
7  nothing but the truth;
       That said deposition was taken before me
8  at the time and place set forth and was taken down
   by me in shorthand and thereafter reduced to
9  computerized transcription under my direction and
   supervision. And I hereby certify the foregoing
10 deposition is a full, true and correct transcript
   of my shorthand notes so taken.
11     Review of the transcript was requested.
   If requested, any changes made by the deponent and
12 provided to the reporter during the period allowed
   are appended hereto.
13     I further certify that I am not of kin or
   counsel to the parties in the case, and I am not in
14 the regular employ of counsel for any of the said
   parties, nor am I in any way financially interested
15 in the result of said case.
       IN WITNESS WHEREOF, I have hereunto
16 subscribed my name this 2nd day of August, 2016.
17
18
19
20
                     *Debra M. Druzisky*
21                   Georgia CCR-B-1848
22
23
24
25

Page 301

1           INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4  and make any necessary corrections. You should
5  state the reason in the appropriate space on the
6  errata sheet for any corrections that are made.
7      After doing so, please sign the errata
8  sheet and date it.
9      You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12     It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you. If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.