BAHAMAS SALES ASSOCIATE,
LLC,

     Plaintiff,

v.                                 Case No. 3:08-cv-1012-J-32JRK

DONALD CAMERON BYERS

     Defendant, et al.

## O R D E R

This RICO action involving a failed real estate development, hotly contested for nearly a decade, is before the Court on Defendants Edward R. Ginn, III, ERG Enterprises, LP, Lubert-Adler Management Company, LP, and Dean Adler's (collectively "Defendants") Motion for Summary Judgment (Doc. 527), to which Plaintiffs responded (Doc. 550), and Defendants replied (Doc. 571). In the course of reviewing the motion for summary judgment, the Court has also considered: (1) Plaintiffs' Motion to Exclude Testimony of Expert Witnesses Ian Ratner, Joshua Harris, and Rosemary Nicholls (Doc. 558) and Defendants' response in opposition (Doc. 559); and (2) Nutmeg Insurance Company's Motion for Reimbursement of Defense Fees Paid on Behalf of Third Party Plaintiffs (Doc. 518) and Third-Party Plaintiffs Edward R. Ginn, III and

ERG Enterprises, L.P.'s response (Doc. 523). The Court has reviewed the extensive written record and heard oral argument on the motion for summary judgment at the June 26, 2017 hearing, the record of which is incorporated herein. (Docs. 576, 579).

## I.    BACKGROUND AND PROCEDURAL HISTORY

Over the years, real estate developer Edward R. Ginn, III ("Bobby Ginn" or "Ginn") and his affiliated companies acquired a reputation for building lavish resort communities with upscale amenities. (Doc. 557-233 at 3). At different points in time, Ginn operated through various corporate entities, including Ginn Development Company and later, The Ginn Companies, LLC. Ginn's investment partner, Lubert-Adler Management Company, LP ("Lubert-Adler") manages real estate equity investment funds (the "LA Funds"), which invest in a broad spectrum of real estate projects, such as office buildings, retail centers, and hotels. (Doc. 528-69 ¶ 1). In 1998, the LA Funds began investing in residential resort communities developed by Ginn, which were aimed at the "baby boomer" second and retirement home markets. (Id. ¶ 6; Doc. 528-1 at 1). According to Lubert-Adler's co-founder Dean Adler, each Ginn development in which the LA Funds invested was owned by a limited liability limited partnership ("LLLP"), with the particular LA Fund acting as a limited partner in the LLLP. (Doc. 528-69 ¶ 7). The general partners of the LLLPs were entities wholly-owned by ERG Enterprises, LP ("ERG"), a Ginn affiliate. (Id.).

Ginn's projects were financed with equity and debt from the LA Funds, third-party debt, and proceeds from lot and condominium sales. (Id. ¶ 10). These Ginn/Lubert-Adler joint ventures typically generated proceeds from the sale of real estate, particularly the pre-sale of single family unimproved lots directly to investors. (Doc. 528-1 at 1). The joint ventures could close on lots before completing the infrastructure and amenities because they posted performance bonds that assured investors that the infrastructure would be finished. (Id.).

Beginning in late 2006 and continuing through the spring of 2008, Plaintiffs, numbering 51,[1] purchased undeveloped lots in Ginn Sur Mer,[2] a Ginn/Lubert-Adler planned luxury resort community on Grand Bahama Island. Plaintiffs were sophisticated real estate investors, looking for the "total lifestyle" experience that Ginn projects promised. (Doc. 317 ¶ 49). Some Plaintiffs, such as Doug Smith, hired attorneys to assist with due diligence for two Ginn Sur Mer lot purchases (Doc. 557-151), while other Plaintiffs, like Vic Taglia, performed their own inquiries before purchasing their lots (Doc. 557-35). Although at the time Plaintiffs bought their lots Ginn Sur Mer consisted of undeveloped "swampland," (Doc. 528-7 at 104:23), Ginn's plans for the property

---

[1] The total number of Plaintiffs is approximately 51, but the number of Ginn Sur Mer lots at issue is only approximately 32, as several Plaintiffs co-own their lots. (Doc. 579 at 28-29). Attorney Ballinger represents the owners of all except two of the lots.

[2] The parties and exhibits often abbreviate Ginn Sur Mer as "GSM."

included approximately 2,000 home sites, condominium towers, a hotel, a marina, two golf courses, and a casino. Ginn-LA West End Ltd., LLLP ("West End") served as the corporate parent of the Ginn Sur Mer developer entity and entered into the purchase contracts with Plaintiffs.[3] (<u>See, e.g.</u>, Doc. 528-10).

While Ginn/Lubert-Adler projects were typically financed on a per project basis, Adler described this approach as "somewhat inefficient from a capitalization standpoint," as it prevented the developments from taking advantage of "favorable entity-level financing options." (Doc. 528-1 at 2). In 2005, an alternate financing opportunity arose. Credit Suisse Securities (USA) LLC ("Credit Suisse"), a global commercial lender, approached The Ginn Company and proposed a loan which would allow for the financing of multiple development projects through a single lending facility.[4] (Doc. 557-199 at 47:23-48:2). In a June 2, 2006 memo to the Advisory Committee of LA Fund III and the Executive Board of the Advisory Committee of LA Fund IV, Adler described the objectives of the new method of "pooled financing":

> (1) eliminating loan guarantees by paying off all existing recourse debt with new non-recourse financing;[5] (2) providing a revolving credit facility to

---

[3] West End is not a party in this lawsuit.

[4] It is unclear exactly which Ginn entity Credit Suisse approached, but Stuart Margulies (a Lubert-Adler principal) testified at his Rule 30(b)(6) deposition on behalf of Lubert-Adler that it was "the Ginn Company."

[5] Recourse debt holds the borrower personally liable and allows a lender to collect what is owed for the debt even after they have taken collateral. Non-

fund the horizontal development and amenity costs at each community; (3) creating a loan with a five-year duration, which, subject to covenant compliance, provides for "staying power" in the event of a downturn; and (4) mitigating Lubert-Adler capital risk through a dividend of $325 million, which would (a) return all currently outstanding Lubert-Adler capital and preferred returns at all five communities of $285 million; and (b) provide a $51 million reserve for potential future capital needs.

(Doc. 528-1 at 3). To that end, on June 8, 2006, Credit Suisse issued a $675 million lending facility (the "Loan") to Ginn-LA CS Borrowers, LLC and Ginn-LA Conduit Lender, Inc. (the "Borrowers").[6] The transaction comprised a syndicated loan facility funded by 45 financial institutions with a five year term that was available for, and collateralized by, five properties: Tesoro (Florida), Quail West (Florida), Hammock Beach River Club (Florida), Laurelmor (North Carolina), and Ginn Sur Mer (Grand Bahama Island) (collectively "the Communities").[7] Lubert-Adler anticipated that sales in the more mature communities, such as Tesoro and Quail West, would bolster the development of

---

recourse debt does not allow the lender to pursue anything other than the collateral. See Internal Revenue Service, Recourse vs. Nonrecourse, UNITED STATES DEPARTMENT OF THE TREASURY (June 22, 2017, 10:00 AM), https://apps.irs.gov/app/vita/content/36/36_02_020.jsp.

[6] These two entities served as co-borrowers and conduits to transfer Loan proceeds. (Doc. 557-24 at 2, 6).

[7] Tesoro and Hammock Beach were LA Fund III investments; Laurelmor and Ginn Sur Mer were LA Fund IV investments; and Quail West was shared equally between LA Funds III and IV. (Doc. 528-1 at 3).

the early-stage properties, which included Ginn Sur Mer. (Doc. 528-24 at 52:9-21).

The Loan consisted of a $385 million senior secured first lien term loan facility; a $165 million senior secured synthetic revolving credit facility; and a $125 million senior secured second lien term loan facility. (Doc. 557-24). Lubert-Adler intended that sales proceeds from any of the collateralized properties would fund development costs and pay down the credit revolver, the funds from which would become available for withdrawal again and be used to build horizontal infrastructure and amenities at all of the Communities. (Doc. 528-1 at 2). In addition, $158 million of the first lien loan repaid existing debt to third party lenders. (Id. at 7). Finally, the Loan provided for a dividend distribution to ERG and certain LA Funds of approximately $325 million ($200 million from the first lien loan and $125 million from the second lien loan).[8] (Id.; Doc. 557-199 at 53:10-54:15).

The Loan's closing coincided with the softening of the real estate market, which eventually devolved into the Great Recession.[9] While Ginn Sur Mer lot

---

[8] Ultimately, the dividend distribution was $323 million, broken down as follows: $267 million repaid preexisting debt and funding that Lubert-Adler had invested which were used for development purposes; $49 million in profits was distributed to LA Fund III and LA Fund IV; and $7 million was distributed to ERG. (Doc. 579 at 11-14).

[9] The Great Recession was so widespread and spawned so much litigation that some federal courts have even taken judicial notice of it. See, e.g., Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 999 n.6 (9th Cir. 2014)

sales were relatively robust when they began in October 2006, by 2008 they had measurably slowed, with the last sale occurring in April 2008.[10] With a weakened real estate market, lot and condominium sales were slower than projected in all five Communities, resulting in reduced cash flow, and by April 2007, the Borrowers could not comply with their financial and reporting requirements under the Loan. (Doc. 557-73). Further, because they were in default, they could not draw on the revolver to pay expenses. (Doc. 557-65).

As a result, although they were not contractually obligated to do so, the Borrowers negotiated a restructuring plan (the "2007 Restructure") in which certain LA Funds would invest approximately $200 million in the five Communities.[11] LA Funds IV and V committed $160 million of that investment to the completion of Ginn Sur Mer's Phase I infrastructure work ($124 million)

---

("We take judicial notice of the recession in the U.S. economy from December 2007 to June 2009."); V.M. Paolozzi Imports, Inc. v. Am. Honda Motor Co., No. 712CV1052FJSATB, 2015 WL 7776926, at *2 (N.D.N.Y. Dec. 2, 2015), appeal dismissed (Mar. 30, 2016) ("To the extent that it is widely known that the U.S. economy experienced a recession beginning in the fall of 2008, the Court takes judicial notice of this fact because Plaintiffs rely on it in bringing this suit.").

[10] Between October 2006-December 2006, 81 lot sales closed; in 2007, 106 lot sales closed; and in 2008, 7 lot sales closed. (Doc. 528-69 ¶ 46).

[11] The LA Funds purchased approximately $54.6 million of condominium development parcels from Laurelmor ($12.6 million) and Ginn Sur Mer ($42 million), and that money, plus a $70 million future equity investment in West End, funded the Ginn Sur Mer Phase I infrastructure plans. (Doc. 528-20 at 25). The remaining portion of the $200 million investment came from an affiliate of Lubert-Adler and Ginn's purchase of The Gardens at Hammock Beach out of the Loan collateral ($41.5 million). (Doc. 528-20 at 23; Doc. 557-75).

and a golf course ($36 million). (Doc. 528-20 at 25-26). Sales in all of the Communities were still slow, leading to additional investments from LA Funds through 2008. Despite the additional investment, as the real estate market collapsed and the global economy contracted, in June and July 2008, the Borrowers again failed to make required interest, principal, and other payments. As part of a 2008 restructuring agreement ("2008 Restructure"), certain LA Funds invested approximately $7.55 million to fund operating and development expenses in the Communities and avoid default. Additional investments by LA Funds made from 2006-2008 totaled approximately $87.3 million.[12] (Doc. 528-20 at 22). Overall, between 2006 and 2008, LA Funds invested approximately $193.8 million in Ginn Sur Mer.[13] (Id.).

As history has shown, the real estate market did not immediately rebound. The Credit Suisse lender group was unwilling to commit additional

---

[12] These investments came from LA Funds' purchase of additional condominium parcels from Laurelmor and Ginn Sur Mer (approximately $37 million); investments in mortgage providers ($20.8 million); sale of Tesoro ($15.1 million); writing off unpaid amounts owed to The Ginn Companies ($11.6 million); and payments to third parties, such as legal counsel and the IRS ($2.8 million). (Doc. 528-20 at 22, 29-30).

[13] According to Adler, the LA Funds have not sold any of the parcels they purchased at Ginn Sur Mer and have not received a return on the investments made at Ginn Sur Mer after the Loan closed. (Doc. 528-69 ¶ 53).

At oral argument, Defendants corrected the record to note that in 2012, Lubert-Adler sold its interest in Laurelmor. Lubert-Adler originally paid $36.5 million for the Laurelmor parcels and sold its entire interest for $250,000. (Doc. 579 at 91).

funds to continue developing the Communities (Doc. 528-69 ¶ 51), and consequently, the Borrowers defaulted on the Loan on July 1, 2008. (Doc. 557-168).

Plaintiffs claim that because of Defendants' allegedly fraudulent actions in connection with the Loan, its restructuring, and ultimate default, Ginn Sur Mer was never developed as planned; as a result, they allegedly suffered monetary damages, including the amounts they paid for and owe on their lots and other incidental fees and costs associated with their lot purchases. (Doc. 317 ¶ 190). These events led to six lawsuits filed against Defendants between 2008 and 2012, which the Court consolidated on July 24, 2013.[14] (Doc. 152). The litigation has been fiercely contested, involving at least two appeals to the Eleventh Circuit in 2012 and 2013 (Doc. 141; Case 3:10-cv-422-TJC-JRK, Doc. 67), the appointment of a special master in 2015 to oversee the voluminous discovery (Doc. 251), and insurance coverage disputes litigated to summary judgment (Docs. 337, 504), among other issues. Plaintiffs have filed four amended master complaints in the consolidated proceeding, asserting numerous claims which they have subsequently withdrawn or had dismissed,

---

[14] The consolidated lawsuits include: <u>Bahamas Sales Assoc., LLC v. Byers</u>, Case No. 3:08-cv-1012-J-32JRK; <u>Bahamas Sales Assoc., LLC v. Willis</u>, Case No. 3:08-cv-1062-J-32JRK; <u>Webb v. Ginn Fin. Servs.</u>, Case No. 3:09-cv-516-J-32JRK; <u>Bailey v. ERG Enters., LP</u>, Case No. 3:10-cv-422-J-32JRK; <u>Taliaferro v. ERG Enters., LP</u>, Case No. 3:11-cv-199-J-32JBT; and <u>Taglia v. ERG Enters., LP</u>, Case No. 3:12-cv-731-J-32JBT.

claims based on title defects, misrepresentations regarding taxes, and an appraisal fraud scheme. (Docs. 154, 239, 300, 317).[15]

The FAMC, the current operative pleading, filed on August 24, 2015, alleges two counts for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), against Defendants based on a "cash out" scheme. (Doc. 317). In the FAMC, Plaintiffs allege that following the collapse of the Ginn real estate market, Defendants concocted the cash out scheme to eliminate their investment risk and harvest unearned

---

[15] Plaintiffs' first master complaint alleged substantive violations of RICO (including a cash out scheme and an appraisal fraud scheme), RICO conspiracy, breach of fiduciary duty, and fraud in the inducement. (Doc. 154). In the Order dismissing allegations of bank fraud (with prejudice), breach of fiduciary duty, and fraudulent inducement, the Court noted that the pleading was "(perhaps unduly) lengthy" and "by no means a model." (Doc. 224 at 5). With respect to the RICO claims, the Court observed that "Plaintiffs face substantial challenges as a matter of both fact and law to marry up the alleged severe and repeated misconduct by these Defendants to their own alleged losses." (Id. at 6). However, the Court wished to provide Plaintiffs with the opportunity to have their claims evaluated with the benefit of a full record, and therefore allowed the RICO claims to survive Defendants' challenges at the dismissal stage.

With each amended master complaint, Plaintiffs' claims fell by the wayside. In the Second Amended Master Complaint, Plaintiffs dropped their breach of fiduciary duty claims (Doc. 239); in the Third Amended Master Complaint, they dispensed with their fraud in the inducement claims (Doc. 300); and in the Fourth Amended Master Complaint ("FAMC"), they abandoned their RICO appraisal fraud claims, leaving only the RICO cash out scheme and conspiracy claims (Doc. 317). While the FAMC was still by no means a masterpiece, Defendants filed answers, and the case progressed to summary judgment.

profits from the five Communities. To accomplish their goal, they used Ginn Sur Mer to collateralize the Loan. Plaintiffs assert that at least two of the projects (Tesoro and Quail West) securing the Loan were already failing when the Loan closed, so Defendants knew default was likely and Ginn Sur Mer was at serious risk of foreclosure—even if Ginn Sur Mer itself succeeded. (Id. ¶¶ 66, 92).

Defendants allegedly knew that no reasonably prudent buyer would purchase lots in Ginn Sur Mer with knowledge of the Loan; thus, they executed the cash out scheme and concealed the Loan and the likelihood of default therefrom to induce purchases of residential lots. In addition, after the Loan closed, they allegedly made misleading statements in marketing materials which concealed the Loan's detrimental effects on Ginn Sur Mer's development. In total, the FAMC lists 76 predicate acts of mail and wire fraud. (Doc. 317-1). Plaintiffs allege that if they had known about the Loan and its potential effects, they would never have purchased their Ginn Sur Mer lots. (Doc. 317 ¶¶ 170, 187-90; Doc. 550 at 66 n.6).

## II.    STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue as to any material fact and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005). However, "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his case on which he bears the burden of proof at trial." Schechter v. Ga. State Univ., 341 F. App'x 560, 562 (11th Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted). "Although the existence of a genuine issue of material fact precludes judgment as a matter of law, a jury question does not exist because of the presence of a

mere scintilla of evidence." <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998) (quotation marks omitted).

## III. ANALYSIS

As we begin, a note about Plaintiffs' response to the motion for summary judgment is appropriate. In their response, Plaintiffs have a lengthy listing called "Statement of Undisputed Facts." However, many of the "facts" are not undisputed, and Plaintiffs make no effort to link the "facts" to any specific issue or argument, leaving the Court to guess as to their relevancy. Although Plaintiffs' response spans 74 pages, it is largely a prolix compilation of "facts" and quotations, unhinged from any argument. The actual Argument section is a mere nine pages and contains very few citations to the record or case law, making it difficult for the Court to utilize it. <u>See</u> Fed. R. Civ. P. 56(c)(1)(A) (the party arguing the existence of a genuine issue of material fact must support the assertion with citations to the record); <u>Celotex</u>, 477 U.S. at 325 (where moving party demonstrates lack of evidence supporting the non-moving party's case, the non-moving party must come forward with specific facts showing a genuine dispute); <u>Matsushita</u>, 475 U.S. at 587 (to show genuine issue, non-moving party must provide support by identifying sufficient evidence in the record).

At the summary judgment hearing, the Court permitted Plaintiffs to file a supplemental notice containing citations to the record on two issues: (1) evidence that Ginn testified that there was a plan prior to the Loan closing to

buy parcels; and (2) evidence of a HUD appointment. (Doc. 579 at 103-04). On June 30, 2017, Plaintiffs filed the Notice Identifying Evidence (Doc. 578), which purports to identify "other record evidence referenced at the hearing" beyond what the Court allowed. Neither in their response nor in their supplement do Plaintiffs explain their initial failure to properly cite the record in their response to the motion for summary judgment. The Court did not authorize Plaintiffs to supplement their response other than as to the two issues and will not allow Plaintiffs to bolster their deficient response after the motion was under advisement. In any event, the Notice does nothing to help Plaintiffs' summary judgment position. The Notice, therefore, is due to be stricken, except as it relates to the two aforementioned issues.

In their motion for summary judgment, Defendants contend that Plaintiffs cannot establish the requisite elements of their RICO claims because they fail to show: (1) proximate cause (loss causation); (2) pattern of racketeering; and (3) predicate acts of fraud. (Doc. 527 at 3).

A.    **Loss Causation**

To prevail on a RICO claim, a plaintiff must prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."[16]

_____

[16] To establish a pattern of racketeering activity, a plaintiff must show that a defendant committed at least two predicate racketeering acts that demonstrate criminal conduct of a continuing nature. See Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1264 (11th Cir. 2004). Racketeering conduct includes

See Lawrie v. Ginn Dev. Co., LLC, 656 F. App'x 464, 467 (11th Cir. 2016) (quoting Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1282 (11th Cir. 2006)). Additionally, a plaintiff bringing a civil RICO action for damages must show (1) that an injury occurred to business or property, and (2) "that such injury was 'by reason of' the substantive RICO violation." Id. (quoting 18 U.S.C. § 1964(c)). The "by reason of" standard requires that the defendant's misconduct directly and proximately cause the plaintiff's injury. Id.

For federal RICO purposes, courts analyze proximate cause "in light of its common-law foundations." Hemi Grp., LLC v. City of N.Y., N.Y., 559 U.S. 1, 9 (2010); see also First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994) ("Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.' Although we are mindful

---

any acts that are indictable under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud). See 18 U.S.C. § 1961(1); Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647-48 (2008). "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991)). Fraud requires misrepresentation or concealment of a material fact; mere puffery or sales talk is insufficient to sustain an allegation of mail or wire fraud. See United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013).

of the admonition that RICO is to be liberally construed, the foregoing holds true in a RICO setting because proximate cause, a common law concept, exists independently of the statute.") (internal citations omitted). Proximate cause is typically a question of fact. See Gibson v. Credit Suisse AG, No. 1:10-CV-00001-JLQ, 2016 WL 4033104, at *6 (D. Idaho July 27, 2016) (citation omitted). However, "a link that is too remote, purely contingent, or indirec[t] is insufficient." Hemi Grp., 559 U.S. at 9 (internal quotations and citation omitted). When evaluating proximate cause, courts must ask "whether the alleged violation led directly to the plaintiff's injuries" without any intervening cause. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).

Defendants argue that Plaintiffs cannot establish that the Loan and its subsequent default—not the collapse of the real estate market—proximately caused their damages. (Doc. 527 at 16-20). Defendants point to numerous other courts which have examined the market crash's effect on real estate developments, including Ginn Sur Mer, and found that the collapse proximately caused purchasers' harm. In fact, Defendants argue that the evidence shows that the Loan actually benefitted Ginn Sur Mer. Despite Plaintiffs' contentions that lot sales were thriving and would have continued to do so in 2008 and beyond, Defendants assert that this is merely speculative, and Ginn Sur Mer, like numerous other real estate developments at the time, fell victim to the Great Recession.

Defendants cite several cases in which the inability to prove causation stymied other plaintiffs' efforts to pursue similar claims against Ginn and Lubert-Adler. At least three federal courts, including the Eleventh Circuit, have concluded that plaintiffs failed to show that the Loan proximately caused investors' losses at Ginn Sur Mer and the other Communities included in the Loan collateral. In approving the class action settlement in <u>Demsheck v. Ginn Development Company, LLC</u>, the district court found that "[a]s there was a sharp rise and subsequent 'crash' of virtually the entire United States housing market, it would be nearly impossible to prove that but-for the actions of Defendant Ginn, their subsidiaries, Lubert-Adler and a few banks, Plaintiffs would not have suffered injury." No. 3:09-CV-335-J-25TEM, 2014 WL 11370089, at *4 (M.D. Fla. Mar. 5, 2014), <u>aff'd sub nom.</u> <u>Greco v. Ginn Dev. Co., LLC</u>, 635 F. App'x 628 (11th Cir. 2015).[17] In affirming <u>Demsheck</u> over an investor's objection, the Eleventh Circuit quoted the district court's findings regarding causation with approval. <u>Greco</u>, 635 F. App'x at 632. Similar to

---

[17] The <u>Demsheck</u> court's "research evidences a history of dismissed claims based on substantially similar fraud based claims alleged against Defendant [Ginn Development Company, LLC and Lubert-Adler Partners, L.P], its subsidiaries and other associated entities. (<u>Lawrie et al. v. The Ginn Companies, LLC, et al.</u>, case no. 3:09-cv-446-TJC-JRK); (<u>D.H.G. Properties, LLC v. The Ginn Companies, LLC, et al.</u>, case no. 3:09-cv-735-MMH-JRK); (<u>Karmo v. The Ginn Companies, LLC, et al.</u>, case no. 3:09-cv-705-J-20-JRK); (<u>Najor v. The Ginn Companies, LLC, et al.</u>, case no. 3-09-cv-766-J-25MCR); (<u>Hakim v. The Ginn Companies, LLC, et al.</u>, case no. 3-09-cv-767-J-25TEM)." <u>Demsheck</u>, 2014 WL 11370089, at *3.

<u>Demsheck</u> and <u>Greco</u>, the Bankruptcy Court for the Southern District of Florida dismissed the claims of lot owners in adversary proceedings in the Tesoro and Quail West bankruptcy action in part because their claims were too attenuated in light of the collapse of the real estate market.[18] <u>In re Ginn-LA St. Lucie Ltd., LLLP</u>, No. 08-29769 (Bankr. S.D. Fla. 2013) (Docs. 698, 728). Finally, the District Court of Idaho granted summary judgment for defendants, including Credit Suisse, in a case involving fraud claims relating to the Loan, finding that the plaintiffs failed to produce evidence raising a genuine issue of fact to show that the Credit Suisse loans caused the failure of the Ginn resorts. <u>Gibson</u>, 2016 WL 4033104, at *9. The <u>Gibson</u> court dealt with similar arguments as here, namely plaintiffs asserted that they had shown causation because the loan recapitalization to the developers (including Ginn Sur Mer's) left less equity and operating capital in the resorts than existed previously. <u>Id.</u> The court observed that "[a]ny loan would result in less equity, but yet not all loans fail. Plaintiffs do not establish how recapitalization and less equity caused the failure of the resorts." <u>Id.</u> Further, the court foreclosed the plaintiffs' argument that the Loan

---

[18] The Trustee filed an omnibus objection to creditors' claims for diminution in value of lot or home and related claims, arguing that "given the wide-spread economic downturn in the Florida real estate market at the time of the Petition Date, the Claimants cannot demonstrate that their injury is the direct result of any action of the Debtors." <u>In re Ginn-LA St. Lucie Ltd., LLLP</u>, No. 08-29769 (Bankr. S.D. Fla. 2013) Doc. 698 at 11. The bankruptcy court sustained all of the objections raised in the Trustee's Claims Objection. <u>Id.</u>; Doc. 728 at 5.

caused the resorts to fail, characterizing this assertion as "strained because the market collapse began during the same time frame as the defaults occurred." Id.

A hypothetical proposed by the Honorable Richard Posner of the Seventh Circuit Court of Appeals encapsulates the dilemma Plaintiffs face in proving loss causation:

> Suppose that an issuer of common stock misrepresents the qualifications or background of its principals, and if it had been truthful the plaintiff would not have bought any of the stock. The price of the stock then plummets, not because the truth is discovered but because of a collapse of the market for the issuer's product wholly beyond the issuer's control. There is "transaction causation," because the plaintiff would not have bought the stock, and so would not have sustained the loss, had the defendant been truthful, but there is no "loss causation," because the kind of loss that occurred was not the kind that the disclosure requirement that the defendant violated was intended to prevent. To hold the defendant liable for the loss would produce overdeterrence by making him an insurer against conditions outside his control.

Movitz v. First Nat. Bank of Chicago, 148 F.3d 760, 763 (7th Cir. 1998). Similarly, even if Plaintiffs could prove they would not have purchased their lots had they known about the Loan, that would only demonstrate but for (or transaction) causation. They still must show that the Loan, not the crash, caused their damages. And, as Defendants assert, the "market crash, which devastated resort communities and did not discriminate based on how the

developments were financed, caused the loss in value to plaintiffs' lots, not the financing." (Doc. 527 at 20) (citing <u>Greco</u>, <u>Gibson</u>, <u>In re Ginn-LA St. Lucie</u>, and the Harris Report (Doc. 528-14)).

The undisputed evidence belies any claim that Ginn Sur Mer sales were booming and would continue to do so in 2008 and beyond. In fact, 81 lot sales closed in 2006; 78 closed from January – June 2007; and 35 closed from July 2007 – April 2008. (Doc. 528-69 ¶ 46). Only seven closings occurred in 2008, all occurring from January until April. (<u>Id.</u> ¶¶ 46-47). This evidence undermines Plaintiffs' argument that lot sales were "thriving," showing instead that they had markedly slowed in late 2007 and were nearly at a standstill in 2008.

Defendants' unrebutted experts' analysis of market conditions helps explain the dwindling sales. Joshua Harris analyzed the real estate market forces which affected Gin Sur Mer. (Doc. 528-14 at 3). Despite Plaintiffs' claims that Defendants recognized a collapse of the Ginn market in late 2005/early 2006, and that Tesoro and Quail West were failing, Harris opines that "no economic warnings were visible to sophisticated, contemporaneous observers in 2006 and 2007, and there was no evidence of a severe real estate market crash or economic recession until mid-2008." (Doc. 528-14 at 17). If there was a "cooldown" during 2005-2006, it was only a return to more normalized market conditions following a period of almost unsustainable growth in 2005. <u>Id.</u> Harris describes how most market commentators believed a slowdown in the rate of

sales would occur; they did not anticipate a market freefall, certainly not before the closing of the Loan in mid-2006. (Id. at 27). Rather, many observers predicted appreciation of home values. (Id.).

To the extent Plaintiffs argue that but for the Loan, Ginn Sur Mer would have succeeded, as the Bahamas was insulated from the U.S. housing market crash, Harris refutes this argument as well.[19] Indeed, the Bahamian economy is heavily dependent on the U.S. economy, and "the resort real estate market, which draws heavily from residents of the United States, performed as badly or worse than did the United States economy and real estate market during the Great Recession."[20] (Id. at 49). In fact, Harris opines that the Caribbean real estate market suffered far worse than the U.S. market, and numerous projects in the Bahamas and Caribbean failed during the Great Recession. (Id. at 53, 57). Given these economic circumstances, Harris concludes that "the inability

---

[19] At oral argument, Plaintiffs attempted to dispute Harris's testimony that the Bahamian economy felt the impact of the Great Recession at the same time as the American economy by referring to the expert opinion of an appraiser whose report was never submitted as evidence. (Doc. 579 at 55-57). The Court will not consider this argument because the expert opinion is not part of the record.

[20] Defendants point out that Plaintiffs' appraisal expert (this one being part of the record) acknowledged that the Bahamas' proximity to the United States can be a weakness because of its dependence on the American economy and its tourism. (Doc. 527 at 12; Doc. 528-18).

to develop GSM as planned due to the crash was by no means unique." (Id. at 58).

Defendants' loss causation argument is further buttressed by their unrebutted expert Ian Ratner, who (like Harris) opines that "[t]he real estate collapse caused the projected cash flows to not be realized, not actions taken by LA Partners or The Ginn Companies LLC." (Doc. 528-20 at 4). Ratner explains that Ginn Sur Mer was better off—not "ruined"—because of the Loan. Contrary to Plaintiffs' argument that Ginn Sur Mer was "unable to access Loan proceeds for development," (Doc. 550 at 7), Ratner explains that: (1) from the date the Loan closed through December 31, 2008, $308.4 million was spent on operations and development at Ginn Sur Mer; and (2) had the LA Funds not made any additional investments in Ginn Sur Mer after June 2006, Ginn Sur Mer would only have had access to $133.4 million (Doc. 528-20 at 36-40). As such, Ginn Sur Mer spent $175 million more on development than it would have solely from lot sale proceeds. (Id. at 39). In light of the relevant case law, unrebutted expert reports, and other evidence of record, Defendants submit that Plaintiffs have failed to meet their burden to show proximate causation as RICO requires.

In response to Defendants' well-supported argument, Plaintiffs' entire loss causation argument consists of the following:

PL do not claim GLA [21] anticipated the "Great Recession" in 2008. Rather, the evidence shows GLA experienced a collapse of the market for Ginn resorts in 4Q-2005/1Q-2006. There is sufficient evidence to create a triable issue of fact as to whether Plaintiffs' alleged losses directly relate to GLA's conduct motivated by the 4Q-2005/1Q-2006 downturn the market for GLA's residential resort properties in Florida.

(Doc. 550 at 66).[22] Plaintiffs reiterate the allegations of the FAMC, stating that they do not "claim damages based on a loss of value for their lots," instead

---

[21] Plaintiffs' response does not clearly define the term "GLA," other than that it connotes "Defendants," but ostensibly it refers to Ginn/Lubert-Adler. (Doc. 550 at 2).

[22] The only other reference to loss causation in the response is in the introduction, where Plaintiffs state:

> Loss causation: Internal documents, LA investor reports, transcripts of Bobby Ginn calls, and GLA testimony establish that sales in Ginn residential resorts fell dramatically in 4Q-2005/1Q- 2006. Bobby Ginn called this a "market crash," the worst he'd seen in 40 years, while Dean Adler labelled it "the complete collapse of the residential market" in parts of Florida. At a minimum, this evidence creates disputed issues of fact that preclude a summary finding on loss causation.

(Doc. 550 at 2). This language is conclusory and, like their argument section, contains no citations to the record for support.

To the extent Plaintiffs rely, without any explanation or citations, on Ginn's statement that the 2005-2006 market conditions constituted a "market crash" or Adler's labelling of the same time period "the complete collapse of the residential market," such statements do not explain how the Loan caused Plaintiffs' damages and do not—even "at a minimum"—create disputed issues of fact.

claiming that "they would never have purchased GSM lots if they had known about the CS Loan."[23] (Id. at 66 n.6; Doc. 317 ¶ 187-90).

Although Plaintiffs do not state as much—leaving it to the Court to discern their meaning—the "conduct" to which they refer could only be Defendants' decision to obtain the Loan, which subsequently went into default. Plaintiffs concentrate on the theory that Defendants obtained the Loan for a fraudulent purpose—to mitigate their liability in anticipation of a market downturn, to the detriment of Ginn Sur Mer. [24] Plaintiffs contend that

_____

[23] In short, Plaintiffs dedicate a mere two paragraphs of their argument to loss causation, cite only one case (without applying the law to their facts), and provide no citations to the record to support their argument. (Doc. 550 at 66); see Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .") (emphasis added). Moreover, Plaintiffs have merely set forth conclusory statements, as opposed to factually-supported arguments, to show loss causation.

[24] To the extent Plaintiffs argue that the terms of the Loan, particularly the dividend distribution and its cross-collateralized nature, show that it was obtained for fraudulent purposes, Defendants have submitted the unrebutted expert report of James S. Howard. (Doc. 528-45). Among other things, Howard opines that, although Plaintiffs allege that the Loan was highly unusual, the Loan was actually a "customary financing transaction," whose benefits included the ability to fund expenditures through a single lender versus multiple lenders, access to a larger pool of capital, streamlined administrative requirements, and control over debt levels. (Id. at 9, 10, 20-21). Howard opined that a number of real estate loans involve some form of dividend or distribution to the owner. (Id. at 19 n.25). He describes dividend distributions as "common practice" and not a "risk factor or negative for the loan." (Id.).

Howard's opinion supports Defendants' contention at oral argument that the Loan was "not something that occurred . . . in the heat of the bubble" and that similar financing is still available today. (Doc. 579 at 15).

24

Ginn/Lubert-Adler's recognition of the 4Q2005/1Q2006 collapse of the Ginn real estate market motivated their decision to procure the Loan, which went into default in July 2008.[25] Plaintiffs allege that the default was not caused by paltry lot sales at Ginn Sur Mer, instead characterizing sales as "thriving," with "at least 194 sales closed through 2007 and at least 215 by mid-2008." (Doc. 317 ¶¶ 137-38).[26] Plaintiffs wrongly imply that the Bahamian real estate market outperformed the United States market and conclude that the Loan caused their harm because, due to the cross-collateralized nature of the Loan, "GSM lot sale proceeds were no longer reserved for its own use." (Doc. 550 at 4); see

_____

[25] In what appears to be an effort to demonstrate the motivation behind Defendants' alleged intent to defraud investors, Plaintiffs make a somewhat arbitrary distinction between the collapse of the Ginn real estate market beginning in late 2005 and the overall softening and then collapse of the U.S. real estate market, which is generally recognized to have begun at the earliest in late 2007. See supra note 9.

[26] Plaintiffs also allege in the FAMC that sales at Ginn Sur Mer only stopped in late 2008 because the U.S. Department of Housing and Urban Development ("HUD") revoked the ability of Ginn Sur Mer's developer to market and sell lots in the United States. (Doc. 317 ¶ 182). Plaintiffs characterize the events in connection with HUD as HUD's decision to revoke Ginn's ability to market lots in the United States because of the Loan. (Id.). Defendants describe it as Ginn's decision to voluntarily suspend its HUD registration in September 2008. (Doc. 527 at 19).

Plaintiffs submitted citations to the record in their Notice (unanchored from any argument) to support their HUD argument. (Doc. 578 at 4). However, their evidence does not bear out their characterization of events. Instead, the evidence shows that Defendants "surrendered" their HUD registration; there is no evidence that HUD "shut them down and wouldn't let them sell lots." (Doc. 579 at 80). Moreover, the evidence does not show that any dealings between Defendants and HUD caused or led to the inability to sell Ginn Sur Mer lots.

supra pp. 21-22. They therefore suggest that, without cross-collateralization, Ginn Sur Mer could have succeeded as a separate development, even if the other four American communities failed.

Plaintiffs' claim that sales at Ginn Sur Mer would have thrived but for the Loan is mere speculation. Plaintiffs cite no evidence to support the assertion that sales were thriving in 2008 and would have continued to do so but for the fact that Defendants had to stop selling lots in the wake of the 2008 default. Further, they submitted no expert reports to corroborate these unsubstantiated claims. At oral argument, Plaintiffs argued that Defendants' salespeople stated that the "biggest months ever" for Ginn Sur Mer sales occurred in 2008 and that "we're selling lots at 1.4 million in the Bahamas in 2008 and we think we can continue to do so." (Doc. 579 at 56). Plaintiffs also said that presentations to Credit Suisse indicated that Defendants "believe that there's still a market here," though Plaintiffs did not say who made these presentations or precisely when. (Id.). Plaintiffs did not cite to the record in their brief or at the hearing to confirm any of these statements.[27] Finally, the undisputed lot sales figures listed in Adler's affidavit show that sales were not "going gangbusters," as

---

[27] To the extent Plaintiffs rely on them, sales statements generally constitute "puffing" and are not actionable as fraud. See Wilson v. De Angelis, 156 F. Supp. 2d 1335, 1338 (S.D. Fla. 2001) (citing United States v. Brown, 79 F.3d 1550, 1557 (11th Cir. 1996) ("'[P]uffing' or 'sellers' talk' is . . . not actionable under the mail [or wire] fraud statute[s].")).

Plaintiffs stated at oral argument. (Id. at 57). To the contrary, Ginn Sur Mer closings had dramatically slowed by early 2008, months before the Loan default. (Doc. 528-69 ¶ 46).

When factors other than a defendant's fraud are an intervening direct cause of a plaintiff's injury—such as the collapse of the housing market here— that same injury cannot be said to have occurred by reason of the defendant's actions. See First Nationwide Bank, 27 F.3d at 769 (affirming dismissal of RICO suit against mortgage brokers and borrowers for failure to adequately allege proximate cause). Thus, Plaintiffs' argument that lot sales would have continued apace ignores the impact of the recession on the American and Bahamian real estate markets, as described in numerous judicial opinions related to Ginn developments, as well as in Defendants' unrebutted expert reports. See id. at 772 (citing Bastian v. Petren Res. Corp., 892 F.2d 680, 684 (7th Cir. 1990)) ("when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases").

Plaintiffs not only failed to submit a coherent theory of loss causation, but they also failed to refute Defendants' well-supported argument. Plaintiffs did not substantively address Defendants' experts' findings as to causation or

submit any rebuttal expert reports.[28] They likewise chose not to address Demsheck, Greco, Gibson, or In re Ginn-LA St. Lucie (or any proximate cause cases cited by Defendants, for that matter), other than to say that "[f]indings in other cases cited by GLA are inapposite for purposes of a motion for summary judgment here, which necessarily depends on the evidence submitted in support of PL claims." (Doc. 550 at 66 n.7). But Plaintiffs do not cite any evidence in support of their loss causation argument, nor do they factually distinguish their case from these other highly relevant ones. See Chavez v. Sec'y Florida Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) ("district court judges are not required to ferret out delectable facts buried in a massive record"). Indeed, it is unfathomable how Plaintiffs can argue that these cases are "inapposite" when

---

[28] Plaintiffs simply refer the Court to their Daubert motion (Doc. 558), in which they move to exclude Harris's testimony:

> GLA's reliance on conclusory statements by expert [Joshua] Harris are insufficient to justify a ruling on causation here. As set forth in PL Motion to Exclude these same opinions, Dr. Harris failed, both in his Report and his deposition testimony, to provide a reasonable explanation for his unqualified conclusions. In addition, Dr. Harris' conclusions are contradicted by PL Facts identified above.

(Doc. 550 at 66). Yet again, Plaintiffs cite none of "PL Facts" in support, apparently leaving it to the Court to review their nearly 100-page brief and determine for itself which facts might support their conclusory argument. The Court is also denying Plaintiffs' Daubert motion.

they involve the same Loan, and in some instances the same collateral, at issue here.

Plaintiffs' conclusory argument in no way explains how the Loan caused Plaintiffs' damages. Moreover, Plaintiffs' emphasis is improperly placed. Even if Defendants acted fraudulently in obtaining and concealing the Loan, that alone would not demonstrate a factual issue regarding proximate causation. In other words, if Ginn Sur Mer failed not because Defendants allegedly took out and concealed the Loan but because of an industry-wide phenomenon (namely, the Great Recession) that destroyed their venture, then Plaintiffs have lost nothing by reason of Defendants' fraud and have no claim to damages. See Bastian, 892 F.2d at 685. Thus, to survive summary judgment, Plaintiffs bear the burden of demonstrating that there is a real basis in the record showing a genuine issue of material fact as to whether the Loan, not the market crash, proximately caused their damages. This they have failed to do.

Accordingly, Defendants are entitled to summary judgment on this basis. See Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1351 (11th Cir. 2016) (affirming the dismissal of civil RICO complaint because it failed to adequately plead proximate cause); Se. Laborers Health & Welfare Fund v. Bayer Corp., 444 F.

App'x 401, 410 (11th Cir. 2011) (district court properly dismissed civil RICO claim for failure to adequately plead proximate cause).[29]

## B.    Pattern of Racketeering Activity

Plaintiffs have also failed to meet their burden to establish a pattern of racketeering activity. RICO defines the term "pattern of racketeering activity" as requiring "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). For Plaintiffs to prevail, they must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). The Eleventh Circuit has underscored that "[t]he continuity element . . . is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address—one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future." Jackson, 372 F.3d at 1265. "Sporadic, isolated criminal acts" will not pass muster. Id. Plaintiffs may satisfy the continuity prong in one of two ways: "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past

---

[29] Although these Eleventh Circuit cases involved appeals of orders on motions to dismiss, they use the same analytical framework and are thus highly persuasive.

conduct that by its nature projects into the future with a threat of repetition." H.J., 492 U.S. at 241.

Although their response does not even attempt to identify whether Plaintiffs are arguing that open or closed continuity (or both) exists, when asked by the Court at oral argument, Plaintiffs stated that they believe it is both. (Doc. 579 at 75).[30]

### 1. **Open-Ended Continuity**

Continuity may be demonstrated if the predicate acts "constitute a threat of <u>continuing</u> racketeering activity": "past conduct that by its nature projects into the future with a threat of repetition." H.J., 492 U.S. at 240-41 (emphasis in original). This enables a RICO plaintiff to establish a pattern in instances in which the action is brought before the racketeering activity has extended over a period long enough to constitute closed-ended continuity. "In such cases, liability depends on whether the threat of continuity is demonstrated." Id. at 242 (emphasis in original). To demonstrate open-ended continuity, Plaintiffs must show that the acts were part of Defendants' "regular way of doing business, or that the illegal acts threatened repetition in the future." Jackson,

---

[30] Plaintiffs cite no case law in support of their arguments regarding a purported pattern of racketeering. In fact, the only citations on this issue are to the FAMC and an Order on a collateral issue. (Doc. 550 at 68-69).

372 F.3d at 1267 (citing <u>H.J.</u>, 492 U.S. at 242-43) (internal quotation marks omitted).

Plaintiffs base their RICO claims on numerous predicate acts of mail and wire fraud executed in furtherance of the alleged cash out scheme. (Doc. 317 ¶¶ 192-206). In the FAMC, Plaintiffs allege that Defendants committed 76 predicate acts of mail and wire fraud between March 2006 and January 2010 (Doc. 317-1), but also contend that Defendants' fraud "continue[s] to the present and threaten[s] to continue into the future." (Doc. 317 ¶¶ 196, 206; <u>see also</u> Doc. 550 at 68).

Despite these contentions, the allegations in the FAMC and the evidence undermine the argument that Defendants' conduct is part of their regular way of doing business.[31] To the contrary, Plaintiffs repeatedly allege that the Loan was unique, devoting an entire section of the FAMC to its exceptional nature. (Doc. 317 ¶¶ 114-16): Plaintiffs allege that "Lubert/Ginn's Loan was one-of-a-kind. The Loan was the largest [Credit Suisse Syndicated Term Loan] and the only one that cross-collateralized five separate developments. The Lubert/Ginn Loan was the antithesis of routine financing." (<u>Id.</u> ¶ 116). In <u>Jackson</u>, the Eleventh Circuit similarly concluded that plaintiffs failed to allege open-ended

---

[31] Plaintiffs do not appear to argue this type of open-ended continuity, but due to the vague nature of their arguments both in their brief and at the hearing, the Court addresses it nonetheless.

continuity where "the plaintiffs' own complaint" alleged that "the defendants' actions . . . were a unique, first-time occurrence," and "[made] clear that the alleged criminality was <u>not</u> part of the defendants' <u>regular</u> way of doing business." <u>Jackson</u>, 372 F.3d at 1268 (emphasis in original).[32] Although Plaintiffs did not point the Court toward any evidence, in reviewing the voluminous summary judgment exhibits, the Court noted several pieces of evidence supporting the notion that the Loan was not part of Ginn's usual course of business. For example, Ginn testified that he originally intended to fund Ginn Sur Mer exclusively with lot sales, "just like I did on all of the rest of them. Go to Lubert-Adler and get the money and go to the market and sell some lots and move my way through it. I did it on every one of them we did. Our model was always start with lots first. Everybody knew it. We didn't hide it." (Doc. 550 at 32; Doc. 557-233 at 108:10-15). A Ginn draft presentation to Capital Source reiterates this idea, noting that

> our own lot closings (not Lubert-Adler equity or bank debt) have always been by far our largest source of funds for development expenses, and [Ginn Sur Mer] will be no different. Lot closings will be used first to fund development expenses and only excess cash after development expenses are funded go to repaying Credit Suisse.

---

[32] Although in <u>Jackson</u>, the Eleventh Circuit analyzed continuity in the context of a motion to dismiss, the comparison is highly instructive nonetheless.

(Doc. 557-43 at 3). Not only was taking out a loan an anomaly for Ginn/Lubert-Adler development projects, but the cross-collateralized nature of it was unique as well. Plaintiff Lesesne confirmed as much in his deposition, in which he testified that "[a]s opposed to all the other developments [that] had been independent, this one was -- had, as I learned later, the other developments -- Tesoro, Quail West were on the line in addition with Ginn Sur Mer. . . ." (Doc. 557-187 at 148:4-149:3). This evidence supports Defendants' contention that this "one-of-a-kind" Loan was not part of their regular way of doing business. (Doc. 317 ¶ 116). Accordingly, for Plaintiffs to establish open-ended continuity, they must show that Defendants' illegal acts pose a threat of continued criminal activity in the future.

The only apparent allegation in the FAMC of Defendants' ongoing and future activity is that "LA continues to loot GSM to the present, attempting to negotiate deals involving the GLA Parcels." (Id. ¶ 136). In Plaintiffs' response, the only arguments in connection with ongoing activity seem to be limited to Lubert-Adler's alleged current efforts to sell Ginn-LA OBB, Limited ("Ginn-LA OBB") assets.[33] (Doc. 550 at 68). Plaintiffs fail to explain how such efforts constitute racketeering activity. Moreover, Plaintiffs point to no evidence supporting the proposition that Lubert-Adler is trying to sell assets and cites

---

[33] Ginn-LA OBB purchased condominium parcels from Ginn Sur Mer for $42 million in the 2007 Restructure. (Doc. 528-20 at 24 ¶ 66).

no cases supporting the argument that such activity could be characterized as racketeering.[34]

Plaintiffs also fail to explain how these acts impart any <u>new</u> injuries. <u>See Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.</u>, 953 F.2d 587, 594 (11th Cir. 1992) (finding no open-ended continuity based in part on the conclusion that defendants' acts after the initial taking did not impart any new injury). Further, Defendants state that Plaintiffs' allegations are simply false because "Lubert-Adler and the LA Funds have not sold the parcels they own in Ginn Sur Mer or received any return on the investments made in Ginn Sur Mer in 2007 and 2008." (Doc. 527 at 24 n.16; Doc. 528-69 ¶ 53). Plaintiffs have not pointed to any evidence to the contrary. <u>See</u> <u>Casas v. Sch. Dist. of Hillsborough Cty.</u>, No. 8:13-CV-599-T-17TBM, 2014 WL 2988059, at *8 (M.D. Fla. July 2, 2014) ("In response, Plaintiff again fails to cite any specific facts calling this evidence into dispute, sufficient to raise a genuine issue for trial."). Plaintiffs acknowledge that Ginn and Lubert-Adler have ended their working relationship (Doc. 550 at 57-58), which courts in this District have recognized

---

[34] Plaintiffs' statements at oral argument highlight the dearth of evidence supporting their position, with Plaintiffs' counsel stating at the hearing that "we don't know what [Defendants] are doing with [Ginn Sur Mer] now because they didn't give us anything in discovery on it but I have heard from the grapevine they are trying to sell it." (Doc. 579 at 76-77). Here, Plaintiffs admit that there is no evidence supporting their argument; it is speculation. The Court cannot and will not rely on "the grapevine" as evidence on summary judgment.

as a sign of a lack of a threat of ongoing criminal activity. See Daedalus Capital LLC v. Vinecombe, No. 8:12-CV-2533-T-35TBM, 2014 WL 11412838, at *8 (M.D. Fla. Sept. 29, 2014), aff'd, 625 F. App'x 973 (11th Cir. 2015) ("there is no longer a working relationship between the two companies giving rise to the opportunity for Defendants' pattern of predicate acts to persist into the future"). While Plaintiffs state that acts of racketeering include "conduct in negotiating Bobby Ginn's removal from any involvement in [Ginn Sur Mer]," they provide no explanation for this conclusory statement and cite no case law in support. (Doc. 550 at 68).

It is simply not reasonable to infer from Plaintiffs' evidence that there is a risk of a broader scheme, or that the allegedly fraudulent acts would continue indefinitely into the future. The Loan closed in 2006 and went into default in 2008, nearly a decade ago. Ginn and Lubert-Adler's business relationship has ended, and nothing suggests that they have or will reinstate their partnership to repeat their alleged fraud in a similar business environment. As such, the alleged cash out scheme does not constitute an open-ended RICO pattern.

## 2. **Closed-Ended Continuity**

"A party alleging a RICO violation may [also] demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." H.J., 492 U.S. at 242. In the Eleventh Circuit, "closed-ended continuity cannot be met with allegations of schemes lasting less

than a year." Jackson, 372 F.3d at 1266; see Ferrell v. Durbin, 311 F. App'x 253, 256 (11th Cir. 2009). "[W]here the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." Jackson, 372 F.3d at 1267 (citing Efron v. Embassy Suites (P. R.), Inc., 223 F.3d 12, 18 (1st Cir. 2000) (noting that "the fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims" supports the conclusion that there is no continuity); Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (predicate acts occurring over three year period insufficient to allege pattern of racketeering when complaint alleged a single scheme with a single goal); Viacom, Inc. v. Harbridge Merchant Servs., 20 F.3d 771, 780 (7th Cir. 1994) (various factors besides temporal span should be considered in assessing continuity, including the number of victims, the presence of separate schemes, and the occurrence of distinct injuries); Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1543 (10th Cir. 1993) (in addition to duration, weighing "extensiveness" of the RICO scheme, including number of victims, number and variety of racketeering acts, whether the injuries caused were distinct, the complexity and size of the scheme, and the nature or character of the enterprise or the unlawful activity); U.S. Textiles, Inc. v. Anheuser–Busch Cos., 911 F.2d 1261, 1269 (7th Cir. 1990) ("[I]t is not irrelevant, in analyzing the continuity

requirement, that there is only one scheme.")); see Bivens v. Roberts, No. 208CV026, 2009 WL 891859, at *8 (S.D. Ga. Mar. 31, 2009) (quoting Millette v. DEK Techs., Inc., 2008 WL 5054741, at *4 (S.D. Fla. Nov. 15, 2008) ("even if the plaintiffs had sufficiently pled some facts suggesting that the predicate acts took place over a substantial period of time, 'the duration element might not always be enough to establish closed-ended continuity where there is only one scheme used to accomplish a discrete goal'")).

Defendants argue that the closed period lasted from some point in late 2005, when Credit Suisse approached them about a possible loan, to June 8, 2006—the date the Loan closed, accomplishing their purported goal of cashing out of the Communities. (Doc. 527 at 23). Defendants highlight the allegations of the FAMC to show that under Plaintiffs' own theory, the cash out scheme consisted of a single scheme with a discrete goal and a natural end: to cash out of the Communities by closing the Loan and obtaining the dividend distributions. (Id. at 23). Under these circumstances, Defendants argue that their conduct would not constitute a closed-ended continuity pattern of racketeering in this Circuit, given the single scheme, discrete goal, and period of less than one year. See Jackson, 372 F.3d at 1267; Ferrell, 311 F. App'x at 256.

On the other hand, Plaintiffs allege in the FAMC that Defendants committed 76 predicate acts of mail and wire fraud between March 2006 and

January 2010 to further their "goals" of pulling their investments from the four U.S. projects without showing losses, eliminating their liability for existing debt in the four U.S. projects, and taking unearned future profits from Ginn Sur Mer and the U.S. projects. (Doc. 317 ¶ 54; Doc. 317-1). Somewhat inconsistently, Plaintiffs also contend that the evidence shows related predicate acts from February 2005 which "continue to the present and threaten to continue into the future." (Doc. 317 ¶ 196; Doc. 550 at 68). Plaintiffs list (without any record citations) a litany of acts that they contend create a pattern of racketeering activity:

> (a) the use of inflated cash flow projections to obtain the CS Loan; (b) obtaining the Loan with terms that significantly damaged GSM; (c) using Loan proceeds to refinance recourse debt, cash out every dollar of LA equity and pay early profits to LA Funds; (d) negotiating a 2007 Loan "Restructure" in order to: (i) escrow funds to avoid bond and HUD liability for promised GSM improvements; (ii) push 80% of GSM development spending to a period outside the Loan term; (iii) purchase GSM operating assets from Loan collateral to assemble the necessary elements of a standalone resort; (e) taking steps in early 2008 to abandon the GSM land still held as Loan collateral in order to focus instead on GLA's new standalone resort; (f) concealing the terms and risks of the Loan from Plaintiffs who bought GSM lots from 2006-2008; (g) concealing the effects of the Loan, 2007 Restructure, 2008 abandonment, a 2010 agreement ending Bobby Ginn's involvement with GSM so Plaintiffs would continue to make payments on their GSM mortgage loans; and (h) engaging in efforts to sell GSM operating assets that LA admits continue to present.

(Doc. 550 at 2-3).

Given Plaintiffs' inconsistent pleading and response regarding the time period, and even though Defendants apparently concede in their motion that the period began in late 2005, it falls to the Court to establish the length of the period. See Ward v. Nierlich, 617 F. Supp. 2d 1226, 1237 n.16 (S.D. Fla. 2008) (following plaintiffs failure to provide the court with their alleged beginning and end of the closed-continuity period, the court attempted to approximately determine the starting and ending point of the closed-continuity period). Plaintiffs' response states that the predicate acts began in February 2005 (Doc. 550 at 68), but Plaintiffs fail to specify what those acts were or account for the fact that the predicate acts listed in the FAMC begin in March 2006 (Doc. 317-1). Ostensibly, the acts that took place as early as 2005 involved planning and facilitating the Loan, but Plaintiffs cite no evidence in support of this timeframe.[35] Given the lack of any explanation, the Court will rely on the FAMC and use March 2006 as the beginning period for the closed-ended continuity analysis.

In attempting to ascertain the end of the period, the Court questions whether some of the acts alleged in the FAMC even constitute predicate acts

---

[35] While the evidence shows that Credit Suisse approached Defendants in 2005 regarding a possible loan, and they negotiated the Loan before the 2006 closing, Plaintiffs do not make this argument or explain how it constitutes racketeering.

under RICO. For instance, Plaintiffs state that on May 22, 2009, Lubert-Adler and ERG "received a copy of the lawsuit filed by Credit Suisse in the Supreme Court of the State of New York to Foreclose in GSM" (Id. at 14-15), and on December 23, 2009, those parties "received Order and Judgment of Foreclosure and Sale, entered in the GSM Foreclosure setting agreed Aggregate Indebtedness of $495,095,611.77" (Id. at 15). The Court struggles to understand how these alleged passive acts of receiving court documents were somehow in furtherance of the cash out scheme, and Plaintiffs make no effort to explain it.[36] The Court therefore does not consider them as predicate acts in the pattern analysis.

As such, the only remaining predicate act alleged after December 2008 is Ginn's distribution of a letter to lot owners in January 2010, which Plaintiffs describe as false and misleading because Ginn failed to disclose the Loan effects and other information. (Id. at 15-16). However, the Eleventh Circuit has held that "there is little question that attempts to conceal an initial fraudulent act are not sufficient to establish open-ended continuity," Jackson, 372 F.3d at 1268, and the Court doubts that it can establish closed-ended continuity either.

---

[36] In fact, it appears as though Plaintiffs are attempting to artificially increase the number of predicate acts and thereby extend the period of racketeering by including any document sent in the mail or by wire that has anything to do with the Loan, regardless of whether it was in furtherance of the alleged cash out scheme.

Plaintiffs have neither made this argument nor identified cases which would support such a contention. At oral argument, without pointing to any evidence, Plaintiffs argued that Defendants' alleged concealment of the Loan created new injuries to Plaintiffs because they continued to make mortgage payments, whereas, had they known about the Loan, they would have stopped paying sooner. (Doc. 579 at 75-76). While it is true that if concealing activity imparts a new injury, it may elongate the period of racketeering, see Aldridge, 953 F.2d at 594, Plaintiffs do not show how continuing to pay on a mortgage already in existence constitutes a new injury, as opposed to a continuation of an existing one. Plaintiffs cite no factually-analagous cases nor record evidence which would support this argument.[37]

Plaintiffs' concealment theory is that Defendants committed fraud in concealing the Loan and its terms and risks from them to induce them to buy lots in Ginn Sur Mer. However, even if Defendants actively concealed the Loan, Plaintiffs must first show that Defendants owed them a duty of disclosure. The Eleventh Circuit requires that, "if the [plaintiffs] intended to assert a [RICO] claim for fraudulent concealment, or nondisclosure, they needed to plead that the [defendants] had a duty to disclose." Am. United Life Ins. Co. v. Martinez,

---

[37] At oral argument, Plaintiffs cited Jackson for the general proposition that "when there's not damage as a result of those efforts to conceal, there's not any new injury. And that's Jackson at 1268." (Doc. 579 at 75).

480 F.3d 1043, 1065 (11th Cir. 2007); see also McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1225 (11th Cir. 2002) ("[N]ondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose either by statute or otherwise."). The duty to disclose may exist when the parties have a "special relationship of trust, such as a fiduciary relationship between people." Langford v. Rite Aid of Ala., 231 F.3d 1308, 1312 (11th Cir. 2000) (citing Brown, 79 F.3d at 1557).

Plaintiffs argue that under the Eleventh Circuit's definition of a "scheme to defraud, as well as the broad circumstantial analysis of a duty to disclose, GLA's conduct is precisely the type the federal RICO statutes are intended to encompass." (Doc. 550 at 71). They cite cases which direct courts to identify whether a duty to disclose exists on a case by case basis, giving appropriate attention to the nature of the transaction and the relationship between the parties. Langford, 231 F.3d at 1312-13. However, Plaintiffs have previously admitted in appellate briefing before the Eleventh Circuit in Bailey v. ERG Ent., LP, No. 11-11670 (11th Cir.) that they had no relationship with Defendants, which seemingly precludes an argument that they have the "special relationship of trust" which might mandate a duty to disclose here.[38]

---

[38] In Bailey, Plaintiffs argued that "Buyers have no contractual relationship with any other Mortgage Entities or CS Entities." (Doc. 528-46 at 27). Plaintiffs later argued in a reply brief that "[a]s LA admits, Buyers had no relationship with any entity mentioned in the Complaint, other than the

(Doc. 528-46 at 25-27, Doc. 528-47). At oral argument, Plaintiffs seemingly contended that a duty to disclose stemmed from the fact that taking out a sizable, cross-collateralized loan was a "sea change" in Ginn's usual business practice, in which he typically offered buyers opportunities to purchase property in developments with low leverage. (Doc. 579 at 70-73). While Plaintiffs rely on Langford, they cite no factually-analagous cases or further explain how this change in a business practice creates the "special relationship" required under Langford to find a duty to disclose, instead relying on the vague phrase "nature of the transaction" to find a duty. They also do not articulate separate duties for all four defendants, instead apparently limiting their argument to Ginn.[39]

Even if they had such a duty to disclose, which the undisputed evidence shows they did not, the undisputed evidence also shows that Defendants did not conceal the Loan. Defendants identify evidence that shows that West End disclosed the Loan in the Property Reports provided to Plaintiffs before closing on their lots (Doc. 528-11 at 8), the title insurance policy (Doc. 528-53 at 3-4),

---

signatory to the Purchase Contracts." (Doc. 528-47 at 19).

The Mortgage Entities included Edward R. Ginn, III. (Doc. 528-46 at 16). The CS Entities included Lubert-Adler Management Company, LP and ERG Enterprises, LP. (Id.). Dean Adler was not a defendant in Bailey, but he would also have no relationship with Plaintiffs, given his position as head of Lubert-Adler.

[39] Plaintiffs also do not explain why they did not sue West End, the contracting party.

and the Covenants, Conditions & Restrictions (Doc. 528-54).[40] While Plaintiffs argue that these "oblique" references were insufficient and would not prompt even these sophisticated investors to investigate further, that is a different argument than that there was "active concealment," "conduct constituting deceit," or even "mere silence." (Doc. 550 at 69-71). Further, Defendants identify multiple Plaintiffs who admit that Defendants disclosed the Loan. (Doc. 528-5 at 149:8-11; Doc. 528-51 at 56:3-8[41]; Doc. 528-55 at 80:13-17). Specifically, Plaintiff Taglia noticed the disclosure of the Loan in the Property Report and

---

[40] Plaintiffs seek to avoid this evidence by making a non-sequitur argument: they cannot be bound by the purchase contracts in light of Bailey v. ERG: "GLA's reliance on PL lot purchase contracts is misplaced. The 11th Circuit has already ruled these Defendants are not entitled to invoke the terms of PL lot purchase contracts. Bailey v. ERG Enterprises, LP, 705 F.3d 1311, 1323 (11th Cir. 2013)." (Doc. 550 at 73 n.11). But Plaintiffs do not explain this assertion any further. The Bailey court ruled that Defendants could not invoke the forum selection clauses in the purchase contracts, not that Plaintiffs were no longer bound by their contracts. Bailey, 705 F.3d at 1323. Further, other courts have enforced the non-reliance clauses in plaintiffs' purchase contracts. See Gibson, 2016 WL 4033104, at *16 ("The purchase agreements are unambiguous and made no promises for any amenities and disclaimed oral representations."); Billington v. Ginn-La Pine Island, Ltd., LLLP, 192 So. 3d 77, 84 (Fla. Dist. Ct. App. 2016) ("we hold that the 'non-reliance' clauses in this case negate a claim for fraud in the inducement because Appellant cannot recant his contractual promises that he did not rely upon extrinsic representations"). Therefore, to the extent Plaintiffs argue that the Eleventh Circuit's holding in Bailey v. ERG Enterprises, LP, 705 F.3d 1311 (11th Cir. 2013) precludes Defendants from invoking the purchase contracts in this context, their argument is unavailing.

[41] Defendants cite Plaintiff Van's deposition but do not include the pages containing the relevant material.

contacted Defendants with questions about the Loan. (Doc. 528-49 at 153:5-9). The Ginn Company's Executive Vice President Robert F. Masters responded, describing the Loan in fairly general terms (including that it was for $675 million) but promising to answer any additional questions (Doc. 528-56).[42] Taglia did not follow up with anyone.

The evidence also shows that Ginn salespeople knew about the Loan and were not instructed to hide its existence or terms from potential lot purchasers. For instance, Plaintiff Lesesne was also a Ginn Sur Mer salesperson. He testified that he was told about the Loan, no one told him to hide it from potential purchasers, and no one refused to provide him with information about it (though he testified that he never asked for more details). (Doc. 528-4 at 62:12-65:9, 147:5-23, 153:6-154:18). Other Ginn salespeople knew about the Loan and testified they were not told to withhold information about it either. (Doc. 528-58 at 110:7-111:1). Credit Suisse disclosed the Loan and its terms to the lender group in May 2006 (before the Loan closed), and Ginn disclosed them to CapSource[43] in July 2006 (shortly after the Loan closed). (Docs. 528-63, 528-

---

[42] Plaintiffs cite "(188-189)" (Doc. 550 at 72), which are the depositions of Liles and Roodvoets, not the relevant Taglia and Masters exhibits. It is unclear what Plaintiffs are trying to assert with these citations; there are no page numbers or docket entries listed, and no explanation of their applicability.

[43] CapSource (also referred to as "Capital Source"), a third party entity, committed $100 million for purchase money loans at Ginn Sur Mer. (Doc. 527 at 38).

64). Both Moody's and Standard & Poor's issued publicly-available ratings of the Loan in May 2006. (Docs. 528-66, 528-67).

As Defendants point out, Plaintiffs devote only three sentences to concealment. (Doc. 550 at 69). As in other parts of the response, they simply make conclusory statements with no citation to the record or case law.[44] They do not specifically refute any of Defendants' arguments.[45] Rather, the evidence demonstrates that Defendants made the Loan and its terms available not only to Plaintiffs but also to the public. RICO requires affirmative and deliberate participation in a scheme to defraud or a material omission, if it is intended to create a false impression. Langford, 231 F.3d at 1312.

---

[44] As Defendants state in their reply, "[t]he Ninth Circuit has described this as 'the spaghetti approach:' 'heav[ing] the entire contents of a pot against the wall in hopes that something would stick.' Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003). The Court should not 'sort through the noodles in search of [plaintiffs'] claim.' Id." (Doc. 571 at 25 n.22).

[45] Plaintiffs point to emails between Masters and Ryan Julison, a Ginn public relations officer, as evidence of concealment. (Doc. 550 ¶ 71). In this series of emails, Julison said that Ginn stated he was "OK with . . . publicizing the Loan closing." (Doc. 557-220). In response, Masters stated that he did not want to necessarily highlight the Loan in the press because Ginn usually "made a big deal about not having much debt and using equity . . . ." (Id.). Instead, he preferred to let the financial press print a "small blurb" and "let it go at that." (Id.). While he instructed Julison to "hold off on . . . any [PR] on the [C]redit [S]uisse deal until further notice," the emails do not show that Masters tried to stop the financial press from printing information about the Loan, and he did not even say that Defendants would never publicize the Loan; he merely said they should hold off. (Id.). Regardless, the evidence shows that the Loan was disclosed in the press and other documents.

Defendants had no duty to disclose the Loan to Plaintiffs, given Plaintiffs' own characterization in <u>Bailey</u> of their relationship as "no relationship." And even if there was a duty to disclose, the evidence shows that the Loan was no secret to Plaintiffs. Given these facts, Plaintiffs have failed to show a genuine issue of material fact as to the duty to disclose or concealment. Accordingly, their efforts to show that any acts of concealment lengthened the period of racketeering fail.

Thus, even the most generous closed-ended continuity period would have lasted from March 2006 through December 2008. However, this period does not track, given Plaintiffs' own allegations of the objective of the cash out scheme; Defendants accomplished their supposed goal of cashing out of the Communities—thus eliminating their liability—when the Loan closed on June 8, 2006. Under this scenario, the closed period lasted from March 2006 through June 2006, way too short under Eleventh Circuit precedent. Arguments that the 2007 Restructure and other acts that followed were additional efforts to "maximize the financial return to LA Funds" (Doc. 550 at 68) are (as explained below) simply unsuccessful attempts to prolong the period of alleged RICO racketeering.

While Plaintiffs argue that Defendants' fraudulent conduct was not limited to the specific goal of closing the Loan or a single real estate transaction, their contentions are a quintessential example of "artificially fragmenting a

singular act into multiple acts simply to invoke RICO." Ward, 617 F. Supp. 2d at 1239 n.19 (citation omitted). Defendants' conduct does not constitute a pattern of racketeering activity because all of the acts arose from a single event with one overarching goal: getting the Loan, with its attendant consequences. At oral argument, Plaintiffs attempted to show that Defendants' purchases of parcels in the 2007 Restructure constituted additional acts of racketeering. (Doc. 579 at 61-62, 77-78). Plaintiffs stated that according to Ginn, before the Loan closed, Defendants planned to buy back certain parcels (the core operating assets) so they could create a standalone resort and prevent the Credit Suisse lender group from developing Ginn Sur Mer. (Id. at 61-62). In their supplemental Notice, Plaintiffs identify evidence that they submit corroborates the existence of such a scheme. (Doc. 578 at 2). While this evidence may show that Defendants contemplated buying parcels out of the collateral in the event reinvestment was required, it does not show that they were trying to "prevent the lenders from being available to develop Ginn Sur Mer" or "were thinking about what they would be doing in order to position themselves for a loan default." (Doc. 579 at 62). These assertions are simply speculation on Plaintiffs' part. While Plaintiffs state that Defendants paid "pennies on the dollar" for the parcels, the undisputed evidence in the Ratner report shows that Defendants paid the Cushman and Wakefield appraised values and did not negotiate a

lower purchase price so as to <u>avoid</u> the appearance of self-dealing. (Doc. 528-20 ¶ 67; Doc. 579 at 24).

Defendants acknowledge that Lubert-Adler reserved the ability to reinvest capital, which would ensure that they could keep the Loan in balance; however, this in and of itself is not evidence of an ongoing scheme. To the extent Plaintiffs argue that Defendants contemplated buying back parcels from Ginn Sur Mer during the Loan negotiations and prior to closing, it undermines their argument that these were new acts of racketeering. Instead, these assertions demonstrate that the purchase of parcels was part of a single scheme, which undercuts a closed-ended continuity pattern.

"Courts have consistently held that a single episode of criminal behavior, even if it involves the commission of multiple related acts, does not constitute a pattern." <u>Schultz v. R.I. Hosp. Tr. Nat. Bank, N.A.</u>, 94 F.3d 721, 731 (1st Cir. 1996) (internal quotation marks and citation omitted). Instead, courts have tended to find RICO "patterns" only where the defendant's conduct consists of "multiple criminal episodes" extending over long periods of time. <u>Id.</u> Here, as in other cases where courts have not found a RICO pattern, the alleged instances of wrongful conduct by Defendants all constituted part of a single episode. Taken together, Defendants' actions comprise a "single effort to facilitate a single financial endeavor": cashing out of the Communities by closing the Loan and obtaining the dividend distribution. <u>Id.</u>; <u>see also</u> <u>W. Assocs. Ltd. P'ship, ex</u>

rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs., 235 F.3d 629, 634 (D.C. Cir. 2001) (finding no RICO pattern where plaintiff's four purported schemes were merely a "cosmetic disguise of a single scheme"). Plaintiffs' attempt to characterize the acts that occurred following the closing of the Loan "serve[] as an example of a vain attempt to make a RICO claim seem more viable by parsing one scheme into multiple schemes." W. Assocs., 235 F.2d at 635 ("For the term 'scheme' to retain any utility, it cannot be so easily invoked that it allows such closely related accounting misrepresentations involving a single project to be considered distinct schemes. Under [plaintiff's] interpretation of what constitutes a scheme, almost any fraudulent act could be subdivided to establish a RICO claim.").

The Court is cognizant that in H.J. the Supreme Court left the door open for cases in which a single criminal scheme could constitute closed-ended continuity. See Bivens, 2009 WL 891859, at *9. The H.J. court held that RICO "might encompass multiple predicates within a single scheme that were related and that amounted to or threatened the likelihood of, continued criminal activity." H.J., 492 U.S. at 237. However, the Eleventh Circuit in "Jackson, (a post-H.J. decision) and the cases cited therein, suggest that cases in which a single scheme will suffice for RICO liability are few and far between." Bivens, 2009 WL 891859, at *9. In fact, courts commonly dismiss RICO claims when only a single scheme with few victims is alleged. See, e.g., Millette, 2008 WL

5054141, at *4; <u>Ward</u>, 2008 WL 852789, at 10; <u>Harpole Architects, P.C. v. Barlow</u>, 668 F. Supp. 2d 68, 74-75 (D.D.C. 2009) (finding that a series of related acts across three years had insufficient continuity because they formed a "single scheme" and had only one victim).

The number of plaintiffs here, 51, is comparatively larger than in other cases in which courts have considered the limited number of victims in finding no RICO scheme. However, the Eleventh Circuit affirmed the dismissal of over 50 plaintiffs' RICO claims in <u>Jackson</u>. <u>See</u> <u>Jackson</u>, 372 F.3d at 1254. And, notwithstanding their numerosity, Plaintiffs were not "separately targeted through repetitions of criminal conduct, which could have reflected persistent or broad-based crime." <u>See</u> <u>Efron</u>, 223 F.3d at 18. Instead, their injuries resulted from a "single set of alleged misdeeds and occurred at the same time." <u>Id.</u> The FAMC supports this understanding by alleging that Ginn Sur Mer was "immediately ruined the moment the loan closed," when the cash out scheme "looted [Ginn Sur Mer], crippled it with crushing debt, and left no money for development." (Doc. 317 ¶ 178). In light of the precedent from the Eleventh Circuit and others, combined with Plaintiffs' failure to cite evidence or cases in support of a RICO pattern of racketeering, the Court finds that the activities alleged were one scheme with a discrete goal. As such, Plaintiffs have not established a continuing pattern of criminal conduct worthy of the "drastic"

remedy that RICO provides, and Defendants are entitled to summary judgment on Plaintiffs' RICO claims. See H.J., 492 U.S. at 233.

### C. Predicate Acts of Fraud

In addition to failing to create an issue of fact as to loss causation or demonstrate a pattern of racketeering activity, Defendants argue that Plaintiffs have failed to produce evidence raising a genuine issue of fact that Defendants committed fraud in procuring the Loan. (Doc. 527 at 24). Specifically, Defendants state that Plaintiffs have not met their burden regarding whether Defendants: (1) intended to commit a fraud; (2) owed Plaintiffs a duty of disclosure or concealed the Loan; and (3) made material misrepresentations to Plaintiffs. While the Court has addressed some of these arguments in other portions of this Order, in light of Plaintiffs failure to show a triable issue as to RICO's proximate cause and pattern of racketeering requirements, the undersigned need not consider these arguments further.[46]

### D. RICO Conspiracy

Defendants argue that the Court should grant summary judgment as to Plaintiffs' RICO conspiracy claim (Count II), because Plaintiffs have failed to demonstrate a substantive RICO violation (Count I). (Doc. 527 at 44). Plaintiffs

---

[46] The Court does not deny that Defendants have pointed to evidence which would belie an intent to defraud. However, given that the Court has already found two independent bases for granting summary judgment, and that intent is a fact-based inquiry, the Court chooses not to address this issue.

submit no argument regarding their conspiracy claim. (Doc. 550). The Court agrees with Defendants. See Jackson, 372 F.3d at 1269 ("We have already found that the complaint failed to state a substantive RICO claim, and the RICO conspiracy adds nothing. It simply concludes that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation."). Defendants are entitled to summary judgment as to Count II.

Accordingly, it is hereby

**ORDERED:**

1.     Plaintiffs' Notice Identifying Evidence (Doc. 578) is **STRICKEN**, except as to evidence related to the HUD and Ginn parcel buyback issues, as allowed at the June 26, 2017 hearing.

2.     The Court has considered Plaintiffs' Daubert motion (Doc. 558) and Defendants' response (Doc. 559). The Court finds no basis under Daubert to exclude Defendants' experts. Therefore, Plaintiffs' Motion to Exclude Testimony of Expert Witnesses Ian Ratner, Joshua Harris, and Rosemary Nicholls (Doc. 558) is **DENIED**.

3.     Defendants Edward R. Ginn, III, ERG Enterprises, LP, Lubert-Adler Management Company, LP, and Dean Adler's Motion for Summary Judgment (Doc. 527) is **GRANTED** as to the Fourth Amended Master Complaint (Doc. 317).

4. Nutmeg Insurance Company's Motion for Reimbursement of Defense Fees Paid on Behalf of Third Party Plaintiffs (Doc. 518) is **DENIED without prejudice** as premature.[47]

5. Now that the Court has ruled on the motion for summary judgment in the main action, the parties shall file a joint status report by **September 25, 2017** as to how the Court should proceed with the third party action and any other outstanding matters. If the parties ask for additional proceedings, they should address whether the Court should enter judgment in the main action pursuant to Rule 54(b), Fed. R. Civ. P.

6. The Clerk shall administratively close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 31st day of August, 2017.

TIMOTHY J. CORRIGAN
United States District Judge

sj

---

[47] In an August 9, 2016 Order, the Court stated that it was ruling on the issue of whether Nutmeg had a duty going forward to defend the Ginn Parties under the FAMC. (Doc. 504 at 7 n.11). To the extent other coverage and allocation issues remained in dispute, the Court deferred ruling on them. The Court stated that it intended to discuss those issues with the parties at some future point, when it would also determine whether this Court is the proper forum to resolve those disputes and, if so, how to do so.

Copies:

Counsel of record